98

```
 1              COURT OF COMMON PLEAS

 2              HAMILTON COUNTY, OHIO

 3

 4   STATE OF OHIO  )

 5    PLAINTIFF,    )

 6    vs.          )   Case Number:  B-9807452

 7   FREDRICK HALL  )   (Volume 2 of 5)

 8    DEFENDANT.    )

 9

10                   - - -

11          COMPLETE TRANSCRIPT OF PROCEEDINGS

12                   - - -

13   APPEARANCES:

14         WILLIAM ANDERSON, ESQ.

15              On behalf of the Plaintiff.

16

17         ELIZABETH ZUCKER, ESQ.
                   and
18         JAMES RADER, ESQ.

19              On behalf of the Defendant.

20         BE IT REMEMBERED that upon the jury trial

21   of this cause, in the Court of Common Pleas,

22   before the Honorable STEVEN E. MARTIN, one of the

23   judges of the said Court of Common Pleas, on the

24   date hereinafter stated, the following proceedings

25   were had.
```

99

```
1              MORNING SESSION, April 28, 1999
2         THE COURT:  Back on the record, Pat.
3    We have two people here.  Are either one
4    of these people going to be witnesses in
5    any way, shape or form.
6         MR. ANDERSON:  Yes.  Johann Hart is
7    the State's first witness.
8         THE COURT:  You can stay right there
9    as long as we don't have any argument.
10             And, sir, what's your name?
11        MR. HOWARD:  Michael Howard.
12        MR. RADER:  Your Honor, he will not
13   be a witness in this case.  He's an
14   acquaintance of mine.
15        THE COURT:  No problem.  You're
16   welcome to stay here as long as you want.
17             One of the jurors has a doctor's
18   appointment tomorrow at 4:00 so we'll
19   probably have to knock off at like 3:30.
20             (Jury in at 10:20 a.m.)
21        THE COURT:  Please be seated.  I
22   apologize for the delay in getting started
23   this morning.  Has nothing to do with
24   either one of these parties at all.
25             Mr. Anderson, your first  witness.
```

```
1              MR. ANDERSON:  Your Honor, the State
2         would call Johann Hart.
3              THE COURT:  Mr. Hart, come on up
4         here.
5                   JOHANN HART
6   being first duly sworn, was examined and testified
7   as follows:
8              THE COURT:  Will you state your name
9         and spell your last name?
10             THE WITNESS:  Yes.  My name is Johann
11        Hart, spelled H-a-r-t.  That's my last
12        name.
13             THE COURT:  Thank you.
14             Mr. Anderson?
15                  DIRECT EXAMINATION
16  BY MR. ANDERSON:
17        Q.   Mr. Hart, how old are you?
18        A.   16.
19        Q.   Where do you currently live?
20        A.   With my Aunt Rose.
21        Q.   Whereabouts?  What part of town?
22        A.   Thirteenth Street.
23        Q.   Do you know an individual by the name
24  of Kevin Davis?
25        A.   That's my cousin.
```

1          Q.     How old is Kevin?

2          A.     He's 19.

3          Q.     All right.  Were you and Kevin

4    together back on October 17, 1998?

5          A.     Yes.

6          Q.     On that date did you have occasion to

7    come into contact with someone now known to you as

8    Fredrick Hall?

9          A.     Yes.

10         Q.     Do you see that individual in court

11   today?

12         A.     Right there.

13         Q.     Why don't you describe what he's

14   wearing?

15         A.     He have on a pink shirt, black shoes,

16   and a funny looking tie.

17               MR. ANDERSON:  Let the record

18          reflect identification of the defendant.

19               THE COURT:  The record will reflect

20          identification of the defendant by the

21          witness.

22         Q.     Mr. Hart, had you ever seen the

23   defendant before October 17, 1998?

24         A.     Before that day, no.  Before the day

25   he shot me?

1        Q.    Why don't you tell us where he shot

2   you?

3        A.    In my neck and back.

4        Q.    I'll get to that in a little bit.

5   What location, what street were you on?

6        A.    Fourteenth and Republic.

7        Q.    Is that located in Hamilton County,

8   Ohio?

9        A.    Yes.

10       Q.    About what time of day or night was

11  this, do you remember?

12       A.    It was -- I know it was like 3:15 in

13  the morning.

14       Q.    About 3:15 in the morning?

15       A.    Yes.

16       Q.    You were out with your cousin that

17  night?

18       A.    Yes.

19       Q.    Where were you guys going at 3:15 in

20  the morning?

21       A.    We had just came from a party.  It

22  was late.  We was on our way home.

23       Q.    Had you been drinking?

24       A.    No, I don't drink.

25       Q.    Been smoking?

```
 1          A.   No.

 2          Q.   Your cousin had some cocaine on him,

 3  didn't he?

 4          A.   Yes.

 5          Q.   Did you have any on you?

 6          A.   No.

 7          Q.   You guys out there dealing or

 8  anything?

 9          A.   I don't know what he was doing.  I

10  was with him.  That's what he got caught with.

11          Q.   Why don't you tell us a little bit

12  about your contact with the defendant.  When did

13  you first see him?

14          A.   He approached us.

15          Q.   All right.

16          A.   He pulled up on his own.

17          Q.   Was he driving a car?

18          A.   Yes.

19          Q.   Do you remember what kind of car he

20  was driving?

21          A.   Yes.

22          Q.   What kind of car was he driving?

23          A.   A tan looking, yellow looking Honda.

24  It was dirty, not clean.

25          Q.   Mr. Hart, I'll show you what has been
```

104

1    marked as State's Exhibits 2, 3, 4, 5, and 6.

2    Take a look at those exhibits.

3         A.    I don't remember this car.  I

4    remember this car.

5         Q.    You remember that car?

6         A.    Yes.

7         Q.    Is that the car the defendant was

8    driving that day?

9         A.    Yes.

10        Q.    You indicated he pulled over.  What

11   happened when the defendant pulled over?

12        A.    When he pulled over he called us to

13   the car, and like I went over to the car, and I

14   asked what he wanted.  I did not know what he

15   wanted and he tried to cop some crack from me.  I

16   told him I didn't have none.  Kind of turned into

17   confusion.

18        Q.    Slow down a little bit.  He pulled

19   over and motioned you over?

20        A.    Yes.

21        Q.    You approached the car?

22        A.    Yes.

23        Q.    Was there anybody else in the car at

24   that time?

25        A.    No.

105

1      Q.    The defendant was in the car by
2  himself?

3      A.    Yes.

4      Q.    What happened?  What did he ask you
5  for?

6      A.    He asked for some crack.  And when I
7  told him -- 'cause when I approached the car, I
8  asked him what he wanted.  I said, what you want,
9  dude?  Like 20.  I'm like it's over.  I don't know
10  what you're talking about.

11            I come at him like that.  Then was
12  when I -- something he said, like I just kind of
13  backed up and me and him started arguing.

14     Q.    Hang on.  You were arguing about
15  what?

16     A.    'Cause I told him I didn't have none.

17     Q.    What did he say to you?

18     A.    What did he say?

19     Q.    You said you were arguing with him.

20     A.    He kind of like told me like, it was
21  some other stuff involved, though.  When I backed
22  away from the car he kind of said come here, like
23  he was trying to rob me.  And I didn't know what
24  it was.  I kind of backed off, said, man, what you
25  come at me for?

1          Q.     What happened then after you started

2    backing away from the car?

3          A.     My cousin came up to the car.

4          Q.     That would be Kevin?

5          A.     I told the dude like get out of here.

6    I was getting angry.  So I backed away from the

7    car and he fired.

8          Q.     You said he fired.  What did he fire?

9                 THE COURT:  First off, who's he?

10                THE WITNESS:  Fredrick Hall, the

11           dude sitting right there.

12                THE COURT:  Okay, he fired.

13          Q.     The defendant's the one that fired.

14   What did he fire?

15          A.     A gun.

16          Q.     Did you see where he got the gun?

17          A.     No.

18          Q.     What did he do with the gun?

19          A.     What did he do with the gun when he

20   shot me?

21          Q.     Uh-huh.

22          A.     He drove off.

23          Q.     How many shots did he fire?

24          A.     He fired five shots.

25          Q.     How many times were you struck?

107

```
 1          A.    Twice.

 2          Q.    Where were you hit?

 3          A.    In my neck and my back.

 4          Q.    As a result of being struck by those

 5  gunshots, what happened to you?

 6          A.    I went into shock.

 7          Q.    Did you go to the hospital?

 8          A.    (Indicate yes.)

 9          Q.    Still have some scars from where you

10  were shot?

11          A.    My neck right here.  On my back it's

12  even worse.

13                MR. ANDERSON:  Your Honor, I would

14          ask that the witness be allowed to

15          approach the jury and show the scars to

16          his neck as a result of the gunshot

17          wounds.

18                THE COURT:  Be permitted to do so.

19                Sir, stand right in front of the jury

20          at the direction the prosecutor.  Show

21          all the jurors your neck.

22          Q.    Why don't you show us where the

23  gunshot wound was to the entrance of your neck?

24          A.    Here.

25          Q.    Where did the bullet come out?
```

108

```
 1         A.    (Indicating.)

 2         Q.    Pointing to the back portion of your

 3    neck.  All right.  Have a seat.

 4               THE COURT:  You want him to show

 5               where the back was?

 6         Q.    You can take your shirt off if you

 7    want and show us the entrance and exit wounds to

 8    your back as well.

 9               THE COURT:  Pull your pants up.  Use

10               the belt for what it's there for.

11         A.    (Indicating.)

12         Q.    Where did the bullet enter; do you

13    know?

14         A.    Over there the bullet came out.

15         Q.    Went in up here?

16         A.    Underneath.

17         Q.    Underneath?

18         A.    Came out there.

19         Q.    All right.  Did both bullets pass

20    through your body?

21         A.    Did they pass through?

22         Q.    Right.  Did they come in and out?

23         A.    Yes.

24         Q.    So the bullets were not recovered

25    from your body, right?
```

1        A.    No.

2        Q.    Did you receive any medical treatment

3   as a result of being shot by the defendant?

4        A.    Yeah.  I had a couple, three or four

5   or five times.  We can go over that if you all

6   want to see my hospital records.

7        Q.    I don't think we need to see your

8   hospital records.  But the gunshot wounds that you

9   just showed us to your neck and back, were caused

10  by a gun the defendant Fred Hall was firing that

11  night, right?

12       A.    Yes.

13       Q.    You indicated before you'd never seen

14  him before, had you?

15       A.    No.

16       Q.    Had you ever stopped him before?

17       A.    I didn't even know him till the day

18  he shot me.  That's the only time I ever met him.

19       Q.    Never seen him before?

20       A.    I never even heard of him before.

21       Q.    So after you were shot by the

22  defendant, he took off?

23       A.    Yes.

24       Q.    Did you see where he went?

25       A.    I just seen him go forward and

1  straight.

2       Q.    Now, when you were shot in the back,

3  was your back turned toward him?

4       A.    I was like catecorner like, like his

5  car going this way, I was around like this

6  (indicating).

7       Q.    Where were you shot first; in the

8  neck or the back?

9       A.    In the neck.  I was shot in my back

10  when I was on the ground.

11       Q.    Okay.  You were laying on the ground

12  when he shot you on the ground?

13       A.    Yes.

14       Q.    Did he like lean over the car door

15  and shoot you?

16       A.    (Indicate yes.)

17       Q.    What happened after that?

18       A.    He pulled off.  It's like when he was

19  firing, my cousin came to like try to grab me.

20  And he got caught in the crossfire like.  And he

21  just pulled off.

22       Q.    Your cousin got shot at, didn't he?

23       A.    Yes.

24       Q.    Did you have a chance to take down

25  the license plate number?

1        A.    I tried but I was too shocked.  I was

2   shocked.

3        Q.    Did you go to the hospital after

4   that?

5        A.    Yeah.

6        Q.    What happened after you were treated

7   at the hospital?

8        A.    What happened?

9        Q.    Uh-huh.

10        A.    I was released.

11        Q.    At some point did the police visit

12   you at the hospital?

13        A.    Yes.

14        Q.    Why don't you tell us a little bit

15   about that.

16        A.    They brought me some clothes and

17   photos.  They showed me some photos to be sure

18   that I can identify him.

19        Q.    You were sure that you could identify

20   him?

21        A.    Yeah, I was.

22        Q.    How far away were you from the

23   defendant during the time you were at his car?

24        A.    I was right at his face, right like

25   this, in his car window.

112

1          Q.    Why don't you tell me how far away

2    you were from the defendant during the

3    conversation that you had with him?

4          A.    When I got shot?   Like this close.

5          Q.    Two or three feet?

6          A.    Yes.

7          Q.    How long were you face to face with

8    Fredrick Hall?

9          A.    We talked for like four or five

10   seconds or something.

11         Q.    You got a good look at his face?

12         A.    Yeah, real good look.

13         Q.    I'm going to show you what's been

14   marked as State's Exhibit Number 7 for purposes of

15   identification.  Can you identify what that

16   particular exhibit is, sir?

17         A.    It's a picture of Fredrick Hall.

18         Q.    And you're pointing to the photograph

19   that's in the lower left-hand corner of State's

20   Exhibit Number 7.  Is that the photograph that you

21   picked out?

22         A.    Yeah.

23         Q.    When you were shown those six

24   photographs, that photograph was not in that

25   position, was it?

113

1          A.    No.

2          Q.    I want to show you what has been

3    marked State's Exhibit Number 8 for purposes of

4    identification.  Can you identify who that exhibit

5    is?

6          A.    Fredrick Hall in the middle at the

7    bottom.

8          Q.    Thank you.  When you were shown the

9    photographs contained in State's Exhibit Number 7,

10   they were actually in the position that they are

11   in State's Exhibit Number 8; is that right?

12         A.    Yes.

13         Q.    So you identified Fredrick Hall in

14   the middle photograph of State's Exhibit Number 8;

15   is that right?

16         A.    Yes.

17         Q.    But it's in the left frame in State's

18   Exhibit Number 7; is that correct?

19         A.    Right.

20         Q.    Is there any question in your mind,

21   Mr.  Hart, that that defendant, Fredrick Hall, is

22   the one that fired those shots at you that night?

23         A.    No question.  I know for a fact.

24   I'll never forget it.  It's too scary.

25              MR. ANDERSON:  Judge, I have no

```
 1          further questions.
 2               THE COURT:  Mr. Rader?
 3                CROSS-EXAMINATION
 4  BY MR. RADER:
 5               MR. RADER:  Your Honor, could we have
 6          a marking pen for the board?
 7               THE COURT:  Should be some over
 8          there.  You want the board moved out, too?
 9               MR. RADER:  Yes, if we could, Your
10          Honor.
11                CROSS-EXAMINATION
12  BY MR. RADER:
13          Q.   Good morning, Mr. Hart.
14          A.   Good morning.
15          Q.   My name is Jim Rader, one of the
16  lawyers in this case.  You pronounce your first
17  name Johann?
18          A.   Yes.
19          Q.   How old are you?
20          A.   16.
21          Q.   Are you going to school?
22          A.   Yes, but not at the time.
23               MR. ANDERSON:  Objection.
24               THE COURT:  Overruled.
25          A.   Not at the time 'cause my -- I didn't
```

```
 1   really feel too good.  I go to school about every

 2   day.   Q.    It's been quite a while since you've

 3   been to class?

 4          A.    Yes.

 5          Q.    You live with your Aunt Rosemary?

 6          A.    Yes.

 7          Q.    And your father is named Joseph Hart;

 8   is that right?

 9          A.    Yes.

10          Q.    Isn't it true that you were involved

11   in a car wreck a couple of months ago and went

12   over a hill?

13                MR. ANDERSON:  Objection.

14                THE COURT:  Sustained.

15          Q.    Isn't it true that you had a car

16   towed off the street just a couple of days ago?

17                MR. ANDERSON:  Objection.

18                THE COURT:  Sustained.

19          Q.    Well, let me ask the question

20   directly. You make a lot of money selling dope,

21   don't you?

22                MR. ANDERSON:  Objection.

23                THE COURT:  Sustained.

24          Q.    Are you around drugs a lot?

25                MR. ANDERSON:  Objection.
```

116

1          MR. RADER:  Your Honor.

2          THE COURT:  Sustained.

3     Q.   How long has it been from the time of

4  this incident --

5     A.   Say that again.  I didn't catch that.

6          THE COURT:  He hasn't finished yet.

7     Q.   From the time of this incident, how

8  long back from that had it been that you'd used

9  drugs?

10    A.   I don't know how long.

11    Q.   How long before this incident was it

12 that you had taken some kind of narcotic?

13         MR. ANDERSON:  Objection again.

14         THE COURT:  Unless it shows evidence

15         relative, it's overruled.

16    A.   I was intoxicated that night.

17    Q.   You were intoxicated that night?

18    A.   Yeah.

19    Q.   From drugs?

20    A.   Yeah.

21    Q.   Can you tell us what kind of drugs?

22    A.   I was smoking weed.

23    Q.   How long had it been prior to this

24 incident that you used cocaine?

25         MR. ANDERSON:  Judge --

```
 1       A.    I ain't never used cocaine.

 2             THE COURT:  Anybody that is going to

 3       be a witness in this case will have to sit

 4       outside.

 5             Bill, serve your subpoena.  You have

 6       to go outside.

 7             Hold on a second.  We have a

 8       separation of witnesses here.  I know

 9       everybody watches trials on TV and it

10       makes for real gripping TV when they can

11       point the witness to somebody and they

12       just talk about it.  It looks good on

13       television.  Doesn't do much for the

14       truth.

15             So we make all the witnesses, except

16       for the parties, sit outside so they can't

17       hear anybody else's testimony during

18       trial.  That's customary in the State of

19       Ohio.

20             Go ahead.  Next question.

21             JUROR NUMBER 8:  Can I ask a quick

22       question?

23             THE COURT:  Yes.

24             JUROR NUMBER 8:  If I am listening

25       and not understanding the witness, may I
```

1          -- not this witness but for the future.

2               THE COURT:  Right.

3               Mr. Hart, when you speak, speak

4          slower and speak directly into the

5          microphone, okay?

6               THE WITNESS:  Yes.

7          Q.   Johann, I intended this to be

8     Republic Street.  And Fourteenth is there and

9     Thirteenth there.  And this is north going towards

10    the hill and this is the river right here.

11    Central Parkway's going along here.  Do you know

12    whether or not -- I mean, do you recognize that

13    area?

14         A.   Yes.  It's wrong, though.

15         Q.   What's wrong with it?

16         A.   Fourteenth is the other way.

17         Q.   Thirteenth is towards the river.

18    Fourteenth is back towards the hill, right?

19         A.   Thirteenth is the hill.

20              THE COURT:  Depends on which portion of --

21         why don't you clarify with him which portion of

22         Thirteenth Street you're talking about, 'cause

23         part of Thirteenth is on the hill but that's in

24         the Pendleton area.

25         Q.   Well, you identify with the corner

1  here of Republic and Fourteenth?

2       A.    Right.

3       Q.    And this incident happened in front

4  of 1330.  Do you know if that's right?  Do you

5  know if the address where this happened was 1330?

6       A.    I didn't pay any attention to the

7  address.

8       Q.    Do you recall the corner of

9  Fourteenth and Republic?

10      A.    Right.

11      Q.    And Republic is one way going to the

12  river; is that right?

13      A.    Yes.

14      Q.    You're sure about that?

15      A.    It's only one way; yes, I'm sure.

16      Q.    It's kind of a narrow street, right?

17      A.    Yes.

18      Q.    Is it your testimony that -- well,

19  let me ask you.  How did this car approach on

20  Republic or was it Republic?  Where did it come

21  from?

22      A.    It came from like the top of

23  Republic.

24      Q.    You mean up here?

25      A.    Yeah.

120

```
1          Q.    Came down Republic.  Was it going the
2    right way?
3          A.    Was it going the right way?
4          Q.    Well, was it going --
5          A.    It was only one way.
6          Q.    And it was going --
7          A.    One way.
8          Q.    According to the traffic rules, the
9    right way?
10         A.    Yes.
11         Q.    So the car was going south towards
12   the river?
13         A.    Yes.
14         Q.    You're sure about that?
15         A.    Yes.
16         Q.    This would be the side over towards
17   Gilbert, over towards Eden Park, east; is that
18   right?
19         A.    Yes.
20         Q.    You're sure about that?  You know
21   what I'm talking about?
22         A.    Yes.
23         Q.    And this would be west towards 75,
24   towards Price Hill?
25         A.    Yes.
```

121

1          Q.    Are you with me?

2          A.    Yes.

3          Q.    Is that right?

4          A.    Yes.

5          Q.    You identified what the building is

6    here on the corner?  You know what I'm talking

7    about?

8          A.    Yes, I do.

9          Q.    Can you get up and show the ladies

10   and gentlemen of the jury where this car stopped

11   and where you had this conversation?

12         A.    He approached right here, pulled up,

13   stopped, pulling over right here.  He called us to

14   his car.  Then I walked over to his car.  And I

15   was talking to him at the building, by the

16   building, I'm talking to him like this.

17               I walk up to his car and then my

18   cousin walked up.  He pulled over right here,

19   about right here and right here.

20         Q.    Well, draw me a little car there.

21         A.    (Witness complies.)

22         Q.    Okay.  And put a little X there where

23   you were.

24         A.    (Indicating.)

25               THE COURT:  All right.  You can have

122

1              a seat, again, Mr. Hart.

2         Q.    Now, describe -- do you know what

3    this person was wearing?

4         A.    No.

5         Q.    No idea?

6         A.    No.

7         Q.    Do you recall if he was wearing a

8    baseball cap?

9         A.    No.

10        Q.    He wasn't or you don't know?

11        A.    I didn't pay no attention.

12        Q.    Was he clean shaven at the time?

13        A.    No, trashy looking.

14        Q.    Johann, at some point shortly after

15   this incident, there were police there?

16        A.    Yes.

17        Q.    Did you give them a description of

18   this  person that had shot you?

19        A.    No.

20        Q.    Did they ask you for a description?

21        A.    No.

22        Q.    Did you ever give them a description

23   of the person?

24        A.    No.

25        Q.    And it's your testimony it was only

1  one person in this car?

2          A.    Yes.  It was one person in the car

3  and we was having conversation.  Somebody

4  approached him and got in.  Then when he shot us,

5  the person that got in got out like, I mean kind

6  of shook up his self.

7          Q.    Do you know who this person was?

8          A.    Who got in?

9          Q.    Yes.

10         A.    Yes, I know who he is.

11         Q.    Who was he?

12         A.    He was a crack head.  When I told him

13  I didn't have none, he said, I'll take you

14  somewhere where you can get some.  He told him no

15  and he told him to get out of the car.

16         Q.    Do you know this for a fact?  This

17  person's name?

18         A.    His name is John.  I don't know what

19  his last name is.

20         Q.    Were you picked up by the emergency

21  medical service, by the life squad?

22         A.    Yes.

23         Q.    Where were you when you were picked

24  up by the life squad?

25         A.    I was right in the middle of the

124

```
 1  street.
 2          Q.   Near this area?
 3          A.   Yes.
 4          Q.   Did you see the police interviewing
 5  any witnesses?
 6          A.   No.
 7          Q.   Were you able to give the police a
 8  license number of this car?
 9          A.   No.
10          Q.   Did you hear their conversations with
11  anybody that they were interviewing?
12          A.   No.
13          Q.   Do you recall if the person that you
14  were talking to had on a white shirt, white
15  T-shirt?
16          A.   I don't remember what he had on.
17          Q.   Did this person have any scars on
18  their face?
19          A.   I don't recall.
20          Q.   Pardon?
21          A.   No, I couldn't tell.
22          Q.   Is there anything else that you
23  remember about this person that you can identify?
24          A.   His face.  I remember his face.
25          Q.   I guess it's obvious that he had the
```

125

1    window rolled down?

2            A.    Yes.

3            Q.    Was it cold that evening?

4            A.    It was like windy.

5            Q.    Pardon me?

6            A.    It was like windy.

7            Q.    Didn't you offer those -- in your

8    discussions didn't you tell the police that you

9    knew what this person looked like?

10           A.    Yes.  I knew his face, yes.

11           Q.    When did you tell them that?

12           A.    When they came to try to identify

13   him, I just told them, yeah, I remember his face.

14           Q.    They took you to the hospital?

15           A.    I told them if they showed me a

16   picture that I would know.

17           Q.    But you never told them that at the

18   scene?

19           A.    No, they never asked.

20           Q.    Sir, this person that shot you, there

21   is nothing about him that you can point your

22   finger to to identify him other than just his

23   face; is that right?

24           A.    Yeah.

25           Q.    You didn't notice that this person

126

 1   was injured in any way?

 2         A.    No.

 3         Q.    No other means of identification

 4   whatsoever?

 5         A.    No.  He never got out of his car.

 6   All he was was I contacted him mouth to mouth.

 7         Q.    Did you see him shoot you?

 8         A.    Did I see him shoot me?

 9         Q.    Yes.

10         A.    No.  I seen him pulling a gun,

11   though.  I didn't see him when he fired.

12         Q.    Okay.  Could you stand up here a

13   minute again, and Mr. Hart, just keep your voice

14   up, okay, so everybody can hear you.

15         A.    Yeah.

16         Q.    Come here, please.  Just a minute.

17   Just stand here like I am facing the Judge and

18   imagine you're in the seat of this car.  Okay.  If

19   you'd turn around a little more, 'cause I got the

20   car pointed this way.  Turn around this way, face

21   the Judge.

22               Okay.  You're sitting in the seat of

23   this car.  Could you demonstrate to the ladies and

24   gentlemen of the jury what the person does, what

25   their physical movements were as you were being

127

1  shot?

2          A.    It was like -- it was all he kept

3  doing was motioning his hand up arguing with me.

4  And I never seen no gun or anything.  When I kind

5  of got a little verbal with my words, he just shot

6  me.

7          Q.    But you saw his -- he was motioning

8  with his hands?

9          A.    Yeah, he was motioning with his

10  hands.

11          Q.    You didn't notice anything peculiar

12  about that; nothing different about it?

13              THE COURT:  All right.  Have a seat

14          again.

15          Q.    Which hand did he have the gun in?

16          A.    It was in this hand.

17              THE COURT:  Gesturing with his right

18          hand for the record.

19          Q.    Did you ever talk to the police about

20  the possibility of your being charged with

21  possession of the drug that Kevin Davis had?

22          A.    I never was caught with no drugs.  I

23  never had no drugs.

24          Q.    But you were there on the corner of

25  Fourteenth and Republic.  Did you have any

128

1    conversations between you and the police about you

2    having drugs or being a party to Kevin's drugs?

3          A.    No.

4          Q.    Have you ever been convicted in a

5    criminal court or juvenile court?

6               MR. ANDERSON:  Objection.

7               THE COURT:  Sustained.  Next

8          question.

9               MR. RADER:  Your Honor, we'd like to

10              --

11              MR. ANDERSON:  If he's going to do a

12                  dissertation, I'd appreciate it if we

13          do it outside the presence of the jury.

14              THE COURT:  Excuse us for just a

15          moment.

16                  Mr. Hart, stay right where you are.

17                  Mr. Rader.

18                  (Discussion in chambers off the

19          record.)

20              THE COURT:  Okay.  Any more

21          questions, Mr. Rader?

22              MR. RADER:  No, Your Honor.

23              THE COURT:  Mr. Anderson?

24                  MR. ANDERSON:  Thank you.

25                  REDIRECT EXAMINATION

129

1  BY MR. ANDERSON:

2         Q.    Mr. Hart, you indicated that the

3  defendant had the gun in his right hand; is that

4  correct?

5         A.    Yes.

6         Q.    You indicated that he also, when you

7  were discussing with him, made gestures with his

8  hands; is that right?

9         A.    Yes.

10        Q.    Do you see this sling he has on him

11  today?

12        A.    Yes.

13        Q.    Was he wearing that that night?

14        A.    No.

15        Q.    Was there any problem with his left

16  arm that night?

17        A.    No.

18        Q.    I want to show you what's been marked

19  as State's Exhibit Number 15.  Can you identify

20  that?

21        A.    Talking about the scar on his face?

22        Q.    What's that picture of?

23        A.    Oh, Mr. Hall.

24        Q.    That's the defendant, right?

25        A.    Yes.

```
 1          Q.    A picture of the defendant.  Is that
 2    the way he looked that night, as far as facial
 3    hair and the goatee and everything like that?
 4          A.    Yes, he had a goatee.
 5                THE COURT:  Hold on.  Your answer was
 6          what?
 7                THE WITNESS:  Yes.
 8                THE COURT:  Next question.
 9          Q.    So has his appearance changed since
10    the night he shot you?
11          A.    Yes.
12          Q.    In what way?
13          A.    He shaved.  He cut his hair.
14          Q.    Now, how long were you lying in the
15    street while the paramedics were treating you for
16    the gunshot wound?
17          A.    About 10 to 12 minutes.
18          Q.    Were the police actually on the scene
19    at that time?
20          A.    Yes.
21          Q.    How long did they talk to you?
22          A.    They didn't really talk to me.  They
23    just told me that they was going to get the
24    ambulance on their way.
25          Q.    So they never asked you for a
```

131

1    description or anything, right, until after you

2    were at the hospital and being treated?

3        A.    Correct.

4        Q.    You told them I think I can identify

5    the guy if I see a picture of him.  They showed

6    you some pictures and you identified the

7    defendant?

8        A.    Yes.

9        Q.    You indicated that you never -- that

10   you didn't see the defendant shoot at you; is that

11   correct?

12       A.    Right.

13       Q.    Did you see any other guns that night

14   besides the one that was in the defendant's hand?

15       A.    No.

16       Q.    What did you do once you saw the

17   defendant with that gun?

18       A.    I really couldn't do nothing, 'cause

19   he started firing immediately with no hesitation.

20       Q.    He started firing immediately?

21       A.    Yes.

22       Q.    Did you take off to try to run away?

23       A.    I wasn't expecting it.

24       Q.    Did you get hit with the first shot

25   from the gun?

132

```
 1          A.   Right, the neck, first shot.

 2          Q.   Took you down?

 3          A.   No.

 4          Q.   You were standing up then?

 5          A.   Yeah, but in going down I was in

 6   shock.

 7          Q.   You mean on the ground and he pumped

 8   another one into your shoulder?

 9          A.   No.

10          Q.   Is there any question that's the guy?

11          A.   No question.

12               THE COURT:  Anything else?

13               MR. ANDERSON:  No further questions.

14               THE COURT:  Anything else, Mr. Rader?

15               RECROSS-EXAMINATION

16   BY MR. RADER:

17          Q.   Mr. Hart, you indicated that at the

18   time of this incident, that his hair was longer?

19          A.   No.  It was a little nappy like.  He

20   didn't have no haircut.  It wasn't long.  He just

21   didn't have no haircut.  His hair was flyaway.

22          Q.   And you don't recall seeing any

23   scars?

24          A.   No.

25          Q.   Anywhere?
```

133

1        A.    I wasn't looking for that.

2        Q.    You said that you didn't see who shot

3   you at the time you were being shot?

4        A.    I seen who shot me.  I didn't see him

5   with the gun.  I seen him pull the gun out.  When

6   I seen him, he was firing, when I seen him

7   pointing and shooting.

8        Q.    And did this other person that was in

9   the back seat of the car at the time --

10       A.    There was no one in the back seat.

11       Q.    Where was this crack head?

12       A.    The crack head got in the car.  Me

13  and him was having a confrontation and was

14  arguing.  The crack head seen it, he jumped in,

15  and was about to take him, 'cause I heard the

16  crack head say, come on, I'll take you somewhere

17  later.  And then he just started firing with the

18  dude in there, like he was about to drive off, and

19  the dude got out and I seen it all that night.

20       Q.    So the crack head was in the car?

21       A.    Say what?

22       Q.    The crack head was in the car?

23             MR. ANDERSON:  Judge, I'm going to

24  object.  He never said the crack head was in

25  the car.  He said he wasn't in the back seat.

```
 1                    THE COURT:  That's true.  Sustained.
 2        Q.    Where was the crack head seated?
 3        A.    He was in the passenger's seat.
 4        Q.    In the front?
 5        A.    Yes.
 6        Q.    Did you tell the police that this
 7  person was a witness?
 8        A.    No.
 9        Q.    Not until that day?
10        A.    They never asked me any questions.
11        Q.    Not until that day, did you ever tell
12  them that he was a witness; is that right?
13        A.    No.
14                    MR. RADER:  No further questions.
15                    THE COURT:  Mr. Hart, you're here
16  under subpoena and you're subject to recall at
17  any time in this case until it's conclusion; do
18  you understand that?
19        THE WITNESS:  Uh-huh.
20        THE COURT:  Now, you are not to discuss
21  the nature of your testimony with anyone else
22  until this case is completed; do you
23  understand?
24                    THE WITNESS:  Yes.
25                    (Witness excused.)
```

```
 1              THE COURT:  Thank you very much.

 2               Is he free to leave, Mr. Anderson?

 3              MR. ANDERSON:  Yes.

 4              THE COURT:  Mr. Rader?

 5              MR. RADER:  As I indicated, I would

 6         like him to stay.

 7              THE COURT:  I can order him to stay

 8         here for the balance of the trial if you'd

 9         like.

10              MR. RADER:  Your Honor, I'd like for

11         him to be available for the defense on

12         reasonable notice if the prosecutor knows

13         where he can be contacted.

14              THE COURT:  Mr. Hart, just have a

15         seat out in the hallway for now.

16               State's next witness.

17              MR. ANDERSON:  Judge, it will be

18         Kevin Davis.  Of course, we're going to

19         have some problems with him.

20              THE COURT:  Okay.  Kevin Davis will

21         be available in about -- we expect 15 to

22         20 minutes.  He's not available right now

23         so we're going to take a break for 15 or

24         20 minutes.

25               The fact he is not available is not
```

```
 1          the fault of anyone.  It's not the fault
 2          of Mr. Davis and not the fault of either
 3          one of these parties, so don't hold it
 4          against anybody or read anything into it.
 5              In the meantime, don't discuss the
 6          case amongst yourselves, don't allow
 7          anyone to discuss it with you or in your
 8          presence, and don't come to any
 9          conclusions based on anything you've seen
10          or heard thus far.
11              We will break now.  Try and be back
12          in the jury room by 11:15 and we'll
13          reconvene as soon after that as possible.
14          Thank you very much.
15              (Jury out at 11:00 a.m.)
16              THE COURT:  Back on the record.  I'll
17          order Mr. Hart to stay here and return
18          every day until the trial is concluded.  I
19          don't know that the State can guarantee
20          that they can physically find him.  That's
21          up to you.
22              MR. ANDERSON:  We'll get him if he
23          wants him.
24              THE COURT:  Tell me what you want.
25              MR. RADER:  The prosecutor says if we
```

137

```
1     want him they will get him with some
2     reasonable recess.
3          THE COURT:  No problem.  Get Mr.
4     Hart back in here.
5          MR. RADER:  Admonish him if you
6     would, please.
7          THE COURT:  Mr. Hart, come on up.
8     Mr. Hart, as I explaIned to you, you're
9     under subpoena.  You're required to come
10    back here.  You are not to leave the
11    county or the State until this trial is
12    completed.  Who are you here with?
13         THE DEFENDANT:  My Aunt Rose.
14         THE COURT:  She's your guardian.  Who
15    do you live with?
16         THE WITNESS:  Her.
17         THE COURT:  What's your address,
18    ma'am?
19         AUNT ROSE:  503 East Fourteenth
20    Street.
21         THE COURT:  Phone number?
22         AUNT ROSE:  621-0086.
23         THE COURT:  All right.  Just be
24    available in the next couple of days, all
25    right?
```

138

```
 1              THE WITNESS:  (Indicate yes.)

 2              THE COURT:  And this will go into

 3          next week, too.  All right.  Thank you.

 4                  (Witness excused.)

 5              THE COURT:  Sir, in the back, have a

 6          seat out in the hall until we start again,

 7          will you?  Thank you.

 8                  (Proceedings recessed.)

 9              THE COURT:  Back on the record.  We

10          will swear him in in the witness chair.

11                  (Jury in at 11:30 a.m.)

12              THE COURT:  Please be seated.

13              MR. RADER:  Your Honor, may I mention

14          a preliminary matter?  Could we designate

15          the map that was used in the examination

16          of Johann Hart as Defendant's Exhibit

17          Number 5?

18              THE COURT:  Sure.

19                  KEVIN DAVIS

20  being first duly sworn, was examined and testified

21  as follows:

22              THE COURT:  Okay, sir.

23              Will you state your name and spell

24          your last name?

25              THE WITNESS:  Kevin Davis, D-a-v-i-s.
```

139

```
 1                    THE COURT:  Okay.

 2                    Mr. Anderson?

 3                       DIRECT EXAMINATION

 4   BY MR. ANDERSON:

 5        Q.    Mr. Davis, how old are you?

 6        A.    19.

 7        Q.    And where are you from originally?

 8   Where are you currently living?

 9        A.    At 503 East Thirteenth, Apartment 2.

10        Q.    Do you know an individual by the name

11   of Johann Hart?

12        A.    Yes.

13        Q.    Who is Johann?

14        A.    That's my cousin.

15        Q.    And you are currently in the Justice

16   Center; is that right?

17        A.    Yes.

18        Q.    And you were convicted of possession

19   of cocaine, a felony of the fifth degree, and were

20   sentenced I believe to six months in the Justice

21   Center?

22        A.    Yes.

23        Q.    The night you got shot you had some

24   cocaine on you, right?

25        A.    Yes.
```

140

1        Q.    Why don't we talk about what happened

2   on October 17, 1998.  Were you with your cousin,

3   Johann?

4        A.    Yes.

5        Q.    Where were you guys?

6        A.    On Fourteenth and Republic.

7        Q.    About what time of day or night was

8   it; do you remember?

9        A.    About 2:00 or 3:00 in the morning.

10       Q.    And what had you guys been doing all

11  night?

12       A.    I just came from a party and ran into

13  my cousin and I picked him up, came and picked him

14  up.

15       Q.    Came and picked him up.  You guys

16  were standing on the corner of Fourteenth and

17  Republic at about 2:00 or 3:00 in the morning.  At

18  some point, did you have contact with an

19  individual now known to you as Fredrick Hall?

20       A.    Like I ain't had nothing really to do

21  with it.  I was just telling my cousin to come on.

22       Q.    Do you see somebody in court that you

23  saw that night or that early morning of October

24  17?

25       A.    Yes.

141

```
 1          Q.    Would you please point to him and
 2   describe what he's wearing?
 3          A.    Wearing all black suit and pink
 4   shirt.
 5                MR. ANDERSON:  Your Honor, let the
 6          record reflect identification of the
 7          defendant.
 8                THE COURT:  The record will reflect
 9          identification of the defendant by the
10          witness.
11          Q.    On October 17, 1998, is that the
12   first time you'd ever seen that defendant?
13          A.    Yes.
14          Q.    Never seen him before?
15          A.    No.
16          Q.    Why don't you tell us what happened
17   that early morning?
18          A.    Then I was using the restroom, came
19   to pick up my cousin, I got out the car and used
20   the restroom.  I got finished using the restroom.
21          Q.    Why don't you slow down a little bit
22   and try to talk more clearly.
23                THE COURT:  Speak up and speak
24          slower, all right?
25          A.    That night I had got out the car,
```

```
 1  used the restroom, came back out.  I went back to
 2  the corner to tell my cousin to come on because he
 3  was over there at the car talking to the guy.  I
 4  didn't know who he was.
 5          Q.   Slow down a little bit.  Your cousin
 6  was over talking to the guy?
 7          A.   Yeah.
 8          Q.   What guy are you talking about?
 9          A.   Him.
10          Q.   That guy right there, the defendant?
11          A.   Yes.
12          Q.   Was the defendant in a car?
13          A.   Yes.
14          Q.   Do you remember what kind of car it
15  was?
16          A.   I just remember it was a Honda,
17  little four door Honda.
18          Q.   Let me show you what have been marked
19  as State's Exhibits 2, 3, 4, and 5.  Take a look
20  at those.  Is that the car the defendant was
21  driving that night?
22          A.   Yes.
23          Q.   What did you do when your cousin was
24  over talking to him, to the defendant?
25          A.   I told my cousin like 15 times to
```

1   come on 'cause I was already fixing to leave to go

2   to a girl's house.  I kept on telling him to come

3   on if you want a ride.

4           Q.    Do you have any idea what he was

5   talking to the defendant about?

6           A.    No.  I did not run up onto the corner

7   until, like, I'm getting about ready to leave.  I

8   walked over there and grabbed him.

9           Q.    Grabbed who?

10          A.    My cousin, Johann.  I grabbed him and

11  told him to come on.  As soon as I grabbed him,

12  that's when the gunshots occurred.

13          Q.    Did you ever see the defendant,

14  Fredrick Hall, with a gun in his hand?

15          A.    Once I looked I seen him -- he kept

16  on holding like he had something.  That's why I

17  kept on telling him to come on, like.

18               THE COURT:  The question was did you

19          ever  see him with a gun in his hand, the

20          defendant?

21               THE WITNESS:  No, but that's where

22          the gunshots had came out the window.

23               THE COURT:  Next question.

24          Q.    Gunshots came out of the window of

25  the car?

144

```
 1        A.    Yes.

 2        Q.    From where the defendant was sitting?

 3        A.    Yes.

 4        Q.    Did you get struck by a bullet?

 5        A.    Yes.

 6        Q.    Where did you get hit?

 7        A.    On my arm.

 8        Q.    Did the bullet go through your arm?

 9        A.    Yes.

10        Q.    So the bullet was never recovered?

11        A.    No.

12        Q.    I mean it's not like they took you up

13   and had surgery and pulled the bullet out of your

14   body 'cause it went through; is that right?

15        A.    It went straight through, yes.

16        Q.    Did you receive medical treatment as

17   a result of that?

18        A.    Yes.

19        Q.    What type of medical treatment did

20   you receive?

21        A.    They just started running tests and

22   all that stuff to make sure the gun -- I don't

23   know, 'cause they wanted to make sure nothing --

24   ain't nothing wrong with the bullets and all that,

25   see did it go all through my heart or my chest
```

1   'cause by it being so close.

2            Q.    Where specifically did the bullet go

3   into your arm?

4            A.    In the side of my arm muscle.

5            Q.    Through this way?

6            A.    Yes.

7                  THE COURT:  You're gesturing towards

8            your left arm?

9                  THE WITNESS:  Yes.

10                 THE COURT:  Okay.  That's for the

11           record.  Go ahead.

12           Q.    Do you know how many shots were fired

13  that night?

14           A.    About three or four.

15           Q.    Do you know how many times your

16  cousin, Johann, got hit?

17           A.    Twice.

18           Q.    Was there anybody else around there

19  with a gun that night that you saw?

20           A.    No, sir.

21           Q.    Is there any question in your mind

22  that this defendant, Fredrick Hall, is the one

23  that had the gun and shot you and your cousin that

24  night?

25           A.    Yes.

146

```
 1        Q.    Is this that guy?

 2        A.    Yes.

 3        Q.    No doubt?

 4        A.    No doubt.

 5        Q.    What happened after the defendant

 6   shot you and your cousin?

 7        A.    I took off running.  I ran around the

 8   corner and fell, and that's when the police that

 9   was on duty in front of the warehouse, they took

10   me and brung me back around.  Some ladies ran

11   around talking about a guy had been shot in his

12   neck.  They took us both around there, and called

13   an ambulance and backup.

14        Q.    Did you ever give the police a

15   description of the car?

16        A.    Yes.

17        Q.    Did you give the description or did

18   you give the license plate number itself?

19        A.    I didn't know the license plate

20   number, just gave them a description of the car.

21        Q.    Did you give them a description of

22   the person that was in the car?

23        A.    Uh-huh.

24        Q.    Were you taken to the hospital?

25        A.    Yes.
```

147

 1        Q.    What happened in the hospital?  Did

 2   they treat you and release you?

 3        A.    Yes.

 4        Q.    At some point, were you shown some

 5   photographs by the police?

 6        A.    Yes.

 7        Q.    I'll hand you what's been marked as

 8   State's Exhibit Number 7 for purposes of

 9   identification.  Have you seen that particular

10   exhibit before?

11        A.    Yes.

12        Q.    When did you see that?

13        A.    The next morning.

14        Q.    And what happened when you were shown

15   State's Exhibit Number 7?

16        A.    He asked me, the detective asked me

17   to point the guy out, did I know any of those guys

18   on there personally.  And I said, no, sir.

19        Q.    So you didn't know anybody on there,

20   did you?  I mean by name or anything?

21        A.    No, I didn't.

22        Q.    What did he ask you to do next?

23        A.    He asked me to point the guy out that

24   shot me.

25        Q.    Do you see the guy on State's Exhibit

1  Number 7 who shot you?

2        A.    Yes.

3        Q.    Which one is it?

4        A.    Seven.

5        Q.    You're pointing to the lower

6  left-hand corner of State's Exhibit Number 7?

7        A.    Yes.

8        Q.    That's a photograph of Fredrick Hall;

9  the guy sitting right there?

10       A.    Yes.

11       Q.    All right.

12             Yesterday, you were brought over to

13  testify, were you not?

14       A.    Yes.

15       Q.    Where were you kept when you were

16  brought over?

17       A.    Upstairs on six in the felony pod.

18       Q.    The night of the shooting, did the

19  defendant have that arm brace on that he's wearing

20  now, or that sling?

21       A.    I don't recall.

22       Q.    Did he have -- did you see the

23  defendant yesterday?

24       A.    Yes.

25       Q.    Where did you see him?

149

```
 1          A.    In the holding tank.

 2          Q.    In the holding tank?

 3          A.    Yes.

 4          Q.    Did you talk to him?

 5          A.    He asked me some questions.  I ain't

 6  got nothing to say.

 7          Q.    What did he ask you?

 8          A.    He just asked me to be, like to be --

 9  I don't know, I wasn't even really trying to pay

10  attention.  I don't really got too much to say to

11  a person that shot me.

12          Q.    What specifically did he ask you?

13          A.    He was asking me questions.

14          Q.    Like what?

15          A.    If I need anything or something.

16          Q.    Did you need anything?

17          A.    Yeah.

18          Q.    Like what?

19          A.    Talking about he'd give me some money

20  or something.

21          Q.    Give you some money or something?

22          A.    Not to testify.

23          Q.    You said he'd pay you money not to

24  testify?

25          A.    Yes.
```

```
 1          Q.    Did he tell you that?

 2          A.    Yes.

 3          Q.    Did he have that sling on yesterday?

 4          A.    He had it on but he took it off.

 5          Q.    When he took off the sling yesterday

 6  up in the holding tank, was he having any problems

 7  with his arm?

 8          A.    Not that I can recall of.

 9          Q.    What did you tell him when he told

10  you he'd pay you money not to testify?

11          A.    I didn't reply.  I didn't say

12  nothing.

13               MR. ANDERSON:  I have no further

14          questions.

15               THE COURT:  Mr. Rader?

16               (Defendant's Exhibit 5 marked for

17          identification.)

18                    CROSS-EXAMINATION

19  BY MR. RADER:

20          Q.    Good morning, Mr. Davis.

21          A.    Good morning.

22          Q.    My name is Jim Rader, one of the

23  counsel in this case.

24                    At the scene of this incident, did

25  you give the police officers a description of the
```

151

1  person who did the shooting?

2          A.    On the scene of the crime?

3          Q.    Yes.

4          A.    I gave the police that brought me

5  back around to the warehouse, I mean back around

6  to the scene of the crime, the police that was

7  standing in front of the warehouse.

8          Q.    And at the time of this shooting, how

9  many people were in the car?

10         A.    From all I can recall, one.

11         Q.    And that was the defendant here in

12  this case?

13         A.    Yes.

14         Q.    Are you sure about that?

15         A.    I'm sure.

16         Q.    So there wasn't somebody else in the

17  passenger's seat?

18         A.    No, sir.

19         Q.    How long did you observe this scene

20  before the shooting?

21         A.    For maybe like 15 minutes or 30

22  minutes 'cause I kept constantly telling Johann to

23  come on.

24         Q.    So the car was there maybe up to 30

25  minutes?

1          A.    Yeah.  It was there from the time I

2    used the restroom to the time I came back, for a

3    long time, just parked right there on the corner.

4          Q.    I've heard that there was somebody

5    around that was characterized as a crack head.  Do

6    you recall who that might have been?

7          A.    Character to what?

8          Q.    Some male person was characterized as

9    a crack head.  Did you see any other person

10   around, male?

11         A.    Yeah.  There was a guy, yeah.

12         Q.    Do you know his name?

13         A.    I think his name is like John.

14         Q.    Do you know his last name or where he

15   lives or anything?

16         A.    No, sir.

17         Q.    But John wasn't in the car, either,

18   was he?

19         A.    No.  He was standing out on the

20   corner, too.

21         Q.    Did you hear or see people on the

22   scene giving the police a description of the car,

23   the license number, or anything like that?

24         A.    Yes.

25         Q.    You mentioned some young women,

1  right?

2         A.    Some women came up out their house

3  because they heard the gunshots and the apartment

4  building was right there, two apartment buildings

5  was right across.

6         Q.    Did you hear them giving a

7  description to the police?

8         A.    No.  I heard the guy that was

9  standing out there giving a description.

10        Q.    Was that John?

11        A.    Yes.

12        Q.    And you said the car was there 30

13  minutes, huh?

14        A.    Yes.

15                   (Defendant's Exhibit 6 marked for

16             identification.)

17             THE COURT:  What have you marked that

18        as, Mr. Rader?

19             MR. RADER:  Defense Exhibit Number 6,

20        Your Honor.

21             THE COURT:  Okay.

22        Q.    Mr. Davis, if this is Republic

23  Street, do you recognize this area, do you know

24  where I'm talking about?

25        A.    Yes, sir.

154

```
 1          Q.    Can you see this clearly?
 2          A.    Yes.
 3                THE COURT:  Mr. Davis, sit up and
 4          speak into the microphone.
 5                (Witness complies.)
 6          Q.    Are you familiar with this house here
 7   on the corner at 1330?
 8          A.    Yes.
 9          Q.    Corner of Republic and Fourteenth?
10          A.    Yes.
11          Q.    Can you tell me where this car that
12   you referred to was parked?
13          A.    Right there parked like 1338 or 1330,
14   whatever it is.
15          Q.    Here?
16          A.    Right.
17          Q.    On which side of the street?  I don't
18   want to lead you, I want you to tell me, which
19   side of the street?
20          A.    It's like a five-way coming down, one
21   coming down the street, coming down this way, this
22   way, like on this side.
23          Q.    Can you tell me relevant to this
24   building?
25          A.    Right there by the building?
```

155

1        Q.    Right here?

2        A.    Right.

3        Q.    Now, you indicated that you got out

4   of your car, went to the bathroom?

5        A.    Yes.

6        Q.    Where was your car parked?

7        A.    1400 Race Street.

8        Q.    It's over here?

9        A.    Yes, on the other side around the

10  block.

11       Q.    Over in here some place?

12       A.    Right.

13       Q.    Let's call that the Davis car.  Where

14  did you go to the bathroom, what building?

15       A.    It's another building right across

16  from that building, an entranceway.  It's two

17  apartment buildings that sit right across from

18  each other.

19       Q.    So I assume you were standing on the

20  street when you were watching this incident?

21       A.    Yes.

22       Q.    Where were you standing?

23       A.    Right on the other side of the

24  street, right there on the corner (indicating).

25  Right there.

156

```
 1          Q.    On the street?

 2          A.    Right there.

 3          Q.    On Republic or --

 4          A.    On Republic and Fourteenth right

 5   there on the corner.

 6          Q.    But you were on Republic, not on

 7   Fourteenth?

 8          A.    Yeah, I was on Republic.

 9          Q.    Here (indicating)?

10          A.    Right.  Right across, right there on

11   the corner.

12          Q.    Is that accurate?

13          A.    Yes.

14          Q.    And did you observe this whole thing?

15          A.    Yes.

16          Q.    Did you see the person in the car

17   that you say did the shooting; did you see him

18   gesturing and arguing with Johann?

19          A.    The reason I told Johann to come on

20   when I came back out from using the restroom, both

21   of their voices was loud.  I'm wondering why you

22   arguing with that man in the car.  It was like

23   they both raising their voice at each other.

24          Q.    Waving his arms around?

25          A.    No, he wasn't waving his arms around.
```

157

1          Q.    You didn't see his hands at all?

2          A.    No, not until I walked up on the car

3    and grabbed Johann by the neck.

4          Q.    Did you walk in front of the car or

5    behind the car?

6          A.    I walked in back of the car to come

7    around from the side and grabbed him by his neck.

8    Told him to come on.  That's when the gunshots

9    occurred.

10         Q.    And there was one person in the car?

11         A.    Yes, and another guy standing out,

12   that was the guy that was standing on the corner.

13         Q.    Republic is one way here, isn't it?

14         A.    Yes.

15         Q.    Going towards the river?

16         A.    Yes.  No, not going -- it's going

17   straight up towards -- I think like Twelfth Street

18   or something, going straight up.  If you go

19   straight up Republic, that's Twelfth Street.

20         Q.    And then Central Parkway?

21         A.    Yeah.  After you turn, you got to

22   either make a left or right.  You make a left I

23   think you end up on Vine.  Central Parkway to turn

24   into Race, then a couple of streets over Elm, and

25   then Central Parkway.

158

1        Q.    Isn't that because Republic dead ends

2   before it gets to Central Parkway?

3        A.    Right.  It's not a dead end street,

4   though.

5        Q.    But you're already heading toward the

6   river?

7        A.    Yes.

8        Q.    If you're flying like a bird?

9        A.    Yes.

10        Q.    Did the police arrive there very soon

11   after this thing happened?

12        A.    After I had ran around the corner,

13   the police was already standing out, some off duty

14   officers.  They walked all the way back around and

15   they radioed it in, plus the police was coming.

16        Q.    When the emergency medical service

17   was treating with you, you were actually on

18   Fourteenth; is that right?

19        A.    Right.  No, I was on Republic Street.

20   They brought me, the police brought me all the way

21   back around to the scene of the crime to check on

22   Johann.

23        Q.    How were you and Johann related?

24        A.    Through him, I mean through my mother

25   and his mother.

159

1          Q.     Had you ever seen Mr. Hall before?

2          A.     No, sir.

3          Q.     Do you hang around on that corner a

4     lot?

5          A.     Yes.

6          Q.     What were you doing out there at 3:15

7     in the morning?

8          A.     I had just arrived.  And I stopped

9     and seen my cousin.  He was on Fourteenth and

10    Race.  I stopped to see my cousin.  That's when I

11    parked and got out with him, telling him, oh, come

12    on.

13                He asked me to go walk around the

14    corner with him.  I walked around the corner and

15    used the restroom, came back out.  He was over

16    there arguing.  It was getting louder and louder.

17         Q.     But nobody was waving their arms or

18    anything, just verbal?

19         A.     No.

20         Q.     Can you tell us what the driver of

21    this car was wearing?

22         A.     Basically, to be truthful, I wasn't

23    even paying attention.  It wasn't basically my

24    business.  I was just concerned about Johann.

25         Q.     You can't shed any light on whether

160

1  he was wearing maybe a white T-shirt or a black

2  coat?

3       A.    No.  I don't remember all that,

4  'cause he was sitting inside of the car, plus it

5  was dark.  I wasn't looking in the car.  It was

6  dark.

7       Q.    You didn't notice any scars or

8  anything on this person's face?

9       A.    No.  I just noticed that the person

10  was wearing glasses that was sitting in the car.

11       Q.    Okay.  Was his hair longer?

12       A.    No.  Not that I can recall.  I just

13  basically seen his face, 'cause I wasn't never all

14  up on the car from the time that I was about to

15  leave.

16       Q.    So you just don't know about his car?

17       A.    Yeah.

18       Q.    So what you're testifying to here is

19  that you saw Mr. Hall in that car, wearing

20  glasses; is that right?

21       A.    Yes.

22       Q.    Were they gold rimmed glasses or

23  black frames or could you tell us something about

24  it?  Gold frames like mine?

25       A.    I think they was black frames.

161

1          Q.    A man with black frames sitting in a

2    car by himself, and you didn't notice anything

3    about his clothing, correct?

4          A.    Correct.

5          Q.    You didn't get the license number,

6    you don't know who might have given the license

7    number to the police or what happened.  You don't

8    have any knowledge about anybody giving a

9    description to the police?

10         A.    I didn't notice the license plate

11   number but I gave a description of the car.

12         Q.    So you've known Johann all your life?

13         A.    Correct.

14         Q.    Had you seen Johann smoking any

15   marijuana earlier that evening?

16         A.    No, I wasn't with Johann that

17   evening, till then.  I just had seen him.  When I

18   pulled up is the first time I seen him all day,

19   that's why I had stopped.

20         Q.    Had you done any drugs that evening?

21         A.    No.  I had smoked a little marijuana

22   earlier that day.

23         Q.    How early that day?

24         A.    About 2:00 in the afternoon.

25         Q.    Do you do crack cocaine yourself?

162

```
 1        A.    No, sir.

 2        Q.    The purpose of the cocaine you had

 3   taped to your arm was for sale; is that right?

 4        A.    I didn't have crack taped to my arm.

 5   It was in my jacket pocket.

 6        Q.    If the emergency medical services

 7   report indicates otherwise, they are wrong, right?

 8        A.    Right.

 9        Q.    It was in your jacket pocket?

10        A.    Yes.

11        Q.    How much?

12        A.    A gram or something.

13        Q.    And that was for sale?

14        A.    Yes.

15        Q.    What kind of car do you drive?

16              MR. ANDERSON:  Objection.

17              THE COURT:  Sustained.

18        Q.    Did you walk up to the car when you

19   were trying to retrieve Johann or did you run or

20   --

21        A.    I walked to the car.

22        Q.    Walked up to the car?

23        A.    Yes.

24        Q.    You got him by the neck?

25        A.    Yes.
```

163

 1          Q.    And that's when this incident
 2    happened?
 3          A.    Yes.
 4                MR. RADER:  May I have just a moment,
 5          Your Honor?
 6                THE COURT:  Sure.  Take your time.
 7                (Pause in proceedings.)
 8          Q.    Mr. Davis, you weren't arrested that
 9    night, were you?
10          A.    No.
11          Q.    When were you arrested?
12          A.    For the charge that I'm in here now?
13          Q.    Yes.
14          A.    Three weeks later.
15          Q.    And you saw Johann many times during
16    that three weeks, right?
17          A.    Right.
18          Q.    And you talked about this incident?
19          A.    No.
20          Q.    Never discussed it?
21          A.    (Indicate no.)
22          Q.    Not one time?
23          A.    Only I asked him one thing, why was
24    he arguing with the guy?  Why did he shoot him?
25    That's the only question I asked him.

164

1       Q.    Did he give you an answer?

2       A.    No.

3       Q.    But otherwise, you never discussed

4  this?

5       A.    No.

6       Q.    You've seen him maybe a dozen times

7  during that three weeks?

8       A.    Not a dozen, probably about five

9  times.

10      Q.    What Judge did you have in your case?

11           MR. ANDERSON:  Objection.

12           THE COURT:  Sustained.

13      Q.    Were there any negotiations as to

14  your sentence in what you would plead guilty to in

15  your case?

16      A.    Yes.

17      Q.    And it's true, in fact, that you did

18  plead guilty, isn't it?

19      A.    Yes.

20      Q.    What was the --  did anybody ever

21  suggest to you that you would be a witness in this

22  case?  Did you talk to the police or prosecutor's

23  office or anybody about being a witness in this

24  case?

25      A.    Yes, and detectives and the

165

1    prosecutor's office had mailed me a letter to my

2    house.

3         Q.    Did they come and talk to you about

4    this case?

5         A.    The prosecutor's office?

6         Q.    Yes.

7         A.    No.

8         Q.    Did the police officers talk to you

9    about this case?

10        A.    Yes.

11        Q.    Did they also talk to you about your

12   drug case?

13        A.    Not the detectives.  Three weeks

14   later some other police had knew me, had knew my

15   car, I had got pulled over.  That's when I

16   received the ticket for running a red light and

17   speeding.  That's when they was about to cut me

18   loose.

19              Some other police showed up and said

20   they had been looking for me.  They had filed

21   felony warrants on me.  The police that was in the

22   car that pulled me over was about to cut me loose,

23   until those police came and said they'd signed

24   felony warrants on me.

25        Q.    Did you plead guilty to what you were

 1  charged with?

 2        A.    Yes.

 3        Q.    So there was no reduction in the

 4  penalty?

 5        A.    No.

 6        Q.    The only consideration you got was in

 7  a reduced sentence, isn't it?

 8              MR. ANDERSON:  Objection.

 9              THE COURT:  Sustained.  You have to

10        rephrase the question.

11        Q.    Were you offered some inducement or

12  something that you wanted in return for your plea

13  to this offense as charged?

14        A.    Yes.

15        Q.    And what was that that you were

16  offered?

17        A.    I was offered either probation or I

18  can do jail time and get out without receiving no

19  paper.

20        Q.    But you were offered probation?

21        A.    Yes.

22        Q.    So you were charged with this offense

23  and you pled guilty as charged and were offered

24  probation, you said, right?

25        A.    Yes.

```
 1          Q.    Was there anything offered to you to
 2   get the probation?   Did anybody tell you that if
 3   you'll do this or that you'll get probation?
 4          A.    No.
 5          Q.    Again, I saw the prosecutor talking
 6   to you here in that chair, right?
 7          A.    Yes.
 8          Q.    And he certainly has a right to do
 9   that.   I talk to my witnesses as well.  But prior
10   to that, has any policeman or prosecutor talked to
11   you about this particular case?
12          A.    No.   The police have but not the
13   prosecutor.
14          Q.    Do you know what policeman; do you
15   know his name?
16          A.    No, sir.
17          Q.    And so the substance of it, the only
18   reason you're here today in custody is because you
19   refused probation?
20          A.    Yes.
21          Q.    Can you explain that to us?  Why did
22   you refuse probation?
23                MR. ANDERSON:  Objection.
24                THE COURT:  Sustained.
25          Q.    But that's the substance of it, you
```

168

1  refused probation?

2              MR. ANDERSON:  Objection.

3              THE COURT:  Sustained, asked and

4         answered.

5         A.   Yes.

6              MR. RADER:  No further questions,

7         Your Honor.

8              THE COURT:  Anything else, Mr.

9         Anderson?

10                  REDIRECT EXAMINATION

11  BY MR. ANDERSON:

12         Q.   Actually, isn't it true that the

13  reason you're locked up today is because he shot

14  you?

15         A.   Yes.

16         Q.   If he wouldn't have shot you, they

17  never would have found that cocaine.  You never

18  would have been convicted and sent to jail, right?

19         A.   Yes.

20         Q.   I never talked to you before this

21  morning, right?

22         A.   Yes.

23         Q.   I talked to you for about two minutes

24  while you were sitting in the hall?

25         A.   Yes.

169

 1        Q.    Did you ever talk about coming in
 2   here and not telling the truth?
 3        A.    No.
 4        Q.    I told you to tell the truth here
 5   today, didn't I?
 6        A.    Yes.
 7        Q.    Is that what you've done?
 8        A.    Yes.
 9        Q.    All right.  Now, let's talk a little
10   bit about this identification procedure.  You
11   indicated that you were shown State's Exhibit
12   Number 7, and you identified the picture in the
13   lower left hand corner as the person who shot you;
14   is that correct?
15        A.    Yes.
16        Q.    Was your cousin around when you did
17   that identification process?
18             MR. RADER:  Your Honor, that's not
19             rebuttal.
20             MR. ANDERSON:  Actually, it is.
21             THE COURT:  No, it's rebuttal.
22             Identification certainly was raised in
23             cross-examination.  Go ahead.
24        A.    When they showed me the pictures, my
25   cousin was still in the hospital.

```
 1        Q.    So when you identified the picture of

 2   the defendant as the person who shot you, your

 3   cousin wasn't there, was he?

 4        A.    No.

 5        Q.    You hadn't talked to him, had you?

 6        A.    No.

 7        Q.    When your cousin identified this

 8   person, Fredrick Hall, as the shooter, you hadn't

 9   talked to him, had you?

10        A.    No.

11        Q.    You weren't present when this

12   identification was done, were you?

13        A.    No.

14        Q.    Let's talk a little bit about this 30

15   minute aspect of it.  You indicated that you

16   parked your car up on Race Street.  You'd been to

17   a party or something, right?

18        A.    Right.

19        Q.    You hook up with your cousin up here?

20        A.    Yes.

21        Q.    You came around and were standing on

22   the street corner?

23        A.    Yes.

24        Q.    This car pulled up?

25        A.    Yes.
```

171

```
 1         Q.    Your cousin walks across the street
 2    to talk to this guy?
 3         A.    Yes.
 4         Q.    You go around the corner to go to the
 5    bathroom somewhere?
 6         A.    No.  Across from that building.
 7         Q.    So you go over here to go to the
 8    bathroom.  How long did that take?
 9         A.    About two minutes.
10         Q.    Come back out, right?
11         A.    Right.
12         Q.    You go and then you hear them
13    arguing?
14         A.    Yes.
15         Q.    And you go across the street?
16
17         A.    No, I stood on the corner for a
18    minute.
19         Q.    How long did you stand on the corner?
20         A.    About 10 minutes.
21         Q.    Did you have a watch on?
22         A.    No.
23         Q.    So you stayed on the corner for about
24    10 minutes then you go over and get your cousin
25    and start to lead him away, and that's when this
```

 1  defendant shot you and your cousin?

 2        A.    Yes.

 3        Q.    So what you described is maybe about

 4  15 minutes, 10 minutes, 15 minutes?

 5        A.    Yes.

 6        Q.    Is there any doubt in your mind that

 7  that defendant sitting right here, Fredrick Hall,

 8  is the one that had the gun and squeezed the

 9  trigger of that bullet that struck you in your

10  arm?

11        A.    Yes.

12        Q.    Is there any question about it?

13        A.    No.

14        Q.    Is this the guy?

15        A.    Yes.

16              MR. ANDERSON:  Nothing further.

17              THE COURT:  Anything else?

18              RECROSS-EXAMINATION

19  BY MR. RADER:

20        Q.    Mr. Davis, did you see the gun fire?

21        A.    Yes.

22        Q.    And can you tell the jury which hand

23  it was in for purposes of firing it?

24        A.    No.  I just seen fire coming out the

25  gun.  I didn't even -- when I first turned around

173

1    I heard gunshots but I did not know I was struck

2    until I looked.  I seen my cousin screaming at me.

3    That's when gunshots kept on firing and I took off

4    running.

5              Q.    Well, what did you see?  Did you

6    actually see the gun as it fired?

7              A.    No.  I seen fire just rage from the

8    window, the spark coming out the window. That's

9    all I seen.

10             Q.    So if there had been somebody else in

11   the car, they could have been firing the gun?

12             A.    Not from that angle.  If it would be

13   another person in the car I don't know why I would

14   be shot 'cause I wasn't even that close to the

15   car.

16             Q.    Did you see the persons in the car at

17   the time that you saw the sparks?

18             A.    Yes.

19             Q.    Were they facing forward, turning

20   just like this looking out the window talking?

21             A.    That's how I know who the person was.

22             Q.    And you're sure that they had on dark

23   glasses?

24             A.    Not dark glasses.

25                   MR. ANDERSON:  Objection.

174

```
1              THE COURT:  He didn't say dark.

2         Q.   Black frames?

3         A.   Yes.

4              MR. RADER:  No further questions.

5              THE COURT:  All right.

6              Thank you, Mr. Davis.

7              You're not to discuss this case with

8         anyone else until it's concluded.  Do you

9         understand that?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.  You can stay

12        right there for just a second.

13             Ladies and gentlemen, we're going to

14        break until about 1:30 for lunch.  Same

15        admonitions apply.  Don't discuss the case

16        amongst yourselves nor allow anyone to

17        discuss it with you or in your presence.

18             Don't come to any conclusions based

19        on anything you've seen or heard thus far.

20        Don't attempt to do any independent

21        investigation to prove or disprove any

22        facts you have heard in this case.

23             Has anybody got a conflict, if the

24        sequence of witnesses permits, that we go

25        between 4:15 and 4:45?
```

1           Jill told me somebody's got a

2      doctor's appointment tomorrow at 4:00.

3           A JUROR:  I have.

4           THE COURT:  Where is the appointment?

5           A JUROR:  Kenwood.

6           THE COURT:  We'll break then tomorrow

7      around 3:30.  Give you time to get out

8      there.  Then we won't be here on Friday.

9      But you will be here on Monday.  With

10     that, we'll break and see you about 1:30.

11     Thank you.

12          (Jury out at 12:10 p.m.)

13             (Witness excused)

14          THE COURT:  Just take him out this

15     door.  They have to be separated.

16          Mr. Anderson, anything else on behalf

17     of the State before we break?

18          MR. ANDERSON:  Yes, Judge.  As I

19     indicated previously in chambers,  I

20     inadvertently left off the name of a

21     police witness, Officer Eatrides, from my

22     discovery, in compliance with Rule 16D.

23          I did read his name to the jury as a

24     potential witness but I failed to disclose

25     him in my formal discovery.

176

```
 1              THE COURT:  When is he going to
 2         testify and what is the nature of his
 3         testimony?
 4              MR. ANDERSON:  He'll be testifying
 5         this afternoon if all goes well.  Once the
 6         police obtained the make of the vehicle
 7         and the license plate number was run in
 8         the computer, it came back to a certain
 9         address.   He responded to that address,
10         talked to the vehicle's owner about the
11         car.   The vehicle owner indicated to the
12         officer that her son may possibly be
13         involved.  She gave a description of her
14         son and that was broadcast.
15              The officers then were leaving the
16         residence at which time that person, her
17         son, was home.  And the police took him
18         into temporary custody at that time to
19         interview him.
20              THE COURT:  Okay.  Any objection?
21              MR. RADER:  Yes, Your Honor.  This
22         is a very serious case.  And the names
23         that we were supplied with earlier in the
24         investigation, what you've done is proven
25         in this case to be relevant and material
```

177

```
 1          to the case.  We would ask the Court not

 2          to allow that testimony.

 3              MR. ANDERSON:  Judge, for the record,

 4          Officer Eatrides is outside.  If Mr. Radar

 5          would like an opportunity to talk to him

 6          over lunch, we'll make him available.

 7              THE COURT:  That's fine.  Here's what

 8          we'll do.  I'll permit him to testify but

 9          I'll permit you to interview him right now

10          if you like.

11              And if you have a further objection

12          after the interview you can come in and

13          put that on the record.  But as for now,

14          I'll let him testify.  But I will let you

15          or Ms. Zucker or both of you go out and

16          interview him and have a chance to discuss

17          what he's going to say with your client.

18          With that we'll break until 1:30.

19              (Proceedings recessed.)

20

21

22

23

24

25
```

178

1            AFTERNOON SESSION, April 28, 1999

2                 THE COURT:  Defense ready to

3    proceed?             MR. RADER:  Yes.

4                 THE COURT:  State ready to proceed?

5                 MR. ANDERSON:  Yes.

6                 THE COURT:  Line them up.

7                 (Jury entered courtroom at 1:45

8    p.m.)             MR. ANDERSON:  The State

9    would call       Officer Eatrides.

10                THE COURT:  Come on up, sir.

11                    GREGORY EATRIDES

12   being first duly sworn, was examined and testified

13   as follows:

14                THE COURT:  Please have a seat.

15   Pull that microphone right over to you.  A

16   little       closer.  There you go.

17                THE COURT:  State your name and

18   spell  your last name, please.

19                THE WITNESS:  Gregory Eatrides,

20          E-a-t-r-i-d-e-s.

21                THE COURT:  Thank you, Officer.

22                Mr. Anderson?

23                DIRECT EXAMINATION

24   BY MR. ANDERSON:

25        Q.    Officer Eatrides, how are you

179

1   currently employed?

2        A.      I'm a police officer for the City

3   of Cincinnati.

4        Q.      Where are you currently assigned?

5        A.      I'm currently assigned to District

6   2.

7        Q.      Back on October 17, 1998, where

8   were you assigned?

9        A.      District 1.

10       Q.      Back on that date, did you have an

11  occasion to respond to a radio run concerning the

12  description of a car and the license plate number?

13       A.      That's correct.  There was a

14  shooting down in Over The Rhine.  There was a

15  license plate given.  The registration came back I

16  believe on Fulton Avenue and I responded out to

17  that residence that night.

18       Q.      Who were you working with that

19  night?

20       A.      I believe I was with Kathy

21  Echelberry.

22       Q.      You and Officer Echelberry

23  responded to the Fulton Avenue address?

24       A.      Correct.

25       Q.      What did you find when you got

1   there?

2        A.        First we looked for the car, it was

3   not present in front of or in the immediate

4   vicinity of the residence.  At that point then we

5   responded to the actual apartment.

6        Q.        How far away is Fulton Avenue from

7   Windsor Avenue?

8        A.        I believe it's within a block or

9   two.  I'm not sure if they are intersecting

10  streets but they are parallel.  It's been awhile

11  since I worked in Walnut Hills but it's in the

12  same actual neighborhood.

13       Q.        Okay.  When you responded to the

14  Fulton Avenue apartment, what did you do?

15       A.        We knocked on the door that the

16  registration came back to.  At that point, the

17  owner of the vehicle responded to the door and we

18  had a conversation with her.

19       Q.        You talked to the owner of the

20  vehicle.  Was the vehicle present at that

21  location?

22       A.        No.

23       Q.        How long did this conversation with

24  the owner of the vehicle last?

25       A.        We had off and on conversation with

1  her.  We were probably there altogether probably a

2  total of 15, maybe 20 minutes.

3      Q.    Do you remember the owner of the

4  vehicle's name?

5      A.    I don't recall it.

6      Q.    Did you have a conversation with

7  the owner of the vehicle concerning who may be

8  operating the vehicle?

9      A.    Yes, I did.

10     Q.    What did she tell you?

11     A.    She stated that she believed her

12 son -- I believe his name is Dexter, possibly had

13 the car.

14     Q.    Did she give you a description of

15 Dexter?

16     A.    Yes, she did.

17     Q.    What description did she give you?

18     A.    I don't recall specifically.  I

19 know he was a male black, approximately 18 years

20 of age.  He was late teens.  As far as the rest of

21 the description I don't recall off the top of my

22 head.

23     Q.    Based on your conversation with

24 her, did you put out a description of a possible

25 suspect, young, male black, late teens or early

182

1   twenties?

2       A.      Yes.

3       Q.      What happened during the course of

4   this conversation with the car owner?

5       A.      During the conversation, that's

6   when we heard Lt. Bailey come on saying that he

7   had observed the vehicle and I believe had

8   actually engaged in a brief car chase.

9       Q.      So that came over the radio while

10  you were at the Fulton Avenue residence?

11      A.      Correct.

12      Q.      What did you do when that came over

13  the radio?

14      A.      When that came over, we initially

15  started to respond out to the car, to respond to

16  the area.  Actually the pursuit was coming near to

17  where we were at.  I think, when I heard he was

18  actually I believe up in Eden Park, which Fulton

19  Street actually runs out into Eden Park, we

20  started to respond out there.

21              I believe that's when Lt. Bailey

22  came on saying that he had actually lost the

23  vehicle.  And then subsequent to that, a short,

24  maybe a half minute or minute later, I believe, he

25  came back on and said he spotted the car but it

183

1   was unoccupied at that point.

2        Q.       Now, did anything happen as you

3   were leaving the Fulton Avenue apartment to engage

4   in this chase, if you will?

5        A.       Actually, we responded back after

6   this other kid had left the car unattended, and we

7   responded back up the steps.  And at that point we

8   talked to her briefly again.

9                We started to leave again.  And

10  that's when maybe a few seconds later, as we were

11  walking down the steps to our car, the woman came

12  out yelling for us, and said that she had located,

13  actually had located her son, that he was in his

14  room.

15       Q.       Had you ever left the Fulton Avenue

16  place where you had parked your police cruiser?

17       A.       No.

18       Q.       So could you give us an estimate of

19  the time between the time that you arrived on the

20  doorstep and had your first conversation with this

21  witness until the time she came out and told you

22  that her son was actually in the room?

23       Q.       Like I say, it was probably roughly

24  about 15 minutes.

25       Q.       Okay.  At that time or during that

184

 1    time did you see anybody leave or enter the house?

 2         A.    No.

 3         Q.    What did you do then, once you

 4    became aware that Dexter was actually in the house

 5    at that time?

 6         A.    At that point I believe the initial

 7    broadcast, based on witnesses, was that there was

 8    possibly more than one occupant of the car at the

 9    time of the shooting.  At that point we took her

10    son into custody and took him down to District 1

11    for follow-up investigation.

12         Q.    I'll hand you what's marked as

13    State's Exhibit Number 16 for purposes of

14    identification.  Can you identify what that

15    particular exhibit is, sir?

16         Q.    Yes.  This is her son, Dexter.  I'm

17    not sure what his last name is.

18         Q.    That's the young man that you took

19    from the Fulton Avenue residence that evening?

20         A.    Correct.

21         Q.    Did you talk to Dexter that night?

22         A.    Yes.

23         Q.         Did he indicate to you

24    whether he'd been driving the car or not?

25         A.    I believe he indicated that he had

1    been in the car earlier, several hours earlier

2    that night, but he denied any involvement in the

3    shooting, denied that he was in the car at the

4    time of the shooting, denied that he was down in

5    Over The Rhine in the car at the time of the

6    shooting.

7         Q.    Did he tell you where he was?

8         A.    I believe he made some statement to

9    that.  From my independent recollection I don't

10   recall.

11        Q.    But according to what you saw and

12   observed, there is no question he was in the

13   residence at the time this police chase ensued

14   with the vehicle?

15             MR. RADER:  Objection.

16   Speculation,   Your Honor.

17             THE COURT:  It's not speculation,

18   it's  just what he observed and saw.  Overruled.

19        A.    We saw him come from out of the

20   residence shortly after the pursuit.  And we were

21   at the front.  I didn't see anybody come in or out

22   the front where we were at.

23        Q.    Did you do anything else besides

24   take custody of Dexter and take him down and

25   interview him?

186

```
 1        A.    No.

 2        Q.    Did you have any contact with

 3  Fredrick Hall at all?

 4        A.    No, I did not.

 5              MR. ANDERSON:  Thank you.

 6              No further questions.

 7              THE COURT:  Any questions at all?

 8              MR. RADER:  May we have a sidebar

 9     conference on the record?

10              THE COURT:  Sure.  Excuse us,

11  ladies and   gentlemen.

12                  THE COURT:  We're in chambers

13         at this point out of the presence of the

14         jury.  Defense, go ahead.

15            MR. RADER:  Your Honor, Mr. Anderson

16         indicated on the record what the nature

17         and the substance of his testimony was

18         going to be.  We objected to calling the

19         witness, not having notice in discovery.

20         And it turns out that the witness'

21         testimony is as Mr. Anderson represented

22         it to be.  We are not prepared to rebut

23         that testimony and we need a continuance

24         until tomorrow morning for

25         cross-examination of that witness.  It's
```

187

```
 1            not what this witness said on direct.
 2            It's our ability to effectively
 3            cross-examine him.  And we need time to
 4            prepare exhibits, et cetera.
 5                 THE COURT:  So you want a continuance
 6            of the trial in progress until tomorrow
 7            from this point on?
 8                 MR. RADER:  Yes, and do
 9            cross-examination tomorrow morning.
10                 THE COURT:  Did you examine or speak
11            with Officer Eatrides during the hour and
12            a half or so we took for lunch?
13                 Did you have a chance or did you do
14            that?
15                 MR. RADER:  I didn't do that, Your
16            Honor, because I took Mr. Anderson at his
17            word, and the crux of this, if you want me
18            to get right to the point --
19                 THE COURT:  You don't need to get to
20            the point.  I'm just asking if you did.
21            This witness has been disclosed.  I find
22            your request to be inconvenient but not
23            unreasonable.  So we'll adjourn till
24            tomorrow.  I'll go out and adjourn the
25            case until tomorrow, until 10:00 and
```

```
 1          instruct Officer Eatrides not to discuss

 2          it with anyone else until then.

 3               MR. RADER:  I appreciate your kind

 4          consideration, Your Honor.

 5               THE COURT:  No problem.

 6               (Ends discussion in chambers.)

 7               THE COURT:  Ladies and gentlemen,

 8          what we're going to do now is not exactly

 9          what I had planned.  But you shouldn't

10          read something into it one way or the

11          other.  But we are going to break at this

12          time for the day.

13               I am mindful of your time, trying

14          not to waste it, trying to conduct a fair

15          trial, too.  So you'll have to take me at

16          my word that this is not an unreasonable

17          thing and it's a necessary delay.

18               Is 10:00 tomorrow morning okay for

19          everybody?  We'll meet again tomorrow

20          morning at 10:00.  If you could be in the

21          jury room by 5 till, that would be great.

22

23               The same admonitions apply.  Don't

24          discuss the case amongst yourselves, and

25          don't allow anyone to discuss it in your
```

1          presence.  Don't come to any conclusions

2          based on what you've seen or heard thus

3          far.

4               Don't do any independent

5          investigation to verify the facts of this

6          case.  For example, do not go to 14th and

7          Republic.  I wouldn't go through there at

8          3:00 in the morning to get a feel for it

9          yourself.  If the attorneys wanted you to

10         go down, somebody would have made a

11         motion.  Both parties agree you can decide

12         this case one way or the other based on

13         the evidence that you will hear during the

14         trial.

15              There was a reporter from the Post

16         who stuck his head in here today.  I don't

17         think that he was poking around about this

18         case in particular.  It's their job to

19         check the courtrooms.  So I'm going to

20         give you no admonitions about any news

21         outlet or anything else.  If you do come

22         across anything, let me know, and if you

23         do come across anything, ignore it.

24         You're the only ones that will hear all

25         the evidence in this case and you're the

190

```
 1      only ones that will decide.
 2              With that, I apologize for the delay
 3      but it is necessary.
 4              And we'll reconvene tomorrow at
 5      10:00.  Tomorrow I hope to go from 10:00
 6      till about 3:30.  Thank you very much.
 7
 8              (Jury excused at 2:05 p.m.)
 9              THE COURT:  Mr. Eatrides, Officer,
10      you're in progress right now here.  You
11      don't have to get back up there.  You're
12      not to discuss this case with anyone else
13      until you come back here tomorrow on the
14      witness stand.  That would include
15      anybody, unless you're given specific
16      permission by me to do so.  None of your
17      fellow officers, none of the other
18      witnesses, not the prosecutor, not the
19      defense counsel.
20              We were proceeding today directly
21      into cross-examination, which we're
22      obviously not.  If we were proceeding
23      today you wouldn't have a chance to talk
24      to anyone.  So between now and tomorrow
25      don't talk to anybody about the case.
```

191

```
 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  Thank you very much.

 3       You're free to go.  See you tomorrow.

 4                Anything else on behalf of the State?

 5                MR. ANDERSON:  Not at this time, Your

 6       Honor.

 7                THE COURT:  Anything else on behalf

 8       of the defense?

 9                MS. ZUCKER:  No, Your Honor.

10                THE COURT:  Deputy, hold on to him a

11       few minutes here until Ms. Schweir gives

12       you a green light and then take him back

13       up.

14                (Proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

25
```