```
 1                    COURT OF COMMON PLEAS

 2                    HAMILTON COUNTY, OHIO

 3

 4    STATE OF OHIO   )

 5    PLAINTIFF,      )

 6    vs.            )    Case Number:  B-9807452

 7    FREDRICK HALL   )    (Volume 3 of 5)

 8    DEFENDANT.      )

 9

10                         - - -

11              COMPLETE TRANSCRIPT OF PROCEEDINGS

12                         - - -

13    APPEARANCES:

14          WILLIAM ANDERSON, ESQ.

15                On behalf of the Plaintiff.

16

17          ELIZABETH ZUCKER, ESQ.
                    and
18          JAMES RADER, ESQ.

19                On behalf of the Defendant.

20          BE IT REMEMBERED that upon the jury trial of this

21    cause, in the Court of Common Pleas, before the Honorable

22    STEVEN E. MARTIN, one of the judges of the said Court of

23    Common Pleas, on the date hereinafter stated, the following

24    proceedings were had.

25
```

```
 1                    MORNING SESSION, April 29, 1999
 2                         (Jury entered courtroom at 10:25 a.m.)
 3                         THE COURT:  Ready to continue with the
 4              cross-examination of the police officer, Ms.
 5              Zucker?
 6                         MS. ZUCKER:  Yes, I am.
 7                              GREGORY EATRIDES
 8         being first duly was examined and testified as follows:
 9                              CROSS-EXAMINATION
10         BY MS. ZUCKER:
11              Q.        Good morning, Officer Eatrides.
12              A.        Good morning.
13              Q.        My name is Liz Zucker.
14                        Dr. Parrott was telling us there was this
15         new high tech kit for testing gunpowder residue on
16         suspects' hands.  Are you familiar with that?
17              A.        I'm not familiar with the new testing
18         methods for that, no.
19              Q.        I heard it was readily available for most
20         police departments.
21              A.        I'm not familiar with that.
22              Q.        I forgot my glasses.  Excuse me.
23                        And was it your testimony yesterday that you
24         watched the front of the apartment building?
25              A.        Correct.
```

```
 1          Q.      And was it also your testimony yesterday
 2    that the description you broadcast for possible suspect
 3    came from his mother?
 4          A.      Yes.
 5          Q.      And was it also your testimony yesterday
 6    that you were at the house for approximately 15 minutes?
 7          A.          Approximately, yes.
 8                  MS. ZUCKER:  Your Honor, at this point
 9          I'd like to play the transmission from the radio calls
10          that were recorded from that time period.
11                  THE COURT:  Any objection?
12                  MR. ANDERSON:  I haven't heard them, and
13          I don't know that they have been properly
14          identified, but I'm not going to object to them.   '
15                  THE COURT:  Have you got something to
16          play them on?
17                  MS. ZUCKER:  Some of the pages have
18          previously been identified as Defendant's Exhibit
19          Number 4.
20                  Your Honor, just as a technicality,
21          there's some time period in here where there's    just
22          a recording of the time, that just gives the 10 second
23          increments.
24                  THE COURT:  Okay.
25                  MS. ZUCKER:  Judge, do you want this
```

```
 1              played in its entirety or can I skip around?
 2                   THE COURT:  First off I believe that when
 3              you're going to play a tape, you play it with the
 4              prosecutor before we get the jury in here.  It's
 5              your case.  You play the tape, what you want to
 6              play.
 7                   (Tape playing.)
 8                   (Tape turned over.)
 9                   THE COURT:  Ms. Zucker, do you need some
10              time to find something?
11                   MS. ZUCKER:  About 30 seconds.
12                   THE COURT:  30 seconds.  We'll wait.
13              If you need more than that, just let us know.
14                   (Tape playing.)
15                   THE COURT:  Turn it up.
16                   All right, Ms. Zucker.  Stop the tape,
17              will you?
18                   (Tape playing.)
19                   THE COURT:  Stop it.
20                   (Tape stopped.)
21              THE COURT:  Can I see counsel in chambers     real
22         quick?
23                   (Discussion in chambers off the record.)
24                   THE COURT:  All right.  Do you have any
25              more questions of the Officer at this time?
```

```
 1                        MS. ZUCKER:  No, Your Honor.  If I can
 2            take a minute I'll advance this to a different
 3            point.
 4                             (Tape playing.)
 5                             (Tape stopped.)
 6     BY MS. ZUCKER:
 7            Q.      You said that you made the report at 3:38
 8     and that you were with the car owner on Fulton?
 9            A.      That's correct.
10                             (Tape playing.)
11                        MS. ZUCKER:  Just one minute.
12                             (Tape turned over.)
13     BY MS. ZUCKER:
14            Q.      The description of possible suspect,
15     Dexter Parker, that you gave over the radio, was not of an
16     18 or 20 year old; is that correct?
17            A.      I believe he's 15.
18            Q.      One other location we're going to hear.
19                             (Tape playing.)
20                             (Ends tape.)
21     BY MS. ZUCKER:
22            Q.      What did he say?
23            A.      I believe he said 4:18.
24            Q.      What time did you get there?
25            A.      I don't remember.
```

```
 1          Q.      About 3:38?
 2          A.      Something like that.
 3          Q.      So you were actually at the house for
 4     about 45 minutes?
 5          A.      Something like 40 or 45.
 6          Q.      And during that entire time, you stayed in
 7     front of the house?
 8          A.      Either at the door or out by our vehicle.
 9                  MS. ZUCKER:  I have no further
10          questions.
11                  THE COURT:  Anything else?
12                  MR. ANDERSON:  No.
13                  THE COURT:  Officer, thank you very much.
14          You're free to go.
15                      (Witness excused.)
16                  THE COURT:  State's next witness.
17                  MR. ANDERSON:  State will call Officer
18     Bailey.
19                      DAVID BAILEY
20     being first duly sworn, was examined and testified as
21     follows:
22                  THE COURT:  Pull that microphone up to
23          you a little bit.  Right there.  Even closer.
24          State your name and spell your last name, please.
25                  THE WITNESS:  David Bailey, B-a-i-l-e-y.
```

```
 1                         THE COURT:  Go ahead, Mr. Anderson.
 2                         MR. ANDERSON:   Thank you, Your Honor.
 3                              DIRECT EXAMINATION
 4      BY MR. ANDERSON:
 5           Q.     Mr. Bailey, how are you employed?
 6           A.     I work for the City of Cincinnati Police
 7      Division assigned to District 2.
 8           Q.     Were you working for Cincinnati Police
 9      back on October 17, 1998?
10           A.     Yes, sir, I was.
11           Q.     On that date did you have an occasion to
12      hear a radio call concerning a vehicle and a license plate
13      number?
14           A.     Yes, sir.
15           Q.     Why don't you tell us a little bit about
16      how you became aware of the vehicle and the license plate
17      and what you did as a result of that.
18           A.     Okay.  As I stated before, I'm assigned to
19      District 2, which is the east side of Cincinnati.  District
20      1, our downtown area, had a shooting, apparently two
21      victims were shot in the Over-The-Rhine area.
22      District 1 received the call.  They began their
23      investigation and initiated a broadcast of possible
24      suspects and vehicles connected with the shooting.
25           Q.     What was the description of the vehicle
```

1    that you heard?

2        A.        As I recall it, a description was put out,

3    it was a small brown vehicle, possibly a Honda Accord with

4    an Ohio registration.  Dispatchers ran the plate that was

5    given apparently from witnesses on the scene.  The plate

6    came back to a Fulton Street address which is East Walnut

7    Hills by Eden Park.

8        Q.        Okay.

9        A.        They gave a description of a possible

10   suspect described as what I would call a male black with a

11   baseball cap, that he got in his vehicle and fled the

12   scene.

13              The vehicle was possibly last seen in the

14   Stark Street area off Central Parkway.  I believed that the

15   car was probably going to come up McMillan Street.  If it

16   was going to return home to Fulton Street, it would pass by

17   the Peebles Corner area.

18       Q.        You were basically doing some guesswork as

19   far as where you thought the vehicle might be traveling in

20   order to get back to the registered owner?

21       A.        Absolutely.  I was thinking he would come

22   that way, and I just pulled the cruiser down on Gilbert and

23   McMillan and waited for a while.

24       Q.        You were at Gilbert and McMillan?

25       A.        I was sitting on Gilbert facing southbound

1    just north of McMillan.

2         Q.        Were you in a marked vehicle and in

3    uniform?

4         A.        Yes, sir.

5         Q.        What happened when you were on Gilbert

6    Avenue looking for the possible car?

7         A.        As I said, and you said, it was just

8    guesswork.  I believed he was going to be coming up

9    McMillan; however, there was a car approaching from my rear

10   southbound on Gilbert.  Looking back in my mirror, it

11   appeared to resemble a Honda Accord, so I took notice.  And

12   I was at the light.  The car pulled up beside me.

13        Q.        The car pulled up beside you?

14        A.        Right.

15        Q.        Did it stop?

16        A.        Right.  There was a stop light.  They had

17   a red light there, and I was sitting adjacent to him.  I

18   looked over, saw the individual operating the vehicle.

19        Q.        Do you see the individual that was

20   operating the vehicle in court today?

21        A.        Yes, sir.

22        Q.        Please point to him and describe what he's

23   wearing.

24        A.        He's seated behind this table over here,

25   with a dark suit, a red shirt, red tie.

```
 1                          MR. ANDERSON:  Your Honor, let the
 2             record reflect identification of the defendant,
 3             Fredrick Hall.
 4                          THE COURT:  The record will reflect
 5             identification of the defendant by the witness.
 6             Q.        Officer, how long of an opportunity did
 7   you have to observe the defendant as he pulled up beside
 8   you and stopped his car?
 9             A.        Well, it was just briefly.  It was
10   seconds.  He pulled past me.  He looked at me, and then as
11   the light turned green he sped off.  I was able to take a
12   look at the tag, the plate, and it did indeed match what
13   was given out in the description of the incident.
14             Q.        Did you get a real good look at the driver
15   of the vehicle?
16             A.        Right.  As I said, he pulled up adjacent
17   to me and looked at me and then what happened was we became
18   involved in a vehicle pursuit.
19             Q.        Is there any question that this defendant
20   you just identified, Fredrick Hall, was the individual
21   driving that Honda Accord?
22             A.        He was.
23             Q.        What happened when the light turned green?
24             A.        When his light turned green, he began to
25   speed away.  I activated my emergency lights and siren.
```

202

1          Q.        Attempting to pull him over?

2          A.        Wanting him to pull over.  As I said, he

3     did speed away, I would guess at a speed in excess of 60

4     miles an hour.

5          Q.        What particular road were you traveling on

6     at that time?

7          A.        He proceeded through the light southbound

8     on Gilbert Avenue.

9          Q.        What's the speed limit on Gilbert Avenue

10    at that location?

11         A.        As best I recall I believe that's a 35

12    through there, it's a posted 35.

13         Q.        Okay.

14         A.        A pursuit took place, and I do not know

15    all the routes we took, but this pursuit was contained in

16    the Eden Park, Walnut Hills area, Nassau, Fulton, Windsor

17    Street areas, like I said, even sometimes through Eden

18    Park, we went through there.  The pursuit went on for some

19    time.

20         Q.        How long did the pursuit go on?

21         A.        Possibly several minutes, several minutes

22    chase through those streets.

23         Q.        What kinds of speeds were you operating

24    your vehicle at?

25         A.        As I said, anywhere from 60 and as we went

1    back northbound on Gilbert sometimes 80 mile an hour.  He

2    was pulling away from my cruiser.  The cruiser won't go

3    that fast.

4         Q.      During this chase, were there any stop

5    signs, stop lights, or anything else that a driver would

6    tend to yield to?

7         A.      Throughout this chase there was numerous

8    stop signs.  I mean there's lots of cross streets by the

9    park and Nassau and Fulton, and all the streets have stop

10   signs.

11        Q.      Okay.

12        A.      Which he disregarded all of them

13   virtually.

14        Q.      Just sped through them and run stop signs,

15   stop lights?

16        A.      He continued through all the stop signs,

17   and of course, I had to stop.  It's late in the evening so

18   I had to stop for a lot of those stop signs.

19        Q.      Was there other traffic out at the time?

20        A.      Right.  There was still people coming home

21   from being out that night.  There was a few times I had to

22   stop for traffic to let them through during this pursuit.

23        Q.      At some point did you lose visual contact

24   with the vehicle that the defendant was operating.

25        A.      I did, and it was down by the entrance to

 1    Eden Park where Kemper goes down to Columbia Parkway.

 2                    As I said, I'd stopped for traffic a few

 3    times.  One of those times I did have to stop and let

 4    traffic through, and I lost sight of the vehicle.  I saw

 5    taillights proceed down Kemper towards Columbia Parkway.  I

 6    was guessing it could be him.  As I approached that

 7    vehicle, it wasn't the car.  So at that point I had lost

 8    him in the pursuit.

 9         Q.      During the course of this chase at 60 to

10    80 miles an hour, running stop signs and things like that,

11    were the public in danger at that time?

12         A.      Well, like I said, very much so.  There

13    was a lot of people driving home at that time of the

14    morning.  There were people who had been out.

15                    There was still people driving through

16    those areas so there was traffic, people at the

17    intersections trying to get through.

18                    As I said, I had to negotiate around

19    several cars trying to get through.  So it was a hazardous

20    situation.

21         Q.      Now, you indicated that you saw some stop

22    lights that you believed may be the vehicle, and you went

23    to that vehicle, and it was not the vehicle?

24         A.      Right.  That vehicle was approaching

25    Columbia Parkway from Kemper.

1        Q.        So you lost the vehicle at that point.
2    When did you next come into contact with the vehicle that
3    you had been chasing?
4        A.        A very short time after I advised that I'd
5    lost the vehicle somewhere in the Eden Park area, a
6    District 4 car came on and indicated that they had located
7    the car in the 1000 block of Windsor Avenue, which is just
8    adjacent to Eden Park.
9        Q.        So at that point, having located the car
10   on Windsor Avenue, what was the length of time between when
11   you lost visual contact with the vehicle that he was
12   driving and the time that the radio run came on indicating
13   that the police had found the vehicle on Windsor Avenue?
14       A.        Well, this was only a period I would say
15   from 30, 40 seconds to a minute.
16       Q.        So approximately a minute after you had
17   lost the vehicle, other police officers had found the
18   vehicle parked in a stationary position?
19       A.        Right.  They advised me they had the car.
20       Q.        Did you respond to the scene at that time?
21       A.        Right I made it to the scene within
22   another 20, 30 seconds.
23       Q.        What did you do when you got to the scene?
24       A.        As I pulled up on the scene, they had
25   brought the driver out of one of the front yards and

```
 1      brought him out to one of the police cruisers parked on
 2      Windsor Avenue.
 3              Q.      So at the time that you arrived on the
 4      scene, the defendant was already in custody; is that
 5      correct?
 6              A.      Yes, sir.
 7              Q.      Other officers had found him in the front
 8      yard or behind some bushes or something and brought him
 9      out?
10              A.      Right.
11                      MR. RADER:  Objection, Your Honor,
12              leading.
13                      THE COURT:  Sustained.
14              A.      He was in the front yard area.  There were
15      some bushes there that he had dug behind.
16                      MR. RADER:  Objection, Your Honor, that's
17              hearsay.
18                      THE WITNESS:  He was located in the front
19              yard as I walked up.
20                      THE COURT:  Hold on.  Let's start over
21              again.  Sustained.  Ask a new question.
22              Q.      Officer Bailey, is there any question that
23      the person that the police had in custody at that time, at
24      that location, was the same individual driving the car?
25              A.      He was the same individual driving the
```

```
 1    car.
 2          Q.       And who was that?
 3          A.       Mr. Hall.
 4          Q.       The defendant?
 5          A.       Right.
 6          Q.       Sir, I'd like to hand you what's been
 7    marked as Exhibits 2, 3, 4, 5, and 6, have you take a look
 8    at those.  Can you identify those particular photos?
 9          A.       This is the Honda Accord that Mr. Hall was
10    operating.
11                   THE COURT:  What exhibit do you have in
12          your hand?
13                   THE WITNESS:  I'm referring to --
14                   THE COURT:  Just refer to them by number,
15          if you can.
16                   THE WITNESS:  You want me to refer to
17          all the exhibits?
18                   THE COURT:  Well, answer his questions.
19                   THE WITNESS:  Okay.  I will.
20          A.       Exhibits 2, 3, 5, and 6 are the exterior
21    of Mr. Hall's vehicle.  That was the vehicle I was in fact
22    chasing through Walnut Hills.  Exhibit 4 is the interior of
23    that vehicle, of one of the seats.
24          Q.       At the time that you observed the
25    defendant driving that Honda Accord, was there anybody else
```

1    in the vehicle?

2        A.      No, sir.  He was the only person in the

3    vehicle.

4        Q.      Once the car was located on Windsor Avenue

5    and the defendant was in custody, did you do anything else?

6        A.      Basically, he was administered his rights

7    and --

8                MR. RADER:  Objection, Your Honor, unless

9        there's some indication whether or not he did it

10       or saw it.

11               THE COURT:  Overruled.  Establish a

12       little more foundation.

13       Q.      Did you have any further contact with the

14   defendant after he was taken into custody?

15       A.      I talked to Mr. Hall about the driving,

16   why he fled.

17       Q.      Were you present when Mr. Hall was advised

18   of his constitutional rights?

19       A.      I don't recall if I was there or not.

20       Q.      Did he make any statements to you

21   concerning the operation of the motor vehicle?

22       A.      He didn't make any statements about the

23   operation of the vehicle.  No, he didn't really say

24   anything.

25       Q.      Did he make any statements to you about

```
 1    operating the vehicle or anything else?
 2          A.    No.
 3          Q.    Did you have any further contact with the
 4    defendant after that?
 5          A.    No.
 6          Q.    Did you have any further contact with the
 7    vehicle after that?
 8          A.    No.
 9                MR. ANDERSON:  Thank you, Judge.  I
10          have no further questions.
11                THE COURT:  Any questions?
12                     CROSS-EXAMINATION
13    BY MS. ZUCKER:
14          Q.    Good morning, Officer Bailey.
15          A.    Good morning.
16          Q.    I'm Liz Zucker.
17                Was it your testimony that you were parked
18    on Gilbert right before the intersection of McMillan?
19          A.    Yes.
20          Q.    And where exactly were you?  There's no
21    map.
22          A.    Oh, I thought there was a map on there.
23    As I said, the cruiser was southbound on Gilbert just north
24    of McMillan Street.
25          Q.    Is that right where the bank is?
```

```
 1          A.        Yeah, there is a bank there.  But it would

 2     have been on the bank side; not the pawn shop side but the

 3     bank side.

 4          Q.        On the bank side southbound?

 5          A.        Yes.

 6          Q.        That's a six lane road, isn't it?

 7          A.        I believe so.

 8          Q.        And do you remember testifying in this

 9     courtroom on April 13?

10          A.        Yes, ma'am.

11          Q.        I'll refer you to your testimony --

12     there's no page number -- Line 10.  Let's start with Line

13     8.  Can you read the question and the answer?

14          A.        Line 8?

15          Q.        Uh-huh.

16          A.        Line 8 says --

17          MR. ANDERSON:  Judge, I'm going to object.

18                    THE COURT:  I agree.  Sustained.

19          You can ask him to review it.

20          Q.        Please review Line 8 through Line 20.

21                    THE COURT:  Officer, when you've had a

22          chance to review it, let us know.

23                    THE WITNESS:  Okay, I've reviewed the

24          testimony.

25                    THE COURT:  Next question.
```

211

1      Q.       Does that refresh your recollection?

2      A.       It does.

3      Q.       And did Mr. Hall have a stop light at the

4  time?

5      A.       As he approached the intersection, the

6  light was red, but he was able to stop and then the light

7  turned green so then he proceeded through.  But he was able

8  to stop adjacent to where I was and as soon as his light

9  turned he proceeded from the intersection at a high rate of

10  speed.  So it was a matter of a second and then the light

11  changed over to cycle to green.

12             MS. ZUCKER:  Your Honor, can I have him

13         read his testimony from that day?

14             THE COURT:  No.  You want him to read it

15         again?

16             MS. ZUCKER:  No, I'd like him to read it

17         out loud.

18             THE COURT:  The proper way to do it is

19         for you to read it and ask him if that was the

20         question that was asked and that's the answer you

21         gave.

22      Q.       Do you recall being asked:  "At that

23  point, did you see who was operating the car?"

24             You answered:  "I did.  I was looking

25  out the mirror trying to see the traffic behind me as  well

1    as looking in front of me.  I saw this car come up.  I

2    could tell it was a Honda that matched the description.

3    Mr. Hall passed to the left."

4          A.       Right.

5          Q.       And then you were asked:  "Mr. Hall the

6    one driving that car?"

7                   You answered:  "Right.  And he, as he

8    passed me, he looked at me.  I looked back.  He proceeded

9    through the intersection.  He had the green light.  I

10   pulled away from the curb.  At that point Mr. Hall began to

11   flee in his Honda."

12                  Is that your testimony?

13         A.       Right.

14         Q.       And at that time you didn't mention

15   anything of Mr. Hall slowing down or anything, did you?

16         A.       Like I said, he passed to my left.  And I

17   was behind the intersection.  There was still some traffic

18   there.  But as he approached, he had a red, and then the

19   green light cycled so he went on through.  That's when he

20   took off at a high rate of speed.

21         Q.       Was he traveling -- going through the

22   intersection, was he traveling at a normal rate of speed?

23         A.       As he approached, yeah.  But like I say he

24   slowed down for the light.

25         Q.       In that area it's approximately 35 miles

```
 1    an hour?
 2          A.     I believe it's 35.
 3          Q.     If somebody were traveling 35 miles an
 4    hour, do you know approximately how many feet that would be
 5    per second?
 6                 MR. ANDERSON:  Objection.
 7                 THE COURT:  Overruled, if he knows.
 8          A.     I don't, I don't know.
 9          Q.     And how long -- how much width did you
10    actually see Mr. Hall face to face?
11          A.     Five to seven feet away from me.
12          Q.     He was five to seven feet away from you.
13    And actually he was in your visibility for maybe three feet
14    in the window?
15          A.     Right.  That's about right I guess.
16          Q.     Did you call in on your radio at the
17    beginning once you noticed the Honda?
18          A.     I did.
19          Q.     And that would be within the radio call
20    format?
21          A.     It should be.
22          Q.     And did you review the radio transmissions
23    earlier today?
24                 THE COURT:  What are you referring to?
25          A.     Are you talking about the big boards?
```

```
 1          Q.      Yes.

 2          A.      I looked over them.

 3          Q.      And are you familiar with what these are?

 4          A.      Right.  I don't know how much of the radio

 5   incidents there are.  I don't know if it's a summary of the

 6   whole radio incident.  I don't know what you have there.

 7          Q.      And you had the opportunity to look at

 8   them?

 9          A.      Right.

10              MS. ZUCKER:  I'll marked these exhibits

11          as defense exhibits.

12              (Defendant's Exhibits 7 and 8 marked for

13          identification.)

14              THE COURT:  Just refer to them by number

15          when you refer to them.

16          Q.      Looking at this do you find the

17   transmission that you made on Gilbert Avenue?

18              THE COURT:  Officer, you can get up and

19          take a look at those if you like.

20              THE WITNESS:  I can but --

21              THE COURT:  It's up to you.

22                  (Witness at board.)

23          A.      This doesn't have --

24              THE COURT:  You're referring to

25          exhibit 8?
```

1                    THE WITNESS:  Exhibits 7 and 8 will not

2          show my exact vehicle pursuit.  That will be under

3          a different, probably be under my car number and

4          district.

5                    So you would need to actually pull up my

6          entries for car 2400 to find out what I was doing

7          prior.

8                    What will happen is we'll have several

9          things going on at one time.  It may be the same thing,

10         may be connected the way they categorize it.

11             We got three different districts here.  That's

12         why you don't see a lot of what happened on there.

13         Q.        You can have a seat, again, Officer.

14                   (Witness resumes stand.)

15                   THE COURT:  Next question.

16                   MS. ZUCKER:  I'd like to mark this as

17         Defendant's Exhibit Number 9.

18                   (Defendant's Exhibit 9 marked for

19         identification.)

20                   THE COURT:  Show it to the prosecutor.

21         Q.        I'm showing you a copy of the subpoena

22         that was issued to the keeper of the records.  Can you read

23         what was requested on those records?

24                   MR. ANDERSON:  I'm going to object.

25                   THE COURT:  Sustained.

```
 1              Q.      And it was requesting all radio
 2      transmissions?
 3                      MR. ANDERSON:  Objection.
 4                      THE COURT:  Sustained.  He's not the
 5              keeper of the records, or at least not been
 6              established as such.
 7                      MS. ZUCKER:  Can I establish whether that
 8              information should be available?
 9                      THE COURT:  You've not established that
10              he's the witness that would know that.
11                      MS. ZUCKER:  Okay.  No further
12              questions, Your Honor.
13                      THE COURT:  Thank you.  Anything else,
14              Mr. Anderson?
15                      MR. ANDERSON:  No.
16                      THE COURT:  Officer Bailey, thank you
17              very much for your testimony.  You're free to
18              leave now.
19                          (Witness excused.)
20                      THE COURT:  State's next witness?
21                      MR. ANDERSON:  The State will call
22              Officer Fromhold.
23                      MR. RADER:  Your Honor, may the witness,
24              Officer Bailey, be subject to recall?
25                      THE COURT:  They all are.
```

```
1                        MR. RADER:  Thank you.
2                        STEPHEN FROMHOLD
3     being first duly sworn, was examined and testified as
4     follows:
5                        THE COURT:  State your name and spell
6              your last name.
7                        THE WITNESS:  Police Officer Stephen
8              Fromhold, F-r-o-m-h-o-l-d.
9                        THE COURT:  Thank you.
10                       Mr. Anderson?
11                       DIRECT EXAMINATION
12    BY MR. ANDERSON:
13         Q.       Officer Fromhold, you're employed by the
14    City of Cincinnati?
15         A.       Yes, sir.
16         Q.       Were you employed by the City of
17    Cincinnati back on October 17, 1998?
18         A.       Yes, sir.
19         Q.       On that date did you have an occasion to
20    respond to the Republic Street area?
21         A.       Yes, sir.
22         Q.       Please tell the ladies and gentlemen of
23    the jury why you responded to that location and what you
24    did.
25         A.       We responded to the area of the report of
```

1      a shooting at Thirteenth and Republic.

2            Q.      What did you do when you arrived at the

3      scene?

4            A.      We found a subject lying on the southeast

5      corner that had sustained a gunshot wound.

6            Q.      Who was that?

7            A.      I believe his name was Johann Hart.

8            Q.      So Mr. Hart was actually still present at

9      the scene when you responded?

10           A.      He was in the prone position being tended

11     to by other citizens.

12           Q.      Were the paramedics there yet?

13           A.      No.

14           Q.      What did you do as a result of Mr. Hart's

15     condition?

16           A.      We attempted to converse with him.  We

17     already were aware that medical was responding and fire

18     division.  We also learned that there was a second subject

19     had been shot that ran east on Thirteenth and south on Vine

20     and was over there near the Warehouse Bar where another

21     officer was working a bar detail, and was requesting fire

22     also for his gunshot wounds.

23           Q.      That would be Kevin Davis?

24           A.      That's correct.

25           Q.      What did you do when you got to the scene

 1    to ascertain that Mr. Hart had been shot, Mr. Davis had

 2    been shot; what did you do specifically?

 3            A.        Our supervisors were enroute.  One of them

 4    pulled up shortly thereafter and we roped off the area of

 5    Thirteenth and Republic with crime scene tape to preserve

 6    it.

 7                    We ascertained what direction the

 8    investigation was going to go in in relationship to the

 9    extent of the injuries to both Mr. Davis and Mr. Hart.

10                    Obviously, if it was going to be a

11    homicide, we would have called CIS personnel and they would

12    have picked up the investigation of the witnesses.

13            There was a lot of lag time, so to speak, while we

14    were waiting for fire division personnel to assess the

15    extent of the gunshot injuries, to see which way the

16    direction of the investigation was going to go.        The

17    burden of the investigation is dictated on the severity of

18    the gunshot wounds.  If it appears that the subjects are

19    going to die, obviously homicide will be called out.   We

20    have crime scene techs come to the scene.

21                    If it doesn't appear that either subject's

22    gunshots are life threatening, it may stay at the district

23    level.  But due to the fact that there was multiple

24    victims, it could dictate a recall of an investigator from

25    home.   We don't have investigators working the evening

1   hours, 3:00 AM, 3:15 AM.

2        Q.        So basically, did you see and try to gauge

3   the severity of the injuries to the victims to decide

4   whether or not to call homicide for them to come and

5   investigate or whether this investigation will stay within

6   your district?

7        A.        That's correct.

8        Q.        In this particular case when you arrived

9   on the scene, did you have a chance to observe Mr. Davis's

10  injuries?

11       A.        No, I did not.  I stayed right at

12  Thirteenth and Republic.  I was apprised that his injuries

13  almost immediately were not life threatening.

14       Q.        What about Mr. Hart?

15       A.        There was some concern about his initially

16  because it was in the shoulder and neck area.

17       Q.        Was Mr. Hart conscious when you arrived at

18  the scene?

19       A.        Yes, he was.

20       Q.        As a result of that, what did you do in

21  the course of your investigation?

22       A.        Well, it slowed everything down.  We held

23  the crime scene, waited for fire personnel to transport

24  him, and send an officer to the hospital to get a more

25  accurate diagnosis of his injuries, the extent and if it

1    was life threatening or not.

2         Q.       So basically Mr. Hart was transported to

3    the hospital, they were making a medical diagnosis of his

4    potential condition, and at that point the decision would

5    be made whether or not it would stay within the district or

6    homicide would be called?

7         A.       That's correct.

8         Q.       Did it slow things down a little bit?

9         A.       A lot.

10        Q.       What happened once you determined that Mr.

11   Hart's injuries were probably not life threatening, so to

12   speak?

13        A.       District personnel supervisors recalled

14   Detective Huffman and I believe his supervisor, also.

15        Q.       What was the time line between the time

16   you responded to the scene and the time that a detective

17   from the district was called out to investigate?

18        A.       I believe the dispatch on it was around

19   3:15, 3:20 in the morning.

20        Q.       That would have been the time of the

21   shooting?

22        A.       Yes, and we were there within a minute of

23   the shooting.  We were at Twelfth and Republic when the

24   dispatch came out.  We were on bikes and we were only a

25   block away, so we went the wrong way up Republic on our

1    bicycles.

2                    I recall getting off close to on time,

3    which my shift would terminate at 4:00 AM.  So it was close

4    to 4:00 AM before Officer Huffman actually got to the

5    district because I touched base with him on the preliminary

6    investigation, what we had done, and what he needed to pick

7    up on.

8           Q.      As a result of cordoning off crime scene,

9    putting tape around it, did you conduct a survey of the

10   scene?

11          A.      Yes, and I talked to a couple of

12   witnesses, also.

13          Q.      Okay.  Officer Fromhold, I'll hand you

14   what's been marked as State's Exhibits 11, 12, 13, and 14;

15   if you could take a look at those individually and identify

16   them by number.  Can you identify what those exhibits are,

17   sir?

18          A.      State's Exhibit Number 11 is a white arrow

19   which was drawn by myself on the asphalt pointing to a

20   shell casing that we had located almost immediately.

21          Q.      Okay.  Now, you've indicated there is a

22   photograph there.  State's Exhibits 11, 12, 13, and 14 are

23   all photographs.  Were those photographs taken by you?

24          A.      They were taken at my direction by Officer

25   Ball.  He came and I pointed out what we needed to

 1    photograph.

 2         Q.       So those photographs were taken at your

 3    direction.  Do they all truly and accurately depict the

 4    scene as it existed on October 17, 1998?

 5         A.       Yes.

 6         Q.       What about State's Exhibit Number 12?

 7         A.       After we'd been there a while, to be quite

 8    candid with you, we were kind of bored waiting for somebody

 9    to make a decision.  We had talked to both of the

10    witnesses.  We started scouring the area a little bit more

11    thoroughly, hoping to find more shell casings because there

12    was an indication of four or five shots fired.

13                   And I started kicking garbage in the curb

14    area and I kicked over a brown paper bag and a Cheetos bag

15    and some other trash and located another shell casing.  It

16    appeared much -- appeared to be weathered, tarnished.  But

17    I marked an arrow, put an arrow to it in case it was

18    involved.  It's unusual to find shell casings in that area.

19         Q.       That shell casing was also recovered from

20    the scene, correct?

21         A.       Yes.

22         Q.       What about State's Exhibit 13?

23         A.       13 is the blood from Mr. Hart in the

24    street where he was lying right on the curb area.

25         Q.       What about State's Exhibit 14?

224

 1          A.          That's more of a distance shot of the area

 2     where he was lying after they removed him from the scene.

 3          Q.          Those were all taken under your direction?

 4          A.          Yes.

 5          Q.          Officer Fromhold, I'll hand you what's

 6     been marked as State's Exhibit Number 10 for purposes of

 7     identification.  Can you identify what that particular

 8     exhibit is, sir?

 9          A.          Three .380 shell casings, .380 caliber

10     shell casings.

11          Q.          Now, are you aware of where those shell

12     casings were recovered?

13          A.          Two were from the scene and one I believe

14     was recovered by Detective Huffman from the vehicle that I

15     had broadcast.

16          Q.          Now, are you aware of whether or not those

17     bullets were in fact submitted for analysis at the Hamilton

18     County Coroner's Laboratory?

19          A.          I'm aware of a report of analysis, yes.

20          Q.          Two of those shell casings were recovered

21     by you and those are the two shell casings that are

22     contained in photographs or State's Exhibits 11 and 12; is

23     that correct?

24          A.          Correct.

25          Q.          You indicated that one of the shell

```
 1    casings, particularly the shell casing contained in State's
 2    Exhibit Number 12, appears to be worn and things like that?
 3              A.         Weathered, tarnished much more, wasn't
 4    shiny.  It was under some debris.
 5              Q.         How far away from the initial shell casing
 6    that you found was the shell casing in State's Exhibit
 7    Number 12?
 8              A.         It was, the first one we found was south
 9    of the victim, probably 25 feet.  The other one was more in
10    an easterly direction.
11              Q.         How far away from each other,
12    approximately?
13              A.         Probably about 30, 35 feet.
14                         MR. ANDERSON:  Judge, I have no further
15              questions.
16                         THE COURT:  Cross-examination?
17                         CROSS-EXAMINATION
18    BY MR. RADER:
19              Q.         Good morning, Officer Fromhold.
20              A.         Good morning.
21              Q.         How are you today?
22              A.         Fine, thank you.
23              Q.         My name is Jim Rader, one of the counsel
24    for the defendant in this case.  Good to see you here this
25    morning --
```

226

1          A.          Thank you.

2          Q.          -- to shed some light on this situation

3    for us.

4                      I understand you arrived there almost

5    immediately?

6          A.          That's correct.

7          Q.          And your testimony was that Detective

8    Huffman didn't get there till around 4:00?

9          A.          He was at the district around then

10   approximately.

11         Q.          At the district or on the scene?

12         A.          I don't know that he even went to the

13   scene, to be quite candid with you.  I met with him in the

14   district.  There was another officer who took my place at

15   the scene so we could go in and touch base with him.

16         Q.          Officer, being on the scene, you know --

17   I've studied this situation fairly closely, and I

18   compliment the department on the fact that I think this

19   license number was out on the radio within about three

20   minutes of the first 911 call at 3:18; do you recall that?

21         A.          Yes.

22         Q.          Quickly, very quickly?

23         A.          Yes.

24         Q.          And at some point not long after that,

25   there was a description broadcast of a male black, light

```
 1    complected, clean shaven, 20 or 21 years old.  Do you
 2    remember that description being broadcast?
 3         A.       No.  It may have come from the --
 4    generated from the vehicle pursuit.  I don't recall that. I
 5    recall putting a description out of a male black with a
 6    dark cap, and that age range.
 7         Q.       Okay.  You're with me.  Male black, how
 8    old?
 9         A.       I believe it was like in his twenties is
10    what I stated.
11         Q.       And male black in his twenties,
12    baseball cap?
13         A.       That's correct.
14         Q.       You don't remember light complected?
15         A.       I believe I stated on the radio dark cap.
16    That's about the description.  I was just ecstatic that we
17    got a good license number from a witness.
18         Q.       You don't remember clean shaven?
19         a.       No, I don't.  I reviewed the reports
20    yesterday, and I was just going off what we wrote on the
21    report.  I don't recall saying that without listening to
22    the tape.
23         Q.       But if they came out on the radio, as I've
24    indicated, as clean shaven, roughly 20 years old, light
25    complected black gentleman, baseball cap, then you would
```

1    have been the source of that information?

2         A.    I don't know what transpired in the

3    District 2 pursuit of a vehicle that was allegedly involved

4    in it, if there was a bail out, and that description was

5    generated by a bail out of the vehicle.  I wasn't on that

6    area.  That was a different channel.  I picked up part of

7    the pursuit on my radio.  But my generating that

8    information, my generation of it was what I explained.

9         Q.    Excuse me, didn't mean to interrupt but as

10   you're testifying here today, it refreshed your

11   recollection reading your report the other day?

12        A.    Certainly.  This happened in October.

13        Q.    I understand that.  This radio

14   transmission I've been able to listen to also indicates

15   that there were three people in the car?

16        A.    That's what my report reflected, yes.

17        Q.    That was your initial -- put out over your

18   radio?

19        A.    That's correct.

20        Q.    Do you recall whether there were -- what

21   their position was in the car?

22        A.    I don't recall where the rear person was,

23   but I do recall them explaining to me that it was one of

24   the two people in the front, one in the back.  I don't

25   recall where the person in the back was seated, what side

1    of the vehicle.

2          Q.      Now, this information that you were able

3    to get was not from either one of the victims?

4          A.      No, that's correct.

5          Q.      Can you shed some light on who this

6    information came from?  Do you recall their names or --

7          A.      It's in the addendum to the report, their

8    names.  The one gentleman was tending to Johann, trying to

9    -- telling him he was going to be okay, hang in there.

10              As soon as I walked up, I got off my bike

11   and walked up and he mumbled out a license number.  I said,

12   what?  He said, this is the car that's involved.  He said,

13   ADU 6730.

14         Q.      Who said that to you?

15         A.      The gentleman that was tending to Mr.

16   Hart.  And he says it's a beige Honda or Nissan, I believe

17   was his statement to me.  And he kept repeating the license

18   plate to reinforce it in his mind and make sure I got it.

19   I put that much out almost immediately because he seemed

20   pretty confident that he had the license plate down.

21         Q.      Did he tell you how many people were in

22   the car?

23         A.      Later, once we got Hart stabilized, his

24   version was pretty consistent with the female's version.

25   There were some discrepancies.

```
 1          Q.       How many people did he tell you?
 2          A.       He told me there were three and one jumped
 3     out of the car.
 4          Q.       Can you describe this witness for us?
 5          A.       Male black, mid thirties, probably one of
 6     our street people that's drug dependent.
 7          Q.       Did you get his name?
 8          A.       Oh, yeah.
 9          Q.       And address?
10          A.       Oh, yeah.
11          Q.       And the second witness, I understand that
12     that was a female?
13          A.       Yes.
14          Q.       Can you tell me generally what she looked
15     like?
16          A.       20, 30 year old female black.  Lived on
17     1400 block of Race.  Her name is in the addendum, also.
18          Q.       Let's go back to the man for a moment, if
19     we could, please.  In your experience as a police officer,
20     did this person seem to you to be forthright and credible?
21          A.       Well, the thing that impressed me most
22     about him, was he just kept repeating the license number.
23     So he had made, in my opinion, a cognizant desire to
24     remember that.  He kept repeating it, repeating it,
25     repeating it, over and over.  He probably said it six,
```

1    seven times.

2                    And I wrote it down the second time he

3    said it.  So I think he knew in his mind he had something

4    solid that could contribute to the investigation and he

5    didn't want to forget it.

6          Q.      Sounds like an effort to remember it.  He

7    didn't want to forget it?

8          A.      Yes, in my opinion, that's how I

9    interpreted that.

10         Q.      I understand.

11                 MR. RADER:  Excuse me for a moment, Your

12         Honor, will you please?

13                 (Pause in proceedings.)

14         Q.      Maybe I can refresh your memory a little

15    bit.  Maybe you'll recognize -- the man, was his name Jimmy

16    Martin; does that ring a bell?

17         A.      I believe so.

18         Q.      Are you fairly confident?

19         A.      I can look at the report.  I don't have it

20    right in front of me.

21         Q.      Do you have the report here?

22         A.      I'm sure Detective Huffman has got it out

23    in the hall or the prosecutor probably has a copy of that.

24                 MR. RADER:  Your Honor, could the

25         witness ask Officer Huffman if he has those?

```
 1                    MR. ANDERSON:  Judge, I'll address it in
 2          a little bit.
 3                    Judge, if we can have a sidebar real
 4          quick.
 5                    THE COURT:  I think we need one.
 6          Excuse us, ladies and gentlemen.
 7                        Stay right there, Officer.
 8                    THE WITNESS:  Yes, sir.
 9                    (Discussion in chambers off the record.)
10                    THE COURT:  Thank you, ladies and
11          gentlemen.
12                    Next question, Mr. Rader.
13     BY MR. RADER:
14          Q.        Officer, do you recall that the lady that
15     we're talking about is Lolita Moore?
16          A.        That rings a bell, yes.
17          Q.        Okay.  Can you indicate to us the nature
18     of the information that she gave you?
19          A.        My recollection was, without looking at
20     the report, was she was on Thirteenth, I believe, west of
21     the crime scene, and saw the vehicle proceed past here,
22     start to make a turn, multiple gunshots rang out.  She said
23     somebody exited the vehicle, went over to the fallen victim
24     -- the other subject, Mr. Davis, had ran -- and go through
25     his pockets and run back to the vehicle, go back to the car
```

233

```
 1    and take off.

 2           Q.        Please go over that again, will you?

 3           A.        My recollection from what --

 4                     THE COURT:  Wait a minute.  He doesn't

 5           have to go over it again.  Next question.

 6           Asked and answered.

 7           Q.        What you told me, and honestly there is no

 8    trick questions here, what you told me sounded like a

 9    drive-by shooting; is that right?  That was the impression

10    that you got from Lolita Moore?

11                     MR. ANDERSON:  Objection.

12                     THE COURT:  Sustained.  Next question.

13           You don't have to answer.  Next question.

14           Q.        Did Ms. Moore indicate to you how many

15    people were in the car?

16           A.        I believe she said three.

17           Q.        And she indicated that somebody got out of

18    the car?

19           A.        She did.

20           Q.        And did what?

21                     MR. ANDERSON:  Objection.

22                     THE COURT:  Sustained.  Asked and

23           answered.

24           Q.        Was it your understanding from her that

25    this car didn't stop?
```

```
 1                    MR. ANDERSON:  Objection.

 2                    THE COURT:  Sustained.

 3         Q.         Officer, you found these two .380

 4    cartridge cases at the scene; is that right?

 5         A.         That's correct.

 6         Q.         Approximately 35 feet apart?

 7         A.         That's correct.

 8         Q.         Have you reviewed the criminalistics

 9    report from the Coroner's Lab as to these casings?

10         A.         I have.

11         Q.         Your investigation led you to the

12    conclusion that these casings were fired from the same gun?

13                    MR. ANDERSON:  Objection.

14                    THE COURT:  Sustained.  He's not an

15              expert witness, or he's not been qualified as

16              such.

17                    MR. RADER:  May I have just a moment,

18              please, Your Honor?

19                    THE COURT:  Sure, take your time.

20                    (Pause in proceedings.)

21         Q.         Did Ms. Moore indicate to you that she had

22    seen the shooter?

23         A.         I don't believe she gave me a very good

24    description.  I don't think so.  I don't believe so.  She

25    saw the vehicle and somebody run from the vehicle and then
```

 1    re-enter the vehicle.  I don't believe so.

 2                  I think my description, the vague

 3    description of -- the one that you referenced earlier was a

 4    little off from what I thought I'd put out.  Male black,

 5    twenties, dark baseball cap, was generated from the male

 6    subject, male witness, as the operator of the vehicle,

 7    because that would have been the position he would have the

 8    best view of, to my recollection.

 9          Q.      Did he tell you anything about the

10    proceedings of the vehicle?

11          A.      Yes, he did.

12          Q.      What did he tell you?

13          A.      He was actually, according to him, on the

14    opposite corner of Johann and Mr. Davis.  He was on the

15    northeast corner, and they were on the southeast corner.

16                  He was facing northbound.  The vehicle

17    came east and then turned south.  And he didn't see the

18    vehicle initially.  He heard the first gunshot, then turned

19    to see the vehicle driving by, somebody hanging out the

20    window shooting.  And that's when he saw the rear of the

21    vehicle proceed southbound and made a mental note of the

22    license plate.

23          Q.      In your experience as an officer -- how

24    long have you been an officer?

25          A.      20 years.

236

1          Q.       You've seen a lot of things?

2          A.       Yes, sir.

3          Q.       And you were investigating this incident

4    at the time?

5          A.       I was conducting a preliminary

6    investigation, yes, sir.

7          Q.       I understand.  You testified that you saw

8    these cartridge cases 35 feet apart?

9          A.       Yes.

10         Q.       And you know from your experience that

11   distance is hard to judge, but being a police officer,

12   you're aware of that, correct?

13         A.       Yes, sir.

14         Q.       Is your -- tell me how good your estimate

15   is.  Are you sure within a foot or two?

16                  MR. ANDERSON:  Objection.

17                  THE COURT:  Sustained.

18         Q.       Well, that was your testimony, right?

19         A.       Yes, sir.

20         Q.       And that's based on your 20 years of

21   experience with being careful about these things?

22         A.       Yes, sir.

23         Q.       I understand that.  I appreciate that.

24                  MR. RADER:  Your Honor, this officer has

25                  testified that he's been on the Cincinnati Police

```
 1          Department 20 years.  I would ask that he be
 2          qualified as an expert.
 3                    THE COURT:  Expert as to what?
 4                    MR. RADER:  To the fact that these shell
 5          casings were 35 feet apart.
 6                    THE COURT:  That's ballistics.  He's not
 7          going to qualify as a ballistics expert.  The mere
 8          fact that someone is familiar with the operation
 9          of guns and firearms, and maybe an expert in that
10          operation, does not make them a ballistics expert.
11                    MR. RADER:  My point is 35 feet --
12                    THE COURT:  The point is if you want to
13          make an argument we'll go back in chambers.
14                    MR. RADER:  Can we please, Your Honor?
15                    THE COURT:  Excuse us.
16                    (Discussion in chambers off the record.)
17                    THE COURT:  Next question, if you have
18          one.
19                    MR. RADER:  Officer Fromhold, I
20          appreciate your being here.  Thank you.  No
21          further questions.
22                    THE COURT:  Anything further, Mr.
23          Anderson?
24                    MR. ANDERSON:  A few questions, Your
25          honor.
```

```
 1                         REDIRECT EXAMINATION
 2   BY MR. ANDERSON:
 3          Q.      Officer Fromhold, could you describe Jimmy
 4   Martin to the jury?
 5          A.      Seemed to be a homeless person, somebody
 6   you would see commonly in that area.  Possibly drug
 7   dependent.  Thin male black.  Mid thirties.
 8          Q.      Now, according to what you testified to on
 9   cross-examination, he told you that he first became aware
10   of this car being there when he heard the first gunshots;
11   is that correct?
12          A.      That's correct.
13          Q.      So he didn't see anything prior to that?
14          A.      No, he didn't.
15          Q.      Did he give you an address?
16          A.      A what?
17          Q.      Did he give you an address?
18          A.      He did.
19          Q.      And that was 662 Ridge Acres?
20          A.      Yes.
21          Q.      What about Lolita Moore; can you give us a
22   description of her?
23          A.      Female black, probably in her late
24   twenties, early thirties.  Gave me an address on Race
25   Street.  I believe it was one of the Hart Realty buildings.
```

1          Q.        How about 1527 Race Street?

2          A.        Yes, sir.

3          Q.        Can you describe her?

4          A.        She was kind of well dressed actually for

5     the area.  She didn't look like a street person.  She

6     didn't look disheveled like the other gentleman did.  She

7     surfaced later in the investigation, not initially.

8                    She was there probably within, I think

9     maybe 20 minutes after we saw her standing over there, one

10    of them talked to her.  She didn't seem real interested in

11    getting involved initially.

12         Q.        So these are the two witnesses that you

13    talked to at the scene?

14         A.        Right.

15         Q.        Were there any other witnesses there that

16    you were aware of?

17         A.        Not that could provide us any valuable

18    information for the investigation.

19         Q.        Now, you've had experience investigating

20    gunshots and things of that nature; is that correct?

21         A.        Yes, sir.

22         Q.        Is it safe to say it can be somewhat

23    chaotic?

24         A.        Absolutely.

25         Q.        People seeing the same thing describe it

1    differently?

2                    MR. RADER:  Objection, Your Honor.

3            That's speculation.

4                    THE COURT:  Sustained.

5        Q.      How far away did Ms. Moore indicate she

6    was when these gunshots rang out or when she saw the car?

7        A.      She would have been a hundred, 150 feet.

8        Q.      Away from the scene?

9        A.      (Indicate yes.)

10       Q.      3:00 in the morning?

11       A.      Right.

12       Q.      Some street lights out there but it's

13   probably dark?

14       A.      Dimly lit.

15       Q.      A hundred to 150 feet away?

16       A.      Yes.

17                   MR. ANDERSON:  Judge, I have nothing

18           further of this witness.

19                   THE COURT:  Any other questions for

20           Officer Fromhold, Mr. Rader?

21                   MR. RADER:  Yes, Your Honor.

22                       RECROSS-EXAMINATION

23   BY MR. RADER:

24       Q.      Officer, how long did you stay on the

25   scene?

```
 1              A.       I would imagine I was there, let's see --
 2    occurred around I believe 3:19 in the morning.  We were
 3    there at 3:20.  Probably close to an hour if not a little
 4    less.
 5              Q.       So close to 4:20, 4:15 or 4:20?
 6              A.       I recall getting out of work a little late
 7    that night.  We usually get off at 4:00 AM.  So it was
 8    probably about an hour, 45 minutes to an hour.
 9              Q.       Did you leave to go home from the scene or
10    did you go back to the district?
11              A.       We had to go back and turn our bicycles in
12    and touch base with Detective Huffman who was coming in
13    from home.
14              Q.       Someone called in a description at 3:52
15    from the scene, the description of the driver; was that
16    you?
17              A.       3:52 from the scene.
18              Q.       Yes.
19              A.       I don't recall putting one out that late.
20    Most of my description was either written in the report, if
21    it developed later, because of what transpired in District
22    2 in pursuit of the vehicle.
23                       The investigation kind of took a twist, so
24    to speak.
25                              MR. RADER:  May I have just a moment,
```

1          Your Honor?

2                    THE COURT:  Sure.

3                    (Pause in proceedings.)

4                    RECROSS-EXAMINATION

5     BY MS. ZUCKER:

6          Q.      Officer, are you able to -- by reviewing a

7     --

8                    MR. ANDERSON:  Judge, I'm going to

9          object.

10                   THE COURT:  Yeah.  Is this some new area

11         that we're getting into?

12                   MS. ZUCKER:  It's on the same line, Your

13         Honor.

14                   THE COURT:  All right.  Ask your

15         question.  Overruled.

16         Q.      By reading a radio printout, can you tell

17    if you're the one who gave a description at a certain time?

18         A.      I may be able to.  I didn't even see that

19    behind me.

20                   THE COURT:  Why don't you get up and go

21         take a look at it?  It's no problem.

22                   Ms. Zucker, just let him look   at it.

23                   For the record, he's looking at

24         Defendant's Exhibits 7 and 8 which have been blown

25         up.

```
 1                    THE WITNESS:  Most of this here is
 2            generating an area that I wasn't in.
 3                    THE COURT:  I believe with his hand
 4            gesture, he referred to defense Exhibit 7.
 5                    Go ahead, Mr. Fromhold.
 6                    THE WITNESS:  Most of this is radio
 7            traffic that's going on back and forth from
 8            dispatch to cars.
 9                    The only thing I can see here that would
10            be relevant to me would be this number three,
11            1483.  I'm 1480, that's my partner.
12                    She advised me that 1325 was going to
13            photograph and recover in our direction the stuff
14            that was marked on the photos.  My description is
15            not on there, so I can't say that I did.
16            Q.      Do you know who 1420 is?
17            A.      1420 was probably Sergeant Gabel that
18     night, her regular car number.  She is 1420.
19                    MS. ZUCKER:  Thank you.
20                    THE COURT:  Anything else?
21                    MS. ZUCKER:  No, Your Honor.
22                    THE COURT:  Thank you, officer, very much
23            for your testimony.  You're free to go at this
24            time.
25                    (Witness excused.)
```

244

```
 1                         THE COURT:  State's next witness?
 2                         MR. ANDERSON:  We will call Officer
 3           Neack.
 4                              DOUG NEACK
 5    having been first duly sworn, was examined and testified as
 6    follows:
 7                         THE COURT:  Officer, can you state your
 8           name and spell your last name, please?
 9                         THE WITNESS:  Doug Neack, N-e-a-c-k.
10                         THE COURT:  Pull that microphone over
11           to you just a little bit.  Thank you.
12                         Mr. Anderson?
13                         DIRECT EXAMINATION
14    BY MR. ANDERSON:
15           Q.    Sir, where do you work?
16           A.    City of Cincinnati, Police Division,
17    District 1.
18           Q.    And were you so employed back on October
19    17, 1998?
20           A.    I was.
21           Q.    Did you have an occasion to come into
22    contact with someone on that date now known to you as
23    Fredrick Hall?
24           A.    I did.
25           Q.    Do you see me him in court today?
```

```
 1              A.       Yes.   It's the gentleman at the defense

 2     table with the black suit and pink shirt and red tie.

 3              Q.       Officer Neack, where did you come in

 4     contact with the defendant that day?

 5              A.       I believe it was up on Windsor.

 6              Q.       And why did you respond to that location?

 7              A.       We'd been looking for a particular car and

 8     Lt. Bailey had located the vehicle up -- I believe it was

 9     District 2.

10              Q.       The vehicle that the police were looking

11     for was located, you responded to the scene.  What did you

12     find when you got up on Windsor?

13              A.       This gentleman was located up there, and

14     Lt. Bailey placed him in my vehicle.

15              Q.       Okay.

16              A.       I at that time read him his rights.

17              Q.       What specific rights did you advise this

18     defendant of at that time?

19              A.       I always remove my wallet and read the

20     rights verbatim from a rights card I carry in my wallet.

21              Q.       What rights were those that you read to

22     him?

23              A.       It's the Miranda warning as to your

24     rights.  "You have the right to remain silent.  Anything

25     you say can and will be used against you in a court of law.
```

1     You have a right to talk to a lawyer and to have him

2     present with you while you're being questioned.  If you

3     cannot afford to hire a lawyer, one will be appointed to

4     represent you before any questioning if you wish.

5                    "You can decide at any time to exercise

6     these rights and not answer any questions or make any

7     statements.  Do you understand each of your rights?"

8          Q.     You read those to the defendant?

9          A.     I did.

10         Q.     Did the defendant indicate to you that he

11    understood those rights?

12         A.     He did when I asked him.

13         Q.     What happened after you read the defendant

14    his rights?  Did you talk to him about the shooting or the

15    police chase or operating a car or anything else like that?

16         A.     I didn't say a whole lot to him.

17    Basically, the statement he made was he was just out buying

18    shaving cream.

19         Q.     He was out buying shaving cream.  Did he

20    indicate whether or not he had been driving a car?

21         A.     He didn't say a whole lot.  I wasn't

22    asking a lot of questions at that point due to the ongoing

23    investigation.

24         Q.     He told you he was out buying shaving

25    cream?

```
 1            A.       That's correct.
 2            Q.       At some point later, did you transport the
 3     defendant to the district?
 4            A.       I did.
 5            Q.       And what happened when you got the
 6     defendant back to the district?
 7            A.       I took him into District 1, and per
 8     procedure, what we do at District 1 is I reread his rights
 9     to him off a written form that we have in the district, and
10     went over the rights again.
11            Q.       Sir, I'll hand you what's been marked as
12     State's Exhibit Number 1 for purposes of identification.
13     Can you identify what that particular exhibit is, sir?
14            A.       That is the rights form from October 17 at
15     0615 in the morning, when I reread those rights.
16            Q.       It's actually a photocopy of the rights
17     waiver?
18            A.       That's correct.
19            Q.       And again, did you advise the defendant of
20     the rights contained on that form?
21            A.       I did.
22            Q.       Did you read them verbatim like you did
23     with the card you just got out of your wallet?
24            A.       That's correct.
25            Q.       At that time did the defendant indicate
```

```
 1    that he understood what those rights were?

 2         A.    He did.

 3         Q.    Your signature appears thereon?

 4         A.    Yes, it does.

 5         Q.    The signature of Officer Huffman appears

 6    on there?

 7         A.    It does.

 8         Q.    Doesn't the signature of the defendant

 9    appear on there?

10         A.    No, it doesn't.

11         Q.    Did he agree to sign that particular

12    document?

13         A.    No, he refused.

14         Q.    Even though he refused to sign that

15    document, did the defendant indicate to you that he

16    understood what his rights were?

17         A.    Verbally, he did.

18         Q.    Did he make any additional statements to

19    you after you advised him of his rights off that rights

20    waiver form?

21         A.    No.

22         Q.    Again, he said he was out buying shaving

23    cream?

24         A.    That's pretty much --

25               MR. RADER:  Objection, leading, Your
```

1              Honor.

2                        THE COURT:  Sustained.

3              Q.      At what point did you break off your

4    interview of the defendant?

5              A.      Well, once -- as I stated, I did not ask

6    him very much in the car, and once I got back to District 1

7    I, after reading him his rights, Detective Huffman took

8    over and I went to the garage to look over the vehicle.

9              Q.      Okay.  What did you find when you looked

10   over the vehicle?

11             A.      The one item I found was a cartridge in

12   the driver's seat, basically on the right-hand side of the

13   driver's seat of the vehicle.

14             Q.      Officer, I'll hand you what have been

15   marked as State's Exhibits 4 and 5.  Can you identify what

16   those particular exhibits are, sir?

17             A.      Yes.  Four is the photo of the driver's

18   seat of the vehicle, and five is a photo of the vehicle

19   itself.

20             Q.      And what specifically did you recover or

21   did you find contained in the vehicle?

22             A.      It was a shell casing.

23             Q.      And I know that in front of you are items

24   that were contained in State's Exhibit Number 10.  Do you

25   remember the caliber of the particular shell casing that

250

1    you recovered from the scene, or from the vehicle?

2         A.        I believe it was a .380.

3         Q.        Would that be the same caliber that is

4    consistent with the shell casings that I'm handing you that

5    were contained in State's Exhibit 10?

6         A.        These all appear to be .380 shell casings.

7         Q.        Okay.  Did you recover a gun from the

8    vehicle?

9         A.        I didn't hear the question, sir.

10        Q.        Did you recover a gun from the vehicle?

11        A.        No, I did not.

12        Q.        Were there any other items contained in

13    the vehicle besides the shell casing that you recovered?

14        A.        None that I remember.

15        Q.        Do you remember a baseball cap?

16        A.        Not offhand, I do not, sir.

17                  MR. ANDERSON:  Thank you.

18                  Judge, I have no further questions of

19            this witness at this time.

20                  THE COURT:  Thank you.

21                  Any questions, Mr. Rader?

22                      CROSS-EXAMINATION

23    BY MR. RADER:

24        Q.        Good afternoon.

25        A.        Good afternoon, sir.

```
 1          Q.       How are you today?

 2          A.       Fine, thank you.

 3          Q.       Jim Rader, counsel for the defendant.

 4                   Did you attempt to lift fingerprints from

 5    these cartridge cases?

 6          A.       I myself, no, sir.

 7          Q.       Did you attempt to obtain fingerprints

 8    from the car?

 9          A.       No, I am not fingerprint trained.

10          Q.       Did you make an effort to determine if

11    these three cartridge cases had been fired from the same

12    gun?

13          A.       That particular -- I'm not trained to do

14    that.  That was sent to criminalistics.

15          Q.       By you in an effort to determine that?

16          A.       No, not by me.

17          Q.       Okay.  Officer, your testimony was that

18    you advised the defendant of his rights on the scene, is

19    that right?

20          A.       That's correct.

21          Q.       And it's your mind set or your

22    understanding that a person, a defendant must be advised of

23    his rights pursuant to Miranda; is that right?

24          A.       I do, that's correct.

25          Q.       Can you explain why you would redo that
```

1    several hours later?

2         A.        That's simple procedure that we follow at

3    District 1 -- I cannot answer for every police district --

4    that once we get an individual back to the district where

5    we can sit down, hold the piece of paper in our hand and go

6    over the rights in particular, show them the rights

7    verbatim, make sure they understand what their rights are.

8    It's just simple, call it a courtesy, call it a procedure,

9    but that's what we do at District 1 just to make sure an

10   individual does understand each and every one of their

11   rights.

12        Q.        But that implies that probably previously

13   they didn't understand their rights?

14                  MR. ANDERSON:  Objection.

15                  THE COURT:  Sustained.  Next question.

16        Q.        The simple fact of this case is that there

17   is no admission or confession in writing, or one recorded?

18        A.        I was not privy to any of the interviews

19   and I didn't take any written statements.

20        Q.        And there's no waiver of any

21   constitutional rights in writing or on recording; is that

22   right?

23        A.        I would differ with that, sir, 'cause he

24   did refuse to sign that form in my presence and Detective

25   Huffman's presence and it is my writing where I wrote the

1    words refused in his signature spot.

2         Q.      If I can clarify my own knowledge, there

3    is no waiver of rights in writing, is there?

4         A.      Not without his signature, no.

5                 MR. RADER:  Thank you.  No further

6         questions.

7                 THE COURT:  Anything else?

8                 MR. ANDERSON:  No.

9                 THE COURT:  Officer, thank you very much,

10        And you're free to leave.  Like everybody else in

11        this case, you're subject to recall.  Thank you

12        very much for your time.

13                (Witness excused.)

14                THE COURT:  With that, we'll break for

15        lunch.  We'll resume at 1:45.  I have a matter at

16        1:30.  We'll proceed directly, if the witnesses

17        allow, we'll proceed directly as we can to 3:30 or

18        3:45.

19                And we won't be here tomorrow but we will be

20        here on Monday.  The same admonitions apply.

21                Don't discuss the case amongst yourselves

22        or permit anyone to discuss it with you or in your

23        presence.  Don't come to any conclusions based on

24        anything you've seen or heard thus far.  And don't

25        attempt to do anything to independently prove or

254

1           disprove any fact you may have heard in this case.
2                   With that I thank you for your attention to
3           this case.  And I'll see you about -- we'll come
4           back and get you about 1:45.  Thank you.
5                   (Jury left courtroom at 12:10 p.m.)
6                   THE COURT:  All right.  Before we break, Mr.
7           Rader, you wanted to -- we've had a discussion in
8           chambers whereby you wanted to qualify Officer
9           Fromhold as an expert in ballistics or other
10          police matters to ask him the question that the
11          distance of the cartridges is how many feet apart
12          and such a distance apart from where the victim
13          was allegedly shot, that that indicated that this
14          was somehow a drive-by shooting.
15                  And I said that Officer Fromhold hadn't been
16          qualified to do that and I refused to let you ask
17          that question.  Is that a fair summation of where
18          we are and what happened?
19                  MR. RADER:  Yes, Your Honor.
20                  THE COURT:   Record should reflect before
21          Officer Fromhold's cross-examination was
22          completed, the defense wanted to ask him the
23          questions I just indicated.  We took care of it in
24          chambers out of the presence of the jury and
25          without the court reporter.  But the record should

```
 1              reflect that they did want to ask those questions
 2              at that time and I wouldn't let them ask them of
 3              Officer Fromhold.
 4                   Anything else on behalf of the State?
 5                   MR. ANDERSON:  Not at this time.
 6                   THE COURT:  How many more witnesses do you
 7              have?
 8                   MR. ANDERSON:  I have one more witness, Your
 9              Honor.  Now might be a good time to take care of
10              stipulations, I believe to what will be State's
11              Exhibit 16.
12                   THE COURT:  State's what?
13                   MR. ANDERSON:  I believe it's 16 which would
14              be the Hamilton County Coroner's laboratory report
15              analysis by Mr. Schrand.  Actually it's 17.  The
16              analysis by Mr. Schrand of the three shell casings
17              that were submitted to him.
18                   THE COURT:  Okay.
19                   MR. RADER:  May I add a comment on Officer
20              Fromhold, to have him qualified so he can offer an
21              opinion.  It's been my experience over 20 years
22              that police officers are asked how long they have
23              been a member of the police department, how many
24              intoxicated people they have arrested.  And they
25              offer an opinion as to whether or not a person was
```

1        intoxicated.

2               They do so without -- generally without

3        being formally qualified as an expert witness.

4        Actually, they are qualified just by doing them,

5        how many people they have come across that were

6        intoxicated.

7               My question to the officer was anticipated

8        to be whether or not the physical configuration of

9        these cartridge cases was consistent with them

10       being ejected by a gun in a car that was in

11       motion.

12             I think that's less technical than asking a

13       police officer whether somebody was intoxicated.

14           THE COURT:  I understand and your question

15       is preserved for the record.  I just disagree, so

16       I wouldn't let you ask it.  But it's preserved for

17       the record.

18           MR. RADER:  Thank you, Your Honor.

19           THE COURT:  Is the way clear out here, Jill?

20       Are the juror's gone?

21           THE BAILIFF:  Let me check.

22           THE COURT:  Deputy, can you bring him back

23       here at 1:30?

24           (Proceedings recessed.)

25