```
 1    AFTERNOON SESSION, April 29, 1999
 2                    (Jury entered courtroom at 2:05 p.m.)
 3                    THE COURT:  State's next witness.
 4                    MR. ANDERSON:  Your Honor, the State
 5         would call Officer Huffman.
 6                    THE COURT:  Okay.  Officer, raise your
 7         right hand and be sworn.
 8                         DAN HUFFMAN
 9    being first duly sworn, was examined and testified as
10    follows:
11                    THE COURT:  Pull that microphone up to
12         you.  State your name and spell your last name,
13         please.
14                    THE WITNESS:  It's Police Officer Dan
15         Huffman, H-u-f-f-m-a-n, assigned to the Cincinnati
16         Police Division, District 1 investigator.
17                    THE COURT:  Mr. Anderson.
18                    MR. ANDERSON:  Thank you, Your Honor.
19                         DIRECT EXAMINATION
20    BY MR. ANDERSON:
21         Q.    Officer Huffman, were you employed by the
22    Cincinnati Police back on October 17, 1998?
23         A.    Yes, sir, I was.
24         Q.    On that date, did you have an occasion to
25    investigate a shooting that occurred within the city?
```

```
 1              A.      Yes, sir, I did.

 2              Q.      Why don't you tell us a little bit about

 3     when you first became involved in this investigation,  what

 4     you personally did.

 5              A.      I was responding to -- I was called in to

 6     District 1 around 5:00 AM the morning of October 17.  Once

 7     I arrived at the District 1 Police Division, I was advised

 8     that there had been a shooting with two juveniles involved.

 9     They were both at University Hospital and they apparently

10     had a car chase with the suspect at that time.

11              Q.      Where did the shooting occur?

12              A.      I believe it was the 1400 block of

13     Republic.

14              Q.      That's located in the City of Cincinnati,

15     Hamilton County, Ohio?

16              A.      Yes, sir, it is.

17              Q.      At that time, at the time you came on

18     duty, they already had a suspect in custody; is that

19     correct?

20              A.      That's correct.

21              Q.      Do you see the suspect in the courtroom

22     today?

23              A.      Yes, I do.

24              Q.      Please point to him and describe what he's

25     wearing.
```

```
 1            A.        It's the gentleman seated at the defense

 2   table wearing a red tie with the arm sling and dark suit

 3   coat.

 4                      MR. ANDERSON:  Your Honor, may the record

 5            reflect identification of the defendant?

 6                      THE COURT:  Record will reflect

 7   identification of the defendant by the witness.

 8            Q.        Officer Huffman, on the morning that you

 9   came into contact with the defendant, was he wearing the

10   arm sling he's wearing in here today?

11            A.        No, sir, he was not.

12            Q.        Approximately what time did you come into

13   contact with the defendant?

14            A.        If I had to guess, I'd say between 5:30 AM

15   and 6:00 AM.

16            Q.        Where did you come in contact with him?

17            A.        District 1 headquarters.

18            Q.        Was there like an interview room or

19   something?

20            A.        Yes, sir, there is.

21            Q.        Why don't you tell us what happened when

22   you first came into contact with the defendant?

23            A.        He was in the interview room, he was given

24   his rights by Officer Neack, and I was present.

25            Q.        Okay.  Sir, I'll hand you what's been
```

```
 1    marked as State's Exhibit Number 1 for purposes of
 2    identification.  Do you recognize what that particular
 3    exhibit is?
 4         A.      Yes, sir, I do.
 5         Q.      What is that?
 6         A.      It's the Miranda Rights form.
 7         Q.      Was that read to the defendant by Officer
 8    Neack on the early morning hours of October 17?
 9         A.      Yes, sir, it was.  And there was one
10    placed in front of him so he could read along with us.
11         Q.      Did the defendant indicate to you that he
12    understood the rights that Officer Neack explained to him?
13         A.      Yes, he did.  He said that he understood
14    the rights.
15         Q.      Also, there's a signature line on there
16    that you signed and Officer Neack signed, but there is a
17    refusal by the defendant to sign it?
18         A.      That's correct.
19         Q.      He refused to sign the statement?
20         A.      Yes, sir, he did.
21         Q.              But did he say to you that he did
22    understand those rights?
23         A.      Yes, sir, he did.
24         Q.      Based on his understanding of the rights,
25    did you converse with the defendant concerning the
```

```
 1   allegations of a shooting on Republic Street?

 2        A.      Yes, sir.

 3        Q.      Why don't you tell us what he said to you.

 4        A.      At first he stated that he was driving

 5   around.  He picked up an individual by the name of Dave at

 6   the Barn Barrel at 15th and Pleasant.  He then proceeded to

 7   drive around, and he was coming down Republic Street.  He

 8   spotted two individuals that he told me that had robbed him

 9   two weeks prior and shot him.

10                            At that time he said Dave made

11   mention to him I'll take care of them.  They stopped the

12   car and he said the two individuals approached the car, and

13   at that time Dave began firing shots.

14        Q.      He indicated he was in the car with a guy

15   named Dave, Dave is the guy that fired the shots at those

16   two guys?

17        A.      Yes, sir, that's correct.

18        Q.      What did he tell you after that?

19        A.      He stated that he lived on Republic Street

20   and stated that he dropped Dave off somewhere in the West

21   End, and told him, advised him to hide the gun.

22        Q.      Did he make any other statements?

23        A.      Later on, during the interview, he asked

24   if his car was going to be impounded and I stated there was

25   a possibility, it was involved in an offense, and we have
```

1    to process it as such.

2                        He then stated that if he would take us

3    and recover the gun, would that help. I stated yes, it

4    would. We don't want the gun to get in the hands of young

5    children if it was hidden somewhere.

6         Q.        Did the defendant take you somewhere to

7    look for this gun?

8         A.        Yes, sir, he did.

9         Q.        Where did he take you?

10        A.        It was approximately 1035 Windsor. That's

11   apparently where he was apprehended in a grassy back yard.

12   He instructed us, there is a -- myself and Lt. Ruberg was

13   there and a uniformed guy along with us, he was

14   transporting a uniformed car.

15                       He stated to us that he hid the gun either

16   under a limb or near a tree. There were several limbs and

17   several trees in this yard where we were. We couldn't

18   locate the weapon, went back to the police car and

19   physically removed him from the police car and had him walk

20   up and view the area where he thought he would have hidden

21   the gun, or the gun was hidden.

22                       At that time he kind of looked blank like

23   he didn't know where the gun was. At that time he was

24   placed back in the police cruiser and we called for a

25   criminalist. They have access to metal detectors. And we

263

```
 1    spent another hour with a metal detector in that yard.

 2         Q.      Were you successful in finding the gun?

 3         A.      No, sir.

 4         Q.      What happened after that, after the

 5    defendant took you up there and there was no gun and you

 6    did not find it; where did you go then?

 7         A.      He was transported to the Justice Center

 8    on the other charges.  At that time I responded back to

 9    District 1, I obtained a picture of the defendant.  I put

10    together a lineup which is photographs of individuals.  I

11    responded to University Hospital.

12              When I got to University Hospital, one of

13    the victims, Mr. Davis, had already been released.  It was

14    probably 10:00 AM, 10:30 AM maybe now.

15              At that time I went to Mr. Hart -- I

16    believe that is his name -- the other victim, told him who

17    I was.  I asked him what happened.  He stated that a tan

18    car come up Republic Street had stopped and called him over

19    to the car, that he went to the car, and he got shot.

20              I asked if he knew who shot him.  He said

21    no.  I stated could you identify him if you saw him again

22    and he stated yes.  At this time I showed him a photo

23    lineup.

24         Q.      Sir, I'll hand you what's been marked as

25    Plaintiff's Exhibit 2 for purposes of identification.  Can
```

1    you identify what that particular exhibit is?

2         A.       This is a lineup that I put together on

3    that morning, and I took to the hospital.

4         Q.       How about State's Exhibit Number 8.  Can

5    you identify that?

6         A.       That's a photograph of the same lineup but

7    the pictures have been switched.

8         Q.       Now, apparently you obtained a picture of

9    the defendant and placed it in that photo lineup?

10        A.       That's right.

11        Q.       And in State's Exhibit Number 8 that

12   photograph is contained in the bottom center portion?

13        A.       That's correct.  That's the one that I

14   showed at the University Hospital with Johann Hart.

15        Q.       Who did Mr. Hart identify as being the

16   shooter?

17        A.       Mr. Hall.

18        Q.       And where was this picture located at the

19   time you showed State's Exhibit Number 7 to him?

20        A.       In the lower middle.

21        Q.       So it would have been down in this

22   position right here, this one?

23        A.       That's correct.

24        Q.       Now, I'll hand you what's been marked as

25   State's Exhibit Number 9 for purposes of identification.

```
 1          A.      Can you identify that particular exhibit?
 2          A.      Yes, sir.  It's another Polaroid
 3   photograph of the lineup that I put together.
 4          Q.      And that Polaroid photograph actually
 5   depicts the photo lineup as it exists today; is that right?
 6          A.      That's correct.
 7          Q.      What did you do with State's Exhibit
 8   Number 7, the lineup, after Johann Hart identified Fredrick
 9   Hall as being the shooter?
10          A.      I went to the front seat of my police car
11   and I switched photographs, took a photograph of the new
12   lineup, which is this picture.
13          Q.      In that particular lineup the picture of
14   the defendant is in the lower left hand corner; is that
15   correct?
16          A.      That's correct.
17          Q.      Is there some reason that you felt it
18   necessary to switch the location of the defendant from that
19   lineup when you showed it to Mr. Hart versus when you
20   showed it to Mr. Davis?
21          A.      Through my investigation I determined that
22   the victims were cousins.
23          Q.      Okay.
24          A.      And since one of them had been previously
25   released from the hospital, in my past experience as an
```

266

```
 1      investigator, I wanted to make sure that there was no
 2      connection of the pictures, so I changed the locations of
 3      the picture.  I just wanted to make sure there was no
 4      hanky-panky, Johann calling Kevin saying, hey, I picked out
 5      the bottom center picture, that's the guy.
 6      That's the reason why.
 7                Q.      You switched the pictures around.  What
 8      happened when you showed the photo lineup to Kevin Davis?
 9                A.      I responded to the -- I believe it's 503
10      East Thirteenth Street.  I went in and I met Mr. Davis and
11      I believe it was Johann's mother and Mr. Davis's aunt.
12                        At that time I asked Mr. Davis what
13      happened.  He said that they were down on Republic Street
14      and that Johann had went up to a car.  He heard some shots.
15      He went over.  He knew -- he was trying to get Johann out
16      of the way and at that time he was shot, also.         I
17      asked him if he knew the individual who shot him.  He
18      stated, no, he did not.  I asked him if he could identify
19      the subject that fired the shots at him.  He said, yes, he
20      could.
21                Q.      Did you show him State's Exhibit    Number
22      7?
23                A.      Yes, sir, I did.
24                Q.              Who did Kevin Davis identify as
25      being the shooter on October 17, 1998?
```

```
 1          A.      Mr. Hall.

 2          Q.      The defendant?

 3          A.      Yes, sir.

 4                  MR. ANDERSON:  Judge, I have no further

 5          questions at this time.

 6                  THE COURT:  Cross-examination?

 7                  CROSS-EXAMINATION

 8  BY MR. RADER:

 9          Q.      Officer, how are you?

10          A.      Fine, sir.

11          Q.      I'm Jim Rader, one of the counsel in this

12  case.  I notice in your testimony you indicated on the

13  waiver at 6:15 that Mr. Hall refused to sign it?

14          A.      Yes, sir.

15          Q.      And you indicated that he indicated to you

16  that he understood his rights; is that right?

17          A.      That's correct.

18          Q.      But isn't there a substantial difference

19  between understanding your rights and waiving your rights?

20          A.      It says in there he doesn't have to talk

21  if he doesn't want to.  To my best of my knowledge he

22  understood his rights.

23          Q.      But that's different than waiving your

24  rights.  You can't waive a right if you don't understand

25  it, can you?
```

```
 1           A.        As far as my knowledge he understood his
 2    rights.
 3           Q.        But in fact he wouldn't indicate on the
 4    paper that he waived those rights, would he?
 5           A.        He just wouldn't sign the paper.
 6           Q.        Sir, you assumed that he waived his
 7    rights?
 8           A.        I assumed that he didn't want to sign the
 9    paper.  Some people don't want to sign the paper.
10                     MR. RADER:  No further questions, Your
11           Honor.  Thank you.
12                     THE COURT:  Anything else, Mr. Anderson?
13                     REDIRECT EXAMINATION
14    BY MR. ANDERSON:
15           Q.        Did the defendant indicate a willingness
16    to talk to you after you had explained his rights?
17           A.        Yes, sir.
18           Q.        He willingly talked to you, didn't hold a
19    gun to his head, didn't beat him up?
20           A.        No, sir.
21           Q.        Basically he said I don't want to sign the
22    paper but this is what happened?
23           A.        That's correct.
24                     MR. ANDERSON:  I have nothing further.
25                     THE COURT:  All right, Officer.  Thank
```

1   you very much for your time.  You're released at

2   this time.  Leave the exhibits there.  Thank you.

3       (Witness excused.)

4       THE COURT:  Does the State have any

5   further witnesses at this time?

6       MR. ANDERSON:  No.

7       THE COURT:  State rests?

8       MR. ANDERSON:  State will rest.

9       THE COURT:  Ladies and gentlemen, there

10   are a few things we have to take care of out of

11   your presence and we'll reconvene -- take a break

12   now.  Reconvene here at 2:30.

13     I understand that thus far the pattern has

14   been when I've said 10 minutes, it's about 20.

15   I'm not unmindful of that fact.  But I am trying.

16   But things come up and I do my best.  So we'll try

17   to get together again at 2:30.

18     Same admonitions.  Don't discuss the case

19   amongst yourselves or with anyone else.  Don't

20   permit anyone to discuss it with you or in your

21   presence.  Don't come to any conclusions based on

22   anything  you've seen or heard thus far.  And

23   don't attempt to do any investigation in this

24   matter.

25     With that, we'll break until 2:30.  Thank

1            you very much.

2                    (Jury out at 12:20 p.m.)

3                    THE COURT:  All right.  Mr. Anderson, you

4            submitted your exhibits.  Let's see here.  Exhibit

5            1 is the rights waiver.  Any objection?

6                    MR. RADER:  No, Your Honor.

7                    THE COURT:  Exhibit 1 is admitted.

8            State's Exhibits 2, 3, 4, 5 and 6 are photos?

9                    MR. ANDERSON:  Yes.

10                   THE COURT:  Any objection?

11                   MR. RADER:  No, Your Honor.

12                   THE COURT:  Exhibits 7 and 8?

13                   MR. ANDERSON:  Seven is a photo lineup, 8

14           and 9 are Polaroid photographs of the photo

15           lineup.

16                   THE COURT:  Any objection to 7, 8 and 9?

17                   MR. RADER:  No.

18                   THE COURT:  Ten is shell casings.

19                   MR. RADER:  May I have a moment, Your Honor,

20           to take a look at 10?

21                   THE COURT:  Sure.

22                   (Pause in proceedings.)

23                   THE COURT:  17.  Mr. Anderson, before you

24           rest we'll state on the record you'll introduce

25           State's Exhibit 17 as a stipulation between you

```
 1              and the defense as to a lab report regarding the

 2              shell casings.

 3                   Any objection to Exhibit 10?

 4                   MR. RADER:  Give me 30 seconds more, if Your

 5              Honor please.

 6                   THE COURT:  Oh, sure.

 7                   MR. RADER:  No objection to Exhibit 10, Your

 8              Honor.

 9                   THE COURT:  Exhibits 11, 12, 13 and 14,

10              which are photographs of I believe a vehicle.

11                   MR. ANDERSON:  Actually they are photographs

12              of the crime scene.  11 and 12 are photographs of

13              shell casings.  13 is blood.  14 is just kind of

14              an outer view.  Any objection to any of those?

15                   MR. RADER:  No.

16                   THE COURT:  15 is a picture of the

17              defendant.  Any objection to that?

18                   MR. RADER:  No.

19                   THE COURT:  And 16 is a photograph of

20              Dexter, his son.  Are you introducing that as

21              well?

22                   MR. ANDERSON:  I may hold off on that.

23                   THE COURT:  16 is not being submitted.

24                   17, there is a stipulation as to the lab

25              report.
```

```
 1                    MR. ANDERSON:  That's correct.
 2                    THE COURT:  You want to make a motion at
 3          this time?
 4                     We're going to put 17 -- we're going to do
 5          it in front of the jury on the record.  You do
 6          rest at this time although I'll give you
 7          permission to rest in front of the jury.
 8                    MR. ANDERSON:  Yes.
 9                    THE COURT:  Do you want to make a motion?
10                    MR. RADER:  Your Honor, I'd just as soon
11          pass.
12                    THE COURT:  Okay.  All right.  We got five
13          minutes left.  It's half past.  I'll give you five
14          minutes or so.
15                    THE COURT:  Do you have a witness ready to
16          go.
17                    MR. RADER:  I hope so, Your Honor.  I'll
18          check on that during the 5 minutes.  I think so.
19          If there's no witnesses ready to go and the
20          defendant is going to testify, we'll go with him.
21                    (Proceedings recessed.)
22                    THE COURT:  Do you guys have witnesses ready
23          to go.
24                    MR. RADER:  Yes, Your Honor, we're ready.
25                    THE COURT:  Mr. Hall, come on up here with
```

```
 1          Mr. Rader.

 2               Mr. Hall, we've reached that point in the

 3          case where the State's about to rest.  It's not

 4          required that you go forward and present any

 5          evidence in this case.

 6               It's especially not required that you

 7          testify.  You have an absolute constitutional

 8          right not to testify.  If you choose not to

 9          testify, then I will inform the jury by jury

10          charge that they're to read nothing into that and

11          to take nothing from that.

12               On the other hand, conversely, you have a

13          constitutional right to present a defense and to

14          testify, if you so desire.  It's your decision.

15          You should do it after consulting with your

16          attorneys, but understand that it is your

17          decision.  You understand me, Mr. Hall?

18               THE DEFENDANT:  Yes, sir.

19               THE COURT:  Okay, great.  Have a seat.

20               All right.  Line them up.

21               (Jury entered courtroom at 2:35 p.m.)

22               THE COURT:  Bill, we'll go through Exhibit

23          17, and then you'll rest.

24               MR. ANDERSON:  Okay.

25               THE COURT:  Please be seated.
```

```
 1                    Mr. Anderson?
 2                    MR. ANDERSON:  Judge, I believe the State
 3             and the defendant have an agreement whereby we
 4             would stipulate to State's Exhibit 17, which is
 5             the Hamilton County Coroner's Office laboratory
 6             report concerning analysis of the shell casings
 7             performed by William Schrand.
 8                    THE COURT:  Is that the case, Mr. Rader?
 9                    MR. RADER:  Yes, Your Honor, it is.
10                    THE COURT:  Okay.  All right.  The State
11             have any further witnesses?
12                    MR. ANDERSON:  No, Your Honor, not at this
13             time.
14                    THE COURT:  State rests?
15                    MR. ANDERSON:  The State will rest.
16                    THE COURT:  Does the defendant care to
17             present a defense at this time?
18                    MR. RADER:  Yes, Your Honor, if it please
19             the Court.
20                    THE COURT:  Your first witness?
21                    MR. RADER:  Mr. Hall.
22                       FREDRICK HALL
23     being first duly sworn, was examined and testified as
24     follows:
25                    THE COURT:  State your name and spell
```

```
 1                 your last name, please.

 2                      THE WITNESS:  Fredrick Hall, H-a-l-l.

 3                      THE COURT:  Go ahead, Mr. Rader.

 4                      DIRECT EXAMINATION

 5   BY MR. RADER:

 6          Q.     Mr. Hall, I want you to keep your voice

 7   up, make sure the jury can hear you.

 8                 How old are you, Mr. Hall?

 9          A.     42.  I'll be 43 this year.

10                      THE COURT:  Jill, can you tip the

11                 microphone out just a little bit that way?  There

12                 you go.  Talk right into it.  Go ahead.

13          Q.     And what is your residence address?

14          A.     2116 Fulton, Apartment 13.

15          Q.     Who do you live there with?

16          A.     My wife and kids.

17          Q.     How many children do you have?

18          A.     I have a daughter and a son.

19          Q.     How old is your daughter?

20          A.     She just turned 18 December 22nd.

21          Q.     And what is your wife's name?

22          A.     Sheila Parker-Hall.

23          Q.     I'd like to direct your attention to

24   sometime around the first of October.  Can you tell me in

25   the first of October, 1998, tell me did you have an injury
```

1    to your arm at that time?

2           A.    Yes, I did.

3           Q.    And what was that injury?

4           A.    A gunshot to the elbow which broke part of

5    my elbow off and done a lot of nerve damage.

6           Q.    Can you tell us in simple terms what the

7    injury is?

8           A.    A gunshot wound.

9           Q.    I mean what that did to your arm.

10          A.    It unabled me to use it, like right now I

11   still don't have full use of my left hand, like these

12   fingers are just coming back.  These two are back but the

13   last two are still trying to come back.  I still don't have

14   no feeling in them.

15          Q.    Where did the bullet go through your arm?

16          A.    The top of the elbow, right here.

17          Q.    Could you show it on the arm that was hit?

18   You can point to it and we can get some idea where the

19   bullet hit.

20          A.    Right down through the elbow.  It came out

21   the other end.

22          Q.    Did it hit any bones?

23          A.    Yes, it did.

24          Q.    Did it sever a bone?

25          A.    Right now there's a bone loose in there

```
 1    that you can just move around with your hand.
 2         Q.      Is that one of the two bones in your lower
 3    arm?
 4         A.      Yes, it is.
 5         Q.      And was it your testimony that that bone
 6    was still not connected in your elbow?
 7         A.      It's still not connected.  You can take
 8    your hand and move it and there's a lot of nerves there.
 9         Q.      Can you show the jury that?
10         A.      I would have to take my coat and stuff
11    off.
12                 MR. RADER:  Will the Court permit that?
13                 THE COURT:  No objection from the State?
14                 MR. ANDERSON:  No, Judge.
15                 THE COURT:  Go ahead.
16                 (Witness in front of jury.)
17         A.      The bullet went in right here and came out
18    back here.
19                 THE COURT:  You'll have to speak up.
20            He's not answering any question, either.  There's
21            got to be a question on the table before he can
22            just start talking, Mr. Rader.  Ask him a
23    question.
24         Q.      Can you show the jury which bone is not
25    attached?
```

```
 1            A.        The one right here at the lower part of
 2    the elbow.  The bullet broke it in half, and it's never
 3    grown back.  I'm going back and forth to the doctor.  I
 4    keep my doctor's appointments.
 5                      MR. RADER:  Thank you very much.
 6                      (Witness resumes stand.)
 7            Q.        Mr. Hall, do you or do you not have some
 8    pain from that injury?
 9            A.        I have pain every day from it.  It's
10    hurting now, because when it gets cold it just hurts like a
11    toothache or something.  That's why I keep this glove on to
12    keep it warm.
13            Q.        Do you have use of your fingers?
14            A.        The two on the end I don't.  Sometimes I
15    can stretch them out about like that but I can never, you
16    know, get them all the way out.
17            Q.        But your two fingers and your thumb you
18    have use of?
19            A.        Some use of my thumb, just like to grab a
20    piece of paper, or something like that, this bone right
21    here will go all the way down and I don't have any grip in
22    it.  It's like it's turned inside out or something.
23            Q.        Tell us how you got that injury.  Where
24    were you when you got that injury?
25            A.        Down around --
```

```
 1                    MR. ANDERSON:  Objection.
 2                    THE COURT:  Sustained.  Next question.
 3          Q.        Can you tell us what was going on when you
 4     got that injury?
 5          A.        I was visiting a friend on Fourteenth and
 6     Walnut.
 7          Q.        And who was that friend?
 8          A.        A guy named Charles Woods.  He's from the
 9     same hometown I'm from.  I'm from Dayton.
10                    THE COURT:  Okay.  Next question.
11          Q.        Were you not being robbed at the time?
12          A.        Well, what had happened was a couple of
13     guys came up to me and asked me did I want to do a bootleg.
14     That means you want to give a cab trip or something.  I
15     told them that I didn't.  They kind of like helped their
16     self in, you know what I'm saying?  They just got on in the
17     car.  They asked me who was I looking for and what did I
18     need.  I told them I didn't need anything, you know, I
19     didn't want to take them nowhere.       They asked me was I
20     trying to cop.  That means was I trying to buy some drugs.
21     That's a drug area.  I told them that I wasn't.  One of
22     them got mad and said we'll take that money.  Then like a
23     fight broke out with me and the guy in the front seat
24     because he had pulled a pistol out and like was trying to
25     put it on me.
```

```
 1                        And the gun went off and one bullet went

 2      through my arm and the other bullet went right here through

 3      my coat.  I had a leather coat on and I got a big bullet

 4      hole right there where my heart would have been at had he

 5      been pointing it right at me.

 6             Q.       Do you remember what these two people

 7      looked like?

 8             A.       Yes.

 9             Q.       Were either of these people Johann Hart or

10      Kevin Davis?

11             A.       The guys?

12             Q.       Yes.

13             A.       No, they wasn't.

14             Q.       Had you ever met Johann Hart or Kevin

15      Davis before this trial proceeding, before you were

16      charged?

17             A.       I have never met them, you know, like

18      meeting them.  I seen Johann in the courtroom, and before

19      that I saw the other guy, the other day, I think it was

20      Tuesday, up in the holding tank.  But I didn't know who he

21      was and he didn't know who I was.

22             Q.       But before you were charged in this

23      situation, had you ever met either one of them?

24             A.       No.

25             Q.       Did you go to the hospital because of this
```

```
 1    injury?

 2          A.       Yes, I did.

 3          Q.       What hospital did you go to?

 4          A.       University Hospital Emergency Room.

 5          Q.       The ladies and gentlemen of the jury

 6    understand that you're in custody.

 7          A.       Yes.

 8          Q.       Have you received treatment in the jail

 9    for your arm?

10          A.       Yes.   I've been back and forth to the hand

11    clinic at University Hospital.  But they wanted to do

12    surgery on it, and the week that I went there to make the

13    appointment for the surgery, we had a real bad winter storm

14    and a guy broke his leg and I had to get rescheduled.  And

15    every time I get rescheduled, it would be on a Tuesday

16    seemed like.  That's what they tell me.  I have court on

17    that day so I don't get to go.

18          Q.       But you have treated with the Justice

19    Center at the infirmary for your arm?

20          A.       Yes.

21          Q.       I want to direct your attention to the

22    night of or the morning of October 17th.  Sometime after

23    3:00 in the morning, did you talk to your son, Dexter?

24          A.       Yes, I did.

25          Q.       And what was that discussion about?
```

```
 1          A.        Well, my wife and I, we hadn't been long

 2    got back from Dayton.  I guess it was around about --

 3          Q.        Start from the point where you're talking

 4    to Dexter.

 5          A.        Okay.  Dexter came in and said, dad --

 6                    MR. ANDERSON:  Objection.

 7                    THE COURT:  Sustained.

 8          Q.        Did you see your son Dexter?

 9          A.        Yes, I did.

10          Q.        Did you then go someplace?  Did you leave

11    the house?

12          A.        Yes, I did.

13          Q.        And in response to what did you leave the

14    house?

15          A.        In response to him telling me --

16                    MR. ANDERSON:  Objection.

17                    THE COURT:  Sustained.

18                    THE WITNESS:  -- that the car was up

19    there on Windsor.

20                    THE COURT:  Mr. Hall, when I say

21    sustained, it does not mean to just talk faster   and get

22    it in.  It means sustained.

23                    The answer is stricken.  Next question.

24          Q.        After talking with your son, were you

25    aware of where your wife's car was?
```

283

 1          A.      Yes, I was.

 2          Q.      And what was your understanding of where

 3     it was?

 4          A.      Up on Windsor and Park Street.

 5          Q.      And why did -- did you go up on Windsor?

 6          A.      Yes, I did.

 7          Q.      Why did you go up on Windsor?

 8          A.      To go get the car.

 9          Q.      What did you see when you arrived in that

10     area?

11          A.      A lot of police was in the area, and it

12     looked like they were around the car.

13          Q.      Was it your intent to drive the car back

14     home?

15          A.      Yes.

16          Q.      Can you explain to the ladies and

17     gentlemen of the jury, tell them whether or not you can

18     drive the car?

19          A.      I would have to drive it the same way that

20     I drove it when I got shot, like I have to shift it in one

21     gear, and hold the steering wheel with my leg and drive it

22     like that.  I almost burned the clutch up doing that.  So

23     that's how I was going to drive it.

24          Q.      But it was your intent to drive your car

25     home?

```
 1           A.      Yes.

 2           Q.      Can you tell us what happened there on the

 3    scene; were you taken into custody?

 4           A.      Yes, I was.

 5           Q.      Describe that to us.

 6           A.      Well, after I saw the police around the

 7    car and in the area, I didn't go straight to the car

 8    because I didn't know exactly what was going on with it.

 9    So I kind of like -- I was in some people's yard and I was

10    like behind a tree like looking at them at the car, and

11    they came up on me and arrested me.  Well -- yeah, they

12    arrested me.

13           Q.      Did they handcuff you?

14           A.      Yes, they did.

15           Q.          Did they handcuff you almost

16    immediately?

17           A.      Yes.

18           Q.      Did they handcuff your hands behind you?

19           A.      Yes, I believe so.  Yes, they did.

20           Q.      Did that cause you any discomfort?

21           A.      Yes, it did.

22                   MR. ANDERSON:  Objection.

23                   THE COURT:  Sustained.  Answer is

24    stricken.  Question is stricken.  Next question.

25           Q.      How long did you remain handcuffed?
```

```
 1          A.      If seemed like it was all night.  I guess

 2    a couple of hours we set out there.  And I set in the

 3    police car at least two hours, two and a half hours or

 4    something.

 5          Q.      Did you indicate that you were injured to

 6    the police?

 7          A.      Yes, I did.  I had this on (indicating).

 8          Q.      Were you handcuffed behind your back?

 9          A.      Yes.

10          Q.      And that's inconsistent.  Can you explain

11    that to us?

12          A.      This was just, after they handcuffed me,

13    they took my arm out of this and handcuffed me in the back,

14    and this was dangling around my neck for a while.  And I

15    never seen it no more once we got to the police station.

16          Q.      Yet you have it now?

17          A.      This is another one.  I got this from

18    University Hospital.

19          Q.      How long were you at Windsor before you

20    were taken downtown?

21          A.      Two and a half hours; at least two, two

22    and a half hours.  I didn't have a watch on.  I couldn't

23    have seen it no way.

24          Q.      Did the police ask you questions?

25          A.      Yes, they did.
```

1          Q.        Tell us what those conversations were

2     about.

3          A.        He kept asking me what happened and where

4     was I at, and where was the other two guys at.  I told him

5     I didn't know, I didn't know what he was talking about.  I

6     didn't know what was going on.

7          Q.        And then you were taken down to District

8     1; is that right?

9          A.        Yes, sir.

10         Q.        Tell us what happened down there.    A.

11         When I got to District 1, they put me in like a

12    holding area I guess.  And a detective came and talked to

13    me.  A police lieutenant came and talked to me, too.  They

14    was asking me, you know, they said we going to charge your

15    son with murder if this guy dies, we know he did it.  And

16    where is the gun at and who was with him.  He was asking me

17    those kind of questions.

18         A.        So I just told them I didn't know what

19    they were talking about.  I stuck to that for a while.

20    They said we got your wife down here, too, we going to

21    charge her, also.

22                   MR. ANDERSON:  Objection.

23                   THE COURT:  Sustained.  This is all

24         hearsay.  Stricken.  Next question.

25         Q.        Were you advised of your rights up on the

287

```
 1   hill, on Windsor?

 2          A.      No, I wasn't.

 3          Q.      Were you advised of your rights down at

 4   District 1?

 5          A.      The next morning, yes, 'cause they tried

 6   to get me to sign a waiver paper for me to waive my rights.

 7          Q.      Did you sign that paper?

 8          A.      No, I didn't.

 9          Q.      Did you have any intent to waive your

10   rights?

11                  MR. ANDERSON:  Objection.

12                  THE COURT:  Overruled.

13          A.      No, I had no intentions on waiving my

14   rights.  I wanted a lawyer at that time.

15          Q.      Did you communicate that to them?

16          A.      Yes, I did.

17          Q.      What was the response?

18                  MR. ANDERSON:  Objection.

19                  THE COURT:  Sustained.

20          Q.      Were you provided with a lawyer?

21          A.      No, I wasn't.

22          Q.      Did the questioning continue?

23          A.      Yes, it did.

24          Q.      What did you tell the police?

25          A.      Regarding what?
```

288

 1          Q.      After 6:15 at the time of your signing of
 2      the refusal?
 3          A.      They kept saying, like I said, to --
 4                  MR. ANDERSON:  Objection.
 5                  THE COURT:  Sustained.  It's
 6          unresponsive.
 7          Q.      What did you tell them?
 8          A.      I told them that I would help them look
 9      for the gun.
10          Q.      Why did you tell them that?
11          A.      Because they told me they was going to
12      charge my son with --
13                  MR. ANDERSON:  Objection.
14                  THE COURT:  Sustained.  You can't say
15          what the police said, okay?  Just answer his
16          question.  He's not asking what the police
17          said.  He's asking for what you said.
18                  Next question.
19          Q.      Does your wife use the car to go to work?
20          A.      Yes.
21          Q.      Was the seizure of the car important to
22      you?
23          A.      Yes, it was.
24          Q.      When did you leave District 1?
25                  MR. ANDERSON:  Objection.

```
 1                         THE COURT:  Sustained.
 2            A.      It was light out.
 3                         THE COURT:  It's irrelevant.
 4            Q.      Did you go back out with the police again?
 5            A.      Yes, I did.
 6            Q.      At about what time?
 7            A.      It was around 6:00 in the morning.  It was
 8  light outside.
 9            Q.      Where did you go?
10            A.      Up to the scene where they picked me up
11  at.
12            Q.      What did you do up there?
13            A.      I sat in the car for a while and after a
14  while they came and got me out the car and asked me where
15  was the gun at.
16            Q.      And what did you do?
17            A.      I told them what gun, and one of them
18  slapped me.  Then I got -- they took me up there to right
19  where they handcuffed me at on this hill behind this tree.
20  I looked around, and I said I told you I don't know where
21  no gun is at.  They put me back in the car.
22       Q.      Did the police ever do a gunpowder residue check on
23  your hands?
24            A.      I asked for one but they didn't do it.
25                         MR. ANDERSON:  Objection.
```

```
 1                    THE COURT:  Sustained.  Answer is
 2          stricken.  It's a yes or no question.
 3                    Did they do a gunshot residue test on you
 4          to your knowledge?
 5                         THE WITNESS:  No, they didn't.
 6                         THE COURT:  Thank you.  Next question.
 7          Q.       And then at some point I guess you were
 8     taken over to the Justice Center; is that correct?
 9          A.       Yes.
10                         MR. RADER:  May I have just a moment,
11          Your Honor?
12                    THE COURT:  Sure, take your time.
13                    (Pause in proceedings.)
14          Q.       Have you ever owned a .380 caliber pistol?
15          A.       No, sir.
16          Q.       Have you ever shot anybody?
17          A.       No, sir.
18          Q.       On the night in question, on the 17th of
19     October, were you ever at the corner of Republic and
20     Thirteenth?
21          A.       No, I wasn't.
22          Q.       Republic and Fourteenth?
23          A.       No, I wasn't.
24          Q.       Is Dexter Hall your natural son?
25          A.       Yes, he is.
```

```
 1          Q.      You love him very much?

 2          A.      Yes, I do.

 3                  MR. RADER:  No further questions at this

 4      time, Your Honor.

 5                  THE COURT:  Cross-examination?

 6                  CROSS-EXAMINATION

 7  BY MR. ANDERSON:

 8          Q.      You can drive a car; is that right?

 9          A.      Yes, I can.

10          Q.      So you could have driven the car that

11  night, couldn't you?

12          A.      Had I driven it the way I said I was going

13  to do it, yeah, with one hand and one leg.

14          Q.      Well, you can drive --

15                  MR. RADER:  I object.  Let the witness

16      answer.

17                  THE COURT:  Next question.

18          Q.      You have pretty good use of that left

19  hand, don't you?

20          A.      No, I don't.

21          Q.      You don't?

22          A.      No.

23          Q.      Well, you seemed to be pretty agile in

24  taking that off in front of the jury just a minute ago?

25          A.      Yes.
```

292

```
 1            Q.       When you come down into the courtroom,
 2    those shoes you're wearing right there --
 3            A.       Pardon me?
 4            Q.       Were you wearing the shoes that you have
 5    on right now down to court?
 6            A.       No, I'm not.
 7            Q.       How are you putting those shoes on?
 8            A.       With my hands.
 9            Q.       And your tie and your shoe laces, aren't
10    you?
11            A.       Yes.
12            Q.       You're taking your hand out of your sling
13    to tie your shoe laces, aren't you?
14            A.       Sure.
15            Q.       It's a fact that you didn't have that
16    sling on that night, isn't it?
17            A.       I had it on.
18            Q.       The police said you didn't have one.
19            A.       They said a lot of things.
20            Q.       So everything that the police said that
21    controverts what you're saying is incorrect; is that right?
22            A.       Yes.
23            Q.       You heard Officer Bailey talk about seeing
24    you driving that car; that's incorrect?
25            A.               It's incorrect.
```

```
 1                          MR. RADER:  Your Honor, he's asking --
 2                          THE COURT:  Overruled.
 3            Q.     Well, let's talk a little bit.  Have you
 4      within the last 10 years been convicted of an offense that
 5      carries with it a term of imprisonment in excess of one
 6      year?
 7            A.     Repeat that question.
 8            Q.     Have you within the last 10 years been
 9      convicted of an offense that carries with it a potential
10      term of imprisonment in excess of one year?
11            A.     Yes, sir.
12            Q.     Have you within the last 10 years been
13      convicted of a theft offense?
14            A.     Yes.
15            Q.     Could you please relate to the ladies and
16      gentlemen of the jury how many theft offenses you've been
17      convicted of within the last 10 years?
18            A.     I guess around three.
19            Q.     Around three?
20            A.     Yes.
21            Q.     Well, in 1989 you were convicted of
22      receiving stolen property; is that right?
23            A.     Yes.
24            Q.     Unauthorized use of a motor vehicle; is
25      that right?
```

```
1          A.     I don't know.  I'm not sure.

2          Q.     You don't know.  How about in 1989,

3     receiving stolen property, a motor vehicle?

4          A.     Yes, that sounds about right.

5          Q.     Sounds about right?  Okay.

6                 How about in 1992, burglary?

7          A.     I'm not sure.

8          Q.     You're not sure?

9          A.     No, I'm not.

10         Q.     Well, you're not sure if you were

11    convicted of burglary?

12         A.     I may have been charged with it, but I

13    don't know if I was convicted of it.

14         Q.     Did you do some time on that charge back

15    then?

16         A.     I can't remember.

17         Q.     Have you done some time up in jail on some

18    of these theft charges?

19         A.     Yes, I have.

20         Q.     How about carrying concealed weapon in

21    1995?

22         A.     Yes.

23         Q.     Did some time on that one?

24         A.     Yes.

25         Q.     What kind of weapon were you carrying?
```

295

```
 1              A.       Well, actually I wasn't carrying, I was in
 2      someone else's car and it was in there.
 3              Q.       And that was what?
 4              A.       I don't know. I think a Derringer or
 5      something; I'm not sure.
 6              Q.       A what?
 7              A.       A Derringer or a .25 or something to that
 8      effect.
 9              Q.       A gun?
10              A.       A gun.
11              Q.       Now, you indicated that you were shot by
12      somebody about 10 or 12 days prior to these guys being
13      shot; is that right?
14              A.       That's correct.
15              Q.       Do you know who shot you?
16              A.       No, I don't.
17              Q.       Did you report it to the police?
18              A.       No.
19              Q.       So you're in your car, two guys jump in,
20      they shoot you in the elbow, you go up to University
21      Hospital, a bone in your elbow is broke, but you don't
22      report that to the police?
23              A.       I thought they would take the report
24      there.
25              Q.       Did you report it to the police?
```

296

```
 1            A.        They never came.

 2            Q.        Did you ever talk to a policeman?

 3            A.        No.

 4            Q.        Did you ever call the police to say, gosh,

 5    I've been shot?

 6            A.        No, I didn't.

 7            Q.        Isn't it a fact that you waited for about

 8    five or six hours between the time you got shot and the

 9    time you even showed up at the hospital?

10            A.        No, it wasn't that long.

11            Q.        How long was it?

12            A.        A couple of hours.

13       Q.    So you got a gunshot wound, you wait a couple of

14    hours, you go to the hospital, and you don't tell the

15    police that you've just been robbed and shot?

16            A.        I can tell you why.

17            Q.        I'm just asking you is that the way it

18    happened; did you not report it to the police?

19            A.        No, I didn't.

20            Q.        Okay.

21                      Now, you heard testimony from Johann Hart.

22    He pointed to you and said you're the guy who shot him,

23    right?

24            A.        Yes.

25            Q.        You heard testimony from Kevin Davis.   He
```

```
 1        pointed to you and said you're the guy who shot him, right?
 2             A.    Yes.
 3             Q.    You heard testimony that they identified
 4        you from a photo lineup the morning after they got shot and
 5        they said there's the guy, right?
 6             A.    Yeah, I heard that.
 7             Q.    That's all mistaken?
 8             A.    It's got to be because I didn't do it.
 9             Q.    So they were just -- were they wrong about
10        picking you out?
11             A.    Sure, they was, 'cause I wasn't there.
12             Q.    You weren't there?
13             A.    I don't know what went on with those
14        pictures in that lineup.
15             Q.    Don't you?  Would you agree with me that
16        Officer Huffman testified he showed them pictures at
17        different times and they both picked you out?
18             A.    That's what he said.
19             Q.    You're saying that that may be true and
20        may not be true?
21             A.    I'm saying I didn't do it.  I was never
22        there.
23             Q.    You were never in the car when Lt. Bailey
24        chased you?
25             A.    Right.  I wasn't behind the wheel in the
```

298

1    car and I wasn't in the car.

2         Q.    So when he says that he saw you and chased

3    you at 60, 70 miles an hour, he's mistaken?

4         A.    He said a couple of things the other day.

5    He said something different.

6         Q.    Let's talk about the other day.  You were

7    hiding in the bushes, weren't you?

8         A.    No, I wasn't.

9         Q.    Hiding behind a tree?

10        A.    Behind a tree.

11        Q.    Crouched down?

12        A.    Yes.  Just standing behind it crouched

13   down.

14        Q.    When the police were there looking at the

15   car.  You told them that you were out buying shaving cream,

16   didn't you?

17        A.    I told them something to that effect.

18        Q.    What specifically did you tell them?

19        A.    I can't remember.

20        Q.    Don't remember?

21        A.    No.

22        Q.    So when Officer Neack testified that he

23   read you your rights and you said you were out buying

24   shaving cream, he's inaccurate about, at least about the

25   part about the shaving cream?

299

 1          A.      I don't know if I told him that night.  I

 2    don't know who Officer Neack is.

 3          Q.      You heard him testify this morning?   A.

 4    I heard a lot of officers testify.

 5          Q.      He was the one that testified he read you

 6    your rights in the police station.

 7          A.      He never read me no -- by lying?  He asked

 8    me --

 9          Q.      Hey, listen, I ask the questions here,

10    sir.

11                  THE COURT:  Sir, you have to answer the

12            latest -- the way this work he asks the

13            questions, you give the answers.

14                  Next question.

15          Q.      Isn't it true that Officer Neack advised

16    you of your rights in the car?

17          A.      No.

18          Q.      So that he was mistaken?  He was trying to

19    mislead this jury when he said that?

20          A.      I don't know what he was doing.  He didn't

21    read me my rights in the car.

22          Q.      You told him that you were out buying

23    shaving cream?

24          A.      I don't remember what officer I said that

25    to.

```
 1          Q.      But you did say it to someone?

 2          A.      I said that.

 3          Q.      Let's talk about that a little bit.  You

 4     admit at least having seen State's Exhibit 1?

 5          A.      That's right.

 6          Q.      That's a rights waiver form?

 7          A.      Yes.

 8          Q.      They read that to you?

 9          A.      Yes.

10          Q.      You read it over?

11          A.      Yes.  It was more like Officer Huffman

12     said.  I had a copy laying in front of me 'cause they asked

13     me how many years of school I had, could I read and write,

14     but he still went on.

15          Q.      You understood what those rights were,

16     didn't you?

17          A.      Yes.

18          Q.      And in fact, you continued to talk with

19     the police, didn't you?

20          A.      I asked to see a lawyer after they read me

21     that.

22          Q.      Didn't you continue to talk to the police?

23          A.      I'm not sure if I said anything to them

24     before or after that.  I'm not certain.

25          Q.      Now, question -- this is your testimony in
```

1    the motion to suppress hearing.

2                 Question:  "But you in fact continued to

3    talk with the police, didn't you?"

4                 Your answer:  "Yes."

5                 You did continue to talk with the police,

6    didn't you?

7         A.      Yes.

8         Q.      And they didn't hold a gun to your head,

9    they didn't threaten you, they didn't force you to talk,

10   did they?  They didn't coerce you?

11        A.      No, they didn't.

12        Q.      So you were voluntarily talking?

13        A.      I think they were saying --

14        Q.      Let's talk a little bit about what you

15   were saying.  Isn't it true that you told Officer Huffman

16   that you were driving the car that night?

17        A.      No, I never told him that.

18        Q.      Isn't it true that you told Officer

19   Huffman that you picked up some guy named Dave and went to

20   Fourteenth and Republic Street?

21        A.      I don't remember.

22        Q.      You don't remember whether you told them

23   that or not?

24        A.      I don't remember. I don't think so.

25        Q.      You don't think so.  Well, how about that

1     same motion, sir.  I asked you the question:

2                    Question:  "You didn't tell them that you

3     were driving that car at the shooting?"

4                    Answer:  "No."

5                    Question:  "You didn't?  Didn't you state

6     to the police that you were driving that car when these two

7     gentlemen were shot, that some guy named Dave was the guy

8     that shot them?"

9                    Answer:  "Yes, I said that."

10                    Remember testifying that way a couple of

11    weeks ago?

12         A.        Yes, I remember.

13         Q.        So you did tell -- did you or did you not

14    tell the police that you picked up some guy named Dave and

15    you were driving the car when the shooting occurred?

16         A.        I don't think I said that.

17         Q.        You don't think you did?

18         A.        I don't think I did.

19         Q.        But you said before that you did and now

20    you're not sure?

21         A.        It was so many things said that night.  I

22    can't remember, and I want to be --

23         Q.        Let's, the question is did you or did you

24    not tell the police, specifically Officer Huffman, that you

25    picked up a guy named Dave.  Did you tell them that or not?

| | | |
|---|---|---|
| 1 | A. | Yes, I believe I said that. |
| 2 | Q. | Was that true or was that a lie? |
| 3 | A. | About me picking somebody up? |
| 4 | Q. | Uh-huh. |
| 5 | A. | No, I never picked no one up. |
| 6 | Q. | So you're not sure if you said it, right; |

but if you did say it, it was a lie?

| | | |
|---|---|---|
| 8 | A. | I said I didn't pick no one up. |
| 9 | Q. | Well, didn't you tell Officer Huffman that |

you picked up Dave and went down to Fourteenth and

Republic?

| | | |
|---|---|---|
| 12 | A. | I don't remember saying it like that, no. |
| 13 | Q. | How do you remember saying it? |
| 14 | A. | I can't remember. |
| 15 | Q. | You can't remember any of it? |
| 16 | A. | No. |
| 17 | Q. | Just a total blank? |
| 18 | A. | Yeah. |
| 19 | Q. | Did you tell Officer Huffman that the two |

subjects that were shot were the same guys who had robbed

you two weeks ago?

| | | |
|---|---|---|
| 22 | A. | What was said, he asked me what did the |

guys look like that shot me.  I told him one was light

skinned and one was shorter.  He said you just identified

the guys that got shot.  That's what was said.

 1          Q.        So you remember that conversation but you

 2     don't remember anything else you told them?

 3          A.        I remember that, yeah.

 4          Q.        What else do you remember?

 5          A.        I remember they kept saying that if I

 6     don't tell them where the gun is at, they are going to

 7     charge my son and my wife with murder, and this, that, and

 8     the other.

 9          Q.        What else do you remember?

10          A.        I remember me asking for a lawyer, them

11     saying wasn't no lawyers around.

12          Q.        Let me ask you this.  You seem to remember

13     a lot of what these police officers said.  I want to know

14     what you said.

15          A.        I'm telling you what I said.

16          Q.        Let me hear it word for word, what you

17     told the police?

18          A.        I said if I help you all find this gun

19     will you all release the car and not charge my family.

20          Q.        I want to talk about what you said before

21     that.

22          A.        I don't remember what I said before that.

23          Q.        I want to know specifically what you told

24     Officer Huffman word for word.

25          A.        I can't remember that.  That's seven

 1    months ago.  I don't know.

 2          Q.    You're having problems remembering some

 3    things but you're clear about other things?

 4          A.    That's cause you're trying to twist it

 5    around.

 6          Q.    Okay.  I won't try to twist it.  I would

 7    like you to tell this jury everything you remember telling

 8    Officer Huffman.

 9          A.    I can't remember everything that I said to

10    the officer that night.  We talked about a lot of things

11    that night.

12          Q.    I want you to tell the Judge anything you

13    remember about talking to Officer Huffman.

14          A.    I can't remember nothing exactly that me

15    and Officer Huffman talked about as far as me picking

16    somebody up and driving the car.

17          Q.    I won't ask for exactly.  I want you to

18    tell the ladies and gentlemen of the jury what your

19    statements were the morning of October 17.

20          A.    I believe I told him or one of them that I

21    was out buying shaving cream.

22          Q.    Was that true or not?

23          A.    That wasn't true.

24          Q.    That was not true.  So you lied?

25          A.    That was not true.

1          Q.       That was not true.  Okay.  Why would you
2     tell them that?
3          A.       They asked me where is the gun and why did
4     I shoot them guys, and where was my son at and stuff like
5     that.
6          Q.       They already knew where your son was.
7          A.       I didn't know that.
8          Q.       So you told them you were out buying
9     shaving cream.  What else?
10          A.       I told them that I would help them find
11     the gun if they didn't charge my son and my wife and would
12     let, you know -- not tow the car, and they said okay.  At
13     that time they went and got her.
14          Q.       Went and got who?
15          A.       My wife.  They brought her back in the
16     police station and let me talk to her.
17          Q.       What time in the morning was that?
18          A.       I guess around 6:00, 6:30, something like
19     that.
20          Q.       What else did you tell the police?
21          A.       That's about all I can remember.
22          Q.       Nothing else?
23          A.       That's all I can remember.
24          Q.       I hate to reiterate things, but did you
25     tell Officer Huffman you picked up somebody named Dave?

 1          A.      Yes, I believe I told him that.

 2          Q.      Why did you tell him that if it wasn't

 3   true?

 4          A.      I know that my son hangs out with a guy

 5   named David that lives up the street, a guy that's older

 6   than him, so I just said his name.

 7          Q.      Are you trying to say your son was driving

 8   the car that night?

 9          A.      No, I'm not.  I'm saying that is where I

10   got the guy's name from.

11          Q.      When did you get the keys from your son?

12          A.      It was after 3:00.  He came in and said

13   the police was following him and he parked the car.

14                  MR. ANDERSON:  Objection to that.

15                  THE COURT:  Sustained, answer is

16          stricken.

17          A.      In between 3:00 and 3:30.

18          Q.      And that's the time Officer Bailey

19   indicated he saw you driving that car.  Is Officer Bailey

20   mistaken?

21          A.      Yes.

22          Q.      Officer Huffman is mistaken?

23          A.      I don't know who Officer Huffman is.

24          Q.      He was the one that interviewed you the

25   morning of October 17th.  He was the last guy that

1    testified.

2            A.        Yeah.

3            Q.        He's mistaken?

4            A.        About some of the things that he wrote

5    down.  I never wrote nothing down.  He was doing all the

6    writing.  I said a couple of things but I never wrote

7    nothing down.  He was doing the writing.  So I don't know

8    what he put down.

9            Q.        Well, he wrote down -- this is what he

10   wrote down.  You stated:  Picked up Dave and went to

11   Fourteenth and Republic Street, the two subjects who robbed

12   and shot you two weeks ago, you call one over to the car,

13   one's at the car.  Dave began to shoot.  Dave was in the

14   passenger's seat next to you.  Then you drove off south on

15   Republic.  You dropped Dave off somewhere and told him to

16   hide the gun.

17           A.        So you're saying shot past me?

18           Q.        I'm saying did you state that to Officer

19   Huffman?

20           A.        I don't remember saying that.

21           Q.        You don't remember saying that or you did

22   not say it?

23           A.        I didn't say it to my recollection.

24           Q.        Do you remember whether or not you said

25   it?  You either said it or you didn't?

 1          A.          I'm telling you I don't remember making a

 2    statement like that.

 3          Q.          You might have made that statement?

 4          A.          Don't sound like nothing I would have

 5    said.

 6          Q.          Then you stated to the police that if the

 7    car was released, you would tell them the truth.  Do you

 8    remember saying that?

 9          A.          I told them I would help them look for the

10    gun if they would release the car and not charge my family.

11          Q.          Actually, you stated if the car was

12    released you would tell the truth?

13          A.          You sound like you was there.

14          Q.          I'm reading off the piece of paper.

15          A.          That piece of paper means nothing.  A tape

16    recorder would have mentioned it better.

17          Q.          You stated Dave was in the back seat

18    behind you and you heard the shots; is that right or wrong?

19    Did you state that?

20          A.          I don't remember.

21          Q.          Then you told the police you would take

22    them and show them the gun on Windsor Avenue; did you state

23    that?

24          A.          No.  I told you what I said.  Want me to

25    say it again?

```
 1          Q.      Did you tell the police that you would
 2   take them up and help them locate the gun?
 3          A.      I told them that.  I helped them look for
 4   a gun.  Then they searched for approximately 45 minutes and
 5   they were unable to locate the gun.
 6          Q.      You've indicated today that you weren't
 7   there at the time of the shooting; is that right?
 8          A.      Yes.
 9          Q.      You told the police the morning of the
10   shooting that you were there, didn't you?
11          A.      No, I didn't.
12          Q.      Well, how about this?  Again in the
13   suppression motion we had a couple of weeks ago.  Remember
14   testifying, raising your right hand?
15                  MR. RADER:  Your Honor, may we approach
16          the bench?
17                  THE COURT:  No, you can ask the
18          question.
19          Q.      Do you remember being placed under oath
20   previously?
21          A.      Yes, I do.
22          Q.      Were you telling the truth then or now?
23          A.      I told them then I didn't remember.
24          Q.      How about this.  Question:  --
25                  MR. RADER:  May I note an objection at
```

1          this time?

2                    THE COURT:   Overruled.

3          Q.      Question:  "Were you there when there was

4     a shooting?"  Answer:  "No, I wasn't."  Question:  "So you

5     were lying to the police when you were giving the

6     statements?"  Answer:  "Yes."

7                    So you told the police you were at the

8     shooting that night, didn't you?

9          A.      No, I didn't.

10         Q.      Well, here you said that you were.  You

11    didn't tell the police that?

12         A.      I told the police I picked up a guy named

13    Dave.

14         Q.            Is that true or not?

15         A.      No, I didn't pick no one up.

16         Q.            Why did you tell them that?

17         A.      I just told them -- I don't know why I

18    told them that.  I guess I told them because I was scared.

19    I didn't want to see my family charged with something.  I

20    did not know what was going on.  That's why I told them.

21    And they was threatening me.

22         Q.      They were threatening you?

23         A.      Yes, they were.

24         Q.      What were they saying to you?

25         A.      If you don't tell us where the gun is at,

```
 1    if you don't tell us we're going to charge you with murder.
 2    We're going to charge your wife with complicity to it or
 3    obstructing justice, or something to that effect.
 4            Q.      All sorts of force and threats and
 5    coercion; is that what they were doing?
 6            A.      All I'm saying is that I'm telling you
 7    what they said.
 8            Q.      I'm asking you.
 9            A.      I just told you what they said.
10            Q.      You know, that's pretty funny because you
11    didn't mention it the last time you were here.
12            A.      If I did try to, you probably objected.
13            Q.      You didn't mention it the last time we
14    were here, did you?
15            A.      I don't remember.
16            Q.      Well, this was April 13, all right, 16
17    days ago.  You don't remember what happened 16 days ago?
18            A.      Sure, I do.
19            Q.      When we were here 16 days ago, did you
20    tell me or your attorney or the Judge or anybody else that
21    there were threats and coercion and other things like that
22    by the police?
23            A.      I told them everything that I was given a
24    chance to talk about.
25            Q.      I guess it's fair to say, Mr. Hall, that
```

```
 1    everybody that's testified up until now has been mistaken?
 2                     MR. RADER:  Objection, Your Honor.
 3                     THE COURT:  Overruled.
 4         Q.     Is that right?
 5         A.     Everybody that's testified up to now has
 6    been mistaken?
 7         Q.     Uh-huh.
 8         A.     Yes.  If they say that I did this, yes.
 9         Q.     But you stated you were there?
10         A.     No, I didn't ever state that I was there.
11         Q.     But you just admitted that you told
12    officer --
13         A.     That I picked up Dave.  I never said that
14    I was there.
15                     MR. RADER:  Your Honor, I'd object to
16           these questions as being asked and answered.
17                     THE COURT:  Overruled.
18                     MR. ANDERSON:  Judge, I have no other
19           questions.
20                     THE COURT:  Any redirect, Mr. Rader?
21                     MR. RADER:  May I have just a moment,
22           Judge?
23                     THE COURT:  Sure.
24                     (Pause in proceedings.)
25                     MR. ANDERSON:  Judge, I do have one more
```

314

 1          question.

 2                      THE COURT:  Go ahead.

 3                      MR. ANDERSON:  Thank you.

 4          Q.      Mr. Hall, you indicated in your direct

 5   examination that you were in fact in the same holding cell

 6   the other day with Kevin Davis; isn't that right?

 7          A.      Yes.

 8          Q.      You heard Mr. Davis testify, right?

 9          A.      Yes, I did.

10          Q.      You heard Mr. Davis state that you told

11   him that you would pay him if he didn't testify?

12          A.      What am I going to pay him with?  I'm in

13   jail.  A sandwich?

14          Q.      Did you make that statement?

15          A.      No, I didn't.  Can I tell you what was

16   said?

17          Q.      Yeah.  I'd like to hear what -- wait a

18   second.  Before you do that, let me ask you this.  You

19   indicated before that when you and Mr. Davis were in the

20   holding cell, neither one of you guys knew who the other

21   was?

22                      THE WITNESS:  Pardon me?

23          Q.      Earlier in your direct testimony, you

24   indicated that you and Mr. Davis were in the same holding

25   cell, right?

315

```
 1          A.      Right.

 2          Q.      And you said we didn't even know who

 3     either, each other was?

 4          A.      Right.  But I didn't get to go on further

 5     to tell you how I found out who he was.

 6          Q.      My question to you, sir, is did you tell

 7     Kevin Davis that you would pay him if he didn't testify or

 8     came in and lied; yes or no?

 9          A.      No, I didn't tell him that.

10               MR. ANDERSON:  Thank you.  I have nothing

11          further.

12               THE WITNESS:  So you don't want to know?

13               MR. RADER:  Objection.  The prosecutor

14          asked him a question and he won't let him answer.

15               THE COURT:  The answer is complete.

16                    REDIRECT EXAMINATION

17     BY MR. RADER:

18          Q.      Mr. Hall, why didn't you report this

19     incident, the shooting of yourself, to the police right

20     away?

21          A.      Well, when the shooting went down, I was

22     getting out the car.  I ran off and left the car.  I hid

23     for a couple of hours before I went back to get the car.

24     So I said, well, we'll just report it when I got to the

25     police station, 'cause to my knowledge every time a
```

```
 1    stabbing or shooting or something --

 2                   MR. ANDERSON:  Objection.

 3                   THE COURT:  He can testify as to his

 4         understanding.

 5         A.        Every time a stabbing or a shooting or

 6    something like that happened, they actually come to the

 7    hospital and take a police report.  So I said I'll make my

 8    police report then.

 9         Q.        Did you offer to pay money to Mr. Davis?

10         A.        No, I didn't.

11         Q.        Did you see him in the holding cell?

12         A.        Yes, I did.

13         Q.        Tell us what happened, what you saw.

14         A.        We broke I guess around 1:00, 1:30 and

15    they took me and put me in a small holding tank.  There was

16    I guess about eight people in there with us.  So I sat

17    down, asked for something to eat, asked for a couple of

18    sandwiches.  So the jailer said I'm going to get the

19    sandwiches.  This guy was going on about, man, there's --

20                   MR. ANDERSON:  Objection.

21                   THE COURT:  Sustained.

22         Q.        What did you do?  You can't tell us what

23    the other person said, I guess.  Can you tell us what

24    happened otherwise?  He went to get some sandwiches?

25         A.        It's kind of hard for me to say how it
```

 1    went down.  He was talking.  I overheard him talking.  Can

 2    I say that?

 3              Q.      Yes.

 4              A.      So I asked was anybody there from

 5    Queensgate.  And he said yeah.  A couple of people said

 6    yeah.  I said anybody know Kevin Davis, 'cause I seen his

 7    arm band.

 8                   MR. ANDERSON:  Objection.

 9                   THE COURT:  Sustained.

10              Q.      You seen the arm band?

11              A.      Yeah, I seen his arm band and he said that

12    he was --

13                   MR. ANDERSON:  Objection, Judge.

14                   THE COURT:  Sustained.  Answer is

15    stricken.

16                   Hold on, Mr. Rader.

17                   Any reference that you're making to what

18         Mr. Davis might have said is not permitted and is

19         stricken from the record.

20                   Next question.

21                   THE WITNESS:  He's saying what I said?

22                   THE COURT:  Unfortunately, I have to

23         decide all the legal issues in this case.  What

24         the prosecutor doesn't like, and what the defense

25         doesn't like, sometimes I'm able to make both of

1              them unhappy at the same time.  Regardless, you

2              got to follow what I say.

3                   Next question.

4         Q.        Did you observe any sign from Mr. Davis

5    that he recognized you?

6         Q.        MR. ANDERSON:  Objection.

7         A.        He didn't know who I was.

8                   MR. ANDERSON:  Objection, Judge.

9                   THE COURT:  You cannot speak as to

10             what's in someone else's mind.

11                  Next question.

12        Q.        Did you offer Kevin Davis any money about

13   his testimony?

14        A.        No, I didn't.

15        Q.        Were all these other people around you?

16        A.        A couple of people were, 'cause we were

17   like in the back of the holding cell, and it was like two

18   or three people back there and they heard the conversation.

19        Q.        Did you plan or design or something to get

20   this opportunity to see Mr. Davis?

21        A.        I wouldn't have known him had I not seen

22   his arm band.  How could I do that?  I don't have the keys

23   to that place.

24        Q.        But you didn't try to get close to him at

25   any time?

```
 1       A.      No.

 2                   MR. RADER:  No further questions.

 3                   THE COURT:  Anything else, Mr.  Anderson?

 4                   MR. ANDERSON:  No.

 5                   THE COURT:  All right.

 6                   Mr. Hall, please have a seat.

 7                        (Witness excused.)

 8                   THE COURT:  At this point it's 3:26.  We'll

 9       break for the day.  If you all could stay right

10       there for just a second.

11                   Could I see counsel in chambers for just a

12       minute?

13                        (Discussion in chambers off the record.)

14                   THE COURT:  As I indicated to you, some of

15       our discussions that we go into chambers for will

16       be to discuss important legal issues.  That was

17       one that was not.  Just trying to set our

18       scheduling plans.

19                   I think we can get started on Monday but it

20       probably wouldn't be -- looking at the docket

21       probably before 10:15.  And so if you could be

22       here between 10:00 and 10:15, that would be great.

23                   You may or may not have heard all the

24       evidence in this case.  But I once again caution

25       you, don't come to any conclusions based on
```

```
 1              anything you've heard, don't discuss the case

 2              amongst yourselves or with others or permit anyone

 3              to discuss it with you or in your presence.  Don't

 4              do any independent investigation to prove or

 5              disprove any fact that you may have heard in this

 6              case.

 7                   We are off tomorrow, but if you could be

 8              with us on Monday at 10:15 that would be great.

 9                   You're paying close attention.  Part of my

10              job as a judge is to keep an eye on you.

11              Occasionally in the past, believe it or not, we've

12              had some jurors nod off from time to time.  But

13              you all are paying close attention, which is all

14              that anybody can ask of you at this time.

15                   On behalf of the parties, they both

16              appreciate the attention you're giving to this

17              case.  I know they appreciate it.

18                   Thank you very much.  Have a great weekend

19              and we'll see you Monday at 10:15.  Thank you.

20                   (Jury excused at 3:30 p.m.)

21                   THE COURT:  Anything else on behalf of the

22              State?

23                   MR. ANDERSON:  Not at this time, Your Honor.

24                   THE COURT:  Anything else on behalf of the

25              defense?
```

```
 1                    MR. RADER:  No, Your Honor.

 2                    THE COURT:  Okay.  Let him tear down and

 3          dress up.  And the jury, I imagine they'll be out

 4          of the courthouse like a rocket.  Maybe by the

 5          time you get him changed, they will be gone.

 6                    Everybody have a nice weekend.  If you want

 7          any testimony in this case, I'm not saying it's

 8          possible, but ask for it now because -- as opposed

 9          to Monday 'cause that will give Pat more time.  I

10          don't know why anybody would need any but that's

11          up to you.

12                    (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```