322

```
 1                      COURT OF COMMON PLEAS

 2                      HAMILTON COUNTY, OHIO

 3

 4    STATE OF OHIO   )

 5     PLAINTIFF,     )

 6      vs.          )    Case Number:  B-9807452

 7    FREDRICK HALL  )    (Volume 4 of 5)

 8    DEFENDANT.     )

 9

10                         - - -

11              COMPLETE TRANSCRIPT OF PROCEEDINGS

12                         - - -

13    APPEARANCES:

14         WILLIAM ANDERSON, ESQ.

15              On behalf of the Plaintiff.

16

17         ELIZABETH ZUCKER, ESQ.
               and
18         JAMES RADER, ESQ.

19              On behalf of the Defendant.

20         BE IT REMEMBERED that upon the jury trial of this

21    cause, in the Court of Common Pleas, before the Honorable

22    STEVEN E. MARTIN, one of the judges of the said Court of

23    Common Pleas, on the date hereinafter stated, the following

24    proceedings were had.

25
```

```
 1                    MORNING SESSION, May 3, 1999
 2              THE COURT:  For the record, it's now 9:00.
 3         We've had some trouble getting witnesses in.  Has
 4         the defendant's wife shown up?
 5              MR. RADER:  Yes, Your Honor.  We're ready
 6         for her.
 7              THE COURT:  What other witnesses does the
 8         defense care to call today?
 9              MR. RADER:  Somebody from Cincinnati
10         Communications Center and Barry Whitton.
11              THE COURT:  And who else, if anybody?
12              MR. ANDERSON:  Judge, I have made numerous
13         phone calls to Officer Huffman.  Apparently he's
14         not scheduled to work till 10:00 but they were
15         attempting to call him and call the courtroom.
16         Hopefully we'll hear from them.  I have not heard
17         from them this morning.
18              THE COURT:  Do you have rebuttal testimony?
19              MR. ANDERSON:  I believe I might.  But I
20         have some individuals I need to talk to.
21              THE COURT:  Well, get the witnesses done.
22         How long do you have for his wife?
23              MR. RADER:  Your Honor, honestly I can't
24         think up enough questions to go on for hours.
25         This will be fairly short.
```

1               THE COURT:  Good.  We'll do his wife, then

2          we'll break.

3               MR. ANDERSON:  They've got medical records

4          and hopefully Officer Whitton will be here

5          relatively soon.

6               THE COURT:  Nobody ever met this guy.  When

7          he gets here, he's going to have to say what it is

8          these are.  And then the exhibits they have got

9          are unintelligible to me.  I'm sure they mean

10         something to somebody else.

11              Let's get started.

12              (Jury entered courtroom at 11:05 a.m.)

13              THE COURT:  Ladies and gentlemen, I

14         apologize for the delay.

15              Is the next defense witness here?

16              MR. RADER:  Your Honor, if it please the

17         Court, my witness should be in the hall.

18              THE COURT:  Go get her.

19              Ma'am, can you leave your purse back there,

20         please?

21              MR. RADER:  On the chair is fine.

22              THE COURT:  Thank you.

23                   SHEILA PARKER-HALL

24    being first duly sworn, was examined and testified as

25    follows:

325

```
 1                         THE COURT:  Will you state your name and
 2            spell your last name, please?
 3                         THE WITNESS:  My name is Sheila Parker-
 4            Hall.  Last name P-a-r-k-e-r dash H-a-l-l.
 5                         THE COURT:  That's fine.
 6                         Go ahead, Mr. Rader.
 7                         DIRECT EXAMINATION
 8       BY MR. RADER:
 9                         MR. RADER:  Good morning, ladies and
10            gentlemen of the jury.
11                         Good morning, Ms. Hall.
12                         THE WITNESS:  Good morning.
13            Q.      Ms. Hall, what's your residence address?
14            A.      2116 Fulton, Apartment 13, Cincinnati.
15            Q.      Are you married to Fredrick Hall?
16            A.      Yes, I am.
17            Q.      How long have you two been together?
18            A.      For 19 years.
19            Q.      You have a son?
20            A.      Yes, and a daughter.
21            Q.      And is the son the natural child of you
22       two?  You're the biological parents?
23            A.      Yes.
24            Q.      What's that son's name?
25            A.      Dexter.
```

```
 1          Q.      Do you mind if I call you just Ms. Hall?

 2          A.      That's okay.

 3          Q.      Thank you.

 4                  I'd like to direct your attention to the

 5     night of October 17, 1998.  Did the police arrive at your

 6     residence that night?

 7          A.      Yes, they did.

 8          Q.          Can you tell us about what time?

 9          A.          It was early morning, I guess between 3:00

10     and 4:00.

11          Q.      How many policemen were there?

12          A.      Two at my door, but several out in front

13     of my house.

14          Q.      Did they give you some notion about what

15     or who they were looking for?

16                  MR. ANDERSON:  Objection.

17                  THE COURT:  Sustained.

18          Q.      Did they ask you questions?

19          A.      Yes, they did.

20          Q.      Did you respond to those questions?

21          A.      Yes, sir.

22          Q.      Who did those questions concern?

23          A.      My son Dexter and my car.

24          Q.      Did you give them information about your

25     car?
```

327

1         A.      Yes, sir.

2         Q.      And what was it?

3         A.      I had let a neighbor use my car earlier

4    that day before my husband and I went out of town.  My son

5    and my daughter were at home, but me and my husband were in

6    Dayton, so the guy had my car, and it wasn't home when we

7    got home.

8         Q.      Did the police ask you for a description

9    of your car?

10        A.      Yeah.

11        Q.      Did you give that to them?

12        A.      Yes, I did.  They also asked me for

13   Dexter.

14        Q.      What was your response to that?

15        A.      He wasn't home.

16        Q.      Did you give them a description of Dexter?

17        A.      Yes, I did.

18        Q.      How did you describe Dexter?

19        A.      Tall, thin, 15.  That's it.

20        Q.      Does Dexter normally wear a baseball cap?

21        A.      Yeah, he does.

22        Q.      Was your response to the police such that

23   you went someplace with them?

24        A.      Yeah, they came and got me a couple of

25   times.

328

```
 1          Q.        At some point -- I can't ask you to say
 2    what the police said to you.  That's hearsay.  That's the
 3    reason for my hesitation.  I need to ask you what you did.
 4          A.        Okay.  Well, the police came --
 5                    THE COURT:  Hold on.  He's got to ask a
 6          question.
 7          Q.        You said, I believe, that you gave them a
 8    description of Dexter?
 9          A.        Yes, I did.
10          Q.        Then what happened next?
11          A.        Well, they asked me did I know where he
12    was.
13          Q.        What was your response to that?
14          A.        No, I didn't.  I didn't know where he was.
15    I thought he was in his room.
16          Q.        Did you look in his room?
17          A.        Yes.
18          Q.        Was he there?
19          A.        No.
20          Q.        And go on in just chronological order step
21    by step and tell us what happened.
22          A.        He wasn't in his room so I went back to
23    the door and I told them he's not here, but he was here,
24    you know.  I said my daughter's in there and her
25    girlfriend, they were in her room.
```

1              My son wasn't in his room.  I didn't see

2    him.  He wasn't in there.

3         Q.      What did the police do at that point?

4         A.      They walked away from the door, they left

5    the door.  They were outside, so I shut the door, and I

6    went back in the house.  And I was sitting in there for a

7    while, and I woke my daughter up and I told her we're

8    looking for Dexter.  And I didn't know where Dexter was.

9    Well, they came back to the door.

10        Q.      Can you tell us about how much later?

11        A.      Yeah, maybe a half an hour.

12        Q.      And then -- you're doing fine.  What

13   happened then?

14        A.      They came back to the door.  They hadn't

15   left.  They were outside but they weren't at my door.  They

16   came back to the door.  And I told them Dexter was in the

17   house, because he was, he was in the house.

18        Q.      And then what happened?

19        A.      So they asked me to let them see Dexter.

20   So I made Dexter come in the living room and they arrested

21   Dexter.

22        Q.      Go ahead.

23        A.      So they took him to this place called

24   2020.

25        Q.      Did you go with him?

330

```
 1          A.       No, I didn't go with him.

 2          Q.       Okay.

 3          A.       They took him to 2020.  And they came back

 4     at daybreak and got me and took me to 2020 so I could bring

 5     him home.

 6          Q.       How much time was it between the time

 7     Dexter left and they came back?

 8          A.       Hours.

 9          Q.       Got any idea how many?

10          A.       I don't know, maybe five or six.

11          Q.       And what happened when the police

12     returned?

13          A.       They took me to get Dexter, but they came

14     back a second time and got me.

15          Q.       Well, let's take this a step at a time.

16     They came back about what time in the morning the first

17     time?

18          A.       About -- when they got Dexter?

19          Q.       No, after Dexter was taken away.

20          A.       About five or six hours later.  It was

21     daybreak.

22          Q.       And what happened when they came back?

23          A.       It was a female officer and she told me

24     she was taking me to pick Dexter up because they had towed

25     my car.
```

331

```
1                    MR. ANDERSON:  Objection.

2                    THE COURT:  Sustained.  Answer stricken.

3          Next question.

4          Q.       The female officer came back and what did

5   you do with the female officer?

6          A.       Went to 2020.

7          Q.       And do you know what 2020 is?

8          A.       It's a juvenile center.

9          Q.       And did you in fact go there?

10         A.       Yes, sir.

11         Q.       And how long were you there?

12         A.       Just long enough to retrieve Dexter.

13         Q.       And where did you go when you left there?

14         A.       Back home.  The officer took me back home.

15         Q.       In a marked police car?

16         A.       Yes, sir.

17         Q.       Okay.  And then as I understand your

18   testimony, the police came back again?

19         A.       Yes, sir.

20         Q.       Was it the same woman?

21         A.       No, sir, it was Detective Huffman.

22         Q.       Can you tell us about what time that was?

23         A.       No, I really don't know.  It wasn't much

24   longer after I had got Dexter.

25         Q.       Did you go someplace with Detective
```

332

1    Huffman?

2         A.    Yes, sir.  I went to -- I think it's

3    downtown, I think it's the first district.

4         Q.    Who rode downtown with you in that car?

5    Who was in that car?

6         A.    Detective Huffman was driving.  And it was

7    a tall black officer in the car with him.

8         Q.    And yourself?

9         A.    Yeah.

10        Q.    Did you see Fred downtown at District 1?

11        A.    Yeah, I saw him.

12        Q.    Was he handcuffed?

13               MR. ANDERSON:  Objection.

14               THE COURT:  Sustained.

15        Q.    How long did you stay downtown?

16        A.    They wanted me to stay until they came

17   back with Fred.  They were taking him somewhere.  They told

18   me that --

19               MR. ANDERSON:  Objection.

20               THE COURT:  Sustained.

21        Q.    How long did you stay downtown?

22        A.    I don't know.  A while maybe 45 minutes.

23   I didn't stay.  They asked me to and I didn't, but he left

24   out of there.

25        Q.    Does Fred wear glasses?

333

1       A.      No.

2       Q.      Have you ever seen him with a pair of

3  glasses on?

4       A.      Sunglasses.

5       Q.      Does he have a pair of dark rimmed

6  glasses?

7       A.      No.

8               MR. RADER:  No further questions, Your

9       Honor.

10              THE COURT:  Anything, Mr. Anderson?

11              MR. ANDERSON:  A few questions, Your

12      honor.

13              CROSS-EXAMINATION

14  BY MR. ANDERSON:

15      Q.      Ma'am, I'll hand you what's been marked as

16  State's Exhibit Number 5.  Can you identify that exhibit,

17  please?

18      A.      Yes, it's my car.

19      Q.      It's a photograph of your car?

20      A.      Yes, sir.

21      Q.      Now, you indicated that you had let a

22  neighbor use that car that day?

23      A.      Yes, sir.

24      Q.      Who was that?

25      A.      David Chambers.

334

```
 1          Q.      And you let David Chambers use your car a
 2   whole lot?
 3          A.      No, I've let him use it a couple of times,
 4   not a lot.
 5          Q.      What time did you give the car to David
 6   Chambers?
 7          A.      That morning.
 8          Q.      And what was the agreement as far as how
 9   long Mr. Chambers would have the car?
10          A.      He wasn't supposed to have it but a couple
11   of hours and he was going to bring it back.
12          Q.      And did he bring it back?
13          A.      I was gone all day.  Dexter told me he got
14   the keys from him.
15          Q.      So he did bring the car back and Dexter
16   had the keys?
17          A.      He didn't bring it back.  Dexter got the
18   keys from him.
19          Q.      Do you know where the car was at that
20   time?
21          A.      No, I don't.  I wasn't in town.
22          Q.      You were in Dayton?
23          A.      Yes, sir.
24          Q.      How did you get to Dayton?
25          A.      We had an Audi, too, and I drove the Audi.
```

1          Q.        And the defendant was with you when you

2     went to Dayton?

3          A.        Yes, sir.

4          Q.        What time did you get back from Dayton?

5          A.        I guess about 2:30, 3:00 in the morning.

6          Q.        About 2:30 or 3:00 in the morning.  So how

7     long were you home before the police showed up at your

8     doorstep?

9          A.        How long was I home?

10         Q.        Uh-huh.

11         A.        Not long.

12         Q.        Not long?

13         A.        No.

14         Q.        The police come to your doorstep and they

15     asked questions about the car?

16         A.        Yeah.

17         Q.        What did you tell them?

18         A.        It wasn't there.

19         Q.        Did you know where it was?

20         Q.        No, I did not.

21         Q.        Didn't Dexter know where it was?

22         A.        Dexter wasn't home.

23         Q.        When did Dexter show up?

24         A.        Dexter came in sometime after the police

25     had came the first time, within that half an hour frame.

336

```
 1          Q.      Did he come in the front door?

 2          A.      No, sir.

 3          Q.      Come in the back door?

 4          A.      No, sir.

 5          Q.      How did he get in?

 6          A.      Through the bedroom window.

 7          Q.      How do you know that?

 8          A.      Because the police were at the front door

 9   and he couldn't have got by them.

10          Q.      He couldn't have got by them, could he?

11          A.      No, not the front door.

12          Q.      How do you know he came in through the

13   bedroom window?

14          A.      That's the only way he could have got in

15   his room.

16          Q.      Did he tell you he came in through the

17   bedroom window?

18          A.      No, he didn't.

19          Q.      So you're just guessing now?

20          A.      Yes.

21          Q.      You would agree with me there's no way

22   Dexter could have gotten in the house past the police?

23          A.      No, sir, I'm not agreeing with that.

24          Q.      You're not?

25          A.      No.
```

337

```
 1            Q.      Where is Dexter's room?

 2            A.      In the back.

 3            Q.      What floor?

 4            A.      First floor.

 5            Q.      And how high is that above the ground?

 6            A.      Not high at all.

 7            Q.      Does he come and go by the back window a

 8    lot?

 9            A.      Not a lot, but he does.

10            Q.      When did you first become aware that

11    Dexter was in the house?

12            A.      When he came in and told me that he had

13    gave the keys to his dad.

14            Q.      About what time was that?

15            A.      I don't know.  I don't have any idea what

16    time it was actually.

17            Q.      You don't have any idea what time it was?

18            A.      I really don't.  It was between 3:00 and

19    4:00 in the morning, but exactly, no.

20            Q.      How would you leave the house?  How many

21    doors are there in and out of the house?

22            A.      One.

23            Q.      Front door?

24            A.      Yes.

25            Q.      Now, you indicated that Dexter came in
```

```
 1    somehow.  He couldn't have gotten in past the police; is

 2    that right?

 3         A.        Not the front door.

 4         Q.        He couldn't have come in the front door

 5    past the police; is that right?

 6         A.        No, sir.

 7         Q.        Then he told you that he had given the

 8    keys to the defendant; is that right?

 9         A.        Yes, sir.

10         Q.        Now, if the defendant was going to leave

11    the house, he'd have to go out the front door, wouldn't he?

12         A.        My husband?

13         Q.        Uh-huh.

14         A.        Yes, out the front door.

15         Q.        So if he got the keys from Dexter and the

16    police were out front, Dexter sneaks in the back, gives the

17    keys to the defendant, and he leaves, he would have to go

18    out the front door?

19         A.        My husband did.

20         Q.        He went out the front door?

21         A.        My husband went out the front door.

22         Q.        Were the police still there?

23         A.        No, the police weren't there then.   The

24    police weren't there when Dexter gave him the keys.

25         Q.        They weren't?
```

339

```
 1            A.      No.
 2            Q.      Well, did your husband leave before or
 3     after the police took Dexter?
 4            A.      He left before.
 5            Q.      Who did?
 6            A.      My husband left before.
 7            Q.      What time?
 8            A.      I don't know.  I don't know what time it
 9     was.  I was in bed.  I really don't know what time it was.
10            Q.      Well, you indicated that the police were
11     at the door?
12            A.      Yes.
13            Q.      They asked you questions about the car?
14            A.      Uh-huh.
15            Q.      They asked you questions about Dexter's
16     whereabouts and Dexter wasn't there.  Then you said that
17     the police never left your door?
18            A.      No, they left my door.  They were out in
19     front of the house.
20            Q.      They were there when he came in?
21            A.      Right.
22            Q.      Then you said at some point he left before
23     Dexter came in?
24            A.      He left before the police came.
25            Q.      He left before the police came?
```

1          A.      Yes.

2          Q.      About how soon before the police came?

3          A.      I don't know.

4          Q.      No idea?

5          A.      No, sir.  He was gone.  I was in the bed

6    when the police came.  Fred wasn't home.

7          Q.      He wasn't home?

8          A.      No.

9          Q.      Do you know what time Dexter got the keys

10   from David Chambers?

11         A.      I wasn't in town.  Dexter just told us.

12              MR. ANDERSON:  Okay.  I have no further

13         questions.

14              THE COURT:  Anything else?

15              MR. RADER:  No further questions.

16              THE COURT:  Ms. Hall, you may have a seat

17         outside and you're not to discuss this case with

18         anyone.

19              THE WITNESS:  Okay.

20                 (Witness excused.)

21              THE COURT:  Defendant have any other

22         witnesses they want to call?

23              MS. ZUCKER:  Yes, Your Honor.  Barry

24         Whitton.

25              We'd like a short recess.

341

1                    THE COURT:  How short?

2                    MS. ZUCKER:  About 10 minutes.

3                    THE COURT:  Okay.  We'll take a 10 minute

4          recess.  We'll reconvene at 11:30. Don't go far,

5          if you will.

6                    Don't discuss the case amongst yourselves or

7          with anyone else nor permit anyone to discuss it

8          in your presence.  And don't come to any

9          conclusions based on anything you've seen or heard

10         thus far.

11                   Well be in recess until 11:30. Thank you

12         very much.

13                   (Jury out at 11:20 a.m.)

14                   THE COURT:  We'll do this witness.  Break

15         until tomorrow at 10:00.  I trust we can have

16         Huffman here bearing some sort of emergency.

17                   MR. ANDERSON:  I hope so.

18                   THE COURT:  And then you'll rest, and Bill

19         will make a decision whether or not he wants to

20         put on rebuttal.

21                   Ordinarily if you were going to put on

22         Huffman today I'd give you time to prepare.

23                   Who's doing closing?  Prepare it tonight.

24                   MR. RADER:  Okay.

25                   THE COURT:  Mr. Whitton?

```
 1                  Mr. Whitton:  Yes, sir.

 2                  THE COURT:  I appreciate you're coming in on

 3             short notice.

 4                  The attorneys, I need you to come back here

 5             at 2:30.  We're going to discuss and finalize the

 6             charge, okay?  About 2:30 today, finalize the

 7             charge.

 8                  I gave you copies of it.  Go through it.

 9                    Line them up.

10                  The only thing that's going to happen is

11             you're going to call him as a witness.  I'll let

12             him stay in here so you don't have to go get him.

13                  (Jury entered courtroom at 11:35 a.m.)

14                  THE COURT:  Please be seated.

15                  Next defense witness ready to go?

16                  MS. ZUCKER:  Yes, Your Honor.  Call Mr.

17        Barry Whitton.

18                           BARRY WHITTON

19    being first duly sworn, was examined and testified as

20    follows:

21             THE COURT:  Please have a seat.  Pull that

22        microphone over to you a little bit, please.  State

23        your name and spell your last name, please.

24                  THE WITNESS:  My name is Barry Whitton,

25             W-h-i-t-t-o-n.
```

```
 1                    THE COURT:  Okay.  Go ahead, Ms. Zucker.
 2                         DIRECT EXAMINATION
 3    BY MS. ZUCKER:
 4         Q.        And Mr. Whitton, how are you employed?
 5         A.        I work for the City of Cincinnati Police
 6    Division, Communications Section.
 7         Q.        And were you so employed on or about
 8    January 21, 1999?
 9         A.        Yes, I was.
10                    MS. ZUCKER:  May I approach, Your Honor?
11                    THE COURT:  Yes.
12         Q.        I'm going to show you a subpoena which I
13    believe is Defendant's Exhibit Number 10.  It's a subpoena
14    duces tecum.  And can you tell us what that's for?
15         A.        It requests the records from the
16    communications section, requesting all radio transmissions,
17    911 calls, telephone communications, personal
18    communications, devices, et cetera.  Personal calls from
19    phones, telephones, car radio transmissions surrounding the
20    arrest of Fredrick Hall from around 1330 Republic Street
21    and Gilbert Avenue on 10/17 or 10/18 of '98.
22         Q.        Thank you.  And as a result of that
23    subpoena, would you or somebody in your department prepare
24    documents?
25         A.        Yes, that's correct.
```

```
 1            Q.       And if I were to show you this envelope

 2    with two tapes, were these tapes that would have been

 3    prepared by yourself?

 4            A.       Yes, that's correct.

 5            Q.       And are these copies of MDTs which, can

 6    you explain what MDT is?

 7            A.       MDT is a monitor daily form which is the

 8    computer that the officers have in their cruisers.

 9            Q.       That's in their police car?

10            A.       Yes.

11            Q.       They're used to communicate?

12            A.       With each other, yes.

13            Q.       And would these be printouts from this

14    incident?

15            A.       These are printouts from the MDT system;

16    that's correct.

17            Q.       And those are produced in the normal

18    procedure of the evening or day time of the police

19    communicating with each other?

20            A.       The record is recorded at all times.   The

21    log is recorded at all times, yes.

22            Q.       And that's records through tape and

23    through computer; is that correct?

24            A.       All transactions that take place on the

25    MDT are stored in the log.  And those logs are stored on a
```

```
 1    computer.  And if a conversation occurs, you can then print
 2    out portions of the log or the entire log for whatever is
 3    requested, that's correct.
 4              Q.      And a few minutes ago I had the
 5    opportunity to go over these documents with you; is that
 6    right?
 7              A.      That's correct.
 8                      THE COURT:  For the record state what
 9              those documents are.
10                      MS. ZUCKER:  They are Exhibit 8 and I
11              believe they will be 11 and 12.
12                      THE COURT:  Well, mark them if they're
13              not already marked, and when questions are asked
14              of the witness concerning those documents, let's
15              make sure you're identifying which document it is
16              for the record.
17                      Do you have some specific questions for
18              him about those?
19                      MS. ZUCKER:  I will in a second.
20                      THE COURT:  As soon as you do, he can get
21              up and go talk over there.
22              Q.      You've had a chance to review these
23    documents?
24              A.      Yes, I did.
25              Q.      And these are accurate reproductions of
```

1    the printouts?

2            A.      Yes.

3            Q.      And looking beginning at 3:18 on

4    Defendant's Exhibit 8, and continuing through Defendant's

5    Exhibit 10 and then on to Defendant's Exhibit 11.  That

6    would provide a chronological transmission of what had

7    occurred on the evening of October 17, the morning of

8    October 17?

9            A.      Would you like me to --

10           Q.      You want to come up and explain that?

11           A.      Look at them, yeah.

12                   THE COURT:  All right.  Mr. Whitton,

13   you're going to be up there.

14                   I want you, Ms. Zucker, to make sure the

15           exhibit number he's referring to is there.

16                   Mr. Whitton, just keep your voice up.

17                   Can everyone in the jury see what they

18           are trying to do?  Especially those folks on that

19           end.  Can you see?

20                   JUROR 1:  Yes.

21           Q.      And just going to the top part.  Will you

22   explain that on Exhibit 11 there's a time printout here?

23           A.      Yes, right here.

24           Q.      And that comes from what?

25           A.      That's generated by the main computer.

1    The time stamp that this particular information was

2    requested by this particular --

3         Q.      So through 5:09, that's going to show

4    everything that's occurred prior to 5:09?

5         A.      5:09 is when this particular car number

6    1312 requested this information regarding this incident.

7    The incident summary is displayed and then started with

8    this call.  It's in reverse chronological order and it goes

9    through Exhibit 12, going backwards, to a point 3:18 which

10   was actually the first bit of information that was entered

11   regarding the incident.

12               It's a reverse chronological order for the

13   incident.

14        Q.      It's a reverse chronological order?

15        A.      Right.

16        Q.      And these are all recorded or transmitted

17   by police officers to the dispatcher?

18        A.      The information is recorded as part of the

19   incident history.  These are information regarding this

20   particular call at 1330 Republic.  This is information

21   regarding phone calls.  This is information regarding

22   officers being assigned to the call.

23               This is information regarding officers

24   arriving at the scene and then of other various information

25   that the officer has put on via the computer in their car;

1    that is correct.

2         Q.        And if we were to look at Defendant's

3    Exhibit Number 8 and we were to look at 3:20, what would

4    that stand for?  Supplemental text?

5         A.        That's correct.

6         Q.        And where would that come from?

7         A.        That would come from either a dispatcher

8    or 911 operator at the unit center adding additional

9    information to the call.

10        Q.        And what information was transmitted at

11   3:20?

12        A.        I'm highlighting it in, yes, ma'am.  It

13   was 3:20.  The suspect or s-u-s-p, is MB.

14        Q.        Do you know what MB stands for?

15        A.        Generally stands for male black.

16        A.        And this is a comma, 23, no further

17   d-e-s-c, description.

18        Q.        And at 3:21 what would have been

19   transmitted at that point?

20        A.        3:21 there was a change of location done,

21   by this car number which is 1481.  The location was changed

22   to Fourteenth and Republic.  There's additional information

23   here of a second victim.  S-u-s-p, suspect, small b-r-o,

24   Brown, p-o-s-s for possible, Toyota, b-r-o for Brown.

25   Toyota, brown.

1          Q.          And at 3:53, what does that mean?

2          A.          3:53, miscellaneous text was added to the

3     incident either per car 1420 or by car 1420.  That

4     information reads update d-e-s-c for description, passenger

5     is shooter.  MB/19-20, BLK, BBCAP, m-e-d c-o-m-p.  Clean

6     shaven, thin build.  I can't read that right there.

7          Q.          Would it be correct to say this would be a

8     repeat of the same transmission, pointing to 4:37?

9          A.          Right, that's correct.  This information

10    was BCAP, BL JCKT, black jacket.

11         Q.          You can be seated.

12                     (Witness resumes stand.)

13         Q.          In shorthand form that's used in

14    transcribing this, if we refer back to --

15         Q.          Well, if we refer to Defendant's Exhibit

16    11, the 353 miscellaneous 1420 update description,

17    passenger is shooter, MB would be what?

18         A.          Male black.

19         Q.          19 to 20?

20         A.          Generally, referring to the age.

21         Q.          Generally, referring to the age.  So it

22    would be a male black between the ages of 19 and 20.

23         A.          Yes, ma'am.

24         Q.          Black BB cap?

25         A.          Baseball cap.

350

```
 1          Q.      M-e-d  c-o-m-p?

 2          A.      Medium complexion.

 3          Q.      Clean shaven and then BLD?

 4          A.      Build.

 5          Q.      And BLK JCKT?

 6          A.      Black jacket.

 7                  MS. ZUCKER:  Thank you.

 8                  THE COURT:  Do you have anything else?

 9                  MS. ZUCKER:  One moment, please.

10                  THE COURT:  Sure.

11                  (Pause in proceedings)

12                  MS. ZUCKER:  I have no further questions.

13          Thank you, Judge.

14                  THE COURT:  Do you have anything, Mr.

15          Anderson?

16                  MR. ANDERSON:  I do have a few questions,

17          Your Honor.

18                          CROSS-EXAMINATION

19      BY MR. ANDERSON:

20          Q.      Officer Whitton, when this information

21      gets transported in to police communications, are you aware

22      of where the information comes from?

23          A.      Can I ask for clarification on that, when

24      you say transported in?

25          Q.      Well, I mean if a police officer radios in
```

```
 1        to police communications and it receives it, a lot of times

 2        they are taking information from witnesses and things like

 3        that; is that correct?

 4              A.      The police officers?

 5              Q.      Right.

 6              A.      That's correct.

 7              Q.      Well, I mean the police did not observe

 8        the shooting in this case, the police officers don't

 9        observe shootings as eyewitnesses; is that accurate?

10              A.      That's accurate.

11              Q.      And as part of their investigation they

12        talk to witnesses; is that right?

13              A.      That's correct.

14              Q.      And then based on their conversations with

15        the witnesses, they broadcast descriptions of cars,

16        descriptions of suspects, and things like that; is that

17        correct?

18              A.      That's correct.  We get information from

19        the officers in the field who give us information regarding

20        description of vehicles and people, and we also get that

21        from people as they call in.

22              Q.      So in this particular instance, referring

23        to Defendant's Exhibit Number 8, indicates the suspect is

24        male black, no further description, right?

25              A.      That's correct.
```

352

```
 1          Q.        We don't know where that came from except
 2     it was put on the police radio, so it could have been from
 3     a witness or something like that at the scene?
 4          A.        Can I ask if there is a number prior to --
 5          Q.        Sure.  It says supplemental text.
 6          A.        Just looking at that, there is no way that
 7     I can tell exactly where that information came from,
 8     correct.
 9          Q.        You don't know whether it came from a
10     police officer or 911 call or something like that?
11          A.        That's correct.
12          Q.        Now, up here, we've got suspect, small
13     brown possibly a Toyota, a description of the car, right?
14          A.        (Indicate yes.)
15          Q.        And that came from 1481.  That would be a
16     police unit itself?
17          A.        That's correct.
18          Q.        Again, over here, Ms. Zucker highlighted
19     passenger is shooter, male black, 19 to 20, black baseball
20     cap, medium complexion, black jacket.  That was the
21     description that came in; is that right?
22          A.        Yes, sir.
23          Q.        Now, I want to refer to State's Exhibit
24     Number 12, and I don't have my highlighter to point this
25     out, but at 3:28, that's miscellaneous and it comes back up
```

1    to 1481.  That would have been a police officer giving this
2    information; is that right?
3         A.    Yes.
4         Q.    If you could, would you please approach me
5    and just take a look at Defendant's Exhibit Number 12.
6    What does that indicate?
7         A.    3:28, miscellaneous text was added either
8    by car 1481 or from car 1481.  Witness gave plate, two
9    o-c-c-s in front/one in back.  Driver (shooter), dark cap,
10   possible baseball cap.
11        Q.    So according to this description, this
12   witness indicated that there were three occupants in the
13   car, two in the front and one in the back, and there was
14   driver was the shooter; is that right?
15        A.    It's in parentheses behind the words.
16        Q.    But I saw in another one of these and I'm
17   not sure where it was, but it indicated that the passenger
18   was the shooter.
19        A.    (Indicating.)
20        Q.    So we got descriptions from different
21   people coming in, as far as the number of occupants of the
22   vehicle and who in fact was the shooter, whether it was the
23   driver or passenger or things like that; is that right?
24        A.    That's correct.
25        Q.    Is it fair to say that at 3:15 in the

354

1    morning -- people see things differently at night?

2                    MR. RADER:   Objection, Your Honor.   Asks

3            for speculation.

4                    THE COURT:   Sustained.

5                     MR. ANDERSON:   You can have a seat, sir.

6                    I have no further questions.

7                    THE COURT:   Anything else, Ms.   Zucker?

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

355

| | |
|---|---|
| 1 | REDIRECT EXAMINATION |
| 2 | BY MS. ZUCKER: |
| 3 | Q.    Referring back to Defendant's Exhibit 11, |
| 4 | 3:53 MISC 1420, that was also broadcast by a police |
| 5 | officer; isn't that correct? |
| 6 | A.    The miscellaneous information was either |
| 7 | added to that incident -- you said it was 1420? |
| 8 | Q.    Yes. |
| 9 | A.    It was either added to that incident by |
| 10 | 1420, his computer, or it was relayed verbally to the |
| 11 | dispatcher who referred it to 1420. |
| 12 | (Pause in proceedings.) |
| 13 | Q.    For clarification on Defendant's Exhibit |
| 14 | 12, 3:28, Mr. Anderson asked about the description that was |
| 15 | broadcast by 1481. "Witness gave plate, two OCCS."  Would |
| 16 | it be fair to say that OCCS stands for occupants? |
| 17 | A.    Yes, ma'am. |
| 18 | MS. ZUCKER:  I have no further questions. |
| 19 | THE COURT:  Anything else, Mr. Anderson? |
| 20 | MR. ANDERSON:  No, Your Honor. |
| 21 | THE COURT:  Mr. Whitton, thank you very |
| 22 | much for your time.  You're free to leave.  Don't |
| 23 | discuss this case with anyone until you return, if |
| 24 | you do. |
| 25 | (Witness excused.) |

```
 1                    THE COURT:  Okay.  Ladies and gentlemen, at
 2          this point in time, there are no other witnesses
 3          that are ready to go.  So at this point we're
 4          going to -- Mr. Whitton, you can have a seat
 5          outside, please.
 6                    (Witness left courtroom.)
 7                    THE COURT:  We're going to break until 10:00
 8          tomorrow morning.  It was my intention to get you
 9          the case tomorrow; in other words, to complete all
10          the testimony and all the evidence.
11                    Mr. Rader, excuse me just a second. -- to
12          complete all the testimonial evidence and complete
13          closing arguments and give you the jury charge and
14          get you the case tomorrow.  So I am mindful of
15          your time.  Sometimes things go straight through
16          and sometimes there are unavoidable delays.  And
17          this is one.
18                    So until tomorrow -- is 10:00 okay with
19          everybody?  Until tomorrow, don't discuss this
20          case amongst yourselves or with anyone else nor
21          permit anyone to discuss it in your presence.
22                    Don't come to any conclusions about anything
23          you've seen or heard thus far.  You may or may not
24          have heard all the testimonial evidence but you've
25          not seen the exhibits nor have you heard any
```

1        instructions to the law.

2             And don't attempt to do any independent

3        investigation to prove or disprove any fact you

4        may have heard in this case.  To do so would be

5        improper.

6             With that, I thank you very much for your

7        time and we'll see you tomorrow morning at 10:00.

8        Thank you.

9             (Jury left courtroom at 12:10 p.m.)

10            THE COURT:  Let me state this for the

11       record.  We've had numerous breaks for whatever

12       reasons.  Some good, some not good.  I really want

13       to get everybody here tomorrow morning that's

14       going to testify.  Let's have them here at 9:00

15       and let's roll through.  I really would like to

16       get the case to the jury tomorrow.

17            Everybody's got a right to present

18       testimony.  If the defendant has more witnesses he

19       will be permitted to present them.  Let's just see

20       if we can do it tomorrow morning.

21            MR. ANDERSON:  The only problem is we have a

22       witness from Dayton who indicated he would be

23       available tomorrow afternoon.

24            THE COURT:  What time?

25            MR. ANDERSON:  1:00.

358

```
 1              THE COURT:  That's okay.

 2               We've never heard from Huffman.

 3              MR. ANDERSON:  I'll call him again.

 4              THE COURT:  Off the record.

 5                   (Proceedings adjourned.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```