1           COURT OF COMMON PLEAS

2           HAMILTON COUNTY, OHIO

3                - - -

4    STATE OF OHIO,              )
                                 )
5         Plaintiff,             )
                                 )  CASE NO: B-9807452
6      vs.                       )
                                 )
7    FREDRICK HALL,              )
                                 )
8         Defendant.             )

9                - - -

10          Transcript of Proceedings

11               - - -

12   APPEARANCES:

13   WILLIAM ANDERSON, ESQ.

14          On behalf of the Plaintiff.

15   JAMES RADER, ESQ.
     ELIZABETH ZUCKER, ESQ.
16
            On behalf of the Defendant.
17

18

19                    BE IT REMEMBERED that upon

20   the jury trial of this cause, on May 4th, 1999,

21   before the Honorable Steven Martin, a said

22   judge of the said court, the following

23   proceedings were had, to wit:

24

25

| 1 | |
|---|---|
| 1 | MORNING SESSION, MAY 4, 1999 |
| 2 | THE COURT:  Okay.  Mr. Rader, it's |
| 3 | my understanding that you're not going to |
| 4 | put on any additional evidence, but there |
| 5 | is a stipulation that you want to enter |
| 6 | into.  Let's do it now. |
| 7 | MR. RADER:  Your Honor, I believe |
| 8 | that relates to Defendant's Exhibits 15 |
| 9 | and 16. |
| 10 | Number 15 is a request submitted by |
| 11 | Officer Huffman for fingerprint analysis |
| 12 | of the three .380 shell casings in this |
| 13 | case, and the attempt to develop latent |
| 14 | fingerprints resulted in a negative |
| 15 | result. |
| 16 | Defendant's Exhibit 16 is -- there |
| 17 | was a latent print of good quality |
| 18 | retrieved from the automobile, which was |
| 19 | compared with the fingerprint of Fredrick |
| 20 | Hall.  That form for the request for |
| 21 | analysis was also submitted by Officer |
| 22 | Huffman. |
| 23 | THE COURT:  That's Defendant's |
| 24 | Exhibits 15 and 16. |
| 25 | MR. ANDERSON:  Judge, the State |

| | |
|---|---|
| 1 | will stipulate to those two exhibits. |
| 2 | THE COURT: Do you have any other |
| 3 | evidence that you want to submit? |
| 4 | MR. RADER: Your Honor, also, there |
| 5 | was a stipulation as to Defendant's |
| 6 | Exhibit 13, which is the medical records |
| 7 | from Correctional Medical Services, Inc., |
| 8 | which is the facility at the Justice |
| 9 | Center. I believe the prosecutor will |
| 10 | stipulate to those. |
| 11 | MR. ANDERSON: So stipulated. |
| 12 | THE COURT: And Defendant's Exhibit |
| 13 | Number 14 is medical records from |
| 14 | University Hospital, beginning with |
| 15 | treatment on the 3rd of October, 1998. I |
| 16 | believe the prosecution will agree to |
| 17 | stipulate to those as well. |
| 18 | MR. ANDERSON: That's correct. |
| 19 | THE COURT: Okay. All right. Any |
| 20 | other exhibits or evidence? |
| 21 | MR. RADER: Yes, we have some other |
| 22 | exhibits, your Honor. |
| 23 | THE COURT: I know, defense |
| 24 | exhibits. We'll go in order of |
| 25 | introduction: Defendant's Exhibit 5, |

1           it's a chart. Do you want that admitted?
2                   MR. RADER: Please excuse me.
3                   Can we back up to 4, which is
4           marked as Defense Exhibit 4, which is the
5           tape that was authenticated the other day
6           by the gentleman who came down from the
7           police communications.
8                   THE COURT: All right.
9                   MR. RADER: That's numbered 4
10          because it was numbered such in the
11          motion to suppress hearing.
12                  THE COURT: Okay.
13                  Defendant's 4, the tape, do you
14          have something to give them to play it
15          on?
16                  MR. RADER: Yes.
17                  THE COURT: Okay. Any objection,
18          Mr. Anderson?
19                  MR. ANDERSON: No.
20                  THE COURT: Defendant's 5, some
21          chart that you did; do you want that
22          introduced?
23                  MR. RADER: Yes, your Honor.
24                  THE COURT: Defendant's 6, another
25          chart?

```
 1              MR. RADER:  Right.  Any objection
 2        to 5 or 6?
 3              MR. ANDERSON:  No.
 4              MR. RADER:  Number 7 and Number 8,
 5        your Honor, if it please the Court, are
 6        the blowups, the computer generated
 7        chronologies from police communications.
 8              THE COURT:  Any objection?
 9              MR. ANDERSON:  No.
10              THE COURT:  Defendant's 9 is a
11        subpoena?
12              MR. RADER:  Yes.
13              MR. ANDERSON:  Object to that.
14              MR. RADER:  You do?
15              THE COURT:  Sustained.  Defendant's
16        9 won't come in.
17              Defendant's 10, 11, and 12, those
18        were the blowups, weren't they?
19              MR. RADER:  Your Honor, Number 10
20        was a transcript that Ms. Zucker used one
21        page of to cross-examine Officer Baker.
22              MR. ANDERSON:  Objection.
23              THE COURT:  Sustained.  That will
24        be admitted.  What are 11 and 12?
25              MR. RADER:  Those are, again,
```

```
 1          enlargements of computer-generated
 2          materials from police communications.
 3                  THE COURT:  You object?
 4                  MR. ANDERSON:  No.
 5                  THE COURT:  They'll be both be
 6          admitted.
 7                  (Defendant's Exhibit 11 and 12
 8          admitted.)
 9                  THE COURT:  Defendant's 13, 14, 15,
10          and 16 are all stipulated in; is that
11          correct?
12                  MR. RADER:  That's correct.  May I
13          digress to Defendant's Exhibit Number
14          10?
15                  THE COURT:  Uh-huh.
16                  MR. RADER:  Mr. Bailey was asked if
17          he made these statements, et cetera,
18          which included that one page.  He looked
19          at the page here in court from the
20          witness stand, authenticated that is, in
21          fact, what he said.  I would ask that one
22          page be admitted.
23                  THE COURT:  You indicated before,
24          and it's the way that he recalled it, it
25          was for impeachment.  If you impeach him,
```

1          you have the testimony from which you can

2          impeach him.

3                    MR. ANDERSON:  Not only that, he

4          admitted that's what he said.

5                    MR. RADER:  Okay.  With the

6          prosecution's agreement that he admitted

7          what he said in the transcript, we have

8          no problem.

9                    MR. ANDERSON:  He said what he

10         said.

11                   THE COURT:  He said whatever is in

12         the record he said.

13                   All right.  You'll rest.

14                   Bring the jury in.  We'll do the

15         stipulation as to Defendant's Exhibits

16         13, 14, 15 and 16.  You will rest on the

17         record.

18                   Mr. Anderson, I understand you have

19         one rebuttal witness.

20                   MR. ANDERSON:  I do.

21                   THE COURT:  We will go directly

22         from that rebuttal witness -- are you

23         going to introduce any more exhibits?

24                   MR. ANDERSON:  No.

25                   THE COURT:  We will go directly

| | |
|---|---|
| 1 | from rebuttal into closing.  How long do |
| 2 | you need to close?  I'm thinking of an |
| 3 | hour each side.  Is that enough time? |
| 4 | MR. RADER:  Yes. |
| 5 | THE COURT:  In advance, Mr. Rader, |
| 6 | are you or Ms. Zucker going to do the |
| 7 | close or both or what? |
| 8 | MR. RADER:  I believe I will, your |
| 9 | Honor. |
| 10 | THE COURT:  Okay.  Mr. Anderson, |
| 11 | how much time do you want reserved for |
| 12 | rebuttal? |
| 13 | MR. ANDERSON:  It doesn't matter. |
| 14 | If I run over 45 minutes in my opening |
| 15 | portion, I have talked too long anyway. |
| 16 | THE COURT:  If you hit 45 minutes |
| 17 | in your opening portion, I will tell you. |
| 18 | Mr. Anderson, you have 15 minutes |
| 19 | left.  You do what you want. |
| 20 | MR. ANDERSON:  Thank you. |
| 21 | THE COURT:  Okay.  Then we will |
| 22 | probably take a break, maybe send them to |
| 23 | lunch before we read the charge. |
| 24 | Krista is finishing up the charge. |
| 25 | The charge, itself, is done.  She's |

```
 1          finishing up the verdict forms right now.
 2          Okay.  Are all exhibits on this table the
 3          exhibits that have been admitted?
 4                    MR. RADER:  Right.
 5                    THE COURT:  Do you need that thing
 6          during your closing?  If you do, pull it
 7          out now.
 8                    MR. RADER:  I don't believe it's
 9          worthwhile -- to answer your question.
10                    THE COURT:  You don't need it?
11                    MR. RADER:  No.
12                    (The jury entered the courtroom at
13                        10:37 a.m.)
14                    THE COURT:  I apologize for the
15          delay, ladies and gentlemen.
16                    Does the defense have some
17          stipulations that they want to state?
18                    MR. RADER:  Yes, your Honor, if it
19          please the Court, the prosecution and I
20          have agreed to stipulate the admission
21          into evidence of some medical records
22          from the Hamilton County Justice Center.
23          That's Exhibit Number 13.
24                    Exhibit Number 14 are the medical
25          records from the University Hospital
```

1   Medical Center.

2          Exhibit 15 is a report from the

3   Police Department requesting fingerprint

4   analysis of the three cartridge cases.

5   That is the report submitted to the lab

6   by Officer Huffman.

7          And Exhibit Number 16 was, again, a

8   report submitted by Officer Huffman

9   requesting the examination of a

10   fingerprint found in the automobile.  The

11   prosecution and I have agreed to

12   stipulate those documents into evidence

13   without objection.

14          THE COURT:  Okay.  Thank you.  So

15   stipulated.

16          MR. ANDERSON:  Yes, your Honor.

17          THE COURT:  Any further witnesses

18   you want to present for the defense?

19          MR. RADER:  No, your Honor, defense

20   rests.

21          THE COURT:  Any rebuttal from the

22   State of Ohio?

23          MR. ANDERSON:  I have one

24   additional rebuttal witness, your Honor.

25          THE COURT:  Okay.

```
 1              MR. ANDERSON:  The State will call
 2         Officer Huffman back to the stand,
 3         please.
 4              THE COURT:  Officer, come up.  You
 5         have been previously sworn.  You're still
 6         under oath in this case.
 7              THE WITNESS:  Yes.
 8              THE COURT:  Sit down and pull the
 9         microphone over to you.  Okay.  Mr.
10         Anderson.
11              MR. ANDERSON:  Thank you, your
12         Honor.
13                   P.O.  HUFFMAN
14   being first duly sworn, was examined and
15   testified as follows:
16                   DIRECT EXAMINATION
17   BY MR. ANDERSON:
18         Q.   Officer Huffman, you testified in
19   this matter last week, I believe.
20         A.   Yes, sir.
21         Q.   Okay.  You're still under oath.
22              What I will do is I will hand you
23   what's been marked for identification
24   Defendant's Exhibit 15.  Can you identify what
25   that exhibit is, sir?
```

1        A.      Yes, sir.  It's a photo card

2   evidence submission sheet.  Anytime we submit

3   evidence to the coroner's lab or our lab, we fill

4   one of those out.

5        Q.      You previously identified as

6   Defendant's Exhibit 3 three shell casings.  Did

7   you do anything with the shell casings once they

8   were recovered?

9        A.      Yes, sir.  I only recovered one of

10  the spent shell casings, which was in Mr. Hall's

11  car.

12       Q.      Okay.

13       A.      I placed that in an evidence

14  submission envelope, and the other two were

15  already placed in the other two by other

16  officers.  And we sent them to the fingerprint

17  criminalist, and I asked to see if there were

18  fingerprints on those shell casings.

19       Q.      According to Defendant's Exhibit

20  15, Officer Ron Camden, who does the fingerprint

21  analysis, was unable to lift any latent prints

22  from the shell casings?

23       A.      Yes, sir.

24       Q.      You indicated the shell casings

25  were placed in different envelopes, the one that

1   was recovered from the car and two that were
2   recovered from the scene?

3        A.   Yes.

4        Q.   Look at State's Exhibit 10.  Today
5   those shell casings are, in fact, contained in
6   the same envelope?

7        A.   Yes, sir.  After a day or so, after
8   the results of the fingerprint tests, I requested
9   that the criminalist send them to the coroner's
10  lab for a striation test, which is a test to
11  determine -- if all three casings were fired from
12  the same gun, they leave marks and striations in
13  the shell casings.

14       Q.   And you have also got a report from
15  the coroner's office indicating that two of the
16  shell casings were fired from the same gun, and
17  one was not fired from the same gun; is that
18  correct?

19       A.   That's correct, yes, sir.

20       Q.   Can you tell which particular shell
21  casings were recovered from the car and the ones
22  that were recovered from the scene?

23       A.   Not now, no.

24       Q.   Why is that?

25       A.   Evidently, the criminalist or the

1    lab technician, whoever, after the striation test

2    or before the striation test, they were placed

3    together.

4         Q.   Inadvertently?

5         A.   Yes, sir.

6         Q.   Okay.  Now, I will also hand you

7    what's marked as Defendant's Exhibit 16.  Can

8    you identify what that particular exhibit is?

9         A.   Yes, sir.  At the time that I was

10   called in, at the time I processed the car, I had

11   no idea if there was going to be more victims or

12   whatever, so I took fingerprints from the

13   automobile.

14        Q.   How many viable latent fingerprints

15   did you obtain from the automobile?

16        A.   I obtained one quality print, which

17   means it could be identified, but it came back

18   without being Fred Hall's, who I submitted.

19        Q.   Did you submit anybody else?

20        A.   No.

21        Q.   How about Mr. Davis?

22        A.   I believe he was one of the

23   juveniles, or they were both juveniles at the

24   time.  I cannot recall.  No, sir, I did not

25   submit anybody else.

1          Q.    So the fingerprint that was
2    recovered from the car, it was not traced to the
3    defendant. We don't know whose fingerprint that
4    is; is that correct?
5          A.    That's correct.
6          Q.    Now, how long have you been on the
7    police force?
8          A.    I have been a member of the police
9    division for 27 years.
10         Q.    What can you tell about gunshot
11   residue tests?
12         A.    From what I understand, there's a
13   two-hour period, a window between the time that
14   supposedly someone has fired a weapon and the
15   time that the test should be taken.
16         Q.    Okay. Do you know why that is?
17         A.    Apparently they can rub it off on
18   their shirt. If there is -- if they have gone
19   from the scene and out of sight and hiding or
20   whatever, they can rub it in the grass area and
21   get it off, or apparently it loses its
22   effectiveness in two hours. I have never been in
23   that division.
24         Q.    Okay. According to your
25   understanding, there's a two-hour window within

```
 1   which a gunshot-residue test can be performed?
 2        A.    Yes.
 3        Q.    Was there a gunshot-residue test
 4   performed in this case on the defendant?
 5        A.    No, sir, to my knowledge, there was
 6   not.
 7        Q.    Did you perform one?
 8        A.    No.
 9        Q.    Why didn't you?
10        A.    When I met Mr. Hall, the shooting
11   was close to three hours old.
12        Q.    That would be outside the window
13   where gunshot residue findings are valid?
14        A.    Yes, sir, and they lost track of Mr.
15   Hall for a while.
16        Q.    Did the defendant ever ask you to
17   give him a gunshot residue test?
18        A.    No, sir, not as I recall.
19        Q.    Okay. Did the defendant, when you
20   interviewed him -- after you advised him of his
21   rights contained in State's Exhibit 1, did the
22   defendant ever ask for a lawyer?
23        A.    No.
24        Q.    Did the defendant ever indicate he
25   didn't want to talk to you?
```

1           A.    No, he was very cooperative talking
2    to me.
3           Q.    Did you use any threat of force
4    against the defendant in order to get him to
5    talk to you?
6           A.    No, sir.
7           Q.    Did you ever threaten the defendant
8    that you're going to charge his wife and his son
9    with murder and things like that?
10          A.    No, sir.
11          Q.    Did you force him to go back up
12   with you to look for the gun?
13          A.    No, sir.  He suggested he go back
14   up.
15          Q.    He suggested that he go back up and
16   look for the gun?
17          A.    I advised him anything he could do
18   to help with the investigation would help.  If we
19   could recover the gun, that was a big item, so it
20   doesn't fall into the hands of a juvenile or a
21   child.
22          Q.    That's when you suggested you go
23   back up and look for the gun?
24          A.    Yes.
25          Q.    The gun was never recovered?

1           A.      That's correct.

2                   MR. ANDERSON:   Thank you.   I have

3           no further questions.

4                   THE COURT:   Any cross-examination?

5                       CROSS-EXAMINATION

6  BY MR. RADER:

7           Q.      Good morning, Officer Huffman.

8  Officer, isn't it almost a universal police

9  practice for officers to mark items of evidence

10 that they recover?

11          A.      Yes, sir, that's correct.

12          Q.      Can you tell me why none of these

13 three cartridge cases were marked where they

14 were recovered?

15          A.      A .380 casing is very small.   I

16 didn't want to ruin any latent prints or any of

17 the striation marks.

18          Q.      Isn't it a fact that you didn't see

19 these casings or didn't have them in your

20 possession until after 4 o'clock in the morning?

21          A.      That's correct.

22          Q.      Officer Fromhold recovered these

23 casings, didn't he?

24          A.      I recovered one from the front seat

25 of the Honda Accord.

1          Q.    Can you tell who marked these

2    casings -- and you had the opportunity to look

3    at them -- A, B, and C?

4          A.    No, sir, I cannot.

5          Q.    Have you seen the crime laboratory

6    report as to these three casings?

7          A.    Yes, sir, I believe that I have.

8          Q.    And the prosecution, I think, has

9    marked it as an exhibit.  It indicates that

10   these were submitted as Exhibit Q-1, and at the

11   time that they were submitted, they were marked

12   A, B and C.  Can you shed any light on that?

13         A.    No, sir.

14         Q.    Would you agree that that's -- it's

15   an important item of evidence in this case that

16   the odd shell, the one that didn't match, had

17   come from the defendant's car, Mr. Hall's car?

18         A.    Two of the shells matched.  Which

19   two, I don't know.  I don't understand what

20   you're asking -- your question.

21         Q.    Well, if the two casings laying on

22   the street down on Republic, if that could be

23   established through scientific evidence or could

24   be established that they came from the same gun,

25   then wouldn't that be important?

| 1 | A. Yes, sir. It could also be one that |
| 2 | was matched in the car and one on the street. I |
| 3 | don't know which two matched. |
| 4 | Q. Dr. Parrott, the coroner, indicated |
| 5 | to me a couple of weeks ago -- |
| 6 | MR. ANDERSON: Objection. |
| 7 | THE COURT: Sustained. |
| 8 | Q. Is there a new gunshot residue test |
| 9 | kit recently distributed throughout the police |
| 10 | department? |
| 11 | A. I have no knowledge of that. |
| 12 | Q. Has that ever been a part of your |
| 13 | training? |
| 14 | A. No, sir. |
| 15 | Q. What is your rank in the police |
| 16 | department? |
| 17 | A. I am a police investigator for |
| 18 | District 1. |
| 19 | Q. Have you ever used a gunshot |
| 20 | residue kit to try to preserve that kind of |
| 21 | evidence? |
| 22 | A. No, sir. |
| 23 | Q. And how long have you been on the |
| 24 | department? |
| 25 | A. Twenty-seven years. It will be 27 |

1  in July.

2       Q.   Was Mr. Hall handcuffed during his

3  ride back up to Windsor?

4       A.   He was placed in a marked police

5  cruiser, I believe he was, yes, sir.  As I

6  recall, he was.

7       Q.   Do you know if he was handcuffed

8  behind him; his hands were handcuffed behind

9  him?

10      A.   I know he was kind of complaining

11 about his arm.  By procedure, he should have been

12 handcuffed behind his back.  As I recall, he was,

13 but it's been awhile.

14           MR. RADER:  No further questions,

15      your Honor.  Thank you.

16           MR. ANDERSON:  Nothing further.

17           THE COURT:  All right.  Officer

18      Huffman.  Thank you very much for your

19      time.  Have a seat in the hallway.

20           (Whereupon, Officer Huffman was

21      excused.)

22           THE COURT:  State have any further

23      evidence?

24           MR. ANDERSON:  No, your Honor.

25           THE COURT:  State rest?

```
 1              MR. ANDERSON:  Yes.
 2              THE COURT:  Anything else from the
 3         defense?
 4              MR. RADER:  No, your Honor.
 5              THE COURT:  Ladies and gentlemen,
 6         we'll now go directly into closing
 7         arguments.
 8              And Mr. Anderson, you put that
 9         podium wherever you want to.
10              MR. ANDERSON:  Thank you.
11              THE COURT:  Closing arguments of
12         counsel are, as opening arguments, not
13         evidence.
14              You have now heard all of the
15         testimonial evidence, though you have not
16         seen the physical exhibits nor have you
17         heard my instructions as to the law.  So
18         nothing counsel say in the next two hours
19         is going to be evidence.
20              However, it is a perfectly
21         permissible part of the trial.  Counsel
22         will be able to summarize what they
23         believe the evidence has shown and what
24         they believe the conclusions are that you
25         should come to.
```

1          I have allotted each side one hour

2      total for their closing arguments.  It's

3      a total of two hours.

4          Mr. Anderson will speak first and

5      last, and Mr. Rader will speak in

6      between.

7          Mr. Anderson, go ahead.

8          MR. ANDERSON:  Thank you, your

9      Honor.

10         May it please the Court, counsel,

11     ladies and gentlemen of the jury, on

12     October 17, 1998, this defendant,

13     Fredrick Hall, took out a loaded .380

14     caliber handgun and he shot Kevin Davis

15     and Johann Hart on 14th and Republic

16     Street at approximately 3:15 in the

17     morning.  The evidence is clear in this

18     case.

19         Proof beyond a reasonable doubt.

20     Listen to the definition of proof beyond

21     a reasonable doubt that Judge Martin

22     gives to you.  He will tell you that

23     after having carefully consider and

24     compared the evidence, you cannot say

25     that you are firmly convinced of the

| | |
|---|---|
| 1 | truth of the charges. |
| 2 | If you look at the evidence in this |
| 3 | case carefully, there are some things |
| 4 | that are beyond dispute.  The elements in |
| 5 | this indictment are beyond dispute. |
| 6 | There is no question that Kevin Davis -- |
| 7 | somebody attempted to cause physical harm |
| 8 | to Kevin Davis by means of a deadly |
| 9 | weapon, a handgun.  There is no doubt |
| 10 | that somebody caused serious physical |
| 11 | harm to Kevin Davis by shooting him |
| 12 | through the shoulder. |
| 13 | There is no doubt that somebody |
| 14 | attempted to cause serious physical harm |
| 15 | to Johann Hart by means of a deadly |
| 16 | weapon.  There is no doubt that somebody |
| 17 | attempted to cause -- actually did cause |
| 18 | -- serious physical harm to Johann Hart |
| 19 | by means of a deadly weapon. |
| 20 | There is no question that somebody |
| 21 | shot a gun off at those two individuals |
| 22 | with purpose to kill them, with purpose |
| 23 | to murder them, shooting Johann Hart |
| 24 | through the neck and in the shoulder, |
| 25 | shooting him while he is lying on the |

| | |
|---|---|
| 1 | street, shooting Kevin Davis in the arm. |
| 2 | This question is a question of |
| 3 | identity.  There is no question that |
| 4 | Johann Hart and Kevin Davis were shot. |
| 5 | There is no question they were shot with |
| 6 | a gun.  And there is no question that |
| 7 | whoever shot them was trying to kill |
| 8 | them. |
| 9 | Ladies and gentlemen, the evidence |
| 10 | proves that this defendant, Fredrick |
| 11 | Hall, is, in fact, the individual who did |
| 12 | that.  Take a look at the evidence.  You |
| 13 | have got photographs, State's Exhibits 2 |
| 14 | through 6.  These are photographs of the |
| 15 | car that Fredrick Hall was driving on the |
| 16 | night of the shooting. |
| 17 | We heard testimony from his wife |
| 18 | yesterday that this is, in fact, her car. |
| 19 | We heard testimony from his wife |
| 20 | yesterday that he wasn't around when |
| 21 | these shootings occurred.  We heard |
| 22 | testimony from his wife that he wasn't at |
| 23 | the house, he had the car keys, and that |
| 24 | he had been gone for a period of time |
| 25 | before the shooting occurred. |

1      We heard testimony from Johann
2  Hart and Kevin Davis that, in fact, the
3  driver of this car was the assailant.  We
4  have heard testimony from Officer
5  Fromhold, when he arrived on the scene,
6  he got a license plate number that
7  matches this car that was driven by the
8  assailant.

9      He put out that license plate
10  number, and Officer Bailey, finding out
11  where that license plate number was
12  registered to, figures this person might
13  be driving that way.  He stakes it out,
14  and he sees this car driven by this
15  defendant.

16      And when this defendant sees
17  officer Bailey, he takes off at a high
18  rate of speed -- 60, 70 miles an hour --
19  down Gilbert Avenue and through Eden
20  Park, running stop signs, running red
21  lights.

22      officer Bailey got a good look at
23  him.  He pulled up beside him.  The
24  defendant turned and looked at officer
25  Bailey, and he took off.

1            Officer Bailey loses the car
2       momentarily. Officer Neack responds to
3       the area. They find the car. And what
4       do they find when they find the car, this
5       car, the car that was used in the
6       shooting, the car that there is no
7       dispute this gunman drove? They find
8       him, this defendant, Fredrick Hall,
9       hiding in the bushes.

10           And what does he tell the police
11      then? He tells Officer Neack, I was just
12      out buying shaving cream. I am just out
13      for a little stroll in the night buying
14      shaving cream. The defendant admitted he
15      told Officer Neack that he was out buying
16      shaving cream.

17           When he takes the witness stand and
18      tells you yesterday or the day before, he
19      told you that he was going to drive that
20      car. He was going to the car with the
21      car keys and move the car.

22           This defendant was personally
23      capable of driving the car. Much as he
24      would have you believe otherwise, he was
25      perfectly capable of driving the car that

1    night, and he was perfectly capable of

2    pulling the trigger of a gun and striking

3    down two young men.

4         Take a look at that, because I know

5    there is going to be a lot of talk about

6    these boards, what they mean, what they

7    say.  And I will be the first to admit,

8    you have a shooting occurs at 3:15 in the

9    morning.  It's dark on an inner-city

10   street.  Crack cocaine is around.  We

11   know that.  Kevin Davis had crack cocaine

12   on him.

13        We have witness statements from two

14   people that we attempted to bring in,

15   that the defense attempted to bring in

16   and we couldn't locate.

17        One of them was allegedly a

18   crackhead -- or Jimmie Martin.  He is the

19   one that gave the police officer the

20   license plate number off of this car.

21        The suspect is a male black, no

22   further description.  Suspect, small

23   brown, possible Toyota.  It's on

24   Defendant's Exhibit 8.  You will hear

25   that tape.  I am sure defense counsel

1        will play the tape for you about the

2        calls coming in.

3             The bottom line is in certain of

4        these items they say, "Three people in

5        the car, driver is a shooter, passenger

6        is a shooter," things like that.

7             I don't know -- I don't know who

8        put those reports out, and I don't know

9        where they came from.  I know they show

10       up here.

11            Think about this -- think about the

12       testimony that Johann Hart gave you.  He

13       sees the defendant in a car.  He

14       approaches the car.  He and the defendant

15       are talking.  They get into some type of

16       an argument.

17            Kevin Davis is across the street.

18       He comes over.  Johann Hart tells you

19       this crackhead, Jimmie, gets in the car.

20            He says, "Hey, I will take you

21       where there is some crack cocaine."

22       That's two people in the car right there,

23       according to Johann Hart, according to

24       whatever witnesses there were.

25            We have a witness down the street.

| | |
|---|---|
| 1 | this female, who says there were probably |
| 2 | three people in the car.  She sees the |
| 3 | crackhead get in the car.  This defendant |
| 4 | pulls out a .380, shoots Johann Hart in |
| 5 | the neck, shoots him in the shoulder and |
| 6 | Kevin Davis in the arm.  The crackhead |
| 7 | jumps out of the car, according to |
| 8 | Johann, and takes off. |
| 9 | You have got four people at the |
| 10 | scene.  Two are shot, one jumps in the |
| 11 | car, one jumps out.  Jimmie, the |
| 12 | crackhead -- I think he was referred to |
| 13 | as John also -- the one in the car, gave |
| 14 | them the license.  That's the person this |
| 15 | witness down the street saw get out of |
| 16 | the car. |
| 17 | We heard testimony from Officer |
| 18 | Fromhold indicating one of the witnesses |
| 19 | he interviewed talked about somebody |
| 20 | getting out of the car and going through |
| 21 | one of the person's pockets that is shot. |
| 22 | That was the crackhead.  He gets out of |
| 23 | the car.  He comes around and he tries to |
| 24 | help Johann Hart as he was shot in the |
| 25 | neck.  Look at these for what they are |

worth.

I know this:  This car they are

referring to is this car right there, the

car driven by that defendant identified

by Johann Hart, Kevin Davis, and Dave

Bailey.

And we know from his wife's

testimony he wasn't at the house.  He had

gone out for a while.  She didn't know

how long.  She was laying in bed, and he

had the car keys.

And we also know his son was at the

house because, if you remember, when

Police Officer Eatrides showed up at the

house and started talking to the

defendant's wife, she initially said her

son wasn't there.  But the police were at

that location for approximately 40

minutes outside that house.  Nobody could

come in or get out of that house.

The defendant certainly didn't come

out of that house.  And what did he tell

you?  What did Eatrides tell you?  He

told you, as he was at that location out

in front of that house, he heard the

1          radio broadcast concerning the chase, the

2          chase Officer Bailey was engaged in of

3          that car driven by that defendant, when

4          Dexter Hall was, in fact, at home.

5               If you look at one of these boards,

6          it says "Cancel that call for Dexter

7          Hall.  He has been at home, and he's been

8          there for a long time."

9               You also heard about the

10         black jacket.  Look at State's Exhibit

11         Number 7.  The defendant was wearing a

12         black jacket that night.  Admittedly, he

13         was not clean shaven.  One of the

14         descriptions says "clean shaven."  Who

15         did that come from?  Did that come from a

16         witness who was 150 feet down the street,

17         saw a car going by, and heard shots going

18         off?

19               This defendant, Fredrick Hall, is,

20         in fact, the shooter in this case.

21               Look at the testimony of Johann

22         Hart and Kevin Davis.  When Officer

23         Huffman gets this defendant down at the

24         district, he takes this photograph of

25         him, and he puts him in the photo lineup.

```
1        What did he do?  He goes up to the
2     hospital.  He goes up to talk to Johann
3     Hart.  Johann is in the hospital.  He had
4     been shot through the neck, been shot in
5     the back, and he said, "Johann, can you
6     give me a description of the guy that
7     shot you?"
8            Johann says, "If I see a picture of
9     that guy, I will tell you.  I can point
10    him out.  I know who he is."
11           He shows him this exhibit, State's
12    Exhibit Number 7.  What does Johann Hart
13    do?  He picks out Fredrick Hall, and he
14    picks out this defendant, the defendant
15    that Officer Bailey saw driving this car.
16           The interesting thing about it is
17    that when -- and I'll refer to State's
18    Exhibit Number 8 -- when Johann Hart made
19    the identification of Fredrick Hall, this
20    photograph, Mr. Hall's picture was
21    actually right here.  It was in the
22    center.  And if you look at State's
23    Exhibit Number 8, this is a Polaroid
24    photograph of the photo lineup as it
25    existed when Officer Huffman showed it to
```

1        Johann Hart for identification purposes.

2              Officer Huffman, being aware of the

3        relationship between Johann Hart and

4        Kevin Davis, decides he is going to mix

5        things up a little bit.  Instead of

6        leaving the defendant's picture in the

7        center, he is going to switch it around.

8              What does he do?  He goes and talks

9        to Kevin Davis who has been released from

10       the hospital.

11             He said, "Kevin, can you give me a

12       description of the guy?"

13             He says, "If I see him, I will know

14       who he is."

15             Again, he gives him State's Exhibit

16       Number 9 in the current form, and State's

17       Exhibit Number 9 is a photocopy of this

18       Polaroid, copy of it as he showed it to

19       Kevin Davis.

20             Kevin Davis says, "That's the guy,"

21       without hesitation.

22             Johann Hart and Kevin Davis didn't

23       get a chance to talk.  "Let's conspire.

24       Let's identify this guy."

25             Look at the identification in this

1     case.  We have got two witnesses

2     independently identifying Fredrick Hall

3     as the shooter at different times, at

4     different places, without ever having

5     talked to each other.  We have got

6     Officer Bailey, who sees him operating

7     the motor vehicle.

8          Identification.  This case is about

9     identification.

10         The evidence is clear beyond a

11    reasonable doubt that this defendant, in

12    fact, was the shooter that night.

13         You heard what he said from the

14    witness stand.  I asked him, "why don't

15    you tell us what you told the police that

16    night?"  Finally, he fessed up about

17    telling him he was out looking for

18    shaving scream.

19         He said, I don't remember what he

20    told the police that night.  All I

21    remember is they threatened me.  They did

22    this.  They did that.  I don't remember

23    what I told him.

24         Let's take a look what he did tell

25    them.  You heard from Officer Neack that

1    when he Mirandized the defendant, the

2    defendant was aware of his rights, and he

3    made a knowing, intelligent, and

4    voluntary waiver of those rights.  He

5    told him he was out buying shaving cream.

6    He stuck with that story for three hours.

7         Officer Neack transports him from

8    Windsor Avenue down to the district to

9    wait for Officer Huffman to show, the

10   investigator on the case.

11        Again, they Mirandize him.  This

12   one is in writing, State's Exhibit 1.

13   You will have a chance to look at this.

14   You have heard talk about this.  When

15   Officer Neack and Huffman explained the

16   defendant's Miranda Rights to him, he

17   refused sign this waiver.  He said, "I'm

18   not going to sign it."

19        Listen to the instructions that

20   Judge Martin gives to you, because he

21   will tell you that his refusal to sign

22   this waiver doesn't mean he can't

23   intelligently waive his rights, which he

24   did.  You do not need a written rights

25   waiver to take statements from somebody.

1    That's the law.

2        He says he asked for an attorney.

3    We heard Officer Huffman say he didn't

4    ask for an attorney.

5        You heard him say he asked for a

6    gunshot residue test. You heard Officer

7    Huffman tell you he never asked for a

8    gunshot residue test.

9        You heard him tell you the police

10   threatened to arrest his son and charge

11   him with murder and arrest his wife and

12   charge her with murder.

13       Officer Huffman told you this that

14   didn't happen. We haven't heard from

15   Dexter. His wife didn't say -- on the

16   witness stand yesterday, she didn't say

17   that.

18       He said everybody in this case is

19   wrong, except him. Johann is wrong in

20   his identification. Kevin Davis is wrong

21   in his identification. Officer Bailey is

22   wrong in his identification. Officer

23   Neack is wrong in reading him his rights.

24   Huffman is wrong in reading him rights.

25       I asked him, "What did you tell the

1   police?  Tell the ladies and gentlemen of

2   the jury what you told the police that

3   night."

4           "I don't remember."

5           I will tell you who does remember

6   is Officer Huffman, because he wrote it

7   down, and you heard what he said.  He

8   said, "We gave him his Miranda Rights.

9   He agreed to talk to us.  He didn't want

10  to sign the waiver, and this is what he

11  said:"  He said, "He picked up Dave and

12  went to 14th and Republic Street."

13          I always wondered about this until

14  yesterday.  I wondered about Dave.  Who

15  is Dave?  We found out the answer

16  yesterday when his wife took the witness

17  stand.  She said, "I lent the car to Dave

18  earlier in the day.

19          "Dave had the car.  We were in

20  Dayton.  I don't know where the car was.

21  My son, Dexter, got the keys back from

22  Dave.  Dexter gave the keys to my

23  husband, and he was gone.  He was out of

24  the house at the time of the shooting.

25  He had the car keys.  He was gone."

1          What does he do?  He figures, well,
2      the shaving cream story hasn't worked so
3      far.  I will try something else.  I will
4      tell them I picked up Dave, and we went
5      down to 14th and Republic.
6          He tells Police Officer Huffman
7      that the two subjects who robbed and shot
8      him two weeks ago were there, Johann Hart
9      and Kevin Davis; that Dave begins to
10     shoot.  He was on the passenger side next
11     to the driver, and he shot these guys.
12         Then he tells Officer Huffman that
13     he drove off, dropped off Dave somewhere
14     and told him to hide the gun.  That's the
15     second story.  The first is the shaving
16     cream story.  The second is Dave was in
17     the car, Dave did the shooting, and I
18     dropped off Dave and told him to hide the
19     gun.
20         What does he say later?  He says,
21     "If the car is released, I will tell the
22     police the truth."
23         This time it's stated that Dave was
24     in the back seat behind him and fired the
25     shot.  Then he stated he would take the

1    police to where the weapon was, up on

2    Windsor Avenue, where he was arrested.

3            He voluntarily goes with the

4    police.  They are not forcing him,

5    holding a gun to his head.

6            He says, "I will try to take you

7    where the gun is."  They look for the

8    gun.  They are unsuccessful.  The gun is

9    gone.  He has either pitched it during a

10   high-speed chase with Officer Bailey

11   somewhere in Eden Park, or he, in fact,

12   he planted it somewhere up around Windsor

13   when he was hiding behind a tree.  The

14   gun has not been recovered.

15           Why couldn't he remember what he

16   told Officer Huffman?  Because it's not

17   true.  The truth is, he was out that

18   night looking to score some crack cocaine

19   or something.  He sees these two

20   individuals.  He talks to Johann Hart.

21   They get in some type of argument.  He

22   pulls out a gun and he fires.  Why?  I

23   don't know.

24           Let's take a look at some of the

25   other evidence in this case.  I'm sure

1    you will hear a lot about the shell

2    casings.  I will be honest.  I wish the

3    shell casings hadn't been mixed up.  Do

4    you know what?  In the final analysis of

5    this case, it doesn't matter.  This case

6    is a case about identity.  We have three

7    shell casings recovered from the scene;

8    one recovered from the car, all of them

9    .380 caliber.

10        The police did what they should

11    have done, submit them for fingerprints,

12    which they did.

13        Referring to Defendant's Exhibit

14    No. 15, the shell casings, that was an

15    attempt to go take fingerprints from

16    them, which was unsuccessful.

17    Fingerprints are hit or miss.  Sometimes

18    we get them; sometimes we don't.  On

19    objects as small as shell casings,

20    sometimes they don't.  They shipped them

21    up to the coroner's lab to have Bill

22    Schrand actually make another

23    examination.

24        Look at this report.  This is

25    another fingerprint taken off the car.

| | |
|---|---|
| 1 | They lifted one latent print off the car |
| 2 | and compared it to the defendant's. |
| 3 | That wasn't his. Does that mean |
| 4 | anything? This one doesn't. It could be |
| 5 | anybody's fingerprint. Let's take a look |
| 6 | at Bill Schrand's report. He indicates |
| 7 | three discharged .380 caliber shell |
| 8 | casings were submitted to him. That |
| 9 | Q-1(W) and Q-1(C). They are marked now |
| 10 | Q-1(A) Q-1(B) and Q-1(C). And Q-1(B) |
| 11 | Q-1(C) were fired from the same firearm. |
| 12 | Q-1(A) was not. |
| 13 | We know two of these three shell |
| 14 | casings were fired from the same gun, and |
| 15 | one was not. I cannot tell you where |
| 16 | they came from. I don't know if the one |
| 17 | in the car doesn't match the other two. |
| 18 | I don't know if the one in the car might |
| 19 | have matched the one recovered from the |
| 20 | street. I can tell you that is not a |
| 21 | fatal flaw in the case. It's not. It's |
| 22 | a case of identity. |
| 23 | Did Fredrick Hall shoot these two |
| 24 | individuals on October 17, 1998? The |
| 25 | evidence says beyond a reasonable doubt |

1        that he, in fact, did.

2             There were some other exhibits

3        contained in here.  I think they were

4        photographs of shell casings.  Where were

5        recovered?  A little bit of Johann Hart's

6        blood was in the street, where the

7        defendant left him as he sped off in the

8        car.  Here's the defendant in the

9        infamous black jacket that came across

10       one of those reports.

11            Take a look at these medical

12       records quickly.  Let's look at

13       Defendant's Exhibits 13 and 14 that we

14       stipulated to.  Defendant's Exhibits 13

15       and 14 are medical records from the

16       defendant's gunshot wound that he

17       received a couple weeks prior to this

18       shooting.  And I know there is a date on

19       here somewhere.  But look through the

20       medical reports.

21            The defendant, on the witness

22       stand, talked about being shot in the

23       arm, this arm that he can't use, but it

24       doesn't seem to inhibit him from tying

25       his shoes and putting his tie on, taking

1      his sling off and showing you where that

2      bullet wound was with that arm that was

3      going to disable him or not allow him to

4      drive the car.

5           He was, in fact, shot.  There is no

6      question about it.  But look at the

7      medical reports.  He didn't report it for

8      like three, four or five hours after it

9      was done.  He claims he got robbed.  He

10     claims he got shot.  And he doesn't go to

11     the hospital immediately.

12          When he does go to the hospital, he

13     doesn't file a police report about being

14     robbed.

15          Let's see, he goes in the hospital

16     for a gunshot wound, and what is the

17     history of the present illness?  "The

18     patient is a 42-year-old Afro-American

19     male with a past history" -- I cannot

20     pronounce, but -- "stab wounds and other

21     gunshot wounds."  He has been stabbed

22     before.  He has been shot before.

23     Handguns are nothing new to Mr. Hall.

24          Judge Martin will indicate to you

25     that one of the things that you're called

| | |
|---|---|
| 1 | upon to assess is the credibility of |
| 2 | witnesses that you hear from, including |
| 3 | the defendant. One of the ways you test |
| 4 | the credibility of witnesses is you use |
| 5 | your everyday tests that you use in |
| 6 | everyday life. |
| 7 | One of the things that you're |
| 8 | allowed to consider for credibility |
| 9 | purposes are prior felony convictions. |
| 10 | When the witness was up on the stand, I |
| 11 | asked him, "Have you been convicted of a |
| 12 | theft offense or any other type of felony |
| 13 | offense?" |
| 14 | "Yes." He's been convicted of |
| 15 | receiving stolen property from '89, |
| 16 | receiving stolen property of a motor |
| 17 | vehicle, receiving stolen property of a |
| 18 | motor vehicle, burglary, CCW. He was |
| 19 | just in a car where a handgun was located |
| 20 | up in Dayton. You can consider those for |
| 21 | purposes of assessing the defendant's |
| 22 | credibility. |
| 23 | I want to talk a little bit about |
| 24 | the fleeing and eluding. There is no |
| 25 | question that the operator of the car was |

| | |
|---|---|
| 1 | the defendant, and his operation of a |
| 2 | motor vehicle after Officer Bailey turned |
| 3 | on the lights and siren is, in fact, |
| 4 | fleeing and eluding. That created a |
| 5 | substantial risk of serious physical harm |
| 6 | to anybody on the street -- 60 to 70 |
| 7 | miles an hour in a 35-mile-an-hour zone, |
| 8 | running red lights and stop signs. |
| 9 | Ladies and gentlemen, listen |
| 10 | carefully to the instruction on |
| 11 | reasonable doubt that Judge Martin gives |
| 12 | to you. It's evidence of such character |
| 13 | that you would be willing to act and rely |
| 14 | upon it in the most important of your own |
| 15 | affairs. |
| 16 | Ladies and gentlemen, consider the |
| 17 | testimony of Johann Hart, consider the |
| 18 | testimony of Kevin Davis, consider the |
| 19 | testimony of Officer Bailey, consider the |
| 20 | testimony of Officer Huffman, consider |
| 21 | the testimony of Officer Eatrides, |
| 22 | consider the testimony of Officer Neack, |
| 23 | and see if this is just some big |
| 24 | conspiracy these individuals have hatched |
| 25 | to railroad him. |

1       We have got all of these witnesses

2    on this side. Credibility shouldn't be

3    questioned. The identification process

4    was made versus the defendant who says,

5    "They are all wrong. I wasn't there. I

6    didn't do it. I don't know what you're

7    talking about. I was just out buying

8    shaving cream."

9       Ladies and gentlemen, carefully

10   consider the evidence, assess credibility

11   of the witnesses that you have heard

12   from, reach a true and just verdict in

13   this case, a true and just verdict in

14   this case of guilty, as charged, against

15   that defendant, Fredrick Hall, on all

16   four counts of felonious assault, two for

17   using a handgun to shoot Johann Hart in

18   the street, two for using a handgun to

19   shoot down Kevin Davis in the street, two

20   for attempted murder of Johann Hart and

21   Kevin Davis, and one for fleeing and

22   eluding.

23      Judge Martin will also read to you

24   what are called specifications. There

25   are three specifications contained in

```
 1          each of the first six counts.
 2          Specification 1 is that the defendant had
 3          on or about his person or under his
 4          control a firearm while committing the
 5          offenses.
 6              Specification Number 2 is that the
 7          defendant had on or about his person or
 8          under his control and he possessed a
 9          firearm, he brandished it, indicated he
10          possessed it, or used it to facilitate
11          the offense.
12              And the third specification is that
13          the defendant fired the firearm from a
14          motor vehicle.  And again, the evidence
15          is by proof beyond a reasonable doubt
16          that this defendant, Fredrick Hall, in
17          fact, was the shooter on October 17,
18          1998.
19              THE COURT:  Thank you, Mr.
20          Anderson.
21              Mr. Rader.
22              MR. RADER:  Your Honor, would a
23          ten-minute recess be appropriate?
24              THE COURT:  I don't know.  Let's
25          just do it.
```

1              Does anybody on the jury need to

2        take a break to go to the bathroom?  If

3        you do, say so.  Let's just go forward.

4

5              MR. RADER:  Good morning, ladies

6        and gentlemen.  Ladies and gentlemen, an

7        older appellate judge once said to me,

8        "Let's have a little more light and a

9        little less heat," and I'm going to make

10       every effort that I can to shed some

11       light on this situation, sort the

12       evidence out, if you will.

13              I have a feeling, ladies and,

14       gentlemen, as a preliminary matter that I

15       want to address to you.  I hope that when

16       you ladies and gentlemen go home and talk

17       to your family about this case and your

18       friends that you will tell them that you

19       had a wonderful time, that it was a good

20       experience.  And I say that because I

21       have a respect for the jury system.

22       There are blemishes; the blemishes are

23       not on the system, the blemishes are the

24       shortcomings of the people participating

25       in the system.

| | |
|---|---|
| 1 | I cannot even think of voting and |
| 2 | sitting on a jury. I hope you can go |
| 3 | home and say, I had a great experience, a |
| 4 | wonderful experience. I saw how the jury |
| 5 | system works. It's marvelous. The |
| 6 | shortcomings are not in the system. The |
| 7 | shortcomings are human frailties. |
| 8 | Officer Bailey was the officer at |
| 9 | the corner of McMillan and Gilbert. He |
| 10 | came into court and said that the car |
| 11 | stopped for a red light and that Mr. Hall |
| 12 | looked at him, and he was sitting there |
| 13 | in his car. Mr. Hall was sitting right |
| 14 | next to him, and he got a good look. |
| 15 | Ms. Zucker brought out on |
| 16 | cross-examination a quite different |
| 17 | scenario. If I can quote from that |
| 18 | testimony on cross-examination: |
| 19 | "Right. And he, as he passed me, |
| 20 | he looked at me. I looked back. He |
| 21 | proceeded to the intersection. He had |
| 22 | the green light. I pulled away from the |
| 23 | curb, and at that point, Mr. Hall began |
| 24 | to flee in his Honda. And for -- at that |
| 25 | point, he came up behind me. He was |