1

COURT OF COMMON PLEAS

2

HAMILTON COUNTY, OHIO

3

4

STATE OF OHIO                    )
            PLAINTIFF,        )
                                 )
5

            vs.    -          )    Case Number:  B-980752
                                 )    Vol 1 of 4
6

FREDRICK HALL                    )
            DEFENDANT.        )
7                                )

8

TRANSCRIPT OF TRIAL TESTIMONY

9

10

11

APPEARANCES:

12

        WILLIAM ANDERSON, ESQ.

13

                On behalf of the Plaintiff.

14

        ELIZABETH ZUCKER, ESQ.
                    and
15

        JAMES RADER, ESQ.

16

                On behalf of the Defendant.

17

18

        BE IT REMEMBERED that upon the hearing of

19

this cause, in the Court of Common Pleas, before the

20

Honorable STEVEN E. MARTIN, one of the judges of the said

21

Court of Common Pleas, on the date hereinafter stated, the

22

following proceedings were had.

23

24

25

VOLUME 1 OF 4

PLAINTIFF'S WITNESSES:

    JOHANN HART
        DIRECT BY MR. ANDERSON:  Page 4, Line 16
        CROSS BY MR. RADER:  Page 17, Line 8
        REDIRECT BY MR. ANDERSON:  Page 31, Line 3
        RECROSS BY MR. RADER:  Page 34, Line 13

    KEVIN DAVIS
        DIRECT BY MR. ANDERSON:  Page 37, Line 4
        CROSS BY MR. RADER:  Page 48, Line 3
        REDIRECT BY MR. ANDERSON:  Page 64, Line 16
        RECROSS BY MR. RADER:  Page 68, Line 18

                    VOLUME 2 OF 4

    GREGORY EATRIDES
        DIRECT BY MR. ANDERSON:  Page 71, Line 18
        CROSS BY MS. ZUCKER:  Page 80, Line 9

    DAVID BAILEY
        DIRECT BY MR. ANDERSON:  Page 85, Line 3
        CROSS BY MS. ZUCKER:  Page 96, Line 18

    STEPHEN FROMHOLD
        DIRECT BY MR. ANDERSON:  Page 104, Line 22
        CROSS BY MR. RADER:  Page 113, Line 8
        REDIRECT BY MR. ANDERSON:  Page 125, Line 20
        RECROSS BY MR. RADER:  Page 128, Line 17
        RECROSS BY MS. ZUCKER:  Page 130, Line 1

    DOUG NEACK
        DIRECT BY MR. ANDERSON:  Page 132, Line 12
        CROSS BY MR. RADER:  Page 138, Line 23

    DAN HUFFMAN
        DIRECT BY MR. ANDERSON:  Page 142, Line 18
        CROSS BY MR. RADER:  Page 152, Line 8
        REDIRECT BY MR. ANDERSON:  Page 153, Line 14

DEFENDANT'S WITNESSES:

    FREDRICK HALL
        DIRECT BY MR. RADER:  Page 154, Line 23
        CROSS BY MR. ANDERSON:  Page 171, Line 3
        REDIRECT BY MR. RADER:  Page 195, Line 18

```
1                        VOLUME 3 OF 4

2       SHEILA PARKER-HALL
             DIRECT BY MR. RADER:  Page 201, Line 11
3            CROSS BY MR. ANDERSON:  Page 209, Line 19

4        BARRY WHITTON
             DIRECT BY MS. ZUCKER:  Page 217, Line 14
5            CROSS BY MR. ANDERSON:  Page 225, Line 8
             REDIRECT BY MS. ZUCKER:  Page 229, Line 1
6
                         VOLUME 4 OF 4
7
     PLAINTIFF'S REBUTTAL WITNESS:
8
        DAN HUFFMAN
9            DIRECT BY MR. ANDERSON:  Page 239, Line 13
             CROSS BY MR. RADER:  Page 245, Line 9
10

11                       INDEX TO EXHIBITS
     STATE'S EXHIBITS
12         1                    Rights form
           2-6                  Photos of car
13         7                    photo lineup
           8                    Photo
14         9                    Photo
           10                   3 spent shell casings
15         11-15                Photos
           17                   Lab report
16
     DEFENDANT'S EXHIBITS
17
           4                    Tape
18         5                    Diagram
           6                    Diagram
19         13                   Medicals
           14                   Subpoena
20         15                   Evidence Examination
           16                   Evidence Examination
21

22           (Exhibits are in the custody of the Court

23           Reporters' Exhibit Clerk, Jerry Costa, in Room 555

24           of the Court House.)

25
```

```
1              MORNING SESSION, Wednesday, April 28, 1999
2                      THE COURT:  Mr. Anderson, your first
3         witness.
4                      MR. ANDERSON:  Your Honor, the State
5          would call Johann Hart.
6                      THE COURT:  Mr. Hart, come on up here.
7                           JOHANN HART
8    being first duly sworn, was examined and testified as
9    follows:
10                     THE COURT:  Will you state your name and
11        spell your last name?
12                     THE WITNESS:  Yes.  My name is Johann
13        Hart, spelled H-a-r-t.  That's my last name.
14                     THE COURT:  Thank you.
15                     Mr. Anderson?
16                       DIRECT EXAMINATION
17   BY MR. ANDERSON:
18        Q.      Mr. Hart, how old are you?
19        A.      16.
20        Q.      Where do you currently live?
21        A.      With my Aunt Rose.
22        Q.      Whereabouts?  What part of town?
23        A.      Thirteenth Street.
24        Q.      Do you know an individual by the name of
25   Kevin Davis?
```

1          A.          That's my cousin.

2          Q.          How old is Kevin?

3          A.          He's 19.

4          Q.          All right.   Were you and Kevin together

5     back on October 17, 1998?

6          A.          Yes.

7          Q.          On that date did you have occasion to

8     come into contact with someone now known to you as

9     Fredrick Hall?

10         A.          Yes.

11         Q.          Do you see that individual in court

12    today?

13         A.          Right there.

14         Q.          Why don't you describe what he's wearing?

15         A.          He have on a pink shirt, black shoes, and

16    a funny looking tie.

17                      MR. ANDERSON:  Let the record reflect

18             identification of the defendant.

19                      THE COURT:  The record will reflect

20             identification of the defendant by the witness.

21         Q.          Mr. Hart, had you ever seen the defendant

22    before October 17, 1998?

23         A.          Before that day, no.  Before the day he

24    shot me?

25         Q.          Why don't you tell us where he shot you?

```
 1        A.        In my neck and back.

 2        Q.        I'll get to that in a little bit.  What

 3   location, what street were you on?

 4        A.        Fourteenth and Republic.

 5        Q.        Is that located in Hamilton County, Ohio?

 6        A.        Yes.

 7        Q.        About what time of day or night was this,

 8   do you remember?

 9        A.        It was -- I know it was like 3:15 in the

10   morning.

11        Q.        About 3:15 in the morning?

12        A.        Yes.

13        Q.        You were out with your cousin that night?

14        A.        Yes.

15        Q.        Where were you guys going at 3:15 in the

16   morning?

17        A.        We had just came from a party.  It was

18   late.  We was on our way home.

19        Q.        Had you been drinking?

20        A.        No, I don't drink.

21        Q.        Been smoking?

22        A.        No.

23        Q.        Your cousin had some cocaine on him,

24   didn't he?

25        A.        Yes.
```

```
1          Q.        Did you have any on you?

2          A.        No.

3          Q.        You guys out there dealing or anything?

4          A.        I don't know what he was doing.  I was

5     with him.  That's what he got caught with.

6          Q.        Why don't you tell us a little bit about

7     your contact with the defendant.  When did you first see

8     him?

9          A.        He approached us.

10         Q.        All right.

11         A.        He pulled up on his own.

12         Q.        Was he driving a car?

13         A.        Yes.

14         Q.        Do you remember what kind of car he was

15    driving?

16         A.        Yes.

17         Q.        What kind of car was he driving?

18         A.        A tan looking, yellow looking Honda.  It

19    was dirty, not clean.

20         Q.        Mr. Hart, I'll show you what has been

21    marked as State's Exhibits 2, 3, 4, 5, and 6.  Take a look

22    at those exhibits.

23         A.        I don't remember this car.  I remember

24    this car.

25         Q.        You remember that car?
```

```
 1              A.      Yes.

 2              Q.      Is that the car the defendant was driving

 3      that day?

 4              A.      Yes.

 5              Q.      You indicated he pulled over.  What

 6      happened when the defendant pulled over?

 7              A.      When he pulled over he called us to the

 8      car, and like I went over to the car, and I asked what he

 9      wanted.  I did not know what he wanted and he tried to cop

10      some crack from me.  I told him I didn't have none.  Kind

11      of turned into confusion.

12              Q.      Slow down a little bit.  He pulled over

13      and motioned you over?

14              A.      Yes.

15              Q.      You approached the car?

16              A.      Yes.

17              Q.      Was there anybody else in the car at that

18      time?

19              A.      No.

20              Q.      The defendant was in the car by himself?

21              A.      Yes.

22              Q.      What happened?  What did he ask you for?

23              A.      He asked for some crack.  And when I told

24      him -- 'cause when I approached the car, I asked him what

25      he wanted.  I said, what you want, dude?  Like 20.  I'm
```

```
 1    like it's over.  I don't know what you're talking about.
 2                    I come at him like that.  Then was when I
 3    -- something he said, like I just kind of backed up and me
 4    and him started arguing.
 5         Q.        Hang on.  You were arguing about what?
 6         A.        'Cause I told him I didn't have none.
 7         Q.        What did he say to you?
 8         A.        What did he say?
 9         Q.        You said you were arguing with him.
10         A.        He kind of like told me like, it was some
11    other stuff involved, though.  When I backed away from the
12    car he kind of said come here, like he was trying to rob
13    me.  And I didn't know what it was.  I kind of backed off,
14    said, man, what you come at me for?
15         Q.        What happened then after you started
16    backing away from the car?
17         A.        My cousin came up to the car.
18         Q.        That would be Kevin?
19         A.        I told the dude like get out of here.  I
20    was getting angry.  So I backed away from the car and he
21    fired.
22         Q.        You said he fired.  What did he fire?
23                   THE COURT:  First off, who's he?
24                   THE WITNESS:  Fredrick Hall, the dude
25              sitting right there.
```

```
 1                    THE COURT:  Okay, he fired.

 2          Q.        The defendant's the one that fired.  What

 3    did he fire?

 4          A.        A gun.

 5          Q.        Did you see where he got the gun?

 6          A.        No.

 7          Q.        What did he do with the gun?

 8          A.        What did he do with the gun when he shot

 9    me?

10          Q.        Uh-huh.

11          A.        He drove off.

12          Q.        How many shots did he fire?

13          A.        He fired five shots.

14          Q.        How many times were you struck?

15          A.        Twice.

16          Q.        Where were you hit?

17          A.        In my neck and my back.

18          Q.        As a result of being struck by those

19    gunshots, what happened to you?

20          A.        I went into shock.

21          Q.        Did you go to the hospital?

22          A.        (Indicate yes.)

23          Q.        Still have some scars from where you were

24    shot?

25          A.        My neck right here.  On my back it's even
```

1   worse.

2              MR. ANDERSON:  Your Honor, I would ask

3        that the witness be allowed to approach the jury

4        and show the scars to his neck as a result of the

5        gunshot wounds.

6              THE COURT:  Be permitted to do so.

7              Sir, stand right in front of the jury at

8        the direction of the prosecutor.  Show all the

9        jurors your neck.

10       Q.      Why don't you show us where the gunshot

11  wound was to the entrance of your neck?

12       A.      Here.

13       Q.      Where did the bullet come out?

14       A.      (Indicating.)

15       Q.      Pointing to the back portion of your

16  neck.  All right.  Have a seat.

17             THE COURT:  You want him to show where

18       the back was?

19       Q.      You can take your shirt off if you want

20  and show us the entrance and exit wounds to your back as

21  well.

22             THE COURT:  Pull your pants up.  Use the

23       belt for what it's there for.

24       A.      (Indicating.)

25       Q.      Where did the bullet enter; do you know?

1      A.      Over there the bullet came out.

2      Q.      Went in up here?

3      A.      Underneath.

4      Q.      Underneath?

5      A.      Came out there.

6      Q.      All right.  Did both bullets pass through

7   your body?

8      A.      Did they pass through?

9      Q.      Right.  Did they come in and out?

10      A.      Yes.

11      Q.      So the bullets were not recovered from

12   your body, right?

13      A.      No.

14      Q.      Did you receive any medical treatment as

15   a result of being shot by the defendant?

16      A.      Yeah.  I had a couple, three or four or

17   five times.  We can go over that if you all want to see my

18   hospital records.

19      Q.      I don't think we need to see your

20   hospital records.  But the gunshot wounds that you just

21   showed us to your neck and back, were caused by a gun the

22   defendant Fred Hall was firing that night, right?

23      A.      Yes.

24      Q.      You indicated before you'd never seen him

25   before, had you?

1        A.        No.

2        Q.        Had you ever stopped him before?

3        A.        I didn't even know him till the day he

4  shot me.  That's the only time I ever met him.

5        Q.        Never seen him before?

6        A.        I never even heard of him before.

7        Q.        So after you were shot by the defendant,

8  he took off?

9        A.        Yes.

10       Q.        Did you see where he went?

11       A.        I just seen him go forward and straight.

12       Q.        Now, when you were shot in the back, was

13  your back turned toward him?

14       A.        I was like catecorner like, like his car

15  going this way, I was around like this (indicating).

16       Q.        Where were you shot first; in the neck or

17  the back?

18       A.        In the neck.  I was shot in my back when

19  I was on the ground.

20       Q.        Okay.  You were laying on the ground when

21  he shot you on the ground?

22       A.        Yes.

23       Q.        Did he like lean over the car door and

24  shoot you?

25       A.        (Indicate yes.)

1          Q.  .     What happened after that?

2          A.    ‾     He pulled off.  It's like when he was

3    firing, my cousin came to like try to grab me.  And he got

4    caught in the crossfire like.  And he just pulled off.

5          Q.        Your cousin got shot at, didn't he?

6          A.        Yes.

7          Q.        Did you have a chance to take down the

8    license plate number?

9          A.        I tried but I was too shocked.  I was

10   shocked.

11         Q.        Did you go to the hospital after that?

12         A.        Yeah.

13         Q.        What happened after you were treated at

14   the hospital?

15         A.        What happened?

16         Q.        Uh-huh. ,

17         A.        I was released.

18         Q.        At some point did the police visit you at

19   the hospital?

20         A.        Yes.

21         Q.        Why don't you tell us a little bit about

22   that.

23         A.        They brought me some clothes and photos.

24   They showed me some photos to be sure that I can identify

25   him.

1    Q.    You were sure that you could identify

2    him?

3    A.    Yeah, I was.

4    Q.    How far away were you from the defendant

5    during the time you were at his car?

6    A.    I was right at his face, right like this,

7    in his car window.

8    Q.    Why don't you tell me how far away you

9    were from the defendant during the conversation that you

10    had with him?

11    A.    When I got shot?    Like this close.

12    Q.    Two or three feet?

13    A.    Yes.

14    Q.    How long were you face to face with

15    Fredrick Hall?

16    A.    We talked for like four or five seconds

17    or something.

18    Q.    You got a good look at his face?

19    A.    Yeah, real good look.

20    Q.    I'm going to show you what's been marked

21    as State's Exhibit Number 7 for purposes of

22    identification.  Can you identify what that particular

23    exhibit is, sir?

24    A.    It's a picture of Fredrick Hall.

25    Q.    And you're pointing to the photograph

1    that's in the lower left-hand corner of State's Exhibit

2    Number 7.  Is that the photograph that you picked out?

3         A.      Yeah.

4         Q.      When you were shown those six

5    photographs, that photograph was not in that position, was

6    it?

7         A.      No.

8         Q.      I want to show you what has been marked

9    State's Exhibit Number 8 for purposes of identification.

10   Can you identify who that exhibit is?

11        A.      Fredrick Hall in the middle at the

12   bottom.

13        Q.      Thank you.  When you were shown the

14   photographs contained in State's Exhibit Number 7, they

15   were actually in the position that they are in State's

16   Exhibit Number 8; is that right?

17        A.      Yes.

18        Q.      So you identified Fredrick Hall in the

19   middle photograph of State's Exhibit Number 8; is that

20   right?

21        A.      Yes.

22        Q.      But it's in the left frame in State's

23   Exhibit Number 7; is that correct?

24        A.      Right.

25        Q.      Is there any question in your mind, Mr.

1    Hart, that that defendant, Fredrick Hall, is the one that

2    fired those shots at you that night?

3              A.      No question.  I know for a fact.  I'll

4    never forget it.  It's too scary.

5                     MR. ANDERSON:  Judge, I have no further

6         questions.

7                     THE COURT:  Mr. Rader?

8                     CROSS-EXAMINATION

9    BY MR. RADER:

10                    MR. RADER:  Your Honor, could we have a

11        marking pen for the board?

12                    THE COURT:  Should be some over there.

13        You want the board moved out, too?

14                    MR. RADER:  Yes, if we could, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. RADER:

17             Q.      Good morning, Mr. Hart.

18             A.      Good morning.

19             Q.      My name is Jim Rader, one of the lawyers

20   in this case.  You pronounce your first name Johann?

21             A.      Yes.

22             Q.      How old are you?

23             A.      16.

24             Q.      Are you going to school?

25             A.      Yes, but not at the time.

```
 1                    MR. ANDERSON:  Objection.

 2                    THE COURT:  Overruled.

 3         A.         Not at the time 'cause my -- I didn't

 4    really feel too good.  I go to school about every day.

 5         Q.         It's been quite a while since you've been

 6    to class?

 7         A.         Yes.

 8         Q.         You live with your Aunt Rosemary?

 9         A.         Yes.

10         Q.         And your father is named Joseph Hart; is

11    that right?

12         A.         Yes.

13         Q.         Isn't it true that you were involved in a

14    car wreck a couple of months ago and went over a hill?

15                    MR. ANDERSON:  Objection.

16                    THE COURT:  Sustained.

17         Q.         Isn't it true that you had a car towed

18    off the street just a couple of days ago?

19                    MR. ANDERSON:  Objection.

20                    THE COURT:  Sustained.

21         Q.         Well, let me ask the question directly.

22    You make a lot of money selling dope, don't you?

23                    MR. ANDERSON:  Objection.

24                    THE COURT:  Sustained.

25         Q.         Are you around drugs a lot?
```

1       MR. ANDERSON:  Objection.

2       MR. RADER:  Your Honor.

3       THE COURT:  Sustained.

4    Q.  How long has it been from the time of

5 this incident --

6    A.  Say that again.  I didn't catch that.

7       THE COURT:  He hasn't finished yet.

8    Q.  From the time of this incident, how long

9 back from that had it been that you'd used drugs?

10    A.  I don't know how long.

11    Q.  How long before this incident was it that

12 you had taken some kind of narcotic?

13       MR. ANDERSON:  Objection again.

14       THE COURT:  Unless it shows evidence

15     relative, it's overruled.

16    A.  I was intoxicated that night.

17    Q.  You were intoxicated that night?

18    A.  Yeah.

19    Q.  From drugs?

20    A.  Yeah.

21    Q.  Can you tell us what kind of drugs?

22    A.  I was smoking weed.

23    Q.  How long had it been prior to this

24 incident that you used cocaine?

25       MR. ANDERSON:  Judge --

```
 1            A.      I ain't never used cocaine.

 2                    THE COURT:  Anybody that is going to be a

 3       witness in this case will have to sit outside.

 4                    Bill, serve your subpoena.  You have to

 5       go outside.

 6                    Hold on a second.  We have a separation

 7       of witnesses here.  I know everybody watches

 8       trials on TV and it makes for real gripping TV

 9       when they can point the witness to somebody and

10       they just talk about it.  It looks good on

11       television.  Doesn't do much for the truth.

12                    So we make all the witnesses, except for

13       the parties, sit outside so they can't hear

14       anybody else's testimony during trial.  That's

15       customary in the State of Ohio.

16                    Go ahead.  Next question.

17                    JUROR NUMBER 8:  Can I ask a quick

18       question?

19                    THE COURT:  Yes.

20                    JUROR NUMBER 8:  If I am listening and

21       not understanding the witness, may I -- not this

22       witness but for the future.

23                    THE COURT:  Right.

24                    Mr. Hart, when you speak, speak slower

25       and speak directly into the  microphone, okay?
```

1          THE WITNESS:  Yes.

2          Q.        Johann, I intended this to be Republic

3    Street.  And Fourteenth is there and Thirteenth there.

4    And this is north going towards the hill and this is the

5    river right here.  Central Parkway's going along here.  Do

6    you know whether or not -- I mean, do you recognize that

7    area?

8          A.        Yes.  It's wrong, though.

9          Q.        What's wrong with it?

10         A.        Fourteenth is the other way.

11         Q.        Thirteenth is towards the river.

12   Fourteenth is back towards the hill, right?

13         A.        Thirteenth is the hill.

14              THE COURT:  Depends on which portion of

15         -- why don't you clarify with him which portion of

16         Thirteenth Street you're talking about, 'cause

17         part of Thirteenth is on the hill but that's in

18         the Pendleton area.

19         Q.        Well, you identify with the corner here

20   of Republic and Fourteenth?

21         A.        Right.

22         Q.        And this incident happened in front of

23   1330.  Do you know if that's right?  Do you know if the

24   address where this happened was 1330?

25         A.        I didn't pay any attention to the

```
1    address.

2           Q.      Do you recall the corner of Fourteenth

3    and Republic?

4           A.      Right.

5           Q.      And Republic is one way going to the

6    river; is that right?

7           A.      Yes.

8           Q.      You're sure about that?

9           A.      It's only one way; yes, I'm sure.

10          Q.      It's kind of a narrow street, right?

11          A.      Yes.

12          Q.      Is it your testimony that -- well, let me

13   ask you.  How did this car approach on Republic or was it

14   Republic?  Where did it come from?

15          A.      It came from like the top of Republic.

16          Q.      You mean up here?

17          A.      Yeah.

18          Q.      Came down Republic.  Was it going the

19   right way?

20          A.      Was it going the right way?

21          Q.      Well, was it going --

22          A.      It was only one way.

23          Q.      And it was going --

24          A.      One way.

25          Q.      According to the traffic rules, the right
```

```
 1    way?

 2            A.      Yes.

 3            Q.      So the car was going south towards the

 4    river?

 5            A.      Yes.

 6            Q.      You're sure about that?

 7            A.      Yes.

 8            Q.      This would be the side over towards

 9    Gilbert, over towards Eden Park, east; is that right?

10            A.      Yes.

11            Q.      You're sure about that?  You know what

12    I'm talking about?

13            A.      Yes.

14            Q.      And this would be west towards 75,

15    towards Price Hill?

16            A.      Yes.

17            Q.      Are you with me?

18            A.      Yes.

19            Q.      Is that right?

20            A.      Yes.

21            Q.      You identified what the building is here

22    on the corner?  You know what I'm talking about?

23            A.      Yes, I do.

24            Q.      Can you get up and show the ladies and

25    gentlemen of the jury where this car stopped and where you
```

```
 1    had this conversation?

 2           A.        He approached right here, pulled up,

 3    stopped, pulling over right here.  He called us to his

 4    car.  Then I walked over to his car.  And I was talking to

 5    him at the building, by the building, I'm talking to him

 6    like this.

 7                    I walk up to his car and then my cousin

 8    walked up.  He pulled over right here, about right here

 9    and right here.

10           Q.        Well, draw me a little car there.

11           A.        (Witness complies.)

12           Q.        Okay.  And put a little X there where you

13    were.

14           A.        (Indicating.)

15                    THE COURT:  All right.  You can have a

16           seat, again, Mr. Hart.

17           Q.        Now, describe -- do you know what this

18    person was wearing?

19           A.        No.

20           Q.        No idea?

21           A.        No.

22           Q.        Do you recall if he was wearing a

23    baseball cap?

24           A.        No.

25           Q.        He wasn't or you don't know?
```

```
 1              A.        I didn't pay no attention.

 2              Q.        Was he clean shaven at the time?

 3              A.        No, trashy looking.

 4              Q.        Johann, at some point shortly after this

 5    incident, there were police there?

 6              A.        Yes.

 7              Q.        Did you give them a description of this

 8    person that had shot you?

 9              A.        No.

10              Q.        Did they ask you for a description?

11              A.        No.

12              Q.        Did you ever give them a description of

13    the person?

14              A.        No.

15              Q.        And it's your testimony it was only one

16    person in this car?

17              A.        Yes.  It was one person in the car and we

18    was having conversation.  Somebody approached him and got

19    in.  Then when he shot us, the person that got in got out

20    like, I mean kind of shook up his self.

21              Q.        Do you know who this person was?

22              A.        Who got in?

23              Q.        Yes.

24              A.        Yes, I know who he is.

25              Q.        Who was he?
```

1          A.       He was a crack head.  When I told him I

2    didn't have none, he said, I'll take you somewhere where

3    you can get some.  He told him no and he told him to get

4    out of the car.

5          Q.       Do you know this for a fact?  This

6    person's name?

7          A.       His name is John.  I don't know what his

8    last name is.

9          Q.       Were you picked up by the emergency

10   medical service, by the life squad?

11         A.       Yes.

12         Q.       Where were you when you were picked up by

13   the life squad?

14         A.       I was right in the middle of the street.

15         Q.       Near this area?

16         A.       Yes.

17         Q.       Did you see the police interviewing any

18   witnesses?

19         A.       No.

20         Q.       Were you able to give the police a

21   license number of this car?

22         A.       No.

23         Q.       Did you hear their conversations with

24   anybody that they were interviewing?

25         A.       No.

1    Q.    Do you recall if the person that you were

2    talking to had on a white shirt, white T-shirt?

3    A.    I don't remember what he had on.

4    Q.    Did this person have any scars on their

5    face?

6    A.    I don't recall.

7    Q.    Pardon?

8    A.    No, I couldn't tell.

9    Q.    Is there anything else that you remember

10   about this person that you can identify?

11   A.    His face.  I remember his face.

12   Q.    I guess it's obvious that he had the

13   window rolled down?

14   A.    Yes.

15   Q.    Was it cold that evening?

16   A.    It was like windy.

17   Q.    Pardon me?

18   A.    It was like windy.

19   Q.    Didn't you offer those -- in your

20   discussions didn't you tell the police that you knew what

21   this person looked like?

22   A.    Yes.  I knew his face, yes.

23   Q.    When did you tell them that?

24   A.    When they came to try to identify him, I

25   just told them, yeah, I remember his face.

```
 1          Q.        They took you to the hospital?

 2          A.        I told them if they showed me a picture

 3    that I would know.

 4          Q.        But you never told them that at the

 5    scene?

 6          A.        No, they never asked.

 7          Q.        Sir, this person that shot you, there is

 8    nothing about him that you can point your finger to to

 9    identify him other than just his face; is that right?

10          A.        Yeah.

11          Q.        You didn't notice that this person was

12    injured in any way?

13          A.        No.

14          Q.        No other means of identification

15    whatsoever?

16          A.        No.  He never got out of his car.  All he

17    was was I contacted him mouth to mouth.

18          Q.        Did you see him shoot you?

19          A.        Did I see him shoot me?

20          Q.        Yes.

21          A.        No.  I seen him pulling a gun, though.  I

22    didn't see him when he fired.

23          Q.        Okay.  Could you stand up here a minute

24    again, and Mr. Hart, just keep your voice up, okay, so

25    everybody can hear you.
```

1          A.        Yeah.

2          Q.        Come here, please.  Just a minute.  Just

3     stand here like I am facing the Judge and imagine you're

4     in the seat of this car.  Okay.  If you'd turn around a

5     little more, 'cause I got the car pointed this way.  Turn

6     around this way, face the Judge.

7                    Okay.  You're sitting in the seat of this

8     car.  Could you demonstrate to the ladies and gentlemen of

9     the jury what the person does, what their physical

10    movements were as you were being shot?

11         A.        It was like -- it was all he kept doing

12    was motioning his hand up arguing with me.  And I never

13    seen no gun or anything.  When I kind of got a little

14    verbal with my words, he just shot me.

15         Q.        But you saw his -- he was motioning with

16    his hands?

17         A.        Yeah, he was motioning with his hands.

18         Q.        You didn't notice anything peculiar about

19    that; nothing different about it?

20                   THE COURT:  All right.  Have a seat

21         again.

22         Q.        Which hand did he have the gun in?

23         A.        It was in this hand.

24                   THE COURT:  Gesturing with his right

25         hand for the record.

1      Q.      Did you ever talk to the police about the

2   possibility of your being charged with possession of the

3   drug that Kevin Davis had?

4      A.      I never was caught with no drugs.  I

5   never had no drugs.

6      Q.      But you were there on the corner of

7   Fourteenth and Republic.  Did you have any conversations

8   between you and the police about you having drugs or being

9   a party to Kevin's drugs?

10     A.      No.

11     Q.      Have you ever been convicted in a

12  criminal court or juvenile court?

13                   MR. ANDERSON:  Objection.

14                   THE COURT:  Sustained.  Next question.

15                   MR. RADER:  Your Honor, we'd like to --

16                   MR. ANDERSON:  If he's going to do a

17              dissertation, I'd appreciate it if we do it

18              outside the presence of the jury.

19                   THE COURT:  Excuse us for just a moment.

20                   Mr. Hart, stay right where you are.

21                   Mr. Rader.

22                   (Discussion in chambers off the record.)

23                   THE COURT:  Okay.  Any more questions,

24              Mr. Rader?

25                   MR. RADER:  No, Your Honor.

```
 1              THE COURT:  Mr. Anderson?

 2              MR. ANDERSON:   Thank you.

 3                   REDIRECT EXAMINATION

 4   BY MR. ANDERSON:

 5         Q.      Mr. Hart, you indicated that the

 6   defendant had the gun in his right hand; is that correct?

 7         A.      Yes.

 8         Q.      You indicated that he also, when you were

 9   discussing with him, made gestures with his hands; is that

10   right?

11         A.      Yes.

12         Q.      Do you see this sling he has on him

13   today?

14         A.      Yes.

15         Q.      Was he wearing that that night?

16         A.      No.

17         Q.      Was there any problem with his left arm

18   that night?

19         A.      No.

20         Q.      I want to show you what's been marked as

21   State's Exhibit Number 15.  Can you identify that?

22         A.      Talking about the scar on his face?

23         Q.      What's that picture of?

24         A.      Oh, Mr. Hall.

25         Q.      That's the defendant, right?
```

```
1          A.        Yes.

2          Q.        A picture of the defendant.  Is that the

3     way he looked that night, as far as facial hair and the

4     goatee and everything like that?

5          A.        Yes, he had a goatee.

6                    THE COURT:  Hold on.  Your answer was

7          what?

8                    THE WITNESS:  Yes.

9                    THE COURT:  Next question.

10         Q.        So has his appearance changed since the

11    night he shot you?

12         A.        Yes.

13         Q.        In what way?

14         A.        He shaved.  He cut his hair.

15         Q.        Now, how long were you lying in the

16    street while the paramedics were treating you for the

17    gunshot wound?

18         A.        About 10 to 12 minutes.

19         Q.        Were the police actually on the scene at

20    that time?

21         A.        Yes.

22         Q.        How long did they talk to you?

23         A.        They didn't really talk to me.  They just

24    told me that they was going to get the ambulance on their

25    way.
```

1          Q.        So they never asked you for a description

2     or anything, right, until after you were at the hospital

3     and being treated?

4          A.        Correct.

5          Q.        You told them I think I can identify the

6     guy if I see a picture of him.  They showed you some

7     pictures and you identified the defendant?

8          A.        Yes.

9          Q.        You indicated that you never -- that you

10    didn't see the defendant shoot at you; is that correct?

11         A.        Right.

12         Q.        Did you see any other guns that night

13    besides the one that was in the defendant's hand?

14         A.        No.

15         Q.        What did you do once you saw the

16    defendant with that gun?

17         A.        I really couldn't do nothing, 'cause he

18    started firing immediately with no hesitation.

19         Q.        He started firing immediately?

20         A.        Yes.

21         Q.        Did you take off to try to run away?

22         A.        I wasn't expecting it.

23         Q.        Did you get hit with the first shot from

24    the gun?

25         A.        Right, the neck, first shot.

```
1          Q.       Took you down?

2          A.       No.

3          Q.       You were standing up then?

4          A.       Yeah, but in going down I was in shock.

5          Q.       ·You mean on the ground and he pumped

6    another one into your shoulder?

7          A.       No.

8          Q.       Is there any question that's the guy?

9          A.       No question.

10                  THE COURT:  Anything else?

11                  MR. ANDERSON:  No further questions.

12                  THE COURT:  Anything else, Mr. Rader?

13                  RECROSS-EXAMINATION

14   BY MR. RADER:

15         Q.       Mr. Hart, you indicated that at the time

16   of this incident, that his hair was longer?

17         A.       No.  It was a little nappy like.  He

18   didn't have no haircut.  It wasn't long.  He just didn't

19   have no haircut.  His hair was flyaway.

20         Q.       And you don't recall seeing any scars?

21         A.       No.

22         Q.       Anywhere?

23         A.       I wasn't looking for that.

24         Q.       You said that you didn't see who shot you

25   at the time you were being shot?
```

```
 1        A.        I seen who shot me.  I didn't see him

 2   with the gun.  I seen him pull the gun out.  When I seen

 3   him, he was firing, when I seen him pointing and shooting.

 4        Q.        And did this other person that was in the

 5   back seat of the car at the time --

 6        A.        There was no one in the back seat.

 7        Q.        Where was this crack head?

 8        A.        The crack head got in the car.  Me and

 9   him was having a confrontation and was arguing.  The crack

10   head seen it, he jumped in, and was about to take him,

11   'cause I heard the crack head say, come on, I'll take you

12   somewhere later.  And then he just started firing with the

13   dude in there, like he was about to drive off, and the

14   dude got out and I seen it all that night.

15        Q.        So the crack head was in the car?

16        A.        Say what?

17        Q.        The crack head was in the car?

18                  MR. ANDERSON:  Judge, I'm going to

19             object.  He never said the crack head was in the

20             car.  He said he wasn't in the back seat.

21                  THE COURT:  That's true.  Sustained.

22        Q.        Where was the crack head seated?

23        A.        He was in the passenger's seat.

24        Q.        In the front?

25        A.        Yes.
```

```
 1          Q.      Did you tell the police that this person
 2    was a witness?
 3          A.      No.
 4          Q.      Not until that day?
 5          A.      They never asked me any questions.
 6          Q.      Not until that day, did you ever tell
 7    them that he was a witness; is that right?
 8          A.      No.
 9               MR. RADER:  No further questions.
10               THE COURT:  Mr. Hart, you're here under
11          subpoena and you're subject to recall at any time
12          in this case until it's conclusion; do you
13          understand that?
14               THE WITNESS:  Uh-huh.
15               THE COURT:  Now, you are not to discuss
16          the nature of your testimony with anyone else
17          until this case is completed; do you understand?
18               THE WITNESS:  Yes.
19               (Witness excused.)
20                         KEVIN DAVIS
21    being first duly sworn, was examined and testified as
22    follows:
23               THE COURT:  Okay, sir.
24               Will you state your name and spell your
25          last name?
```

```
1                    THE WITNESS:  Kevin Davis, D-a-v-i-s.

2                    THE COURT:  Okay.

3                    Mr. Anderson?

4                        DIRECT EXAMINATION

5    NY MR. ANDERSON:

6         Q.     Mr. Davis, how old are you?

7         A.     19.

8         Q.     And where are you from originally?  Where

9    are you currently living?

10        A.     At 503 East Thirteenth, Apartment 2.

11        Q.     Do you know an individual by the name of

12   Johann Hart?

13        A.     Yes.

14        Q.     Who is Johann?

15        A.     That's my cousin.

16        Q.     And you are currently in the Justice

17   Center; is that right?

18        A.     Yes.

19        Q.     And you were convicted of possession of

20   cocaine, a felony of the fifth degree, and were sentenced

21   I believe to six months in the Justice Center?

22        A.     Yes.

23        Q.     The night you got shot you had some

24   cocaine on you, right?

25        A.     Yes.
```

1      Q.        Why don't we talk about what happened on

2  October 17, 1998.  Were you with your cousin, Johann?

3      A.        Yes.

4      Q.        Where were you guys?

5      A.        On Fourteenth and Republic.

6      Q.        About what time of day or night was it;

7  do you remember?

8      A.        About 2:00 or 3:00 in the morning.

9      Q.        And what had you guys been doing all

10 night?

11     A.        I just came from a party and ran into my

12 cousin and I picked him up, came and picked him up.

13     Q.        Came and picked him up.  You guys were

14 standing on the corner of Fourteenth and Republic at about

15 2:00 or 3:00 in the morning.  At some point, did you have

16 contact with an individual now known to you as Fredrick

17 Hall?

18     A.        Like I ain't had nothing really to do

19 with it.  I was just telling my cousin to come on.

20     Q.        Do you see somebody in court that you saw

21 that night or that early morning of October 17?

22     A.        Yes.

23     Q.        Would you please point to him and

24 describe what he's wearing?

25     A.        Wearing all black suit and pink shirt.

```
 1          Q.      What guy are you talking about?

 2          A.      Him.

 3          Q.      That guy right there, the defendant?

 4          A.      Yes.

 5          Q.      Was the defendant in a car?

 6          A.      Yes.

 7          Q.      Do you remember what kind of car it was?

 8          A.      I just remember it was a Honda, little

 9   four door Honda.

10          Q.      Let me show you what have been marked as

11   State's Exhibits 2, 3, 4, and 5.  Take a look at those.

12   Is that the car the defendant was driving that night?

13          A.      Yes.

14          Q.      What did you do when your cousin was over

15   talking to him, to the defendant?

16          A.      I told my cousin like 15 times to come on

17   'cause I was already fixing to leave to go to a girl's

18   house.  I kept on telling him to come on if you want a

19   ride.

20          Q.      Do you have any idea what he was talking

21   to the defendant about?

22          A.      No.  I did not run up onto the corner

23   until, like, I'm getting about ready to leave.  I walked

24   over there and grabbed him.

25          Q.      Grabbed who?
```

1          A.        My cousin, Johann.   I grabbed him and

2    told him to come on.   As soon as I grabbed him, that's

3    when the gunshots occurred.

4          Q.        Did you ever see the defendant, Fredrick

5    Hall, with a gun in his hand?

6          A.        Once I looked I seen him -- he kept on

7    holding like he had something.   That's why I kept on

8    telling him to come on, like.

9                    THE COURT:   The question was did you ever

10              see him with a gun in his hand, the defendant?

11                   THE WITNESS:   No, but that's where the

12              gunshots had came out the window.

13                   THE COURT:   Next question.

14         Q.        Gunshots came out of the window of the

15   car?

16         A.        Yes.

17         Q.        From where the defendant was sitting?

18         A.        Yes.

19         Q.        Did you get struck by a bullet?

20         A.        Yes.

21         Q.        Where did you get hit?

22         A.        On my arm.

23         Q.        Did the bullet go through your arm?

24         A.        Yes.

25         Q.        So the bullet was never recovered?

```
 1            A.       No.

 2            Q.       I mean it's not like they took you up and

 3   had surgery and pulled the bullet out of your body 'cause

 4   it went through; is that right?

 5            A.       It went straight through, yes.

 6            Q.       Did you receive medical treatment as a

 7   result of that?

 8            A.       Yes.

 9            Q.       What type of medical treatment did you

10   receive?

11            A.       They just started running tests and all

12   that stuff to make sure the gun -- I don't know, 'cause

13   they wanted to make sure nothing -- ain't nothing wrong

14   with the bullets and all that, see did it go all through

15   my heart or my chest 'cause by it being so close.

16            Q.       Where specifically did the bullet go into

17   your arm?

18            A.       In the side of my arm muscle.

19            Q.       Through this way?

20            A.       Yes.

21                     THE COURT:  You're gesturing towards

22            your left arm?

23                     THE WITNESS:  Yes.

24                     THE COURT:  Okay.  That's for the record.

25            Go ahead.
```

```
 1            Q.        Do you know how many shots were fired
 2    that night?
 3            A.        About three or four.
 4            Q.        Do you know how many times your cousin,
 5    Johann, got hit?
 6            A.        Twice.
 7            Q.        Was there anybody else around there with
 8    a gun that night that you saw?
 9            A.        No, sir.
10            Q.        Is there any question in your mind that
11    this defendant, Fredrick Hall, is the one that had the gun
12    and shot you and your cousin that night?
13            A.        Yes.
14            Q.        Is this that guy?
15            A.        Yes.
16            Q.        No doubt?
17            A.        No doubt.
18            Q.        What happened after the defendant shot
19    you and your cousin?
20            A.        I took off running.  I ran around the
21    corner and fell, and that's when the police that was on
22    duty in front of the warehouse, they took me and brung me
23    back around.  Some ladies ran around talking about a guy
24    had been shot in his neck.  They took us both around
25    there, and called an ambulance and backup.
```

```
 1          Q.        Did you ever give the police a
 2   description of the car?
 3          A.        Yes.
 4          Q.        Did you give the description or did you
 5   give the license plate number itself?
 6          A.        I didn't know the license plate number,
 7   just gave them a description of the car.
 8          Q.        Did you give them a description of the
 9   person that was in the car?
10          A.        Uh-huh.
11          Q.        Were you taken to the hospital?
12          A.        Yes.
13          Q.        What happened in the hospital?  Did they
14   treat you and release you?
15          A.        Yes.
16          Q.        At some point, were you shown some
17   photographs by the police?
18          A.        Yes.
19          Q.        I'll hand you what's been marked as
20   State's Exhibit Number 7 for purposes of identification.
21   Have you seen that particular exhibit before?
22          A.        Yes.
23          Q.        When did you see that?
24          A.        The next morning.
25          Q.        And what happened when you were shown
```

```
1    State's Exhibit Number 7?

2         A.      He asked me, the detective asked me to

3    point the guy out, did I know any of those guys on there

4    personally.  And I said, no, sir.

5         Q.      So you didn't know anybody on there, did

6    you?  I mean by name or anything?

7         A.      No, I didn't.

8         Q.      What did he ask you to do next?

9         A.      He asked me to point the guy out that

10   shot me.

11        Q.      Do you see the guy on State's Exhibit

12   Number 7 who shot you?

13        A.      Yes.

14        Q.      Which one is it?

15        A.      Seven.

16        Q.      You're pointing to the lower left-hand

17   corner of State's Exhibit Number 7?

18        A.      Yes.

19        Q.      That's a photograph of Fredrick Hall; the

20   guy sitting right there?

21        A.      Yes.

22        Q.      All right.

23               Yesterday, you were brought over to

24   testify, were you not?

25        A.      Yes.
```

1    Q.    Where were you kept when you were brought

2    over?

3    A.    Upstairs on six in the felony pod.

4    Q.    The night of the shooting, did the

5    defendant have that arm brace on that he's wearing now, or

6    that sling?

7    A.    I don't recall.

8    Q.    Did he have -- did you see the defendant

9    yesterday?

10    A.    Yes.

11    Q.    Where did you see him?

12    A.    In the holding tank.

13    Q.    In the holding tank?

14    A.    Yes.

15    Q.    Did you talk to him?

16    A.    He asked me some questions.  I ain't got

17    nothing to say.

18    Q.    What did he ask you?

19    A.    He just asked me to be, like to be -- I

20    don't know, I wasn't even really trying to pay attention.

21    I don't really got too much to say to a person that shot

22    me.

23    Q.    What specifically did he ask you?

24    A.    He was asking me questions.

25    Q.    Like what?

```
 1          A.      If I need anything or something.

 2          Q.      Did you need anything?

 3          A.      Yeah.

 4          Q.      Like what?

 5          A.      Talking about he'd give me some money or

 6  something.

 7          Q.      Give you some money or something?

 8          A.      Not to testify.

 9          Q.      You said he'd pay you money not to

10  testify?

11          A.      Yes.

12          Q.      Did he tell you that?

13          A.      Yes.

14          Q.      Did he have that sling on yesterday?

15          A.      He had it on but he took it off.

16          Q.      When he took off the sling yesterday up

17  in the holding tank, was he having any problems with his

18  arm?

19          A.      Not that I can recall of.

20          Q.      What did you tell him when he told you

21  he'd pay you money not to testify?

22          A.      I didn't reply.  I didn't say nothing.

23                  MR. ANDERSON:  I have no further

24          questions.

25                  THE COURT:  Mr. Rader?
```

1          (Defendant's Exhibit 5 marked for

2       identification.)

3                     CROSS-EXAMINATION

4    BY MR. RADER:

5          Q.      Good morning, Mr. Davis.

6          A.      Good morning.

7          Q.      My name is Jim Rader, one of the counsel

8    in this case.

9                  At the scene of this incident, did you

10   give the police officers a description of the person who

11   did the shooting?

12         A.      On the scene of the crime?

13         Q.      Yes.

14         A.      I gave the police that brought me back

15   around to the warehouse, I mean back around to the scene

16   of the crime, the police that was standing in front of the

17   warehouse.

18         Q.      And at the time of this shooting, how

19   many people were in the car?

20         A.      From all I can recall, one.

21         Q.      And that was the defendant here in this

22   case?

23         A.      Yes.

24         Q.      Are you sure about that?

25         A.      I'm sure.

1          Q.       So there wasn't somebody else in the

2     passenger's seat?

3          A.       No, sir.

4          Q.       How long did you observe this scene

5     before the shooting?

6          A.       For maybe like 15 minutes or 30 minutes

7     'cause I kept constantly telling Johann to come on.

8          Q.       So the car was there maybe up to 30

9     minutes?

10         A.       Yeah.  It was there from the time I used

11    the restroom to the time I came back, for a long time,

12    just parked right there on the corner.

13         Q.       I've heard that there was somebody around

14    that was characterized as a crack head.  Do you recall who

15    that might have been?

16         A.       Character to what?

17         Q.       Some male person was characterized as a

18    crack head.  Did you see any other person around, male?

19         A.       Yeah.  There was a guy, yeah.

20         Q.       Do you know his name?

21         A.       I think his name is like John.

22         Q.       Do you know his last name or where he

23    lives or anything?

24         A.       No, sir.

25         Q.       But John wasn't in the car, either, was

```
 1   he?

 2         A.        No.  He was standing out on the corner,

 3   too.

 4         Q.        Did you hear or see people on the scene

 5   giving the police a description of the car, the license

 6   number, or anything like that?

 7         A.        Yes.

 8         Q.        You mentioned some young women, right?

 9         A.        Some women came up out their house

10   because they heard the gunshots and the apartment building

11   was right there, two apartment buildings was right across.

12         Q.        Did you hear them giving a description to

13   the police?

14         A.        No.  I heard the guy that was standing

15   out there giving a description.

16         Q.        Was that John?

17         A.        Yes.

18         Q.        And you said the car was there 30

19   minutes, huh?

20         A.        Yes.

21                   (Defendant's Exhibit 6 marked for

22              identification.)

23                   THE COURT:  What have you marked that as,

24              Mr. Rader?

25                   MR. RADER:  Defense Exhibit Number 6,
```

1          Your Honor.

2                    THE COURT:  Okay.

3          Q.       Mr. Davis, if this is Republic Street, do

4    you recognize this area, do you know where I'm talking

5    about?

6          A.       Yes, sir.

7          Q.       Can you see this clearly?

8          A.       Yes.

9                    THE COURT:  Mr. Davis, sit up and speak

10         into the microphone.

11                   (Witness complies.)

12         Q.       Are you familiar with this house here on

13   the corner at 1330?

14         A.       Yes.

15         Q.       Corner of Republic and Fourteenth?

16         A.       Yes.

17         Q.       Can you tell me where this car that you

18   referred to was parked?

19         A.       Right there parked like 1338 or 1330,

20   whatever it is.

21         Q.       Here?

22         A.       Right.

23         Q.       On which side of the street?  I don't

24   want to lead you, I want you to tell me, which side of the

25   street?

1          A.        It's like a five-way coming down, one

2    coming down the street, coming down this way, this way,

3    like on this side.

4          Q.        Can you tell me relevant to this

5    building?

6          A.        Right there by the building?

7          Q.        Right here?

8          A.        Right.

9          Q.        Now, you indicated that you got out of

10   your car, went to the bathroom?

11         A.        Yes.

12         Q.        Where was your car parked?

13         A.        1400 Race Street.

14         Q.        It's over here?

15         A.        Yes, on the other side around the block.

16         Q.        Over in here some place?

17         A.        Right.

18         Q.        Let's call that the Davis car.  Where did

19   you go to the bathroom, what building?

20         A.        It's another building right across from

21   that building, an entranceway.  It's two apartment

22   buildings that sit right across from each other.

23         Q.        So I assume you were standing on the

24   street when you were watching this incident?

25         A.        Yes.

```
1          Q.      Where were you standing?
2          A.      Right on the other side of the street,
3    right there on the corner (indicating).  Right there.
4          Q.      On the street?
5          A.      Right there.
6          Q.      On Republic or --
7          A.      On Republic and Fourteenth right there on
8    the corner.
9          Q.      But you were on Republic, not on
10   Fourteenth?
11         A.      Yeah, I was on Republic.
12         Q.      Here (indicating)?
13         A.      Right.  Right across, right there on the
14   corner.
15         Q.      Is that accurate?
16         A.      Yes.
17         Q.      And did you observe this whole thing?
18         A.      Yes.
19         Q.      Did you see the person in the car that
20   you say did the shooting; did you see him gesturing and
21   arguing with Johann?
22         A.      The reason I told Johann to come on when
23   I came back out from using the restroom, both of their
24   voices was loud.  I'm wondering why you arguing with that
25   man in the car.  It was like they both raising their voice
```

1    at each other.

2            Q.      Waving his arms around?

3            A.      No, he wasn't waving his arms around.

4            Q.      You didn't see his hands at all?

5            A.      No, not until I walked up on the car and

6    grabbed Johann by the neck.

7            Q.      Did you walk in front of the car or

8    behind the car?

9            A.      I walked in back of the car to come

10   around from the side and grabbed him by his neck.  Told

11   him to come on.  That's when the gunshots occurred.

12           Q.      And there was one person in the car?

13           A.      Yes, and another guy standing out, that

14   was the guy that was standing on the corner.

15           Q.      Republic is one way here, isn't it?

16           A.      Yes.

17           Q.      Going towards the river?

18           A.      Yes.  No, not going -- it's going

19   straight up towards -- I think like Twelfth Street or

20   something, going straight up.  If you go straight up

21   Republic, that's Twelfth Street.

22           Q.      And then Central Parkway?

23           A.      Yeah.  After you turn, you got to either

24   make a left or right.  You make a left I think you end up

25   on Vine.  Central Parkway to turn into Race, then a couple

```
 1    of streets over Elm, and then Central Parkway.

 2           Q.       Isn't that because Republic dead ends

 3    before it gets to Central Parkway?

 4           A.       Right.  It's not a dead end street,

 5    though.

 6           Q.       But you're already heading toward the

 7    river?

 8           A.       Yes.

 9           Q.       If you're flying like a bird?

10           A.       Yes.

11           Q.       Did the police arrive there very soon

12    after this thing happened?

13           Q.       After I had ran around the corner, the

14    police was already standing out, some off duty officers.

15    They walked all the way back around and they radioed it

16    in, plus the police was coming.

17           Q.       When the emergency medical service was

18    treating with you, you were actually on Fourteenth; is

19    that right?

20           A.       Right.  No, I was on Republic Street.

21    They brought me, the police brought me all the way back

22    around to the scene of the crime to check on Johann.

23           Q.       How were you and Johann related?

24           A.       Through him, I mean through my mother and

25    his mother.
```

1       Q.       Had you ever seen Mr. Hall before?

2       A.       No, sir.

3       Q.       Do you hang around on that corner a lot?

4       A.       Yes.

5       Q.       What were you doing out there at 3:15 in

6   the morning?

7       A.       I had just arrived.  And I stopped and

8   seen my cousin.  He was on Fourteenth and Race.  I stopped

9   to see my cousin.  That's when I parked and got out with

10  him, telling him, oh, come on.

11               He asked me to go walk around the corner

12  with him.  I walked around the corner and used the

13  restroom, came back out.  He was over there arguing.  It

14  was getting louder and louder.

15      Q.       But nobody was waving their arms or

16  anything, just verbal?

17      A.       No.

18      Q.       Can you tell us what the driver of this

19  car was wearing?

20      A.       Basically, to be truthful, I wasn't even

21  paying attention.  It wasn't basically my business.  I was

22  just concerned about Johann.

23      Q.       You can't shed any light on whether he

24  was wearing maybe a white T-shirt or a black coat?

25      A.       No.  I don't remember all that, 'cause he

1    was sitting inside of the car, plus it was dark.  I wasn't

2    looking in the car.  It was dark.

3            A.      Yes.

4            Q.      You didn't notice any scars or anything

5    on this person's face?

6            A.      No.  I just noticed that the person was

7    wearing glasses that was sitting in the car.

8            Q.      Okay.  Was his hair longer?

9            A.      No.  Not that I can recall.  I just

10   basically seen his face, 'cause I wasn't never all up on

11   the car from the time that I was about to leave.

12           Q.      So you just don't know about his car?

13           A.      Yeah.

14           Q.      So what you're testifying to here is that

15   you saw Mr. Hall in that car, wearing glasses; is that

16   right?

17           A.      Yes.

18           Q.      Were they gold rimmed glasses or black

19   frames or could you tell us something about it?  Gold

20   frames like mine?

21           A.      I think they was black frames.

22           Q.      A man with black frames sitting in a car

23   by himself, and you didn't notice anything about his

24   clothing, correct?

25           A.      Correct.

1    Q.    You didn't get the license number, you

2    don't know who might have given the license number to the

3    police or what happened.  You don't have any knowledge

4    about anybody giving a description to the police?

5    A.    I didn't notice the license plate number

6    but I gave a description of the car.

7    Q.    So you've known Johann all your life?

8    A.    Correct.

9    Q.    Had you seen Johann smoking any marijuana

10    earlier that evening?

11    A.    No, I wasn't with Johann that evening,

12    till then.  I just had seen him.  When I pulled up is the

13    first time I seen him all day, that's why I had stopped.

14    Q.    Had you done any drugs that evening?

15    A.    No.  I had smoked a little marijuana

16    earlier that day.

17    Q.    How early that day?

18    A.    About 2:00 in the afternoon.

19    Q.    Do you do crack cocaine yourself?

20    A.    No, sir.

21    Q.    The purpose of the cocaine you had taped

22    to your arm was for sale; is that right?

23    A.    I didn't have crack taped to my arm.  It

24    was in my jacket pocket.

25    Q.    If the emergency medical services report

1    indicates otherwise, they are wrong, right?

2         A.      Right.

3         Q.      It was in your jacket pocket?

4         A.      Yes.

5         Q.      How much?

6         A.      A gram or something.

7         Q.      And that was for sale?

8         A.      Yes.

9         Q.      What kind of car do you drive?

10                MR. ANDERSON:  Objection.

11                THE COURT:  Sustained.

12        Q.      Did you walk up to the car when you were

13   trying to retrieve Johann or did you run or --

14        A.      I walked to the car.

15        Q.      Walked up to the car?

16        A.      Yes.

17        Q.      You got him by the neck?

18        A.      Yes.

19        Q.      And that's when this incident happened?

20        A.      Yes.

21                MR. RADER:  May I have just a moment,

22        Your Honor?

23                THE COURT:  Sure.  Take your time.

24                (Pause in proceedings.)

25        Q.      Mr. Davis, you weren't arrested that

```
 1   night, were you?

 2          A.      No.

 3          Q.      When were you arrested?

 4          A.      For the charge that I'm in here now?

 5          Q.      Yes.

 6          A.      Three weeks later.

 7          Q.      And you saw Johann many times during that

 8   three weeks, right?

 9          A.      Right.

10          Q.      And you talked about this incident?

11          A.      No.

12          Q.      Never discussed it?

13          A.      (Indicate no.)

14          Q.      Not one time?

15          A.      Only I asked him one thing, why was he

16   arguing with the guy?  Why did he shoot him?  That's the

17   only question I asked him.

18          Q.      Did he give you an answer?

19          A.      No.

20          Q.      But otherwise, you never discussed this?

21          A.      No.

22          Q.      You've seen him maybe a dozen times

23   during that three weeks?

24          A.      Not a dozen, probably about five times.

25          Q.      What Judge did you have in your case?
```

```
 1                    MR. ANDERSON:  Objection.

 2                    THE COURT:  Sustained.

 3          Q.        Were there any negotiations as to your

 4    sentence in what you would plead guilty to in your case?

 5          A.        Yes.

 6          Q.        And it's true, in fact, that you did

 7    plead guilty, isn't it?

 8          A.        Yes.

 9          Q.        What was the -- did anybody ever suggest

10    to you that you would be a witness in this case?  Did you

11    talk to the police or prosecutor's office or anybody about

12    being a witness in this case?

13          A.        Yes, and detectives and the prosecutor's

14    office had mailed me a letter to my house.

15          Q.        Did they come and talk to you about this

16    case?

17          A.        The prosecutor's office?

18          Q.        Yes.

19          A.        No.

20          Q.        Did the police officers talk to you about

21    this case?

22          A.        Yes.

23          Q.        Did they also talk to you about your drug

24    case?

25          A.        Not the detectives.  Three weeks later
```

1  some other police had knew me, had knew my car, I had got

2  pulled over.  That's when I received the ticket for

3  running a red light and speeding.  That's when they was

4  about to cut me loose.

5            Some other police showed up and said they

6  had been looking for me.  They had filed felony warrants

7  on me.  The police that was in the car that pulled me over

8  was about to cut me loose, until those police came and

9  said they'd signed felony warrants on me.

10       Q.       Did you plead guilty to what you were

11  charged with?

12       A.       Yes.

13       Q.       So there was no reduction in the penalty?

14       A.       No.

15       Q.       The only consideration you got was in a

16  reduced sentence, isn't it?

17            MR. ANDERSON:  Objection.

18            THE COURT:  Sustained.  You have to

19       rephrase the question.

20       Q.       Were you offered some inducement or

21  something that you wanted in return for your plea to this

22  offense as charged?

23       A.       Yes.

24       Q.       And what was that that you were offered?

25       A.       I was offered either probation or I can

```
1    do jail time and get out without receiving no paper.

2         Q.     But you were offered probation?

3         A.     Yes.

4         Q.     So you were charged with this offense and

5    you pled guilty as charged and were offered probation, you

6    said, right?

7         A.     Yes.

8         Q.     Was there anything offered to you to get

9    the probation?  Did anybody tell you that if you'll do

10   this or that you'll get probation?

11        A.     No.

12        Q.     Again, I saw the prosecutor talking to

13   you here in that chair, right?

14        A.     Yes.

15        Q.     And he certainly has a right to do that.

16   I talk to my witnesses as well.  But prior to that, has

17   any policeman or prosecutor talked to you about this

18   particular case?

19        A.     No.  The police have but not the

20   prosecutor.

21        Q.     Do you know what policeman; do you know

22   his name?

23        A.     No, sir.

24        Q.     And so the substance of it, the only

25   reason you're here today in custody is because you refused
```

1    probation?

2         A.      Yes.

3         Q.      Can you explain that to us?  Why did you

4    refuse probation?

5              MR. ANDERSON:  Objection.

6              THE COURT:  Sustained.

7         Q.      But that's the substance of it, you

8    refused probation?

9              MR. ANDERSON:  Objection.

10             THE COURT:  Sustained, asked and

11        answered.

12        A.      Yes.

13             MR. RADER:  No further questions, Your

14        Honor.

15             THE COURT:  Anything else, Mr. Anderson?

16                  REDIRECT EXAMINATION

17   BY MR. ANDERSON:

18        Q.      Actually, isn't it true that the reason

19   you're locked up today is because he shot you?

20        A.      Yes.

21        Q.      If he wouldn't have shot you, they never

22   would have found that cocaine.  Never would have been

23   convicted and sent to jail, right?

24        A.      Yes.

25        Q.      I never talked to you before this

1    morning, right?

2         A.      Yes.

3         Q.      I talked to you for about two minutes

4    while you were sitting in the hall?

5         A.      Yes.

6         Q.      Did you ever talk about coming in here

7    and not telling the truth?

8         A.      No.

9         Q.      I told you to tell the truth here today,

10   didn't I?

11        A.      Yes.

12        Q.      Is that what you've done?

13        A.      Yes.

14        Q.      All right.  Now, let's talk a little bit

15   about this identification procedure.  You indicated that

16   you were shown State's Exhibit Number 7, and you

17   identified the picture in the lower left hand corner as

18   the person who shot you; is that correct?

19        A.      Yes.

20        Q.      Was your cousin around when you did that

21   identification process?

22              MR. RADER:  Your Honor, that's not

23         rebuttal.

24              MR. ANDERSON:  Actually, it is.

25              THE COURT:  No, it's rebuttal.

1          Identification certainly was raised in

2     cross-examination.  Go ahead.

3          A.     When they showed me the pictures, my

4     cousin was still in the hospital.

5          Q.     So when you identified the picture of the

6     defendant as the person who shot you, your cousin wasn't

7     there, was he?

8          A.     No.

9          Q.     You hadn't talked to him, had you?

10         A.     No.

11         Q.     When your cousin identified this person,

12    Fredrick Hall, as the shooter, you hadn't talked to him,

13    had you?

14         A.     No.

15         Q.     You weren't present when this

16    identification was done, were you?

17         A.     No.

18         Q.     Let's talk a little bit about this 30

19    minute aspect of it.  You indicated that you parked your

20    car up on Race Street.  You'd been to a party or

21    something, right?

22         A.     Right.

23         Q.     You hook up with your cousin up here?

24         A.     Yes.

25         Q.     You came around and were standing on the

1  street corner?

2         A.      Yes.

3         Q.      This car pulled up?

4         A.      Yes.

5         Q.      Your cousin walks across the street to

6  talk to this guy?

7         A.      Yes.

8         Q.      You go around the corner to go to the

9  bathroom somewhere?

10        A.      No.  Across from that building.

11        Q.      So you go over here to go to the

12  bathroom.  How long did that take?

13        A.      About two minutes.

14        Q.      Come back out, right?

15        A.      Right.

16        Q.      You go and then you hear them arguing?

17        A.      Yes.

18        Q.      And you go across the street?

19        A.      No, I stood on the corner for a minute.

20        Q.      How long did you stand on the corner?

21        A.      About 10 minutes.

22        Q.      Did you have a watch on?

23        A.      No.

24        Q.      So you stayed on the corner for about 10

25  minutes then you go over and get your cousin and start to

```
 1    lead him away, and that's when this defendant shot you and

 2    your cousin?

 3              A.        Yes.

 4              Q.        So what you described is maybe about 15

 5    minutes, 10 minutes, 15 minutes?

 6              A.        Yes.

 7              Q.        Is there any doubt in your mind that that

 8    defendant sitting right here, Fredrick Hall, is the one

 9    that had the gun and squeezed the trigger of that bullet

10    that struck you in your arm?

11              A.        Yes.

12              Q.        Is there any question about it?

13              A.        No.

14              Q.        Is this the guy?

15              A.        Yes.

16                   MR. ANDERSON:  Nothing further.

17                   THE COURT:  Anything else?

18                   RECROSS-EXAMINATION

19    BY MR. RADER:

20              Q.        Mr. Davis, did you see the gun fire?

21              A.        Yes.

22              Q.        And can you tell the jury which hand it

23    was in for purposes of firing it?

24              A.        No.  I just seen fire coming out the gun.

25    I didn't even -- when I first turned around I heard
```

```
 1    gunshots but I did not know I was struck until I looked.
 2    I seen my cousin screaming at me.  That's when gunshots
 3    kept on firing and I took off running.
 4           Q.      Well, what did you see?  Did you actually
 5    see the gun as it fired?
 6           A.      No.  I seen fire just rage from the
 7    window, the spark coming out the window. That's all I
 8    seen.
 9           Q.      So if there had been somebody else in the
10    car, they could have been firing the gun?
11           A.      Not from that angle.  If it would be
12    another person in the car I don't know why I would be shot
13    'cause I wasn't even that close to the car.
14           Q.      Did you see the persons in the car at the
15    time that you saw the sparks?
16           A.      Yes.
17           Q.      Were they facing forward, turning just
18    like this looking out the window talking?
19           A.      That's how I know who the person was.
20           Q.      And you're sure that they had on dark
21    glasses?
22           A.      Not dark glasses.
23                   MR. ANDERSON:  Objection.
24                   THE COURT:  He didn't say dark.
25           Q.      Black glasses?
```

```
1        A.        Yes.

2                  MR. RADER:  No further questions.

3                  THE COURT:  All right.

4                  Thank you, Mr. Davis.

5                     (Witness excused)
```

```
 1              AFTERNOON SESSION, Wednesday, April 28, 1999
 2                         THE COURT:  State's next witness?
 3                         MR. ANDERSON:  The State would call
 4         Officer Eatrides.
 5                         THE COURT:  Come on up, sir.
 6                         GREGORY EATRIDES
 7  being first duly sworn, was examined and testified as
 8  follows:
 9                         THE COURT:  Please have a seat.
10         Pull that microphone right over to you.  A little
11         closer.  There you go.
12                         THE COURT:   State your name and spell
13         your last name, please.
14                         THE WITNESS:  Gregory Eatrides,
15         E-a-t-r-i-d-e-s.
16                         THE COURT:  Thank you, Officer.
17                         Mr. Anderson?
18                         DIRECT EXAMINATION
19  BY MR. ANDERSON:
20         Q.      Officer Eatrides, how are you currently
21  employed?
22         A.      I'm a police officer for the City of
23  Cincinnati.
24         Q.      Where are you currently assigned?
25         A.      I'm currently assigned to District 2.
```

1       Q.       Back on October 17, 1998, where were you

2    assigned?

3       A.       District 1.

4       Q.       Back on that date, did you have an

5    occasion to respond to a radio run concerning the

6    description of a car and the license plate number?

7       A.       That's correct.  There was a shooting

8    down in Over The Rhine.  There was a license plate given.

9    The registration came back I believe on Fulton Avenue and

10   I responded out to that residence that night.

11      Q.       Who were you working with that night?

12      A.       I believe I was with Kathy Echelberry.

13      Q.       You and Officer Echelberry responded to

14   the Fulton Avenue address?

15      A.       Correct.

16      Q.       What did you find when you got there?

17      A.       First we looked for the car, it was not

18   present in front of or in the immediate vicinity of the

19   residence.  At that point then we responded to the actual

20   apartment.

21      Q.       How far away is Fulton Avenue from

22   Windsor Avenue?

23      A.       I believe it's within a block or two.

24   I'm not sure if they are intersecting streets but they are

25   parallel.  It's been awhile since I worked in Walnut Hills

1  but it's in the same actual neighborhood.

2          Q.          Okay.  When you responded to the Fulton

3  Avenue apartment, what did you do?

4          A.          We knocked on the door that the

5  registration came back to.  At that point, the owner of

6  the vehicle responded to the door and we had a

7  conversation with her.

8          Q.          You talked to the owner of the vehicle.

9  Was the vehicle present at that location?

10         A.          No.

11         Q.          How long did this conversation with the

12 owner of the vehicle last?

13         A.          We had off and on conversation with her.

14 We were probably there altogether probably a total of 15,

15 maybe 20 minutes.

16         Q.          Do you remember the owner of the

17 vehicle's name?

18         A.          I don't recall it.

19         Q.          Did you have a conversation with the

20 owner of the vehicle concerning who may be operating the

21 vehicle?

22         A.          Yes, I did.

23         Q.          What did she tell you?

24         A.          She stated that she believed her son -- I

25 believe his name is Dexter, possibly had the car.

1          Q.          Did she give you a description of Dexter?

2          A.          Yes, she did.

3          Q.          What description did she give you?

4          A.          I don't recall specifically.  I know he

5    was a male black, approximately 18 years of age.  He was

6    late teens.  As far as the rest of the description I don't

7    recall off the top of my head.

8          Q.          Based on your conversation with her, did

9    you put out a description of a possible suspect, young,

10   male black, late teens or early twenties?

11         A.          Yes.

12         Q.          What happened during the course of this

13   conversation with the car owner?

14         A.          During the conversation, that's when we

15   heard Lt. Bailey come on saying that he had observed the

16   vehicle and I believe had actually engaged in a brief car

17   chase.

18         Q.          So that came over the radio while you

19   were at the Fulton Avenue residence?

20         A.          Correct.

21         Q.          What did you do when that came over the

22   radio?

23         A.          When that came over, we initially started

24   to respond out to the car, to respond to the area.

25   Actually the pursuit was coming near to where we were at.

1    I think, when I heard he was actually I believe up in Eden

2    Park, which Fulton Street actually runs out into Eden

3    Park, we started to respond out there.

4                 I believe that's when Lt. Bailey came on

5    saying that he had actually lost the vehicle.  And then

6    subsequent to that, a short, maybe a half minute or minute

7    later, I believe, he came back on and said he spotted the

8    car but it was unoccupied at that point.

9         Q.    Now, did anything happen as you were

10   leaving the Fulton Avenue apartment to engage in this

11   chase, if you will?

12        A.    Actually, we responded back after this

13   other kid had left the car unattended, and we responded

14   back up the steps.  And at that point we talked to her

15   briefly again.

16                 We started to leave again.  And that's

17   when maybe a few seconds later, as we were walking down

18   the steps to our car, the woman came out yelling for us,

19   and said that she had located, actually had located her

20   son, that he was in his room.

21        Q.    Had you ever left the Fulton Avenue place

22   where you had parked your police cruiser?

23        A.    No.

24        Q.    So could you give us an estimate of the

25   time between the time that you arrived on the doorstep and

1   had your first conversation with this witness until the

2   time she came out and told you that her son was actually

3   in the room?

4        Q.      Like I say, it was probably roughly about

5   15 minutes.

6        Q.      Okay.  At that time or during that time

7   did you see anybody leave or enter the house?

8        A.      No.

9        Q.      What did you do then, once you became

10  aware that Dexter was actually in the house at that time?

11       A.      At that point I believe the initial

12  broadcast, based on witnesses, was that there was possibly

13  more than one occupant of the car at the time of the

14  shooting.  At that point we took her son into custody and

15  took him down to District 1 for follow-up investigation.

16       Q.      I'll hand you what's marked as State's

17  Exhibit Number 16 for purposes of identification.  Can you

18  identify what that particular exhibit is, sir?

19       Q.      Yes.  This is her son, Dexter.  I'm not

20  sure what his last name is.

21       Q.      That's the young man that you took from

22  the Fulton Avenue residence that evening?

23       A.      Correct.

24       Q.      Did you talk to Dexter that night?

25       A.      Yes.

1    Q.    Did he indicate to you whether he'd been

2  driving the car or not?

3    A.    I believe he indicated that he had been

4  in the car earlier, several hours earlier that night, but

5  he denied any involvement in the shooting, denied that he

6  was in the car at the time of the shooting, denied that he

7  was down in Over The Rhine in the car at the time of the

8  shooting.

9    Q.    Did he tell you where he was?

10    A.    I believe he made some statement to that.

11  From my independent recollection I don't recall.

12    Q.    But according to what you saw and

13  observed, there is no question he was in the residence at

14  the time this police chase ensued with the vehicle?

15                    MR. RADER:  Objection.  Speculation,

16            Your Honor.

17                    THE COURT:  It's not speculation, it's

18            just what he observed and saw.  Overruled.

19    A.    We saw him come from out of the residence

20  shortly after the pursuit.  And we were at the front.  I

21  didn't see anybody come in or out the front where we were

22  at.

23    Q.    Did you do anything else besides take

24  custody of Dexter and take him down and interview him?

25    A.    No.

```
 1          Q.        Did you have any contact with Fredrick

 2   Hall at all?

 3          A.        No, I did not.

 4                    MR. ANDERSON:  Thank you.

 5                    No further questions.

 6                    THE COURT:  Any questions at all?

 7                    MR. RADER:  May we have a sidebar

 8          conversation on the record?

 9                    THE COURT:  Sure.  Excuse us, ladies and

10          gentlemen.

11                    (Sidebar not transcribed.)

12                    (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```