1                    COURT OF COMMON PLEAS

2                    HAMILTON COUNTY, OHIO

3
   STATE OF OHIO                )
4                   PLAINTIFF,   )
                                 )
5            vs.                 )   Case Number:  B-980752
                                 )
6  FREDRICK HALL                 )   Volume 2 of 4
                 DEFENDANT.      )
7                                )

8
                 TRANSCRIPT OF TRIAL TESTIMONY
9

10

11  APPEARANCES:

12       WILLIAM ANDERSON, ESQ.

13              On behalf of the Plaintiff.

14       ELIZABETH ZUCKER, ESQ.
                and
15       JAMES RADER, ESQ.

16              On behalf of the Defendant.

17

18       BE IT REMEMBERED that upon the hearing of

19  this cause, in the Court of Common Pleas, before the

20  Honorable STEVEN E. MARTIN, one of the judges of the said

21  Court of Common Pleas, on the date hereinafter stated, the

22  following proceedings were had.

23

24

25

```
 1                    MORNING SESSION, Thursday, April 29, 1999

 2                         THE COURT:  Ready to continue with the

 3              cross-examination of the police officer, Ms.

 4              Zucker?

 5                         MS. ZUCKER:  Yes, I am.

 6                              GREGORY EATRIDES

 7      being first duly sworn, was examined and testified as

 8      follows:

 9                              CROSS-EXAMINATION

10      BY MS. ZUCKER:

11              Q.      Good morning, Officer Eatrides.

12              A.      Good morning.

13              Q.      My name is Liz Zucker.

14                      Dr. Parrott was telling us there was this

15      new high tech kit for testing gunpowder residue on

16      suspects' hands.  Are you familiar with that?

17              A.      I'm not familiar with the new testing

18      methods for that, no.

19              Q.      I heard it was readily available for most

20      police departments.

21              A.      I'm not familiar with that.

22              Q.      I forgot my glasses.  Excuse me.

23                      And was it your testimony yesterday that

24      you watched the front of the apartment building?

25              A.      Correct.
```

```
1          Q.      And was it also your testimony yesterday
2   that the description you broadcast for possible suspect
3   came from his mother?
4          A.      Yes.
5          Q.      And was it also your testimony yesterday
6   that you were at the house for approximately 15 minutes?
7          A.          Approximately, yes.
8                  MS. ZUCKER:  Your Honor, at this point
9          I'd like to play the transmission from the radio
10         calls that were recorded from that time period.
11                 THE COURT:  Any objection?
12                 MR. ANDERSON:  I haven't heard them, and
13         I don't know that they have been properly
14         identified, but I'm not going to object to them.
15                 THE COURT:  Have you got something to
16         play them on?
17                 MS. ZUCKER:  Some of the pages have
18         previously been identified as Defendant's Exhibit
19         Number 4.
20                 Your Honor, just as a technicality,
21         there's some time period in here where there's
22         just a recording of the time, that just gives the
23         10 second increments.
24                 THE COURT:  Okay.
25                 MS. ZUCKER:  Judge, do you want this
```

1    played in its entirety or can I skip around?

2    THE COURT:  First off I believe that when

3    you're going to play a tape, you play it with the

4    prosecutor before we get the jury in here.  It's

5    your case.  You play the tape, what you want to

6    play.

7    (Tape playing.)

8    (Tape turned over.)

9    THE COURT:  Ms. Zucker, do you need some

10   time to find something?

11   MS. ZUCKER:  About 30 seconds.

12   THE COURT:  30 seconds.  We'll wait.

13   If you need more than that, just let us know.

14   (Tape playing.)

15   THE COURT:  Turn it up.

16   All right, Ms. Zucker.  Stop the tape,

17   will you?

18   (Tape playing.)

19   THE COURT:  Stop it.

20   (Tape stopped.)

21   THE COURT:  Can I see counsel in chambers

22   real quick?

23   (Discussion in chambers off the record.)

24   THE COURT:  All right.  Do you have any

25   more questions of the Officer at this time?

```
 1                        MS. ZUCKER:  No, Your Honor.  If I can
 2            take a minute I'll advance this to a different
 3            point.
 4                        (Tape playing.)
 5                        (Tape stopped.)
 6   BY MS. ZUCKER:
 7            Q.      You said that you made the report at 3:38
 8   and that you were with the car owner on Fulton?
 9            A.      That's correct.
10                        (Tape playing.)
11                        MS. ZUCKER:  Just one minute.
12                        (Tape turned over.)
13   BY MS. ZUCKER:
14            Q.      The description of possible suspect,
15   Dexter Parker, that you gave over the radio, was not of an
16   18 or 20 year old; is that correct?
17            A.      I believe he's 15.
18            Q.      One other location we're going to hear.
19                        (Tape playing.)
20                        (Ends tape.)
21   BY MS. ZUCKER:
22            Q.      What did he say?
23            A.      I believe he said 4:18.
24            Q.      What time did you get there?
25            A.      I don't remember.
```

1          Q.       About 3:38?

2          A.       Something like that.

3          Q.       So you were actually at the house for

4    about 45 minutes?

5          A.       Something like 40 or 45.

6          Q.       And during that entire time, you stayed

7    in front of the house?

8          A.       Either at the door or out by our vehicle.

9                   MS. ZUCKER:  I have no further questions.

10                  THE COURT:  Anything else?

11                  MR. ANDERSON:  No.

12                  THE COURT:  Officer, thank you very much.

13         You're free to go.

14                  (Witness excused.)

15                  THE COURT:  State's next witness.

16                  MR. ANDERSON:  State will call Officer

17         Bailey.

18                        DAVID BAILEY

19   being first duly sworn, was examined and testified as

20   follows:

21                  THE COURT:  Pull that microphone up to

22         you a little bit.  Right there.  Even closer.

23                  State your name and spell your last name,

24         please.

25                  THE WITNESS:  David Bailey, B-a-i-l-e-y.

1              THE COURT:  Go ahead, Mr. Anderson.

2              MR. ANDERSON:  Thank you, Your Honor.

3                        DIRECT EXAMINATION

4    BY MR. ANDERSON:

5         Q.        Mr. Bailey, how are you employed?

6         A.        I work for the City of Cincinnati Police

7    Division assigned to District 2.

8         Q.        Were you working for Cincinnati Police

9    back on October 17, 1998?

10        A.        Yes, sir, I was.

11        Q.        On that date did you have an occasion to

12   hear a radio call concerning a vehicle and a license plate

13   number?

14        A.        Yes, sir.

15        Q.        Why don't you tell us a little bit about

16   how you became aware of the vehicle and the license plate

17   and what you did as a result of that.

18        A.        Okay.  As I stated before, I'm assigned

19   to District 2, which is the east side of Cincinnati.

20   District 1, our downtown area, had a shooting, apparently

21   two victims were shot in the Over-The-Rhine area.

22                  District 1 received the call.  They began

23   their investigation and initiated a broadcast of possible

24   suspects and vehicles connected with the shooting.

25        Q.        What was the description of the vehicle

1  that you heard?

2      A.      As I recall it, a description was put

3  out, it was a small brown vehicle, possibly a Honda Accord

4  with an Ohio registration.  Dispatchers ran the plate that

5  was given apparently from witnesses on the scene.  The

6  plate came back to a Fulton Street address which is East

7  Walnut Hills by Eden Park.

8      Q.      Okay.

9      A.      They gave a description of a possible

10 suspect described as what I would call a male black with a

11 baseball cap, that he got in his vehicle and fled the

12 scene.

13          The vehicle was possibly last seen in the

14 Stark Street area off Central Parkway.  I believed that

15 the car was probably going to come up McMillan Street.  If

16 it was going to return home to Fulton Street, it would

17 pass by the Peebles Corner area.

18     Q.      You were basically doing some guesswork

19 as far as where you thought the vehicle might be traveling

20 in order to get back to the registered owner?

21     A.      Absolutely.  I was thinking he would come

22 that way, and I just pulled the cruiser down on Gilbert

23 and McMillan and waited for a while.

24     Q.      You were at Gilbert and McMillan?

25     A.      I was sitting on Gilbert facing

1    southbound just north of McMillan.

2            Q.        Were you in a marked vehicle and in

3    uniform?

4            A.        Yes, sir.

5            Q.        What happened when you were on Gilbert

6    Avenue looking for the possible car?

7            A.        As I said, and you said, it was just

8    guesswork.  I believed he was going to be coming up

9    McMillan; however, there was a car approaching from my

10   rear southbound on Gilbert.  Looking back in my mirror, it

11   appeared to resemble a Honda Accord, so I took notice.

12   And I was at the light.  The car pulled up beside me.

13           Q.        The car pulled up beside you?

14           A.        Right.

15           Q.        Did it stop?

16           A.        Right.  There was a stop light.  They had

17   a red light there, and I was sitting adjacent to him.  I

18   looked over, saw the individual operating the vehicle.

19           Q.        Do you see the individual that was

20   operating the vehicle in court today?

21           A.        Yes, sir.

22           Q.        Please point to him and describe what

23   he's wearing.

24           A.        He's seated behind this table over here,

25   with a dark suit, a red shirt, red tie.

1              MR. ANDERSON:  Your Honor, let the record

2       reflect identification of the defendant, Fredrick

3       Hall.

4              THE COURT:  The record will reflect

5       identification of the defendant by the witness.

6         Q.       Officer, how long of an opportunity did

7    you have to observe the defendant as he pulled up beside

8    you and stopped his car?

9         A.       Well, it was just briefly.  It was

10   seconds.  He pulled past me.  He looked at me, and then as

11   the light turned green he sped off.  I was able to take a

12   look at the tag, the plate, and it did indeed match what

13   was given out in the description of the incident.

14        Q.       Did you get a real good look at the

15   driver of the vehicle?

16        A.       Right.  As I said, he pulled up adjacent

17   to me and looked at me and then what happened was we

18   became involved in a vehicle pursuit.

19        Q.       Is there any question that this defendant

20   you just identified, Fredrick Hall, was the individual

21   driving that Honda Accord?

22        A.       He was.

23        Q.       What happened when the light turned

24   green?

25        A.       When his light turned green, he began to

1    speed away. I activated my emergency lights and siren.

2         Q.    -    Attempting to pull him over?

3         A.         Wanting him to pull over. As I said, he

4    did speed away, I would guess at a speed in excess of 60

5    miles an hour.

6         Q.         What particular road were you traveling

7    on at that time?

8         A.         He proceeded through the light southbound

9    on Gilbert Avenue.

10        Q.         What's the speed limit on Gilbert Avenue

11   at that location?

12        A.         As best I recall I believe that's a 35

13   through there, it's a posted 35.

14        Q.         Okay.

15        A.         A pursuit took place, and I do not know

16   all the routes we took, but this pursuit was contained in

17   the Eden Park, Walnut Hills area, Nassau, Fulton, Windsor

18   Street areas, like I said, even sometimes through Eden

19   Park, we went through there. The pursuit went on for some

20   time.

21        Q.         How long did the pursuit go on?

22        A.         Possibly several minutes, several minutes

23   chase through those streets.

24        Q.         What kinds of speeds were you operating

25   your vehicle at?

1          A.          As I said, anywhere from 60 and as we

2    went back northbound on Gilbert sometimes 80 mile an hour.

3    He was pulling away from my cruiser.  The cruiser won't go

4    that fast.

5          Q.          During this chase, were there any stop

6    signs, stop lights, or anything else that a driver would

7    tend to yield to?

8          A.          Throughout this chase there was numerous

9    stop signs.  I mean there's lots of cross streets by the

10   park and Nassau and Fulton, and all the streets have stop

11   signs.

12         Q.          Okay.

13         A.          Which he disregarded all of them

14   virtually.

15         Q.          Just sped through them and run stop

16   signs, stop lights?

17         A.          He continued through all the stop signs,

18   and of course, I had to stop.  It's late in the evening so

19   I had to stop for a lot of those stop signs.

20         Q.          Was there other traffic out at the time?

21         A.          Right.  There was still people coming

22   home from being out that night.  There was a few times I

23   had to stop for traffic to let them through during this

24   pursuit.

25         Q.          At some point did you lose visual contact

1    with the vehicle that the defendant was operating.

2         A.        I did, and it was down by the entrance to

3    Eden Park where Kemper goes down to Columbia Parkway.

4                   As I said, I'd stopped for traffic a few

5    times.  One of those times I did have to stop and let

6    traffic through, and I lost sight of the vehicle.  I saw

7    taillights proceed down Kemper towards Columbia Parkway.

8    I was guessing it could be him.  As I approached that

9    vehicle, it wasn't the car.  So at that point I had lost

10   him in the pursuit.

11        Q.        During the course of this chase at 60 to

12   80 miles an hour, running stop signs and things like that,

13   were the public in danger at that time?

14        A.        Well, like I said, very much so.  There

15   was a lot of people driving home at that time of the

16   morning.  There were people who had been out.

17                  There was still people driving through

18   those areas so there was traffic, people at the

19   intersections trying to get through.

20                  As I said, I had to negotiate around

21   several cars trying to get through.  So it was a hazardous

22   situation.

23        Q.        Now, you indicated that you saw some stop

24   lights that you believed may be the vehicle, and you went

25   to that vehicle, and it was not the vehicle?

1   A.  Right.  That vehicle was approaching

2 Columbia Parkway from Kemper.

3   Q.  So you lost the vehicle at that point.

4 When did you next come into contact with the vehicle that

5 you had been chasing?

6   A.  A very short time after I advised that

7 I'd lost the vehicle somewhere in the Eden Park area, a

8 District 4 car came on and indicated that they had located

9 the car in the 1000 block of Windsor Avenue, which is just

10 adjacent to Eden Park.

11   Q.  So at that point, having located the car

12 on Windsor Avenue, what was the length of time between

13 when you lost visual contact with the vehicle that he was

14 driving and the time that the radio run came on indicating

15 that the police had found the vehicle on Windsor Avenue?

16   A.  Well, this was only a period I would say

17 from 30, 40 seconds to a minute.

18   Q.  So approximately a minute after you had

19 lost the vehicle, other police officers had found the

20 vehicle parked in a stationary position?

21   A.  Right.  They advised me they had the car.

22   Q.  Did you respond to the scene at that

23 time?

24   A.  Right I made it to the scene within

25 another 20, 30 seconds.

1    Q.    What did you do when you got to the

2    scene?

3    A.    As I pulled up on the scene, they had

4    brought the driver out of one of the front yards and

5    brought him out to one of the police cruisers parked on

6    Windsor Avenue.

7    Q.    So at the time that you arrived on the

8    scene, the defendant was already in custody; is that

9    correct?

10    A.    Yes, sir.

11    Q.    Other officers had found him in the front

12    yard or behind some bushes or something and brought him

13    out?

14    A.    Right.

15    MR. RADER:  Objection, Your Honor,

16    leading.

17    THE COURT:  Sustained.

18    A.    He was in the front yard area.  There

19    were some bushes there that he had dug behind.

20    MR. RADER:  Objection, Your Honor, that's

21    hearsay.

22    THE WITNESS:  He was located in the front

23    yard as I walked up.

24    THE COURT:  Hold on.  Let's start over

25    again.  Sustained.  Ask a new question.

```
 1          Q.         Officer Bailey, is there any question

 2    that the person that the police had in custody at that

 3    time, at that location, was the same individual driving

 4    the car?

 5          A.         He was the same individual driving the

 6    car.

 7          Q.         And who was that?

 8          A.         Mr. Hall.

 9          Q.         The defendant?

10          A.         Right.

11          Q.         Sir, I'd like to hand you what's been

12    marked as Exhibits 2, 3, 4, 5, and 6, have you take a look

13    at those.  Can you identify those particular photos?

14          A.         This is the Honda Accord that Mr. Hall

15    was operating.

16                     THE COURT:  What exhibit do you have in

17          your hand?

18                     THE WITNESS:  I'm referring to --

19                     THE COURT:  Just refer to them by number

20          if you can.

21                     THE WITNESS:  You want me to refer to all

22          the exhibits?

23                     THE COURT:  Well, answer his questions.

24                     THE WITNESS:  Okay.  I will.

25          A.         Exhibits 2, 3, 5, and 6 are the exterior
```

1  of Mr. Hall's vehicle.  That was the vehicle I was in fact

2  chasing through Walnut Hills.  Exhibit 4 is the interior

3  of that vehicle, of one of the seats.

4          Q.        At the time that you observed the

5  defendant driving that Honda Accord, was there anybody

6  else in the vehicle?

7          A.        No, sir.  He was the only person in the

8  vehicle.

9          Q.        Once the car was located on Windsor

10  Avenue and the defendant was in custody, did you do

11  anything else?

12          A.        Basically, he was administered his rights

13  and --

14                  MR. RADER:  Objection, Your Honor, unless

15          there's some indication whether or not he did it

16          or saw it.

17                  THE COURT:  Overruled.  Establish a

18          little more foundation.

19          Q.        Did you have any further contact with the

20  defendant after he was taken into custody?

21          A.        I talked to Mr. Hall about the driving,

22  why he fled.

23          Q.        Were you present when Mr. Hall was

24  advised of his constitutional rights?

25          A.        I don't recall if I was there or not.

1        Q.        Did he make any statements to you

2   concerning the operation of the motor vehicle?

3        A.        He didn't make any statements about the

4   operation of the vehicle.  No, he didn't really say

5   anything.

6        Q.        Did he make any statements to you about

7   operating the vehicle or anything else?

8        A.        No.

9        Q.        Did you have any further contact with the

10  defendant after that?

11       A.        No.

12       Q.        Did you have any further contact with the

13  vehicle after that?

14       A.        No.

15                 MR. ANDERSON:  Thank you, Judge.  I have

16            no further questions.

17                 THE COURT:  Any questions?

18                      CROSS-EXAMINATION

19  BY MS. ZUCKER:

20       Q.        Good morning, Officer Bailey.

21       A.        Good morning.

22       Q.        I'm Liz Zucker.

23                 Was it your testimony that you were

24  parked on Gilbert right before the intersection of

25  McMillan?

1          A.        Yes.

2          Q.        And where exactly were you?  There's no

3     map.

4          A.        Oh, I thought there was a map on there.

5     As I said, the cruiser was southbound on Gilbert just

6     north of McMillan Street.

7          Q.        Is that right where the bank is?

8          A.        Yeah, there is a bank there.  But it

9     would have been on the bank side; not the pawn shop side

10    but the bank side.

11         Q.        On the bank side southbound?

12         A.        Yes.

13         Q.        That's a six lane road, isn't it?

14         A.        I believe so.

15         Q.        And do you remember testifying in this

16    courtroom on April 13?

17         A.        Yes, ma'am.

18         Q.        I'll refer you to your testimony

19    -- there's no page number -- Line 10.  Let's start with

20    Line 8.  Can you read the question and the answer?

21         A.        Line 8?

22         Q.        Uh-huh.

23         A.        Line 8 says --

24              MR. ANDERSON:  Judge, I'm going to

25         object.

1              THE COURT:  I agree.  Sustained.

2              You can ask him to review it.

3      Q.      Please review Line 8 through Line 20.

4              THE COURT:  Officer, when you've had a

5      chance to review it, let us know.

6              THE WITNESS:  Okay, I've reviewed the

7      testimony.

8              THE COURT:  Next question.

9      Q.      Does that refresh your recollection?

10     A.      It does.

11     Q.      And did Mr. Hall have a stop light at the

12     time?

13     A.      As he approached the intersection, the

14     light was red, but he was able to stop and then the light

15     turned green so then he proceeded through.  But he was

16     able to stop adjacent to where I was and as soon as his

17     light turned he proceeded from the intersection at a high

18     rate of speed.  So it was a matter of a second and then

19     the light changed over to cycle to green.

20             MS. ZUCKER:  Your Honor, can I have him

21     read his testimony from that day?

22             THE COURT:  No.  You want him to read it

23     again?

24             MS. ZUCKER:  No, I'd like him to read it

25     out loud.

1          THE COURT:  The proper way to do it is

2      for you to read it and ask him if that was the

3      question that was asked and that's the answer you

4      gave.

5          Q.      Do you recall being asked:  "At that

6  point, did you see who was operating the car?"

7              You answered:  "I did.  I was looking

8  out the mirror trying to see the traffic behind me as

9  well as looking in front of me.  I saw this car come up.

10  I could tell it was a Honda that matched the description.

11  Mr. Hall passed to the left."

12          A.      Right.

13          Q.      And then you were asked:  "Mr. Hall the

14  one driving that car?"

15              You answered:  "Right.  And he, as he

16  passed me, he looked at me.  I looked back.  He proceeded

17  through the intersection.  He had the green light.  I

18  pulled away from the curb.  At that point Mr. Hall began

19  to flee in his Honda."

20              Is that your testimony?

21          A.      Right.

22          Q.      And at that time you didn't mention

23  anything of Mr. Hall slowing down or anything, did you?

24          A.      Like I said, he passed to my left.  And I

25  was behind the intersection.  There was still some traffic

1    there.  But as he approached, he had a red, and then the

2    green light cycled so he went on through.  That's when he

3    took off at a high rate of speed.

4        Q.        Was he traveling -- going through the

5    intersection, was he traveling at a normal rate of speed?

6        A.        As he approached, yeah.  But like I say

7    he slowed down for the light.

8        Q.        In that area it's approximately 35 miles

9    an hour?

10       A.        I believe it's 35.

11       Q.        If somebody were traveling 35 miles an

12   hour, do you know approximately how many feet that would

13   be per second?

14                 MR. ANDERSON:  Objection.

15                 THE COURT:  Overruled, if he knows.

16       A.        I don't, I don't know.

17       Q.        And how long -- how much width did you

18   actually see Mr. Hall face to face?

19       A.        Five to seven feet away from me.

20       Q.        He was five to seven feet away from you.

21   And actually he was in your visibility for maybe three

22   feet in the window?

23       A.        Right.  That's about right I guess.

24       Q.        Did you call in on your radio at the

25   beginning once you noticed the Honda?

```
1              A.       I did.

2              Q.       And that would be within the radio call

3    format?

4              A.       It should be.

5              Q.       And did you review the radio

6    transmissions earlier today?

7                       THE COURT:  What are you referring to?

8              A.       Are you talking about the big boards?

9              Q.       Yes.

10             A.       I looked over them.

11             Q.       And are you familiar with what these are?

12             A.       Right.  I don't know how much of the

13   radio incidents there are.  I don't know if it's a summary

14   of the whole radio incident.  I don't know what you have

15   there.

16             Q.       And you had the opportunity to look at

17   them?

18             A.       Right.

19                      MS. ZUCKER:  I'll marked these exhibits

20        as defense exhibits.

21                      (Defendant's Exhibits 7 and 8 marked for

22        identification.)

23                      THE COURT:  Just refer to them by number

24        when you refer to them.

25             Q.       Looking at this do you find the
```

1    transmission that you made on Gilbert Avenue?

2                    THE COURT:  Officer, you can get up and

3          take a look at those if you like.

4                    THE WITNESS:  I can but --

5                    THE COURT:  It's up to you.

6                    (Witness at board.)

7    A.        This doesn't have --

8                    THE COURT:  You're referring to

9          Exhibit 8?

10                   THE WITNESS:  Exhibits 7 and 8 will not

11         show my exact vehicle pursuit.  That will be under

12         a different, probably be under my car number and

13         district.

14                   So you would need to actually pull up my

15         entries for car 2400 to find out what I was doing

16         prior.

17                   What will happen is we'll have several

18         things going on at one time.  It may be the same

19         thing, may be connected the way they categorize

20         it.

21                   We got three different districts here.

22         That's why you don't see a lot of what happened on

23         there.

24    Q.        You can have a seat, again, Officer.

25                   (Witness resumes stand.)

```
 1                    THE COURT:  Next question.

 2                    MS. ZUCKER:  I'd like to mark this as

 3          Defendant's Exhibit Number 9.

 4                    (Defendant's Exhibit 9 marked for

 5          identification.)

 6                    THE COURT:  Show it to the prosecutor.

 7          Q.        I'm showing you a copy of the subpoena

 8   that was issued to the keeper of the records.  Can you

 9   read what was requested on those records?

10                    MR. ANDERSON:  I'm going to object.

11                    THE COURT:  Sustained.

12          Q.        And it was requesting all radio

13   transmissions?

14                    MR. ANDERSON:  Objection.

15                    THE COURT:  Sustained.  He's not the

16          keeper of the records, or at least not been

17          established as such.

18                    MS. ZUCKER:  Can I establish whether that

19          information should be available?

20                    THE COURT:  You've not established that

21          he's the witness that would know that.

22                    MS. ZUCKER:  Okay.  No further questions,

23          Your Honor.

24                    THE COURT:  Thank you.  Anything else,

25          Mr. Anderson?
```

```
 1              MR. ANDERSON:  No.

 2              THE COURT:  Officer Bailey, thank you

 3        very much for your testimony.  You're free to

 4        leave now.

 5                   (Witness excused.)

 6              THE COURT:  State's next witness?

 7              MR. ANDERSON:  The State will call

 8        Officer Fromhold.

 9              MR. RADER:  Your Honor, may the witness,

10        Officer Bailey be subject to recall?

11              THE COURT:  They all are.

12              MR. RADER:  Thank you.

13                   STEPHEN FROMHOLD

14   being first duly sworn, was examined and testified as

15   follows:

16              THE COURT:  State your name and spell

17        your last name.

18              THE WITNESS:  Police Officer Stephen

19        Fromhold, F-r-o-m-h-o-l-d.

20              THE COURT:  Thank you.

21              Mr. Anderson?

22                   DIRECT EXAMINATION

23   BY MR. ANDERSON:

24        Q.      Officer Fromhold, you're employed by the

25   City of Cincinnati?
```

1        A.        Yes, sir.

2        Q.        Were you employed by the City of

3   Cincinnati back on October 17, 1998?

4        A.        Yes, sir.

5        Q.        On that date did you have an occasion to

6   respond to the Republic Street area?

7        A.        Yes, sir.

8        Q.        Please tell the ladies and gentlemen of

9   the jury why you responded to that location and what you

10  did.

11       A.        We responded to the area of the report of

12  a shooting at Thirteenth and Republic.

13       Q.        What did you do when you arrived at the

14  scene?

15       A.        We found a subject lying on the southeast

16  corner that had sustained a gunshot wound.

17       Q.        Who was that?

18       A.        I believe his name was Johann Hart.

19       Q.        So Mr. Hart was actually still present at

20  the scene when you responded?

21       A.        He was in the prone position being tended

22  to by other citizens.

23       Q.        Were the paramedics there yet?

24       A.        No.

25       Q.        What did you do as a result of Mr. Hart's

1.  condition?

2.        A.        We attempted to converse with him.  We

3.  already were aware that medical was responding and fire

4.  division.   We also learned that there was a second

5.  subject had been shot that ran east on Thirteenth and

6.  south on Vine and was over there near the Warehouse Bar

7.  where another officer was working a bar detail, and was

8.  requesting fire also for his gunshot wounds.

9.        Q.        That would be Kevin Davis?

10.       A.        That's correct.

11.       Q.        What did you do when you got to the scene

12. to ascertain that Mr. Hart had been shot, Mr. Davis had

13. been shot; what did you do specifically?

14.       A.        Our supervisors were enroute.  One of

15. them pulled up shortly thereafter and we roped off the

16. area of Thirteenth and Republic with crime scene tape to

17. preserve it.

18.               We ascertained what direction the

19. investigation was going to go in in relationship to the

20. extent of the injuries to both Mr. Davis and Mr. Hart.

21.               Obviously, if it was going to be a

22. homicide, we would have called CIS personnel and they

23. would have picked up the investigation of the witnesses.

24.               There was a lot of lag time, so to speak,

25. while we were waiting for fire division personnel to

1    assess the extent of the gunshot injuries, to see which

2    way the direction of the investigation was going to go.

3                    The burden of the investigation is

4    dictated on the severity of the gunshot wounds.  If it

5    appears that the subjects are going to die, obviously

6    homicide will be called out.  We have crime scene techs

7    come to the scene.

8                    If it doesn't appear that either

9    subject's gunshots are life threatening, it may stay at

10   the district level.  But due to the fact that there was

11   multiple victims, it could dictate a recall of an

12   investigator from home.  We don't have investigators

13   working the evening hours, 3:00 AM, 3:15 AM.

14        Q.        So basically, did you see and try to

15   gauge the severity of the injuries to the victims to

16   decide whether or not to call homicide for them to come

17   and investigate or whether this investigation will stay

18   within your district?

19        A.        That's correct.

20        Q.        In this particular case when you arrived

21   on the scene, did you have a chance to observe Mr. Davis's

22   injuries?

23        A.        No, I did not.  I stayed right at

24   Thirteenth and Republic.  I was apprised that his injuries

25   almost immediately were not life threatening.

1          Q.      What about Mr. Hart?

2          A.      There was some concern about his

3     initially because it was in the shoulder and neck area.

4          Q.      Was Mr. Hart conscious when you arrived

5     at the scene?

6          A.      Yes, he was.

7          Q.      As a result of that, what did you do in

8     the course of your investigation?

9          A.      Well, it slowed everything down. We held

10    the crime scene, waited for fire personnel to transport

11    him, and send an officer to the hospital to get a more

12    accurate diagnosis of his injuries, the extent and if it

13    was life threatening or not.

14         Q.      So basically Mr. Hart was transported to

15    the hospital, they were making a medical diagnosis of his

16    potential condition, and at that point the decision would

17    be made whether or not it would stay within the district

18    or homicide would be called?

19         A.      That's correct.

20         Q.      Did it slow things down a little bit?

21         A.      A lot.

22         Q.      What happened once you determined that

23    Mr. Hart's injuries were probably not life threatening, so

24    to speak?

25         A.      District personnel supervisors recalled

1    Detective Huffman and I believe his supervisor, also.

2        Q.        What was the time line between the time

3    you responded to the scene and the time that a detective

4    from the district was called out to investigate?

5        A.        I believe the dispatch on it was around

6    3:15, 3:20 in the morning.

7        Q.        That would have been the time of the

8    shooting?

9        A.        Yes, and we were there within a minute of

10   the shooting.  We were at Twelfth and Republic when the

11   dispatch came out.  We were on bikes and we were only a

12   block away, so we went the wrong way up Republic on our

13   bicycles.

14                I recall getting off close to on time,

15   which my shift would terminate at 4:00 AM.  So it was

16   close to 4:00 AM before Officer Huffman actually got to

17   the district because I touched base with him on the

18   preliminary investigation, what we had done, and what he

19   needed to pick up on.

20       Q.        As a result of cordoning off crime scene,

21   putting tape around it, did you conduct a survey of the

22   scene?

23       A.        Yes, and I talked to a couple of

24   witnesses, also.

25       Q.        Okay.  Officer Fromhold, I'll hand you

1    what's been marked as State's Exhibits 11, 12, 13, and 14;

2    if you could take a look at those individually and

3    identify them by number.  Can you identify what those

4    exhibits are, sir?

5          A.       State's Exhibit Number 11 is a white

6    arrow which was drawn by myself on the asphalt pointing to

7    a shell casing that we had located almost immediately.

8          Q.       Okay.  Now, you've indicated there is a

9    photograph there.  State's Exhibits 11, 12, 13, and 14 are

10   all photographs.  Were those photographs taken by you?

11         A.       They were taken at my direction by

12   Officer Ball.  He came and I pointed out what we needed to

13   photograph.

14         Q.       So those photographs were taken at your

15   direction.  Do they all truly and accurately depict the

16   scene as it existed on October 17, 1998?

17         A.       Yes.

18         Q.       What about State's Exhibit Number 12?

19         A.       After we'd been there a while, to be

20   quite candid with you, we were kind of bored waiting for

21   somebody to make a decision.  We had talked to both of the

22   witnesses.  We started scouring the area a little bit more

23   thoroughly, hoping to find more shell casings because

24   there was an indication of four or five shots fired.

25                  And I started kicking garbage in the curb

1    area and I kicked over a brown paper bag and a Cheetos bag

2    and some other trash and located another shell casing.  It

3    appeared much -- appeared to be weathered, tarnished.  But

4    I marked an arrow, put an arrow to it in case it was

5    involved.  It's unusual to find shell casings in that

6    area.

7           Q.        That shell casing was also recovered from

8    the scene, correct?

9           A.        Yes.

10          Q.        What about State's Exhibit 13?

11          A.        13 is the blood from Mr. Hart in the

12   street where he was lying right on the curb area.

13          Q.        What about State's Exhibit 14?

14          A.        That's more of a distance shot of the

15   area where he was lying after they removed him from the

16   scene.

17          Q.        Those were all taken under your

18   direction?

19          A.        Yes.

20          Q.        Officer Fromhold, I'll hand you what's

21   been marked as State's Exhibit Number 10 for purposes of

22   identification.  Can you identify what that particular

23   exhibit is, sir?

24          A.        Three .380 shell casings, .380 caliber

25   shell casings.

1    Q.    Now, are you aware of where those shell

2    casings were recovered?

3    A.    Two were from the scene and one I believe

4    was recovered by Detective Huffman from the vehicle that I

5    had broadcast.

6    Q.    Now, are you aware of whether or not

7    those bullets were in fact submitted for analysis at the

8    Hamilton County Coroner's Laboratory?

9    A.    I'm aware of a report of analysis, yes.

10    Q.    Two of those shell casings were recovered

11    by you and those are the two shell casings that are

12    contained in photographs or State's Exhibits 11 and 12; is

13    that correct?

14    A.    Correct.

15    Q.    You indicated that one of the shell

16    casings, particularly the shell casing contained in

17    State's Exhibit Number 12, appears to be worn and things

18    like that?

19    A.    Weathered, tarnished much more, wasn't

20    shiny.  It was under some debris.

21    Q.    How far away from the initial shell

22    casing that you found was the shell casing in State's

23    Exhibit Number 12?

24    A.    It was, the first one we found was south

25    of the victim, probably 25 feet.  The other one was more

1    in an easterly direction.

2         Q.        How far away from each other,

3    approximately?

4         A.        Probably about 30, 35 feet.

5              MR. ANDERSON:  Judge, I have no further

6         questions.

7              THE COURT:  Cross-examination?

8                   CROSS-EXAMINATION

9    BY MR. RADER:

10        Q.     -  Good morning, Officer Fromhold.

11        A.        Good morning.

12        Q.        How are you today?

13        A.        Fine, thank you.

14        Q.        My name is Jim Rader, one of the counsel

15   for the defendant in this case.  Good to see you here this

16   morning --

17        A.        Thank you.

18        Q.        -- to shed some light on this situation

19   for us.

20                  I understand you arrived there almost

21   immediately?

22        A.        That's correct.

23        Q.        And your testimony was that Detective

24   Huffman didn't get there till around 4:00?

25        A.        He was at the district around then

1    approximately.

2         Q.        At the district or on the scene?

3         A.        I don't know that he even went to the

4    scene, to be quite candid with you.  I met with him in the

5    district.  There was another officer who took my place at

6    the scene so we could go in and touch base with him.

7         Q.        Officer, being on the scene, you know --

8    I've studied this situation fairly closely, and I

9    compliment the department on the fact that I think this

10   license number was out on the radio within about three

11   minutes of the first 911 call at 3:18; do you recall that?

12        A.        Yes.

13        Q.        Quickly, very quickly?

14        A.        Yes.

15        Q.        And at some point not long after that,

16   there was a description broadcast of a male black, light

17   complected, clean shaven, 20 or 21 years old.  Do you

18   remember that description being broadcast?

19        A.        No.  It may have come from the --

20   generated from the vehicle pursuit.  I don't recall that.

21   I recall putting a description out of a male black with a

22   dark cap, and that age range.

23        Q.        Okay.  You're with me.  Male black, how

24   old?

25        A.        I believe it was like in his twenties is

1   what I stated.

2          Q.          And male black in his twenties, baseball

3   cap?

4          A.          That's correct.

5          Q.          You don't remember light complected?

6          A.          I believe I stated on the radio dark cap.

7   That's about the description.  I was just ecstatic that we

8   got a good license number from a witness.

9          Q.          You don't remember clean shaven?

10         A.          No, I don't.  I reviewed the reports

11  yesterday, and I was just going off what we wrote on the

12  report.  I don't recall saying that without listening to

13  the tape.

14         Q.          But if they came out on the radio, as

15  I've indicated, as clean shaven, roughly 20 years old,

16  light complected black gentleman, baseball cap, then you

17  would have been the source of that information?

18         A.          I don't know what transpired in the

19  District 2 pursuit of a vehicle that was allegedly

20  involved in it, if there was a bail out, and that

21  description was generated by a bail out of the vehicle.  I

22  wasn't on that area.  That was a different channel.  I

23  picked up part of the pursuit on my radio.  But my

24  generating that information, my generation of it was what

25  I explained.

1    Q.        Excuse me, didn't mean to interrupt but

2    as you're testifying here today, it refreshed your

3    recollection reading your report the other day?

4        A.        Certainly.  This happened in October.

5        Q.        I understand that.  This radio

6    transmission I've been able to listen to also indicates

7    that there were three people in the car?

8        A.        That's what my report reflected, yes.

9        Q.        That was your initial -- put out over

10   your radio?

11       A.        That's correct.

12       Q.        Do you recall whether there were -- what

13   their position was in the car?

14       A.        I don't recall where the rear person was,

15   but I do recall them explaining to me that it was one of

16   the two people in the front, one in the back. I don't

17   recall where the person in the back was seated, what side

18   of the vehicle.

19       Q.        Now, this information that you were able

20   to get was not from either one of the victims?

21       A.        No, that's correct.

22       Q.        Can you shed some light on who this

23   information came from?  Do you recall their names or --

24       A.        It's in the addendum to the report, their

25   names.  The one gentleman was tending to Johann, trying to

1    -- telling him he was going to be okay, hang in there.

2              As soon as I walked up, I got off my bike

3    and walked up and he mumbled out a license number.  I

4    said, what?  He said, this is the car that's involved.  He

5    said, ADU 6730.

6         Q.        Who said that to you?

7         A.        The gentleman that was tending to Mr.

8    Hart.  And he says it's a beige Honda or Nissan, I believe

9    was his statement to me.  And he kept repeating the

10   license plate to reinforce it in his mind and make sure I

11   got it.  I put that much out almost immediately because he

12   seemed pretty confident that he had the license plate

13   down.

14        Q.        Did he tell you how many people were in

15   the car?

16        A.        Later, once we got Hart stabilized, his

17   version was pretty consistent with the female's version.

18   There were some discrepancies.

19        Q.        How many people did he tell you?

20        A.        He told me there were three and one

21   jumped out of the car.

22        Q.        Can you describe this witness for us?

23        A.        Male black, mid thirties, probably one of

24   our street people that's drug dependent.

25        Q.        Did you get his name?

1      A.      Oh, yeah.

2      Q.      And address?

3      A.      Oh, yeah.

4      Q.      And the second witness, I understand that

5   that was a female?

6      A.      Yes.

7      Q.      Can you tell me generally what she looked

8   like?

9      A.      20, 30 year old female black. Lived on

10  1400 block of Race. Her name is in the addendum, also.

11     Q.      Let's go back to the man for a moment, if

12  we could, please. In your experience as a police officer,

13  did this person seem to you to be forthright and credible?

14     A.      Well, the thing that impressed me most

15  about him, was he just kept repeating the license number.

16  So he had made, in my opinion, a cognizant desire to

17  remember that. He kept repeating it, repeating it,

18  repeating it, over and over. He probably said it six,

19  seven times.

20            And I wrote it down the second time he

21  said it. So I think he knew in his mind he had something

22  solid that could contribute to the investigation and he

23  didn't want to forget it.

24     Q.      Sounds like an effort to remember it. He

25  didn't want to forget it?

1          A.        Yes, in my opinion, that's how I
2    interpreted that.
3          Q.        I understand.
4                    MR. RADER:  Excuse me for a moment, Your
5          Honor, will you please?
6                    (Pause in proceedings.)
7          Q.        Maybe I can refresh your memory a little
8    bit.  Maybe you'll recognize -- the man, was his name
9    Jimmy Martin; does that ring a bell?
10         A.        I believe so.
11         Q.        Are you fairly confident?
12         A.        I can look at the report.  I don't have
13   it right in front of me.
14         Q.        Do you have the report here?
15         A.        I'm sure Detective Huffman has got it out
16   in the hall or the prosecutor probably has a copy of that.
17                   MR. RADER:  Your Honor, could the witness
18         ask Officer Huffman if he has those?
19                   MR. ANDERSON:  Judge, I'll address it in
20         a little bit.
21                   Judge, if we can have a sidebar real
22         quick.
23                   THE COURT:  I think we need one.
24         Excuse us, ladies and gentlemen.
25                   Stay right there, Officer.

1           THE WITNESS:  Yes, sir.

2           (Discussion in chambers off the record.)

3           THE COURT:  Thank you, ladies and

4       gentlemen.

5           Next question, Mr. Rader.

6   BY MR. RADER:

7       Q.      Officer, do you recall that the lady that

8   we're talking about is Lolita Moore?

9       A.      That rings a bell, yes.

10      Q.      Okay.  Can you indicate to us the nature

11  of the information that she gave you?

12      A.      My recollection was, without looking at

13  the report, was she was on Thirteenth, I believe, west of

14  the crime scene, and saw the vehicle proceed past here,

15  start to make a turn, multiple gunshots rang out.  She

16  said somebody exited the vehicle, went over to the fallen

17  victim -- the other subject, Mr. Davis, had ran -- and go

18  through his pockets and run back to the vehicle, go back

19  to the car and take off.

20      Q.      Please go over that again, will you?

21      A.      My recollection from what --

22          THE COURT:  Wait a minute.  He doesn't

23      have to go over it again.  Next question.

24      Asked and answered.

25      Q.      What you told me, and honestly there is

1    no trick questions here, what you told me sounded like a

2    drive-by shooting; is that right? That was the impression

3    that you got from Lolita Moore?

4                    MR. ANDERSON:  Objection.

5                    THE COURT:  Sustained.  Next question.

6          You don't have to answer.  Next question.

7          Q.        Did Ms. Moore indicate to you how many

8    people were in the car?

9          A.        I believe she said three.

10         Q.        And she indicated that somebody got out

11   of the car?

12         A.        She did.

13         Q.        And did what?

14                   MR. ANDERSON:  Objection.

15                   THE COURT:  Sustained.  Asked and

16         answered.

17         Q.        Was it your understanding from her that

18   this car didn't stop?

19                   MR. ANDERSON:  Objection.

20                   THE COURT:  Sustained.

21         Q.        Officer, you found these two .380

22   cartridge cases at the scene; is that right?

23         A.        That's correct.

24         Q.        Approximately 35 feet apart?

25         A.        That's correct.

1    Q.    Have you reviewed the criminalistics

2  report from the Coroner's Lab as to these casings?

3    A.    I have.

4    Q.    Your investigation led you to the

5  conclusion that these casings were fired from the same

6  gun?

7              MR. ANDERSON:  Objection.

8              THE COURT:  Sustained.  He's not an

9         expert witness, or he's not been qualified as

10        such.

11             MR. RADER:  May I have just a moment,

12        please, Your Honor?

13             THE COURT:  Sure, take your time.

14             (Pause in proceedings.)

15   Q.    Did Ms. Moore indicate to you that she

16  had seen the shooter?

17   A.    I don't believe she gave me a very good

18  description.  I don't think so.  I don't believe so.  She

19  saw the vehicle and somebody run from the vehicle and then

20  re-enter the vehicle.  I don't believe so.

21             I think my description, the vague

22  description of -- the one that you referenced earlier was

23  a little off from what I thought I'd put out.  Male black,

24  twenties, dark baseball cap, was generated from the male

25  subject, male witness, as the operator of the vehicle,

1    because that would have been the position he would have

2    the best view of, to my recollection.

3        Q.    Did he tell you anything about the

4    proceedings of the vehicle?

5        A.    Yes, he did.

6        Q.    What did he tell you?

7        A.    He was actually, according to him, on the

8    opposite corner of Johann and Mr. Davis.  He was on the

9    northeast corner, and they were on the southeast corner.

10        He was facing northbound.  The vehicle

11    came east and then turned south.  And he didn't see the

12    vehicle initially.  He heard the first gunshot, then

13    turned to see the vehicle driving by, somebody hanging out

14    the window shooting.  And that's when he saw the rear of

15    the vehicle proceed southbound and made a mental note of

16    the license plate.

17        Q.    In your experience as an officer -- how

18    long have you been an officer?

19        A.    20 years.

20        Q.    You've seen a lot of things?

21        A.    Yes, sir.

22        Q.    And you were investigating this incident

23    at the time?

24        A.    I was conducting a preliminary

25    investigation, yes, sir.

1    Q.    I understand.  You testified that you saw

2   these cartridge cases 35 feet apart?

3    A.    Yes.

4    Q.    And you know from your experience that

5   distance is hard to judge, but being a police officer,

6   you're aware of that, correct?

7    A.    Yes, sir.

8    Q.    Is your -- tell me how good your estimate

9   is.  Are you sure within a foot or two?

10             MR. ANDERSON:  Objection.

11             THE COURT:  Sustained.

12    Q.    Well, that was your testimony, right?

13    A.    Yes, sir.

14    Q.    And that's based on your 20 years of

15   experience with being careful about these things?

16    A.    Yes, sir.

17    Q.    I understand that.  I appreciate that.

18             MR. RADER:  Your Honor, this officer has

19        testified that he's been on the Cincinnati Police

20        Department 20 years.  I would ask that he be

21        qualified as an expert.

22             THE COURT:  Expert as to what?

23             MR. RADER:  To the fact that these shell

24        casings were 35 feet apart.

25             THE COURT:  That's ballistics.  He's not

1      going to qualify as a ballistics expert.  The mere

2      fact that someone is familiar with the operation

3      of guns and firearms, and maybe an expert in that

4      operation, does not make them a ballistics expert.

5              MR. RADER:  My point is 35 feet --

6              THE COURT:  The point is if you want to

7      make an argument we'll go back in chambers.

8              MR. RADER:  Can we please, Your Honor?

9              THE COURT:  Excuse us.

10             (Discussion in chambers off the record.)

11             THE COURT:  Next question, if you have

12     one.

13             MR. RADER:  Officer Fromhold, I

14     appreciate your being here.  Thank you.  No

15     further questions.

16             THE COURT:  Anything further, Mr.

17     Anderson?

18             MR. ANDERSON:  A few questions, Your

19     Honor.

20                 REDIRECT EXAMINATION

21  BY MR. ANDERSON:

22         Q.      Officer Fromhold, could you describe

23  Jimmy Martin to the jury?

24         A.      Seemed to be a homeless person, somebody

25  you would see commonly in that area.  Possibly drug

1    dependent.  Thin male black.  Mid thirties.

2         Q.        Now, according to what you testified to

3    on cross-examination, he told you that he first became

4    aware of this car being there when he heard the first

5    gunshots; is that correct?

6         A.        That's correct.

7         Q.        So he didn't see anything prior to that?

8         A.        No, he didn't.

9         Q.        Did he give you an address?

10        A.        A what?

11        Q.        Did he give you an address?

12        A.        He did.

13        Q.        And that was 662 Ridge Acres?

14        A.        Yes.

15        Q.        What about Lolita Moore; can you give us

16   a description of her?

17        A.        Female black, probably in her late

18   twenties, early thirties.  Gave me an address on Race

19   Street.  I believe it was one of the Hart Realty

20   buildings.

21        Q.        How about 1527 Race Street?

22        A.        Yes, sir.

23        Q.        Can you describe her?

24        A.        She was kind of well dressed actually for

25   the area.  She didn't look like a street person.  She

1    didn't look disheveled like the other gentleman did.  She

2    surfaced later in the investigation, not initially.

3                    She was there probably within, I think

4    maybe 20 minutes after we saw her standing over there, one

5    of them talked to her.  She didn't seem real interested in

6    getting involved initially.

7        Q.    So these are the two witnesses that you

8    talked to at the scene?

9        A.    Right.

10        Q.    Were there any other witnesses there that

11    you were aware of?

12        A.    Not that could provide us any valuable

13    information for the investigation.

14        Q.    Now, you've had experience investigating

15    gunshots and things of that nature; is that correct?

16        A.    Yes, sir.

17        Q.    Is it safe to say it can be somewhat

18    chaotic?

19        A.    Absolutely.

20        Q.    People seeing the same thing describe it

21    differently?

22                    MR. RADER:  Objection, Your Honor.

23            That's speculation.

24                    THE COURT:  Sustained.

25        Q.    How far away did Ms. Moore indicate she

1    was when these gunshots rang out or when she saw the car?

2         A.    She would have been a hundred, 150 feet.

3         Q.    Away from the scene?

4         A.    (Indicate yes.)

5         Q.    3:00 in the morning?

6         A.    Right.

7         Q.    Some street lights out there but it's

8    probably dark?

9         A.    Dimly lit.

10        Q.    A hundred to 150 feet away?

11        A.    Yes.

12              MR. ANDERSON:  Judge, I have nothing

13        further of this witness.

14              THE COURT:  Any other questions for

15        Officer Fromhold, Mr. Rader?

16              MR. RADER:  Yes, Your Honor.

17                  RECROSS-EXAMINATION

18    BY MR. RADER:

19        Q.    Officer, how long did you stay on the

20    scene?

21        A.    I would imagine I was there, let's see --

22    occurred around I believe 3:19 in the morning.  We were

23    there at 3:20.  Probably close to an hour if not a little

24    less.

25        Q.    So close to 4:20, 4:15 or 4:20?

1      A.      I recall getting out of work a little

2   late that night.  We usually get off at 4:00 AM.  So it

3   was probably about an hour, 45 minutes to an hour.

4      Q.      Did you leave to go home from the scene

5   or did you go back to the district?

6      A.      We had to go back and turn our bicycles

7   in and touch base with Detective Huffman who was coming in

8   from home.

9      Q.      Someone called in a description at 3:52

10  from the scene, the description of the driver; was that

11  you?

12     A.      3:52 from the scene.

13     Q.      Yes.

14     A.      I don't recall putting one out that late.

15  Most of my description was either written in the report,

16  if it developed later, because of what transpired in

17  District 2 in pursuit of the vehicle.

18          The investigation kind of took a twist,

19  so to speak.

20          MR. RADER:  May I have just a moment,

21      Your Honor?

22          THE COURT:  Sure.

23          (Pause in proceedings.)

24

25

```
 1                       RECROSS-EXAMINATION
 2   BY MS. ZUCKER:
 3           Q.      Officer, are you able to -- by reviewing
 4   a --
 5                   MR. ANDERSON:  Judge, I'm going to
 6           object.
 7                   THE COURT:  Yeah.  Is this some new area
 8           that we're getting into?
 9                   MS. ZUCKER:  It's on the same line, Your
10           Honor.
11                   THE COURT:  All right.  Ask your
12           question.  Overruled.
13           Q.      By reading a radio printout, can you tell
14   if you're the one who gave a description at a certain
15   time?
16           A.      I may be able to.  I didn't even see that
17   behind me.
18                   THE COURT:  Why don't you get up and go
19           take a look at it?  It's no problem.
20                   THE COURT:  Ms. Zucker, just let him look
21           at it.
22                   For the record, he's looking at
23           Defendant's Exhibits 7 and 8 which have been blown
24           up.
25                   THE WITNESS:  Most of this here is
```

1          generating an area that I wasn't in.

2                    THE COURT:  I believe with his hand

3          gesture, he referred to defense Exhibit 7.

4                    Go ahead, Mr. Fromhold.

5                    THE WITNESS:  Most of this is radio

6          traffic that's going on back and forth from

7          dispatch to cars.

8                    The only thing I can see here that would

9          be relevant to me would be this number three,

10         1483.  I'm 1480; that's my partner.

11                   She advised me that 1325 was going to

12         photograph and recover in our direction the stuff

13         that was marked on the photos.  My description is

14         not on there, so I can't say that I did.

15         Q.       Do you know who 1420 is?

16         A.       1420 was probably Sergeant Gabel that

17    night, her regular car number.  She is 1420.

18                   MS. ZUCKER:  Thank you.

19                   THE COURT:  Anything else?

20                   MS. ZUCKER:  No, Your Honor.

21                   THE COURT:  Thank you, officer, very much

22         for your testimony.  You're free to go at this

23         time.

24                   (Witness excused.)

25                   THE COURT:  State's next witness?

1          MR. ANDERSON:  We will call Officer

2      Neack.

3                    DOUG NEACK

4  being first duly sworn, was examined and testified as

5  follows:

6                    THE COURT:  Officer, can you state your

7      name and spell your last name, please?

8                    THE WITNESS:  Doug Neack, N-e-a-c-k.

9                    THE COURT:  Pull that microphone over to

10     you just a little bit.  Thank you.

11                   Mr. Anderson?

12                   DIRECT EXAMINATION

13  BY MR. ANDERSON:

14         Q.        Sir, where do you work?

15         A.        City of Cincinnati, Police Division,

16  District 1.

17         Q.        And were you so employed back on October

18  17, 1998?

19         A.        I was.

20         Q.        Did you have an occasion to come into

21  contact with someone on that date now known to you as

22  Fredrick Hall?

23         A.        I did.

24         Q.        Do you see me him in court today?

25         A.        Yes.  It's the gentleman at the defense

1  table with the black suit and pink shirt and red tie.

2       Q.     Officer Neack, where did you come in

3  contact with the defendant that day?

4       A.     I believe it was up on Windsor.

5       Q.     And why did you respond to that location?

6       A.     We'd been looking for a particular car

7  and Lt. Bailey had located the vehicle up -- I believe it

8  was District 2.

9       Q.     The vehicle that the police were looking

10  for was located, you responded to the scene.  What did you

11  find when you got up on Windsor?

12       A.     This gentleman was located up there, and

13  Lt. Bailey placed him in my vehicle.

14       Q.     Okay.

15       A.     I at that time read him his rights.

16       Q.     What specific rights did you advise this

17  defendant of at that time?

18       A.     I always remove my wallet and read the

19  rights verbatim from a rights card I carry in my wallet.

20       Q.     What rights were those that you read to

21  him?

22       A.     It's the Miranda warning as to your

23  rights.  "You have the right to remain silent.  Anything

24  you say can and will be used against you in a court of

25  law.  You have a right to talk to a lawyer and to have him

1    present with you while you're being questioned. If you

2    cannot afford to hire a lawyer, one will be appointed to

3    represent you before any questioning if you wish.

4                    "You can decide at any time to exercise

5    these rights and not answer any questions or make any

6    statements. Do you understand each of your rights?"

7         Q.        You read those to the defendant?

8         A.        I did.

9         Q.        Did the defendant indicate to you that he

10   understood those rights?

11        A.        He did when I asked him.

12        Q.        What happened after you read the

13   defendant his rights? Did you talk to him about the

14   shooting or the police chase or operating a car or

15   anything else like that?

16        A.        I didn't say a whole lot to him.

17   Basically, the statement he made was he was just out

18   buying shaving cream.

19        Q.        He was out buying shaving cream. Did he

20   indicate whether or not he had been driving a car?

21        A.        He didn't say a whole lot. I wasn't

22   asking a lot of questions at that point due to the ongoing

23   investigation.

24        Q.        He told you he was out buying shaving

25   cream?

1      A.      That's correct.

2      Q.      At some point later, did you transport

3  the defendant to the district?

4      A.      I did.

5      Q.      And what happened when you got the

6  defendant back to the district?

7      A.      I took him into District 1, and per

8  procedure, what we do at District 1 is I reread his rights

9  to him off a written form that we have in the district,

10  and went over the rights again.

11      Q.      Sir, I'll hand you what's been marked as

12  State's Exhibit Number 1 for purposes of identification.

13  Can you identify what that particular exhibit is, sir?

14      A.      That is the rights form from October 17

15  at 0615 in the morning, when I reread those rights.

16      Q.      It's actually a photocopy of the rights

17  waiver?

18      A.      That's correct.

19      Q.      And again, did you advise the defendant

20  of the rights contained on that form?

21      A.      I did.

22      Q.      Did you read them verbatim like you did

23  with the card you just got out of your wallet?

24      A.      That's correct.

25      Q.      At that time did the defendant indicate

1   that he understood what those rights were?

2        A.        He did.

3        Q.        Your signature appears thereon?

4        A.        Yes, it does.

5        Q.        The signature of Officer Huffman appears

6   on there?

7        A.        It does.

8        Q.        Doesn't the signature of the defendant

9   appear on there?

10       A.        No, it doesn't.

11       Q.        Did he agree to sign that particular

12  document?

13       A.        No, he refused.

14       Q.        Even though he refused to sign that

15  document, did the defendant indicate to you that he

16  understood what his rights were?

17       A.        Verbally, he did.

18       Q.        Did he make any additional statements to

19  you after you advised him of his rights off that rights

20  waiver form?

21       A.        No.

22       Q.        Again, he said he was out buying shaving

23  cream?

24       A.        That's pretty much --

25                 MR. RADER:  Objection, leading, Your

1        Honor.

2                THE COURT:    Sustained.

3        Q.        At what point did you break off your

4    interview of the defendant?

5        A.        Well, once -- as I stated, I did not ask

6    him very much in the car, and once I got back to District

7    1 I, after reading him his rights, Detective Huffman took

8    over and I went to the garage to look over the vehicle.

9        Q.        Okay.    What did you find when you looked

10   over the vehicle?

11       A.        The one item I found was a cartridge in

12   the driver's seat, basically on the right-hand side of the

13   driver's seat of the vehicle.

14       Q.        Officer, I'll hand you what have been

15   marked as State's Exhibits 4 and 5.    Can you identify what

16   those particular exhibits are, sir?

17       A.        Yes.    Four is the photo of the driver's

18   seat of the vehicle, and five is a photo of the vehicle

19   itself.

20       Q.        And what specifically did you recover or

21   did you find contained in the vehicle?

22       A.        It was a shell casing.

23       Q.        And I know that in front of you are items

24   that were contained in State's Exhibit Number 10.    Do you

25   remember the caliber of the particular shell casing that

1    you recovered from the scene, or from the vehicle?

2        A.        I believe it was a .380.

3        Q.        Would that be the same caliber that is

4    consistent with the shell casings that I'm handing you

5    that were contained in State's Exhibit 10?

6        A.        These all appear to be .380 shell

7    casings.

8        Q.        Okay.  Did you recover a gun from the

9    vehicle?

10       A.        I didn't hear the question, sir.

11       Q.        Did you recover a gun from the vehicle?

12       A.        No, I did not.

13       Q.        Were there any other items contained in

14   the vehicle besides the shell casing that you recovered?

15       A.        None that I remember.

16       Q.        Do you remember a baseball cap?

17       A.        Not offhand, I do not, sir.

18            MR. ANDERSON:  Thank you.

19            Judge, I have no further questions of

20       this witness at this time.

21            THE COURT:  Thank you.

22            Any questions, Mr. Rader?

23                 CROSS-EXAMINATION

24   BY MR. RADER:

25       Q.        Good afternoon.