1      A.      Good afternoon, sir.

2      Q.      How are you today?

3      A.      Fine, thank you.

4      Q.      Jim Rader, counsel for the defendant.

5              Did you attempt to lift fingerprints from

6  these cartridge cases?

7      A.      I myself, no, sir.

8      Q.      Did you attempt to obtain fingerprints

9  from the car?

10     A.      No, I am not fingerprint trained.

11     Q.      Did you make an effort to determine if

12 these three cartridge cases had been fired from the same

13 gun?

14     A.      That particular -- I'm not trained to do

15 that.  That was sent to criminalistics.

16     Q.      By you in an effort to determine that?

17     A.      No, not by me.

18     Q.      Okay.  Officer, your testimony was that

19 you advised the defendant of his rights on the scene, is

20 that right?

21     A.      That's correct.

22     Q.      And it's your mind set or your

23 understanding that a person, a defendant must be advised

24 of his rights pursuant to Miranda; is that right?

25     A.      I do, that's correct.

1       Q.      Can you explain why you would redo that

2  several hours later?

3       A.      That's simple procedure that we follow at

4  District 1 -- I cannot answer for every police district --

5  that once we get an individual back to the district where

6  we can sit down, hold the piece of paper in our hand and

7  go over the rights in particular, show them the rights

8  verbatim, make sure they understand what their rights are.

9  It's just simple, call it a courtesy, call it a procedure,

10  but that's what we do at District 1 just to make sure an

11  individual does understand each and every one of their

12  rights.

13       Q.      But that implies that probably previously

14  they didn't understand their rights?

15           MR. ANDERSON:  Objection.

16           THE COURT:  Sustained.  Next question.

17       Q.      The simple fact of this case is that

18  there is no admission or confession in writing, or one

19  recorded?

20       A.      I was not privy to any of the interviews

21  and I didn't take any written statements.

22       Q.      And there's no waiver of any

23  constitutional rights in writing or on recording; is that

24  right?

25       A.      I would differ with that, sir, 'cause he

1    did refuse to sign that form in my presence and Detective

2    Huffman's presence and it is my writing where I wrote the

3    words refused in his signature spot.

4         Q.        If I can clarify my own knowledge, there

5    is no waiver of rights in writing, is there?

6         A.        Not without his signature, no.

7              MR. RADER:  Thank you.  No further

8         questions.

9              THE COURT:  Anything else?

10             MR. ANDERSON:  No.

11             THE COURT:  Officer, thank you very much,

12        And you're free to leave.  Like everybody else in

13        this case, you're subject to recall.  Thank you

14        very much for your time.

15             (Witness excused.)

16

17

18

19

20

21

22

23

24

25

```
 1              AFTERNOON SESSION, Thursday, April 29, 1999
 2                      THE COURT:  State's next witness.
 3                      MR. ANDERSON:  Your Honor, the State
 4              would call Officer Huffman.
 5                      THE COURT:  Okay.  Officer, raise your
 6              right hand and be sworn.
 7                      DAN HUFFMAN
 8      being first duly sworn, was examined and testified as
 9      follows:
10                      THE COURT:  Pull that microphone up to
11              you.  State your name and spell your last name,
12              please.
13                      THE WITNESS:  It's Police Officer Dan
14              Huffman, H-u-f-f-m-a-n, assigned to the Cincinnati
15              Police Division, District 1 investigator.
16                      THE COURT:  Mr. Anderson.
17                      MR. ANDERSON:  Thank you, Your Honor.
18                      DIRECT EXAMINATION
19      BY MR. ANDERSON:
20              Q.      Officer Huffman, were you employed by the
21      Cincinnati Police back on October 17, 1998?
22              A.      Yes, sir, I was.
23              Q.      On that date, did you have an occasion to
24      investigate a shooting that occurred within the city?
25              A.      Yes, sir, I did.
```

1    Q.    Why don't you tell us a little bit about

2  when you first became involved in this investigation,

3   what you personally did.

4    A.    I was responding to -- I was called in to

5  District 1 around 5:00 AM the morning of October 17.  Once

6  I arrived at the District 1 Police Division, I was advised

7  that there had been a shooting with two juveniles

8  involved.  They were both at University Hospital and they

9  apparently had a car chase with the suspect at that time.

10    Q.    Where did the shooting occur?

11    A.    I believe it was the 1400 block of

12  Republic.

13    Q.    That's located in the City of Cincinnati,

14  Hamilton County, Ohio?

15    A.    Yes, sir, it is.

16    Q.    At that time, at the time you came on

17  duty, they already had a suspect in custody; is that

18  correct?

19    A.    That's correct.

20    Q.    Do you see the suspect in the courtroom

21  today?

22    A.    Yes, I do.

23    Q.    Please point to him and describe what

24  he's wearing.

25    A.    It's the gentleman seated at the defense

1    table wearing a red tie with the arm sling and dark suit

2    coat.

3                        MR. ANDERSON:  Your Honor, may the record

4            reflect identification of the defendant?

5                        THE COURT:  Record will reflect

6            identification of the defendant by the witness.

7            Q.        Officer Huffman, on the morning that you

8    came into contact with the defendant, was he wearing the

9    arm sling he's wearing in here today?

10           A.        No, sir, he was not.

11           Q.        Approximately what time did you come into

12   contact with the defendant?

13           A.        If I had to guess, I'd say between 5:30

14   AM and 6:00 AM.

15           Q.        Where did you come in contact with him?

16           A.        District 1 headquarters.

17           Q.        Was there like an interview room or

18   something?

19           A.        Yes, sir, there is.

20           Q.        Why don't you tell us what happened when

21   you first came into contact with the defendant?

22           A.        He was in the interview room, he was

23   given his rights by Officer Neack, and I was present.

24           Q.        Okay.  Sir, I'll hand you what's been

25   marked as State's Exhibit Number 1 for purposes of

1   identification.  Do you recognize what that particular

2   exhibit is?

3          A.      Yes, sir, I do.

4          Q.      What is that?

5          A.      It's the Miranda Rights form.

6          Q.      Was that read to the defendant by Officer

7   Neack on the early morning hours of October 17?

8          A.      Yes, sir, it was.  And there was one

9   placed in front of him so he could read along with us.

10         Q.      Did the defendant indicate to you that he

11  understood the rights that Officer Neack explained to him?

12         A.      Yes, he did.  He said that he understood

13  the rights.

14         Q.      Also, there's a signature line on there

15  that you signed and Officer Neack signed, but there is a

16  refusal by the defendant to sign it?

17         A.      That's correct.

18         Q.      He refused to sign the statement?

19         A.      Yes, sir, he did.

20         Q.      But did he say to you that he did

21  understand those rights?

22         A.      Yes, sir, he did.

23         Q.      Based on his understanding of the rights,

24  did you converse with the defendant concerning the

25  allegations of a shooting on Republic Street?

1       A.      Yes, sir.

2       Q.      Why don't you tell us what he said to

3 you.

4       A.      At first he stated that he was driving

5 around. He picked up an individual by the name of Dave

6 at the Barn Barrel at 15th and Pleasant. He then

7 proceeded to drive around, and he was coming down Republic

8 Street. He spotted two individuals that he told me that

9 had robbed him two weeks prior and shot him.

10       At that time he said Dave made mention to

11 him I'll take care of them. They stopped the car and he

12 said the two individuals approached the car, and at that

13 time Dave began firing shots.

14       Q.      He indicated he was in the car with a guy

15 named Dave, Dave is the guy that fired the shots at those

16 two guys?

17       A.      Yes, sir, that's correct.

18       Q.      What did he tell you after that?

19       A.      He stated that he lived on Republic

20 Street and stated that he dropped Dave off somewhere in

21 the West End, and told him, advised him to hide the gun.

22       Q.      Did he make any other statements?

23       A.      Later on, during the interview, he asked

24 if his car was going to be impounded and I stated there

25 was a possibility, it was involved in an offense, and we

1    have to process it as such.

2            He then stated that if he would take us

3    and recover the gun, would that help. I stated yes, it

4    would. We don't want the gun to get in the hands of young

5    children if it was hidden somewhere.

6        Q.    Did the defendant take you somewhere to

7    look for this gun?

8        A.    Yes, sir, he did.

9        Q.    Where did he take you?

10       A.    It was approximately 1035 Windsor.

11   That's apparently where he was apprehended in a grassy

12   back yard. He instructed us, there is a -- myself and Lt.

13   Ruberg was there and a uniformed guy along with us, he was

14   transporting a uniformed car.

15           He stated to us that he hid the gun

16   either under a limb or near a tree. There were several

17   limbs and several trees in this yard where we were. We

18   couldn't locate the weapon, went back to the police car

19   and physically removed him from the police car and had him

20   walk up and view the area where he thought he would have

21   hidden the gun, or the gun was hidden.

22           At that time he kind of looked blank like

23   he didn't know where the gun was. At that time he was

24   placed back in the police cruiser and we called for a

25   criminalist. They have access to metal detectors. And we

1    spent another hour with a metal detector in that yard.

2         Q.      Were you successful in finding the gun?

3         A.      No, sir.

4         Q.      What happened after that, after the

5    defendant took you up there and there was no gun and you

6    did not find it; where did you go then?

7         A.      He was transported to the Justice Center

8    on the other charges.  At that time I responded back to

9    District 1, I obtained a picture of the defendant.  I put

10   together a lineup which is photographs of individuals.  I

11   responded to University Hospital.

12              When I got to University Hospital, one of

13   the victims, Mr. Davis, had already been released.  It was

14   probably 10:00 AM, 10:30 AM maybe now.

15              At that time I went to Mr. Hart -- I

16   believe that is his name -- the other victim, told him who

17   I was.  I asked him what happened.  He stated that a tan

18   car come up Republic Street had stopped and called him

19   over to the car, that he went to the car, and he got shot.

20              I asked if he knew who shot him.  He said

21   no.  I stated could you identify him if you saw him again

22   and he stated yes.  At this time I showed him a photo

23   lineup.

24         Q.      Sir, I'll hand you what's been marked as

25   Plaintiff's Exhibit 2 for purposes of identification.  Can

1    you identify what that particular exhibit is?

2         A. .    This is a lineup that I put together on

3    that morning, and I took to the hospital.

4         Q.    How about State's Exhibit Number 8.  Can

5    you identify that?

6         A.    That's a photograph of the same lineup

7    but the pictures have been switched.

8         Q.    Now, apparently you obtained a picture of

9    the defendant and placed it in that photo lineup?

10        A.    That's right.

11        Q.    And in State's Exhibit Number 8 that

12   photograph is contained in the bottom center portion?

13        A.    That's correct.  That's the one that I

14   showed at the University Hospital with Johann Hart.

15        Q.    Who did Mr. Hart identify as being the

16   shooter?

17        A.    Mr. Hall.

18        Q.    And where was this picture located at the

19   time you showed State's Exhibit Number 7 to him?

20        A.    In the lower middle.

21        Q.    So it would have been down in this

22   position right here, this one?

23        A.    That's correct.

24        Q.    Now, I'll hand you what's been marked as

25   State's Exhibit Number 9 for purposes of identification.

1      A.      Can you identify that particular exhibit?

2      A.      Yes, sir.  It's another Polaroid

3   photograph of the lineup that I put together.

4      Q.      And that Polaroid photograph actually

5   depicts the photo lineup as it exists today; is that

6   right?

7      A.      That's correct.

8      Q.      What did you do with State's Exhibit

9   Number 7, the lineup, after Johann Hart identified

10  Fredrick Hall as being the shooter?

11     A.      I went to the front seat of my police car

12  and I switched photographs, took a photograph of the new

13  lineup, which is this picture.

14     Q.      In that particular lineup the picture of

15  the defendant is in the lower left hand corner; is that

16  correct?

17     A.      That's correct.

18     Q.      Is there some reason that you felt it

19  necessary to switch the location of the defendant from

20  that lineup when you showed it to Mr. Hart versus when you

21  showed it to Mr. Davis?

22     A.      Through my investigation I determined

23  that the victims were cousins.

24     Q.      Okay.

25     A.      And since one of them had been previously

1    released from the hospital, in my past experience as an

2    investigator, I wanted to make sure that there was no

3    connection of the pictures, so I changed the locations of

4    the picture.  I just wanted to make sure there was no

5    hanky-panky, Johann calling Kevin saying, hey, I picked

6    out the bottom center picture, that's the guy.

7    That's the reason why.

8           Q.      You switched the pictures around.  What

9    happened when you showed the photo lineup to Kevin Davis?

10          A.      I responded to the -- I believe it's 503

11   East Thirteenth Street.  I went in and I met Mr. Davis and

12   I believe it was Johann's mother and Mr. Davis's aunt.

13               At that time I asked Mr. Davis what

14   happened.  He said that they were down on Republic Street

15   and that Johann had went up to a car.  He heard some

16   shots.  He went over.  He knew -- he was trying to get

17   Johann out of the way and at that time he was shot, also.

18               I asked him if he knew the individual who

19   shot him.  He stated, no, he did not.  I asked him if he

20   could identify the subject that fired the shots at him.

21   He said, yes, he could.

22          Q.      Did you show him State's Exhibit

23   Number 7?

24          A.      Yes, sir, I did.

25          Q.      Who did Kevin Davis identify as being the

1    shooter on October 17, 1998?

2           A.       Mr. Hall.

3           Q.       The defendant?

4           A.       Yes, sir.

5                    MR. ANDERSON:  Judge, I have no further

6           questions at this time.

7                    THE COURT:  Cross-examination?

8                    CROSS-EXAMINATION

9    BY MR. RADER:

10          Q.       Officer, how are you?

11          A.       Fine, sir.

12          Q.       I'm Jim Rader, one of the counsel in this

13   case.  I notice in your testimony you indicated on the

14   waiver at 6:15 that Mr. Hall refused to sign it?

15          A.       Yes, sir.

16          Q.       And you indicated that he indicated to

17   you that he understood his rights; is that right?

18          A.       That's correct.

19          Q.       But isn't there a substantial difference

20   between understanding your rights and waiving your rights?

21          A.       It says in there he doesn't have to talk

22   if he doesn't want to.  To my best of my knowledge he

23   understood his rights.

24          Q.       But that's different than waiving your

25   rights.  You can't waive a right if you don't understand

1  it, can you?

2       A.       As far as my knowledge he understood his

3  rights.

4       Q.       But in fact he wouldn't indicate on the

5  paper that he waived those rights, would he?

6       A.       He just wouldn't sign the paper.

7       Q.       Sir, you assumed that he waived his

8  rights?

9       A.       I assumed that he didn't want to sign the

10  paper.  Some people don't want to sign the paper.

11            MR. RADER:  No further questions, Your

12       Honor.  Thank you.

13            THE COURT:  Anything else, Mr. Anderson?

14                 REDIRECT EXAMINATION

15  BY MR. ANDERSON:

16       Q.       Did the defendant indicate a willingness

17  to talk to you after you had explained his rights?

18       A.       Yes, sir.

19       Q.       He willingly talked to you, didn't hold a

20  gun to his head, didn't beat him up?

21       A.       No, sir.

22       Q.       Basically he said I don't want to sign

23  the paper but this is what happened?

24       A.       That's correct.

25            MR. ANDERSON:  I have nothing further.

1　　　　　　　　THE COURT:  All right, Officer.  Thank

2　　　　you very much for your time.  You're released at

3　　　　this time.  Leave the exhibits there.  Thank you.

4　　　　　　　　(Witness excused.)

5　　　　　　　　THE COURT:  Does the State have any

6　　　　further witnesses at this time?

7　　　　　　　　MR. ANDERSON:  No.

8　　　　　　　　THE COURT:  State rests?

9　　　　　　　　MR. ANDERSON:  State will rest.

10　　　　　　　　THE COURT:  Does the defendant care to

11　　　　present a defense at this time?

12　　　　　　　　MR. RADER:  Yes, Your Honor, if it please

13　　　　the Court.

14　　　　　　　　THE COURT:  Your first witness?

15　　　　　　　　MR. RADER:  Mr. Hall.

16　　　　　　　　　　FREDRICK HALL

17　being first duly sworn, was examined and testified as

18　follows:

19　　　　　　　　THE COURT:  State your name and spell

20　　　　your last name, please.

21　　　　　　　　THE WITNESS:  Fredrick Hall, H-a-l-l.

22　　　　　　　　THE COURT:  Go ahead, Mr. Rader.

23　　　　　　　　　　DIRECT EXAMINATION

24　BY MR. RADER:

25　　　　　　　Q.　　　Mr. Hall, I want you to keep your voice

1    up, make sure the jury can hear you.

2                      How old are you, Mr. Hall?

3        A.      42.  I'll be 43 this year.

4                      THE COURT:  Jill, can you tip the

5    microphone out just a little bit that way?  There

6    you go.  Talk right into it.  Go ahead.

7        Q.      And what is your residence address?

8        A.      2116 Fulton, Apartment 13.

9        Q.      Who do you live there with?

10       A.      My wife and kids.

11       Q.      How many children do you have?

12       A.      I have a daughter and a son.

13       Q.      How old is your daughter?

14       A.      She just turned 18 December 22nd.

15       Q.      And what is your wife's name?

16       A.      Sheila Parker-Hall.

17       Q.      I'd like to direct your attention to

18   sometime around the first of October.  Can you tell me in

19   the first of October, 1998, tell me did you have an injury

20   to your arm at that time?

21       A.      Yes, I did.

22       Q.      And what was that injury?

23       A.      A gunshot to the elbow which broke part

24   of my elbow off and done a lot of nerve damage.

25       Q.      Can you tell us in simple terms what the

1 injury is?

2          A.          A gunshot wound.

3          Q.          I mean what that did to your arm.

4          A.          It unabled me to use it, like right now I

5 still don't have full use of my left hand, like these

6 fingers are just coming back.  These two are back but the

7 last two are still trying to come back.  I still don't

8 have no feeling in them.

9          Q.          Where did the bullet go through your arm?

10         A.          The top of the elbow, right here.

11         Q.          Could you show it on the arm that was

12 hit?  You can point to it and we can get some idea where

13 the bullet hit.

14         A.          Right down through the elbow.  It came

15 out the other end.

16         Q.          Did it hit any bones?

17         A.          Yes, it did.

18         Q.          Did it sever a bone?

19         A.          Right now there's a bone loose in there

20 that you can just move around with your hand.

21         Q.          Is that one of the two bones in your

22 lower arm?

23         A.          Yes, it is.

24         Q.          And was it your testimony that that bone

25 was still not connected in your elbow?

1    A.    It's still not connected.  You can take

2    your hand and move it and there's a lot of nerves there.

3    Q.    Can you show the jury that?

4    A.    I would have to take my coat and stuff

5    off.

6    MR. RADER:  Will the Court permit that?

7    THE COURT:  No objection from the State?

8    MR. ANDERSON:  No, Judge.

9    THE COURT:  Go ahead.

10    (Witness in front of jury.)

11    A.    The bullet went in right here and came

12    out back here.

13    THE COURT:  You'll have to speak up.

14    He's not answering any question, either.  There's

15    got to be a question on the table before he can

16    just start talking, Mr. Rader.  Ask him a

17    question.

18    Q.    Can you show the jury which bone is not

19    attached?

20    A.    The one right here at the lower part of

21    the elbow.  The bullet broke it in half, and it's never

22    grown back.  I'm going back and forth to the doctor.  I

23    keep my doctor's appointments.

24    MR. RADER:  Thank you very much.

25    (Witness resumes stand.)

1        Q.    Mr. Hall, do you or do you not have some

2    pain from that injury?

3        A.    I have pain every day from it.  It's

4    hurting now, because when it gets cold it just hurts like

5    a toothache or something.  That's why I keep this glove on

6    to keep it warm.

7        Q.    Do you have use of your fingers?

8        A.    The two on the end I don't.  Sometimes I

9    can stretch them out about like that but I can never, you

10   know, get them all the way out.

11       Q.    But your two fingers and your thumb you

12   have use of?

13       A.    Some use of my thumb, just like to grab a

14   piece of paper, or something like that, this bone right

15   here will go all the way down and I don't have any grip in

16   it.  It's like it's turned inside out or something.

17       Q.    Tell us how you got that injury.  Where

18   were you when you got that injury?

19       A.    Down around --

20       MR. ANDERSON:  Objection.

21       THE COURT:  Sustained.  Next question.

22       Q.    Can you tell us what was going on when

23   you got that injury?

24       A.    I was visiting a friend on Fourteenth and

25   Walnut.

1        Q.      And who was that friend?

2        A.      A guy named Charles Woods.  He's from the

3 same hometown I'm from.  I'm from Dayton.

4        THE COURT:  Okay.  Next question.

5        Q.      Were you not being robbed at the time?

6        A.      Well, what had happened was a couple of

7 guys came up to me and asked me did I want to do a

8 bootleg.  That means you want to give a cab trip or

9 something.  I told them that I didn't.  They kind of like

10 helped their self in, you know what I'm saying?  They just

11 got on in the car.  They asked me who was I looking for

12 and what did I need.  I told them I didn't need anything,

13 you know, I didn't want to take them nowhere.

14        They asked me was I trying to cop.  That

15 means was I trying to buy some drugs.  That's a drug area.

16 I told them that I wasn't.  One of them got mad and said

17 we'll take that money.  Then like a fight broke out with

18 me and the guy in the front seat because he had pulled a

19 pistol out and like was trying to put it on me.

20        And the gun went off and one bullet went

21 through my arm and the other bullet went right here

22 through my coat.  I had a leather coat on and I got a big

23 bullet hole right there where my heart would have been at

24 had he been pointing it right at me.

25        Q.      Do you remember what these two people

1    looked like?

2         A.      Yes.

3         Q.      Were either of these people Johann Hart

4    or Kevin Davis?

5         A.      The guys?

6         Q.      Yes.

7         A.      No, they wasn't.

8         Q.      Had you ever met Johann Hart or Kevin

9    Davis before this trial proceeding, before you were

10   charged?

11        A.      I have never met them, you know, like

12   meeting them.  I seen Johann in the courtroom, and before

13   that I saw the other guy, the other day, I think it was

14   Tuesday, up in the holding tank.  But I didn't know who he

15   was and he didn't know who I was.

16        Q.      But before you were charged in this

17   situation, had you ever met either one of them?

18        A.      No.

19        Q.      Did you go to the hospital because of

20   this injury?

21        A.      Yes, I did.

22        Q.      What hospital did you go to?

23        A.      University Hospital Emergency Room.

24        Q.      The ladies and gentlemen of the jury

25   understand that you're in custody.

```
 1              A.        Yes.

 2              Q.        Have you received treatment in the jail

 3    for your arm?

 4              A.        Yes.  I've been back and forth to the

 5    hand clinic at University Hospital.  But they wanted to do

 6    surgery on it, and the week that I went there to make the

 7    appointment for the surgery, we had a real bad winter

 8    storm and a guy broke his leg and I had to get

 9    rescheduled.  And every time I get rescheduled, it would

10    be on a Tuesday seemed like.  That's what they tell me.  I

11    have court on that day so I don't get to go.

12              Q.        But you have treated with the Justice

13    Center at the infirmary for your arm?

14              A.        Yes.

15              Q.        I want to direct your attention to the

16    night of or the morning of October 17th.  Sometime after

17    3:00 in the morning, did you talk to your son, Dexter?

18              A.        Yes, I did.

19              Q.        And what was that discussion about?

20              A.        Well, my wife and I, we hadn't been long

21    got back from Dayton.  I guess it was around about --

22              Q.        Start from the point where you're talking

23    to Dexter.

24              A.        Okay.  Dexter came in and said, dad --

25                        MR. ANDERSON:  Objection.
```

```
 1                      THE COURT:  Sustained.

 2            Q.        Did you see your son Dexter?

 3            A.        Yes, I did.

 4            Q.        Did you then go someplace?  Did you leave

 5    the house?

 6            A.        Yes, I did.

 7            Q.        And in response to what did you leave the

 8    house?

 9            A.        In response to him telling me --

10                      MR. ANDERSON:  Objection.

11                      THE COURT:  Sustained.

12                      THE WITNESS:  -- that the car was up

13         there on Windsor.

14                      THE COURT:  Mr. Hall, when I say

15         sustained, it does not mean to just talk faster

16         and get it in.  It means sustained.

17                      The answer is stricken.  Next question.

18            Q.        After talking with your son, were you

19    aware of where your wife's car was?

20            A.        Yes, I was.

21            Q.        And what was your understanding of where

22    it was?

23            A.        Up on Windsor and Park Street.

24            Q.        And why did -- did you go up on Windsor?

25            A.        Yes, I did.
```

1        Q.        Why did you go up on Windsor?

2        A.        To go get the car.

3        Q.        What did you see when you arrived in that

4    area?

5        A.        A lot of police was in the area, and it

6    looked like they were around the car.

7        Q.        Was it your intent to drive the car back

8    home?

9        A.        Yes.

10       Q.        Can you explain to the ladies and

11   gentlemen of the jury, tell them whether or not you can

12   drive the car?

13       A.        I would have to drive it the same way

14   that I drove it when I got shot, like I have to shift it

15   in one gear, and hold the steering wheel with my leg and

16   drive it like that.  I almost burned the clutch up doing

17   that.  So that's how I was going to drive it.

18       Q.        But it was your intent to drive your car

19   home?

20       A.        Yes.

21       Q.        Can you tell us what happened there on

22   the scene; were you taken into custody?

23       A.        Yes, I was.

24       Q.        Describe that to us.

25       A.        Well, after I saw the police around the

1    car and in the area, I didn't go straight to the car

2    because I didn't know exactly what was going on with it.

3    So I kind of like -- I was in some people's yard and I was

4    like behind a tree like looking at them at the car, and

5    they came up on me and arrested me.  Well -- yeah, they

6    arrested me.

7             Q.       Did they handcuff you?

8             A.       Yes, they did.

9             Q.       Did they handcuff you almost immediately?

10            A.       Yes.

11            Q.       Did they handcuff your hands behind you?

12            A.       Yes, I believe so.  Yes, they did.

13            Q.       Did that cause you any discomfort?

14            A.       Yes, it did.

15            MR. ANDERSON:  Objection.

16            THE COURT:  Sustained.  Answer is

17   stricken.  Question is stricken.  Next question.

18            Q.       How long did you remain handcuffed?

19            A.       If seemed like it was all night.  I guess

20   a couple of hours we set out there.  And I set in the

21   police car at least two hours, two and a half hours or

22   something.

23            Q.       Did you indicate that you were injured to

24   the police?

25            A.       Yes, I did.  I had this on (indicating).

1    Q.      Were you handcuffed behind your back?

2    A.      Yes.

3    Q.      And that's inconsistent.  Can you explain

4    that to us?

5    A.      This was just, after they handcuffed me,

6    they took my arm out of this and handcuffed me in the

7    back, and this was dangling around my neck for a while.

8    And I never seen it no more once we got to the police

9    station.

10    Q.      Yet you have it now?

11    A.      This is another one.  I got this from

12    University Hospital.

13    Q.      How long were you at Windsor before you

14    were taken downtown?

15    A.      Two and a half hours; at least two, two

16    and a half hours.  I didn't have a watch on.  I couldn't

17    have seen it no way.

18    Q.      Did the police ask you questions?

19    A.      Yes, they did.

20    Q.      Tell us what those conversations were

21    about.

22    A.      He kept asking me what happened and where

23    was I at, and where was the other two guys at.  I told him

24    I didn't know, I didn't know what he was talking about.  I

25    didn't know what was going on.

1      Q.     And then you were taken down to District

2  1; is that right?

3      A.     Yes, sir.

4      Q.     Tell us what happened down there.

5      A.     When I got to District 1, they put me in

6  like a holding area I guess.  And a detective came and

7  talked to me.  A police lieutenant came and talked to me,

8  too.  They was asking me, you know, they said we going to

9  charge your son with murder if this guy dies, we know he

10  did it.  And where is the gun at and who was with him.  He

11  was asking me those kind of questions.

12      A.     So I just told them I didn't know what

13  they were talking about.  I stuck to that for a while.

14  They said we got your wife down here, too, we going to

15  charge her, also.

16              MR. ANDERSON:  Objection.

17              THE COURT:  Sustained.  This is all

18      hearsay.  Stricken.  Next question.

19      Q.     Were you advised of your rights up on the

20  hill, on Windsor?

21      A.     No, I wasn't.

22      Q.     Were you advised of your rights down at

23  District 1?

24      A.     The next morning, yes, 'cause they tried

25  to get me to sign a waiver paper for me to waive my

1    rights.

2         Q.       Did you sign that paper?

3         A.       No, I didn't.

4         Q.       Did you have any intent to waive your

5    rights?

6                  MR. ANDERSON:  Objection.

7                  THE COURT:  Overruled.

8         A.       No, I had no intentions on waiving my

9    rights.  I wanted a lawyer at that time.

10        Q.       Did you communicate that to them?

11        A.       Yes, I did.

12        Q.       What was the response?

13                 MR. ANDERSON:  Objection.

14                 THE COURT:  Sustained.

15        Q.       Were you provided with a lawyer?

16        A.       No, I wasn't.

17        Q.       Did the questioning continue?

18        A.       Yes, it did.

19        Q.       What did you tell the police?

20        A.       Regarding what?

21        Q.       After 6:15 at the time of your signing of

22    the refusal?

23        A.       They kept saying, like I said, to --

24                 MR. ANDERSON:  Objection.

25                 THE COURT:  Sustained.  It's

1         unresponsive.

2         Q.      What did you tell them?

3         A.      I told them that I would help them look

4  for the gun.

5         Q.      Why did you tell them that?

6         A.      Because they told me they was going to

7  charge my son with --

8         MR. ANDERSON:  Objection.

9         THE COURT:  Sustained.  You can't say

10      what the police said, okay?  Just answer his

11      question.  He's not asking what the police

12      said.  He's asking for what you said.

13      Next question.

14         Q.      Does your wife use the car to go to work?

15         A.      Yes.

16         Q.      Was the seizure of the car important to

17  you?

18         A.      Yes, it was.

19         Q.      When did you leave District 1?

20         MR. ANDERSON:  Objection.

21         THE COURT:  Sustained.

22         A.      It was light out.

23         THE COURT:  It's irrelevant.

24         Q.      Did you go back out with the police

25  again?

1    A.    Yes, I did.

2    Q.    At about what time?

3    A.    It was around 6:00 in the morning.  It

4  was light outside.

5    Q.    Where did you go?

6    A.    Up to the scene where they picked me up

7  at.

8    Q.    What did you do up there?

9    A.    I sat in the car for a while and after a

10 while they came and got me out the car and asked me where

11 was the gun at.

12    Q.    And what did you do?

13    A.    I told them what gun, and one of them

14 slapped me.  Then I got -- they took me up there to right

15 where they handcuffed me at on this hill behind this tree.

16 I looked around, and I said I told you I don't know where

17 no gun is at.  They put me back in the car.

18    Q.    Did the police ever do a gunpowder

19 residue check on your hands?

20    A.    I asked for one but they didn't do it.

21         MR. ANDERSON:  Objection.

22         THE COURT:  Sustained.  Answer is

23         stricken.  It's a yes or no question.

24         Did they do a gunshot residue test on you

25         to your knowledge?

1          THE WITNESS:  No, they didn't.

2          THE COURT:  Thank you.  Next question.

3    Q.          And then at some point I guess you were

4    taken over to the Justice Center; is that correct?

5    A.          Yes.

6          MR. RADER:  May I have just a moment,

7    Your Honor?

8          THE COURT:  Sure, take your time.

9          (Pause in proceedings.)

10   Q.          Have you ever owned a .380 caliber

11   pistol?

12   A.          No, sir.

13   Q.          Have you ever shot anybody?

14   A.          No, sir.

15   Q.          On the night in question, on the 17th of

16   October, were you ever at the corner of Republic and

17   Thirteenth?

18   A.          No, I wasn't.

19   Q.          Republic and Fourteenth?

20   A.          No, I wasn't.

21   Q.          Is Dexter Hall your natural son?

22   A.          Yes, he is.

23   Q.          You love him very much?

24   A.          Yes, I do.

25         MR. RADER:  No further questions at this

```
 1              time, Your Honor.

 2                      THE COURT:  Cross-examination?

 3                      CROSS-EXAMINATION

 4    BY MR. ANDERSON:

 5          Q.      You can drive a car; is that right?

 6          A.      Yes, I can.

 7          Q.      So you could have driven the car that

 8    night, couldn't you?

 9          A.      Had I driven it the way I said I was

10    going to do it, yeah, with one hand and one leg.

11          Q.      Well, you can drive --

12                      MR. RADER:  I object.  Let the witness

13          answer.

14                      THE COURT:  Next question.

15          Q.      You have pretty good use of that left

16    hand, don't you?

17          A.      No, I don't.

18          Q.      You don't?

19          A.      No.

20          Q.      Well, you seemed to be pretty agile in

21    taking that off in front of the jury just a minute ago?

22          A.      Yes.

23          Q.      When you come down into the courtroom,

24    those shoes you're wearing right there --

25          A.      Pardon me?
```

1    Q.    Were you wearing the shoes that you have

2    on right now down to court?

3    A.    No, I'm not.

4    Q.    How are you putting those shoes on?

5    A.    With my hands.

6    Q.    And your tie and your shoe laces, aren't

7    you?

8    A.    Yes.

9    Q.    You're taking your hand out of your sling

10   to tie your shoe laces, aren't you?

11   A.    Sure.

12   Q.    It's a fact that you didn't have that

13   sling on that night, isn't it?

14   A.    I had it on.

15   Q.    The police said you didn't have one.

16   A.    They said a lot of things.

17   Q.    So everything that the police said that

18   controverts what you're saying is incorrect; is that

19   right?

20   A.    Yes.

21   Q.    You heard Officer Bailey talk about

22   seeing you driving that car; that's incorrect?

23   A.    It's incorrect.

24   MR. RADER:  Your Honor, he's asking --

25   THE COURT:  Overruled.

1          Q.        Well, let's talk a little bit.  Have you

2    within the last 10 years been convicted of an offense that

3    carries with it a term of imprisonment in excess of one

4    year?

5          A.        Repeat that question.

6          Q.        Have you within the last 10 years been

7    convicted of an offense that carries with it a potential

8    term of imprisonment in excess of one year?

9          A.        Yes, sir.

10         Q.        Have you within the last 10 years been

11   convicted of a theft offense?

12         A.        Yes.

13         Q.        Could you please relate to the ladies and

14   gentlemen of the jury how many theft offenses you've been

15   convicted of within the last 10 years?

16         A.        I guess around three.

17         Q.        Around three?

18         A.        Yes.

19         Q.        Well, in 1989 you were convicted of

20   receiving stolen property; is that right?

21         A.        Yes.

22         Q.        Unauthorized use of a motor vehicle; is

23   that right?

24         A.        I don't know.  I'm not sure.

25         Q.        You don't know.  How about in 1989,

1    receiving stolen property, a motor vehicle?

2          A.      Yes, that sounds about right.

3          Q.      Sounds about right?  Okay.

4                  How about in 1992, burglary?

5          A.      I'm not sure.

6          Q.      You're not sure?

7          A.      No, I'm not.

8          Q.      Well, you're not sure if you were

9    convicted of burglary?

10         A.      I may have been charged with it, but I

11   don't know if I was convicted of it.

12         Q.      Did you do some time on that charge back

13   then?

14         A.      I can't remember.

15         Q.      Have you done some time up in jail on

16   some of these theft charges?

17         A.      Yes, I have.

18         Q.      How about carrying concealed weapon in

19   1995?

20         A.      Yes.

21         Q.      Did some time on that one?

22         A.      Yes.

23         Q.      What kind of weapon were you carrying?

24         A.      Well, actually I wasn't carrying, I was

25   in someone else's car and it was in there.

1   Q.      And that was what?

2   A.      I don't know. I think a Derringer or

3   something; I'm not sure.

4   Q.      A what?

5   A.      A Derringer or a .25 or something to that

6   effect.

7   Q.      A gun?

8   A.      A gun.

9   Q.      Now, you indicated that you were shot by

10  somebody about 10 or 12 days prior to these guys being

11  shot; is that right?

12  A.      That's correct.

13  Q.      Do you know who shot you?

14  A.      No, I don't.

15  Q.      Did you report it to the police?

16  A.      No.

17  Q.      So you're in your car, two guys jump in,

18  they shoot you in the elbow, you go up to University

19  Hospital, a bone in your elbow is broke, but you don't

20  report that to the police?

21  A.      I thought they would take the report

22  there.

23  Q.      Did you report it to the police?

24  A.      They never came.

25  Q.      Did you ever talk to a policeman?

1          A.        No.

2          Q.        Did you ever call the police to say,

3   gosh, I've been shot?

4          A.        No, I didn't.

5          Q.        Isn't it a fact that you waited for about

6   five or six hours between the time you got shot and the

7   time you even showed up at the hospital?

8          A.        No, it wasn't that long.

9          Q.        How long was it?

10         A.        A couple of hours.

11         Q.        So you got a gunshot wound, you wait a

12  couple of hours, you go to the hospital, and you don't

13  tell the police that you've just been robbed and shot?

14         A.        I can tell you why.

15         Q.        I'm just asking you is that the way it

16  happened; did you not report it to the police?

17         A.        No, I didn't.

18         Q.        Okay.

19                    Now, you heard testimony from Johann

20  Hart.  He pointed to you and said you're the guy who shot

21  him, right?

22         A.        Yes.

23         Q.        You heard testimony from Kevin Davis.  He

24  pointed to you and said you're the guy who shot him,

25  right?

1    A.  Yes.

2    Q.  You heard testimony that they identified

3 you from a photo lineup the morning after they got shot

4 and they said there's the guy, right?

5    A.  Yeah, I heard that.

6    Q.  That's all mistaken?

7    A.  It's got to be because I didn't do it.

8    Q.  So they were just -- were they wrong

9 about picking you out?

10    A.  Sure, they was, 'cause I wasn't there.

11    Q.  You weren't there?

12    A.  I don't know what went on with those

13 pictures in that lineup.

14    Q.  Don't you?  Would you agree with me that

15 Officer Huffman testified he showed them pictures at

16 different times and they both picked you out?

17    A.  That's what he said.

18    Q.  You're saying that that may be true and

19 may not be true?

20    A.  I'm saying I didn't do it.  I was never

21 there.

22    Q.  You were never in the car when Lt.

23 Bailey chased you?

24    A.  Right.  I wasn't behind the wheel in the

25 car and I wasn't in the car.

1  Q.  So when he says that he saw you and

2 chased you at 60, 70 miles an hour, he's mistaken?

3  A.  He said a couple of things the other day.

4 He said something different.

5  Q.  Let's talk about the other day.  You were

6 hiding in the bushes, weren't you?

7  A.  No, I wasn't.

8  Q.  Hiding behind a tree?

9  A.  Behind a tree.

10  Q.  Crouched down?

11  A.  Yes.  Just standing behind it crouched

12 down.

13  Q.  When the police were there looking at the

14 car.  You told them that you were out buying shaving

15 cream, didn't you?

16  A.  I told them something to that effect.

17  Q.  What specifically did you tell them?

18  A.  I can't remember.

19  Q.  Don't remember?

20  A.  No.

21  Q.  So when Officer Neack testified that he

22 read you your rights and you said you were out buying

23 shaving cream, he's inaccurate about, at least about the

24 part about the shaving cream?

25  A.  I don't know if I told him that night.  I

1    don't know who Officer Neack is.

2          Q.      You heard him testify this morning?

3          A.      I heard a lot of officers testify.

4          Q.      He was the one that testified he read you

5    your rights in the police station.

6          A.      He never read me no -- by lying?  He

7    asked me --

8          Q.      Hey, listen, I ask the questions here,

9    sir.

10           THE COURT:  Sir, you have to answer

11        the latest -- the way this work he asks the

12        questions, you give the answers.

13        Next question.

14          Q.      Isn't it true that Officer Neack advised

15    you of your rights in the car?

16          A.      No.

17          Q.      So that he was mistaken?  He was trying

18    to mislead this jury when he said that?

19          A.      I don't know what he was doing.  He

20    didn't read me my rights in the car.

21          Q.      You told him that you were out buying

22    shaving cream?

23          A.      I don't remember what officer I said that

24    to.

25          Q.      But you did say it to someone?

180

```
1          A.       I said that.

2          Q.       Let's talk about that a little bit.  You

3   admit at least having seen State's Exhibit 1?

4          A.       That's right.

5          Q.       That's a rights waiver form?

6          A.       Yes.

7          Q.       They read that to you?

8          A.       Yes.

9          Q.       You read it over?

10         A.       Yes.  It was more like Officer Huffman

11  said.  I had a copy laying in front of me 'cause they

12  asked me how many years of school I had, could I read and

13  write, but he still went on.

14         Q.       You understood what those rights were,

15  didn't you?

16         A.       Yes.

17         Q.       And in fact, you continued to talk with

18  the police, didn't you?

19         A.       I asked to see a lawyer after they read

20  me that.

21         Q.       Didn't you continue to talk to the

22  police?

23         A.       I'm not sure if I said anything to them

24  before or after that.  I'm not certain.

25         Q.       Now, question -- this is your testimony
```

1    in the motion to suppress hearing.

2              Question:  "But you in fact continued to

3    talk with the police, didn't you?"

4              Your answer:  "Yes."

5              You did continue to talk with the police,

6    didn't you?

7         A.      Yes.

8         Q.      And they didn't hold a gun to your head,

9    they didn't threaten you, they didn't force you to talk,

10   did they?  They didn't coerce you?

11        A.      No, they didn't.

12        Q.      So you were voluntarily talking?

13        A.      I think they were saying --

14        Q.      Let's talk a little bit about what you

15   were saying.  Isn't it true that you told Officer Huffman

16   that you were driving the car that night?

17        A.      No, I never told him that.

18        Q.      Isn't it true that you told Officer

19   Huffman that you picked up some guy named Dave and went to

20   Fourteenth and Republic Street?

21        A.      I don't remember.

22        Q.      You don't remember whether you told them

23   that or not?

24        A.      I don't remember. I don't think so.

25        Q.      You don't think so.  Well, how about that

1    same motion, sir.  I asked you the question:

2                        Question:  "You didn't tell them that you

3    were driving that car at the shooting?"

4                        Answer:  "No."

5                        Question:  "You didn't?  Didn't you state

6    to the police that you were driving that car when these

7    two gentlemen were shot, that some guy named Dave was the

8    guy that shot them?"

9                        Answer:  "Yes, I said that."

10                       Remember testifying that way a couple of

11   weeks ago?

12        A.        Yes, I remember.

13        Q.        So you did tell -- did you or did you not

14   tell the police that you picked up some guy named Dave and

15   you were driving the car when the shooting occurred?

16        A.        I don't think I said that.

17        Q.        You don't think you did?

18        A.        I don't think I did.

19        Q.        But you said before that you did and now

20   you're not sure?

21        A.        It was so many things said that night.  I

22   can't remember, and I want to be --

23        Q.        Let's, the question is did you or did you

24   not tell the police, specifically Officer Huffman, that

25   you picked up a guy named Dave.  Did you tell them that or

```
1    not?

2          A.       Yes, I believe I said that.

3          Q.       Was that true or was that a lie?

4          A.       About me picking somebody up?

5          Q.       Uh-huh.

6          A.       No, I never picked no one up.

7          Q.       So you're not sure if you said it, right;

8    but if you did say it, it was a lie?

9          A.       I said I didn't pick no one up.

10         Q.       Well, didn't you tell Officer Huffman

11   that you picked up Dave and went down to Fourteenth and

12   Republic?

13         A.       I don't remember saying it like that, no.

14         Q.       How do you remember saying it?

15         A.       I can't remember.

16         Q.       You can't remember any of it?

17         A.       No.

18         Q.       Just a total blank?

19         A.       Yeah.

20         Q.       Did you tell Officer Huffman that the two

21   subjects that were shot were the same guys who had robbed

22   you two weeks ago?

23         A.       What was said, he asked me what did the

24   guys look like that shot me.  I told him one was light

25   skinned and one was shorter.  He said you just identified
```

184

1    the guys that got shot.  That's what was said.

2         Q.        So you remember that conversation but you

3    don't remember anything else you told them?

4         A.        I remember that, yeah.

5         Q.        What else do you remember?

6         A.        I remember they kept saying that if I

7    don't tell them where the gun is at, they are going to

8    charge my son and my wife with murder, and this, that, and

9    the other.

10        Q.        What else do you remember?

11        A.        I remember me asking for a lawyer, them

12   saying wasn't no lawyers around.

13        Q.        Let me ask you this.  You seem to

14   remember a lot of what these police officers said.  I want

15   to know what you said.

16        A.        I'm telling you what I said.

17        Q.        Let me hear it word for word, what you

18   told the police?

19        A.        I said if I help you all find this gun

20   will you all release the car and not charge my family.

21        Q.        I want to talk about what you said before

22   that.

23        A.        I don't remember what I said before that.

24        Q.        I want to know specifically what you told

25   Officer Huffman word for word.

1      A.      I can't remember that.  That's seven

2  months ago.  I don't know.

3      Q.      You're having problems remembering some

4  things but you're clear about other things?

5      A.      That's cause you're trying to twist it

6  around.

7      Q.      Okay.  I won't try to twist it.  I would

8  like you to tell this jury everything you remember telling

9  Officer Huffman.

10      A.      I can't remember everything that I said

11  to the officer that night.  ·We talked about a lot of

12  things that night.

13      Q.      I want you to tell the Judge anything you

14  remember about talking to Officer Huffman.

15      A.      I can't remember nothing exactly that me

16  and Officer Huffman talked about as far as me picking

17  somebody up and driving the car.

18      Q.      I won't ask for exactly.  I want you to

19  tell the ladies and gentlemen of the jury what your

20  statements were the morning of October 17.

21      A.      I believe I told him or one of them that

22  I was out buying shaving cream.

23      Q.      Was that true or not?

24      A.      That wasn't true.

25      Q.      That was not true.  So you lied?

1          A.        That was not true.

2          Q.        That was not true.  Okay.  Why would you

3    tell them that?

4          A.        They asked me where is the gun and why

5    did I shoot them guys, and where was my son at and stuff

6    like that.

7          Q.        They already knew where your son was.

8          A.        I didn't know that.

9          Q.        So you told them you were out buying

10   shaving cream.  What else?

11         A.        I told them that I would help them find

12   the gun if they didn't charge my son and my wife and would

13   let, you know -- not tow the car, and they said okay.  At

14   that time they went and got her.

15         Q.        Went and got who?

16         A.        My wife.  They brought her back in the

17   police station and let me talk to her.

18         Q.        What time in the morning was that?

19         A.        I guess around 6:00, 6:30, something like

20   that.

21         Q.        What else did you tell the police?

22         A.        That's about all I can remember.

23         Q.        Nothing else?

24         A.        That's all I can remember.

25         Q.        I hate to reiterate things, but did you

```
 1    tell Officer Huffman you picked up somebody named Dave?

 2         A.        Yes, I believe I told him that.

 3         Q.        Why did you tell him that if it wasn't

 4    true?

 5         A.        I know that my son hangs out with a guy

 6    named David that lives up the street, a guy that's older

 7    than him, so I just said his name.

 8         Q.        Are you trying to say your son was

 9    driving the car that night?

10         A.        No, I'm not.  I'm saying that is where I

11    got the guy's name from.

12         Q.        When did you get the keys from your son?

13         A.        It was after 3:00.  He came in and said

14    the police was following him and he parked the car.

15                   MR. ANDERSON:  Objection to that.

16                   THE COURT:  Sustained, answer is

17              stricken.

18         A.        In between 3:00 and 3:30.

19         Q.        And that's the time Officer Bailey

20    indicated he saw you driving that car.  Is Officer Bailey

21    mistaken?

22         A.        Yes.

23         Q.        Officer Huffman is mistaken?

24         A.        I don't know who Officer Huffman is.

25         Q.        He was the one that interviewed you the
```

188

1   morning of October 17th.  He was the last guy that

2   testified.

3           A.      Yeah.

4           Q.      He's mistaken?

5           A.      About some of the things that he wrote

6   down.  I never wrote nothing down.  He was doing all the

7   writing.  I said a couple of things but I never wrote

8   nothing down.  He was doing the writing.  So I don't know

9   what he put down.

10          Q.      Well, he wrote down -- this is what he

11  wrote down.  You stated:  Picked up Dave and went to

12  Fourteenth and Republic Street, the two subjects who

13  robbed and shot you two weeks ago, you call one over to

14  the car, one's at the car.  Dave began to shoot.  Dave was

15  in the passenger's seat next to you.  Then you drove off

16  south on Republic.  You dropped Dave off somewhere and

17  told him to hide the gun.

18          A.      So you're saying shot past me?

19          Q.      I'm saying did you state that to Officer

20  Huffman?

21          A.      I don't remember saying that.

22          Q.      You don't remember saying that or you did

23  not say it?

24          A.      I didn't say it to my recollection.

25          Q.      Do you remember whether or not you said

1  it?  You either said it or you didn't?

2       A.    ·    I'm telling you I don't remember making a

3  statement like that.

4       Q.       You might have made that statement?

5       A.       Don't sound like nothing I would have

6  said.

7       Q.       Then you stated to the police that if the

8  car was released, you would tell them the truth.  Do you

9  remember saying that?

10      A.       I told them I would help them look for

11 the gun if they would release the car and not charge my

12 family.

13      Q.       Actually, you stated if the car was

14 released you would tell the truth?

15      A.       You sound like you was there.

16      Q.       I'm reading off the piece of paper.

17      A.       That piece of paper means nothing.  A

18 tape recorder would have mentioned it better.

19      Q.       You stated Dave was in the back seat

20 behind you and you heard the shots; is that right or

21 wrong?  Did you state that?

22      A.       I don't remember.

23      Q.       Then you told the police you would take

24 them and show them the gun on Windsor Avenue; did you

25 state that?

1    A.    No.  I told you what I said.  Want me to

2    say it again?

3    Q.    Did you tell the police that you would

4    take them up and help them locate the gun?

5    A.    I told them that.  I helped them look for

6    a gun.  Then they searched for approximately 45 minutes

7    and they were unable to locate the gun.

8    Q.    You've indicated today that you weren't

9    there at the time of the shooting; is that right?

10    A.    Yes.

11    Q.    You told the police the morning of the

12    shooting that you were there, didn't you?

13    A.    No, I didn't.

14    Q.    Well, how about this?  Again in the

15    suppression motion we had a couple of weeks ago.  Remember

16    testifying, raising your right hand?

17    MR. RADER:  Your Honor, may we approach

18    the bench?

19    THE COURT:  No, you can answer the

20    question.

21    Q.    Do you remember being placed under oath

22    previously?

23    A.    Yes, I do.

24    Q.    Were you telling the truth then or now?

25    A.    I told them then I didn't remember.

```
1          Q.        How about this.  Question:  --

2                    MR. RADER:  May I note an objection at

3          this time?

4                    THE COURT:  Overruled.

5          Q.        Question:  "Were you there when there was

6    a shooting?"  Answer:  "No, I wasn't."  Question:  "So you

7    were lying to the police when you were giving the

8    statements?"  Answer:  "Yes."

9                    So you told the police you were at the

10   shooting that night, didn't you?

11         A.        No, I didn't.

12         Q.        Well, here you said that you were.  You

13   didn't tell the police that?

14         A.        I told the police I picked up a guy named

15   Dave.

16         Q.        Is that true or not?

17         A.        No, I didn't pick no one up.

18         Q.        Why did you tell them that?

19         A.        I just told them -- I don't know why I

20   told them that.  I guess I told them because I was scared.

21   I didn't want to see my family charged with something.  I

22   did not know what was going on.  That's why I told them.

23   And they was threatening me.

24         Q.        They were threatening you?

25         A.        Yes, they were.
```

1    Q.    What were they saying to you?

2    A.    If you don't tell us where the gun is at,

3    if you don't tell us we're going to charge you with

4    murder.  We're going to charge your wife with complicity

5    to it or obstructing justice, or something to that effect.

6    Q.    All sorts of force and threats and

7    coercion; is that what they were doing?

8    A.    All I'm saying is that I'm telling you

9    what they said.

10    Q.    I'm asking you.

11    A.    I just told you what they said.

12    Q.    You know, that's pretty funny because you

13    didn't mention it the last time you were here.

14    A.    If I did try to, you probably objected.

15    Q.    You didn't mention it the last time we

16    were here, did you?

17    A.    I don't remember.

18    Q.    Well, this was April 13, all right, 16

19    days ago.  You don't remember what happened 16 days ago?

20    A.    Sure, I do.

21    Q.    When we were here 16 days ago, did you

22    tell me or your attorney or the Judge or anybody else that

23    there were threats and coercion and other things like that

24    by the police?

25    A.    I told them everything that I was given a

1   chance to talk about.

2       Q.    I guess it's fair to say, Mr. Hall, that

3   everybody that's testified up until now has been mistaken?

4       MR. RADER:  Objection, Your Honor.

5       THE COURT:  Overruled.

6       Q.    Is that right?

7       A.    Everybody that's testified up to now has

8   been mistaken?

9       Q.    Uh-huh.

10       A.    Yes.  If they say that I did this, yes.

11       Q.    But you stated you were there?

12       A.    No, I didn't ever state that I was there.

13       Q.    But you just admitted that you told

14   officer --

15       A.    That I picked up Dave.  I never said that

16   I was there.

17       MR. RADER:  Your Honor, I'd object to

18       these questions as being asked and answered.

19       THE COURT:  Overruled.

20       MR. ANDERSON:  Judge, I have no other

21       questions.

22       THE COURT:  Any redirect, Mr. Rader?

23       MR. RADER:  May I have just a moment,

24       Judge?

25       THE COURT:  Sure.

1          (Pause in proceedings.)

2          MR. ANDERSON:  Judge, I do have one more

3     question.

4          THE COURT:  Go ahead.

5          MR. ANDERSON:  Thank you.

6          Q.     Mr. Hall, you indicated in your direct

7     examination that you were in fact in the same holding cell

8     the other day with Kevin Davis; isn't that right?

9          A.     Yes.

10         Q.     You heard Mr. Davis testify, right?

11         A.     Yes, I did.

12         Q.     You heard Mr. Davis state that you told

13    him that you would pay him if he didn't testify?

14         A.     What am I going to pay him with?  I'm in

15    jail.  A sandwich?

16         Q.     Did you make that statement?

17         A.     No, I didn't.  Can I tell you what was

18    said?

19         Q.     Yeah.  I'd like to hear what -- wait a

20    second.  Before you do that, let me ask you this.  You

21    indicated before that when you and Mr. Davis were in the

22    holding cell, neither one of you guys knew who the other

23    was?

24         THE WITNESS:  Pardon me?

25         Q.     Earlier in your direct testimony, you

1   indicated that you and Mr. Davis were in the same holding

2   cell, right?

3           A.          Right.

4           Q.          And you said we didn't even know who

5   either, each other was?

6           A.          Right.  But I didn't get to go on further

7   to tell you how I found out who he was.

8           Q.          My question to you, sir, is did you tell

9   Kevin Davis that you would pay him if he didn't testify or

10  came in and lied; yes or no?

11          A.          No, I didn't tell him that.

12                      MR. ANDERSON:  Thank you.  I have nothing

13              further.

14                      THE WITNESS:  So you don't want to know?

15                      MR. RADER:  Objection.  The prosecutor

16              asked him a question and he won't let him answer.

17                      THE COURT:  The answer is complete.

18                      REDIRECT EXAMINATION

19  BY MR. RADER:

20          Q.          Mr. Hall, why didn't you report this

21  incident, the shooting of yourself, to the police right

22  away?

23          A.          Well, when the shooting went down, I was

24  getting out the car.  I ran off and left the car.  I hid

25  for a couple of hours before I went back to get the car.

1    So I said, well, we'll just report it when I got to the

2    police station, 'cause to my knowledge every time a

3    stabbing or shooting or something --

4                    MR. ANDERSON:  Objection.

5                    THE COURT:  He can testify as to his

6          understanding.

7          A.        Every time a stabbing or a shooting or

8    something like that happened, they actually come to the

9    hospital and take a police report.  So I said I'll make my

10   police report then.

11         Q.        Did you offer to pay money to Mr. Davis?

12         A.        No, I didn't.

13         Q.        Did you see him in the holding cell?

14         A.        Yes, I did.

15         Q.        Tell us what happened, what you saw.

16         A.        We broke I guess around 1:00, 1:30 and

17   they took me and put me in a small holding tank.  There

18   was I guess about eight people in there with us.  So I sat

19   down, asked for something to eat, asked for a couple of

20   sandwiches.  So the jailer said I'm going to get the

21   sandwiches.  This guy was going on about, man, there's --

22                   MR. ANDERSON:  Objection.

23                   THE COURT:  Sustained.

24         Q.        What did you do?  You can't tell us what

25   the other person said, I guess.  Can you tell us what

1   happened otherwise?  He went to get some sandwiches?

2          A.          It's kind of hard for me to say how it

3   went down.  He was talking.  I overheard him talking.  Can

4   I say that?

5          Q.          Yes.

6          A.          So I asked was anybody there from

7   Queensgate.  And he said yeah.  A couple of people said

8   yeah.  I said anybody know Kevin Davis, 'cause I seen his

9   arm band.

10                     MR. ANDERSON:  Objection.

11                     THE COURT:  Sustained.

12          Q.          You seen the arm band?

13          A.          Yeah, I seen his arm band and he said

14   that he was --

15                     MR. ANDERSON:  Objection, Judge.

16                     THE COURT:  Sustained.  Answer is

17             stricken.

18                     Hold on, Mr. Rader.

19                     Any reference that you're making to what

20             Mr. Davis might have said is not permitted and is

21             stricken from the record.

22                     Next question.

23                     THE WITNESS:  He's saying what I said?

24                     THE COURT:  Unfortunately, I have to

25             decide all the legal issues in this case.  What

1    the prosecutor doesn't like, and what the defense

2    doesn't like, sometimes I'm able to make both of

3    them unhappy at the same time. Regardless, you

4    got to follow what I say.

5            Next question.

6        Q.    Did you observe any sign from Mr. Davis

7    that he recognized you?

8        Q.    MR. ANDERSON:  Objection.

9        A.    He didn't know who I was.

10           MR. ANDERSON:  Objection, Judge.

11           THE COURT:  You cannot speak as to

12    what's in someone else's mind.

13           Next question.

14        Q.    Did you offer Kevin Davis any money about

15    his testimony?

16        A.    No, I didn't.

17        Q.    Were all these other people around you?

18        A.    A couple of people were, 'cause we were

19    like in the back of the holding cell, and it was like two

20    or three people back there and they heard the

21    conversation.

22        Q.    Did you plan or design or something to

23    get this opportunity to see Mr. Davis?

24        A.    I wouldn't have known him had I not seen

25    his arm band. How could I do that?  I don't have the keys

```
 1    to that place.

 2          Q.        But you didn't try to get close to him at

 3    any time?

 4          A.        No.

 5                    MR. RADER:  No further questions.

 6                    THE COURT:  Anything else, Mr. Anderson?

 7                    MR. ANDERSON:  No.

 8                    THE COURT:  All right.

 9                    Mr. Hall, please have a seat.

10                    (Witness excused.)

11                    (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```