```
 1                    COURT OF COMMON PLEAS

 2                  HAMILTON COUNTY, OHIO

 3

    STATE OF OHIO                )
 4              PLAINTIFF,        )
                                  )
 5         vs.                    )    Case Number:  B-980752
                                  )
 6    FREDRICK HALL               )    Volume 3 of 4
                DEFENDANT.        )
 7                                )

 8

                    TRANSCRIPT OF TRIAL TESTIMONY
 9

10

11    APPEARANCES:

12         WILLIAM ANDERSON, ESQ.

13              On behalf of the Plaintiff.

14         ELIZABETH ZUCKER, ESQ.
                and
15         JAMES RADER, ESQ.

16              On behalf of the Defendant.

17

18         BE IT REMEMBERED that upon the hearing of

19    this cause, in the Court of Common Pleas, before the

20    Honorable STEVEN E. MARTIN, one of the judges of the said

21    Court of Common Pleas, on the date hereinafter stated, the

22    following proceedings were had.

23

24

25
```

```
 1              MORNING SESSION, Monday, May 3, 1999

 2                       SHEILA PARKER-HALL

 3    being first duly sworn, was examined and testified as

 4    follows:

 5                       THE COURT:  Will you state your name and

 6              spell your last name, please?

 7                       THE WITNESS:  My name is Sheila Parker-

 8              Hall.  Last name P-a-r-k-e-r dash H-a-l-l.

 9                       THE COURT:  That's fine.

10              Go ahead, Mr. Rader.

11                       DIRECT EXAMINATION

12    BY MR. RADER:

13                       MR. RADER:  Good morning, ladies and

14              gentlemen of the jury.

15              Good morning, Ms. Hall.

16              THE WITNESS:  Good morning.

17       Q.        Ms. Hall, what's your residence address?

18       A.        2116 Fulton, Apartment 13, Cincinnati.

19       Q.        Are you married to Fredrick Hall?

20       A.        Yes, I am.

21       Q.        How long have you two been together?

22       A.        For 19 years.

23       Q.        You have a son?

24       A.        Yes, and a daughter.

25       Q.        And is the son the natural child of you
```

```
 1    two?  You're the biological parents?

 2           A.      Yes.

 3           Q.      What's that son's name?

 4           A.      Dexter.

 5           Q.      Do you mind if I call you just Ms. Hall?

 6           A.      That's okay.

 7           Q.      Thank you.

 8                   I'd like to direct your attention to the

 9    night of October 17, 1998.  Did the police arrive at your

10    residence that night?

11           A.      Yes, they did.

12           Q.      Can you tell us about what time?

13           A.      It was early morning, I guess between

14    3:00 and 4:00.

15           Q.      How many policemen were there?

16           A.      Two at my door, but several out in front

17    of my house.

18           Q.      Did they give you some notion about what

19    or who they were looking for?

20                   MR. ANDERSON:  Objection.

21                   THE COURT:  Sustained.

22           Q.      Did they ask you questions?

23           A.      Yes, they did.

24           Q.      Did you respond to those questions?

25           A.      Yes, sir.
```

```
 1            Q.       Who did those questions concern?

 2            A.       My son Dexter and my car.

 3            Q.       Did you give them information about your

 4   car?

 5            A.       Yes, sir.

 6            Q.       And what was it?

 7            A.        I had let a neighbor use my car earlier

 8   that day before my husband and I went out of town.  My son

 9   and my daughter were at home, but me and my husband were

10   in Dayton, so the guy had my car, and it wasn't home when

11   we got home.

12            Q.       Did the police ask you for a description

13   of your car?

14            A.       Yeah.

15            Q.       Did you give that to them?

16            A.       Yes, I did.  They also asked me for

17   Dexter.

18            Q.       What was your response to that?

19            A.       He wasn't home.

20            Q.       Did you give them a description of

21   Dexter?

22            A.       Yes, I did.

23            Q.       How did you describe Dexter?

24            A.       Tall, thin, 15.  That's it.

25            Q.       Does Dexter normally wear a baseball cap?
```

1           A.      Yeah, he does.

2           Q.      Was your response to the police such that

3      you went someplace with them?

4           A.      Yeah, they came and got me a couple of

5      times.

6           Q.      At some point -- I can't ask you to say

7      what the police said to you.  That's hearsay.  That's the

8      reason for my hesitation.  I need to ask you what you did.

9           A.      Okay.  Well, the police came --

10                  THE COURT:  Hold on.  He's got to ask a

11          question.

12          Q.      You said, I believe, that you gave them a

13     description of Dexter?

14          A.      Yes, I did.

15          Q.      Then what happened next?

16          A.      Well, they asked me did I know where he

17     was.

18          Q.      What was your response to that?

19          A.      No, I didn't.  I didn't know where he

20     was.  I thought he was in his room.

21          Q.      Did you look in his room?

22          A.      Yes.

23          Q.      Was he there?

24          A.      No.

25          Q.      And go on in just chronological order

1    step by step and tell us what happened.

2         A.        He wasn't in his room so I went back to

3    the door and I told them he's not here, but he was here,

4    you know.  I said my daughter's in there and her

5    girlfriend, they were in her room.

6                   My son wasn't in his room.  I didn't see

7    him.  He wasn't in there.

8         Q.        What did the police do at that point?

9         A.        They walked away from the door, they left

10   the door.  They were outside, so I shut the door, and I

11   went back in the house.  And I was sitting in there for a

12   while, and I woke my daughter up and I told her we're

13   looking for Dexter.  And I didn't know where Dexter was.

14   Well, they came back to the door.

15        Q.        Can you tell us about how much later?

16        A.        Yeah, maybe a half an hour.

17        Q.        And then -- you're doing fine.  What

18   happened then?

19        A.        They came back to the door.  They hadn't

20   left.  They were outside but they weren't at my door.

21   They came back to the door.  And I told them Dexter was in

22   the house, because he was, he was in the house.

23        Q.        And then what happened?

24        A.        So they asked me to let them see Dexter.

25   So I made Dexter come in the living room and they arrested

1    Dexter.

2          Q.        Go ahead.

3          A.        So they took him to this place called

4    2020.

5          Q.        Did you go with him?

6          A.        No, I didn't go with him.

7          Q.        Okay.

8          A.        They took him to 2020.  And they came

9    back at daybreak and got me and took me to 2020 so I could

10   bring him home.

11         Q.        How much time was it between the time

12   Dexter left and they came back?

13         A.        Hours.

14         Q.        Got any idea how many?

15         A.        I don't know, maybe five or six.

16         Q.        And what happened when the police

17   returned?

18         A.        They took me to get Dexter, but they came

19   back a second time and got me.

20         Q.        Well, let's take this a step at a time.

21   They came back about what time in the morning the first

22   time?

23         A.        About -- when they got Dexter?

24         Q.        No, after Dexter was taken away.

25         A.        About five or six hours later.  It was

1    daybreak.

2         Q.      And what happened when they came back?

3         A.      It was a female officer and she told me

4    she was taking me to pick Dexter up because they had towed

5    my car.

6                      MR. ANDERSON:  Objection.

7                      THE COURT:  Sustained.  Answer stricken.

8         Next question.

9         Q.      The female officer came back and what did

10   you do with the female officer?

11        A.      Went to 2020.

12        Q.      And do you know what 2020 is?

13        A.      It's a juvenile center.

14        Q.      And did you in fact go there?

15        A.      Yes, sir.

16        Q.      And how long were you there?

17        A.      Just long enough to retrieve Dexter.

18        Q.      And where did you go when you left there?

19        A.      Back home.  The officer took me back

20   home.

21        Q.      In a marked police car?

22        A.      Yes, sir.

23        Q.      Okay.  And then as I understand your

24   testimony, the police came back again?

25        A.      Yes, sir.

```
1          Q.        Was it the same woman?

2          A.        No, sir, it was Detective Huffman.

3          Q.        Can you tell us about what time that was?

4          A.        No, I really don't know.  It wasn't much

5    longer after I had got Dexter.

6          Q.        Did you go someplace with Detective

7    Huffman?

8          A.        Yes, sir.  I went to -- I think it's

9    downtown, I think it's the first district.

10         Q.        Who rode downtown with you in that car?

11   Who was in that car?

12         A.        Detective Huffman was driving.  And it

13   was a tall black officer in the car with him.

14         Q.        And yourself?

15         A.        Yeah.

16         Q.        Did you see Fred downtown at District 1?

17         A.        Yeah, I saw him.

18         Q.        Was he handcuffed?

19                   MR. ANDERSON:  Objection.

20                   THE COURT:  Sustained.

21         Q.        How long did you stay downtown?

22         A.        They wanted me to stay until they came

23   back with Fred.  They were taking him somewhere.  They

24   told me that --

25                   MR. ANDERSON:  Objection.
```

```
 1                        THE COURT:  Sustained.

 2           Q.        How long did you stay downtown?

 3           A.        I don't know.  A while maybe 45 minutes.

 4   I didn't stay.  They asked me to and I didn't, but he left

 5   out of there.

 6           Q.        Does Fred wear glasses?

 7           A.        No.

 8           Q.        Have you ever seen him with a pair of

 9   glasses on?

10           A.        Sunglasses.

11           Q.        Does he have a pair of dark rimmed

12   glasses?

13           A.        No.

14                     MR. RADER:  No further questions, Your

15           Honor.

16                     THE COURT:  Anything, Mr. Anderson?

17                     MR. ANDERSON:  A few questions, Your

18           Honor.

19                     CROSS-EXAMINATION

20   BY MR. ANDERSON:

21           Q.        Ma'am, I'll hand you what's been marked

22   as State's Exhibit Number 5.  Can you identify that

23   exhibit, please?

24           A.        Yes, it's my car.

25           Q.        It's a photograph of your car?
```

```
 1          A.      Yes, sir.

 2          Q.      Now, you indicated that you had let a

 3   neighbor use that car that day?

 4          A.      Yes, sir.

 5          Q.      Who was that?

 6          A.      David Chambers.

 7          Q.      And you let David Chambers use your car a

 8   whole lot?

 9          A.      No, I've let him use it a couple of

10   times, not a lot.

11          Q.      What time did you give the car to David

12   Chambers?

13          A.      That morning.

14          Q.      And what was the agreement as far as how

15   long Mr. Chambers would have the car?

16          A.      He wasn't supposed to have it but a

17   couple of hours and he was going to bring it back.

18          Q.      And did he bring it back?

19          A.      I was gone all day.  Dexter told me he

20   got the keys from him.

21          Q.      So he did bring the car back and Dexter

22   had the keys?

23          A.      He didn't bring it back.  Dexter got the

24   keys from him.

25          Q.      Do you know where the car was at that
```

```
 1    time?

 2            A.      No, I don't.  I wasn't in town.

 3            Q.      You were in Dayton?

 4            A.      Yes, sir.

 5            Q.      How did you get to Dayton?

 6            A.      We had an Audi, too, and I drove the

 7    Audi.

 8            Q.      And the defendant was with you when you

 9    went to Dayton?

10            A.      Yes, sir.

11            Q.      What time did you get back from Dayton?

12            A.      I guess about 2:30, 3:00 in the morning.

13            Q.      About 2:30 or 3:00 in the morning.  So

14    how long were you home before the police showed up at your

15    doorstep?

16            A.      How long was I home?

17            Q.      Uh-huh.

18            A.      Not long.

19            Q.      Not long?

20            A.      No.

21            Q.      The police come to your doorstep and they

22    asked questions about the car?

23            A.      Yeah.

24            Q.      What did you tell them?

25            A.      It wasn't there.
```

```
 1          Q.      Did you know where it was?

 2          Q.      No, I did not.

 3          Q.      Didn't Dexter know where it was?

 4          A.      Dexter wasn't home.

 5          Q.      When did Dexter show up?

 6          A.      Dexter came in sometime after the police

 7  had came the first time, within that half an hour frame.

 8          Q.      Did he come in the front door?

 9          A.      No, sir.

10          Q.      Come in the back door?

11          A.      No, sir.

12          Q.      How did he get in?

13          A.      Through the bedroom window.

14          Q.      How do you know that?

15          A.      Because the police were at the front door

16  and he couldn't have got by them.

17          Q.      He couldn't have got by them, could he?

18          A.      No, not the front door.

19          Q.      How do you know he came in through the

20  bedroom window?

21          A.      That's the only way he could have got in

22  his room.

23          Q.      Did he tell you he came in through the

24  bedroom window?

25          A.      No, he didn't.
```

```
 1          Q.       So you're just guessing now?

 2          A.       Yes.

 3          Q.       You would agree with me there's no way

 4   Dexter could have gotten in the house past the police?

 5          A.       No, sir, I'm not agreeing with that.

 6          Q.       You're not?

 7          A.       No.

 8          Q.       Where is Dexter's room?

 9          A.       In the back.

10          Q.       What floor?

11          A.       First floor.

12          Q.       And how high is that above the ground?

13          A.       Not high at all.

14          Q.       Does he come and go by the back window a

15   lot?

16          A.       Not a lot, but he does.

17          Q.       When did you first become aware that

18   Dexter was in the house?

19          A.       When he came in and told me that he had

20   gave the keys to his dad.

21          Q.       About what time was that?

22          A.       I don't know.  I don't have any idea what

23   time it was actually.

24          Q.       You don't have any idea what time it was?

25          A.       I really don't.  It was between 3:00 and
```

1    4:00 in the morning, but exactly, no.

2        Q.      How would you leave the house?  How many

3    doors are there in and out of the house?

4        A.      One.

5        Q.      Front door?

6        A.      Yes.

7        Q.      Now, you indicated that Dexter came in

8    somehow.  He couldn't have gotten in past the police; is

9    that right?

10       A.      Not the front door.

11       Q.      He couldn't have come in the front door

12   past the police; is that right?

13       A.      No, sir.

14       Q.      Then he told you that he had given the

15   keys to the defendant; is that right?

16       A.      Yes, sir.

17       Q.      Now, if the defendant was going to leave

18   the house, he'd have to go out the front door, wouldn't

19   he?

20       A.      My husband?

21       Q.      Uh-huh.

22       A.      Yes, out the front door.

23       Q.      So if he got the keys from Dexter and the

24   police were out front, Dexter sneaks in the back, gives

25   the keys to the defendant, and he leaves, he would have to

1    go out the front door?

2           A.      My husband did.

3           Q.      He went out the front door?

4           A.      My husband went out the front door.

5           Q.      Were the police still there?

6           A.      No, the police weren't there then.  The

7    police weren't there when Dexter gave him the keys.

8           Q.      They weren't?

9           A.      No.

10          Q.      Well, did your husband leave before or

11   after the police took Dexter?

12          A.      He left before.

13          Q.      Who did?

14          A.      My husband left before.

15          Q.      What time?

16          A.      I don't know.  I don't know what time it

17   was.  I was in bed.  I really don't know what time it was.

18          Q.      Well, you indicated that the police were

19   at the door?

20          A.      Yes.

21          Q.      They asked you questions about the car?

22          A.      Uh-huh.

23          Q.      They asked you questions about Dexter's

24   whereabouts and Dexter wasn't there.  Then you said that

25   the police never left your door?

1    A.    No, they left my door.  They were out in
2  front of the house.
3    Q.    They were there when he came in?
4    A.    Right.
5    Q.    Then you said at some point he left
6  before Dexter came in?
7    A.    He left before the police came.
8    Q.    He left before the police came?
9    A.    Yes.
10    Q.    About how soon before the police came?
11    A.    I don't know.
12    Q.    No idea?
13    A.    No, sir.  He was gone.  I was in the bed
14  when the police came.  Fred wasn't home.
15    Q.    He wasn't home?
16    A.    No.
17    Q.    Do you know what time Dexter got the keys
18  from David Chambers?
19    A.    I wasn't in town.  Dexter just told us.
20    MR. ANDERSON:  Okay.  I have no further
21    questions.
22    THE COURT:  Anything else?
23    MR. RADER:  No further questions.
24    (Witness excused.)
25

```
1                      THE COURT:  Please be seated.  Next
2            defense witness ready to go?
3                      MS. ZUCKER:  Yes, Your Honor.
4                      Call Mr. Barry Whitton.
5                         BARRY WHITTON
6    being first duly sworn, was examined and testified as
7    follows:
8                      THE COURT:  Please have a seat.  Pull
9            that microphone over to you a little bit, please.
10           State your name and spell your last name, please.
11                     THE WITNESS:  My name is Barry Whitton,
12           W-h-i-t-t-o-n.
13                     THE COURT:  Okay.  Go ahead, Ms. Zucker.
14                       DIRECT EXAMINATION
15   BY MS. ZUCKER:
16           Q.      And Mr. Whitton, how are you employed?
17           A.      I work for the City of Cincinnati Police
18   Division, Communications Section.
19           Q.      And were you so employed on or about
20   January 21, 1999?
21           A.      Yes, I was.
22                     MS. ZUCKER:  May I approach, Your Honor?
23                     THE COURT:  Yes.
24           Q.      I'm going to show you a subpoena which I
25   believe is Defendant's Exhibit Number 10.  It's a subpoena
```

1    duces tecum.  And can you tell us what that's for?

2          A.          It requests the records from the

3    communications section, requesting all radio

4    transmissions, 911 calls, telephone communications,

5    personal communications, devices, et cetera.  Personal

6    calls from phones, telephones, car radio transmissions

7    surrounding the arrest of Fredrick Hall from around 1330

8    Republic Street and Gilbert Avenue on 10/17 or 10/18 of

9    '98.

10         Q.          Thank you.  And as a result of that

11   subpoena, would you or somebody in your department prepare

12   documents?

13         A.          Yes, that's correct.

14         Q.          And if I were to show you this envelope

15   with two tapes, were these tapes that would have been

16   prepared by yourself?

17         A.          Yes, that's correct.

18         Q.          And are these copies of MDTs which, can

19   you explain what MDT is?

20         A.          MDT is a monitor daily form which is the

21   computer that the officers have in their cruisers.

22         Q.          That's in their police car?

23         A.          Yes.

24         Q.          They're used to communicate?

25         A.          With each other, yes.

1    Q.    And would these be printouts from this
2    incident?
3    A.    These are printouts from the MDT system;
4    that's correct.
5    Q.    And those are produced in the normal
6    procedure of the evening or day time of the police
7    communicating with each other?
8    A.    The record is recorded at all times.   The
9    log is recorded at all times, yes.
10    Q.    And that's records through tape and
11    through computer; is that correct?
12    A.    All transactions that take place on the
13    MDT are stored in the log.  And those logs are stored on a
14    computer.  And if a conversation occurs, you can then
15    print out portions of the log or the entire log for
16    whatever is requested, that's correct.
17    Q.    And a few minutes ago I had the
18    opportunity to go over these documents with you; is that
19    right?
20    A.    That's correct.
21    THE COURT:  For the record state what
22    those documents are.
23    MS. ZUCKER:  They are Exhibit 8 and I
24    believe they will be 11 and 12.
25    THE COURT:  Well, mark them if they're

1          not already marked, and when questions are asked

2          of the witness concerning those documents, let's

3          make sure you're identifying which document it is

4          for the record.

5                    Do you have some specific questions for

6          him about those?

7                    MS. ZUCKER:  I will in a second.

8                    THE COURT:  As soon as you do, he can get

9          up and go talk over there.

10         Q.        You've had a chance to review these

11    documents?

12         A.        Yes, I did.

13         Q.        And these are accurate reproductions of

14    the printouts?

15         A.        Yes.

16         Q.        And looking beginning at 3:18 on

17    Defendant's Exhibit 8, and continuing through Defendant's

18    Exhibit 10 and then on to Defendant's Exhibit 11.  That

19    would provide a chronological transmission of what had

20    occurred on the evening of October 17, the morning of

21    October 17?

22         A.        Would you like me to --

23         Q.        You want to come up and explain that?

24         A.        Look at them, yeah.

25                   THE COURT:  All right.  Mr. Whitton,

1          you're going to be up there.

2                    I want you, Ms. Zucker, to make sure the

3          exhibit number he's referring to is there.

4                    Mr. Whitton, just keep your voice up.

5                    Can everyone in the jury see what they

6          are trying to do?  Especially those folks on that

7          end.  Can you see?

8                    JUROR 1:  Yes.

9          Q.        And just going to the top part.  Will you

10    explain that on Exhibit 11 there's a time printout here?

11         A.        Yes, right here.

12         Q.        And that comes from what?

13         A.        That's generated by the main computer.

14    The time stamp that this particular information was

15    requested by this particular --

16         Q.        So through 5:09, that's going to show

17    everything that's occurred prior to 5:09?

18         A.        5:09 is when this particular car number

19    1312 requested this information regarding this incident.

20    The incident summary is displayed and then started with

21    the last bit of information that was entered regarding

22    this call.  It's in reverse chronological order and it

23    goes through Exhibit 12, going backwards, to a point 3:18

24    which was actually the first bit of information that was

25    entered regarding the incident.

1               It's a reverse chronological order for

2  the incident.

3        Q.      It's a reverse chronological order?

4        A.      Right.

5        Q.      And these are all recorded or transmitted

6  by police officers to the dispatcher?

7        A.      The information is recorded as part of

8  the incident history.  These are information regarding

9  this particular call at 1330 Republic.  This is

10  information regarding phone calls.  This is information

11  regarding officers being assigned to the call.

12               This is information regarding officers

13  arriving at the scene and then of other various

14  information that the officer has put on via the computer

15  in their car; that is correct.

16        Q.      And if we were to look at Defendant's

17  Exhibit Number 8 and we were to look at 3:20, what would

18  that stand for?  Supplemental text?

19        A.      That's correct.

20        Q.      And where would that come from?

21        A.      That would come from either a dispatcher

22  or 911 operator at the unit center adding additional

23  information to the call.

24        Q.      And what information was transmitted at

25  3:20?

1          A.          I'm highlighting it in, yes, ma'am.  It

2     was 3:20.  The suspect or s-u-s-p, is MB.

3          Q.          Do you know what MB stands for?

4          A.          Generally stands for male black.

5          A.          And this is a comma, 23, no further

6     d-e-s-c, description.

7          Q.          And at 3:21 what would have been

8     transmitted at that point?

9          A.          3:21 there was a change of location done,

10    by this car number which is 1481.  The location was

11    changed to Fourteenth and Republic.  There's additional

12    information here of a second victim.  S-u-s-p, suspect,

13    small b-r-o, Brown, p-o-s-s for possible, Toyota, b-r-o

14    for Brown.  Toyota, brown.

15         Q.          And at 3:53, what does that mean?

16         A.          3:53, miscellaneous text was added to the

17    incident either per car 1420 or by car 1420.  That

18    information reads update d-e-s-c for description,

19    passenger is shooter.  MB/19-20, BLK, BBCAP, m-e-d

20    c-o-m-p.  Clean shaven, thin build.  I can't read that

21    right there.

22         Q.          Would it be correct to say this would be

23    a repeat of the same transmission, pointing to 4:37?

24         A.          Right, that's correct.  This information

25    was BCAP, BL JCKT, black jacket.

```
1            Q.       You can be seated.

2                     (Witness resumes stand.)

3            Q.       In shorthand form that's used in

4    transcribing this, if we refer back to --

5            Q.       Well, if we refer to Defendant's Exhibit

6    11, the 353 miscellaneous 1420 update description,

7    passenger is shooter, MB would be what?

8            A.       Male black.

9            Q.       19 to 20?

10           A.       Generally, referring to the age.

11           Q.       Generally, referring to the age.  So it

12   would be a male black between the ages of 19 and 20.

13           A.       Yes, ma'am.

14           Q.       Black BB cap?

15           A.       Baseball cap.

16           Q.       M-e-d  c-o-m-p?

17           A.       Medium complexion.

18           Q.       Clean shaven and then BLD?

19           A.       Build.

20           Q.       And BLK JCKT?

21           A.       Black jacket.

22                    MS. ZUCKER:  Thank you.

23                    THE COURT:  Do you have anything else?

24                    MS. ZUCKER:  One moment, please.

25                    THE COURT:  Sure.
```

1                    (Pause in proceedings)

2                    MS. ZUCKER:  I have no further questions.

3         Thank you, Judge.

4                    THE COURT:  Do you have anything, Mr.

5         Anderson?

6                    MR. ANDERSON:  I do have a few questions,

7         Your Honor.

8                         CROSS-EXAMINATION

9    BY MR. ANDERSON:

10        Q.    Officer Whitton, when this information

11   gets transported in to police communications, are you

12   aware of where the information comes from?

13        A.       Can I ask for clarification on that, when

14   you say transported in?

15        Q.       Well, I mean if a police officer radios

16   in to police communications and it receives it, a lot of

17   times they are taking information from witnesses and

18   things like that; is that correct?

19        A.       The police officers?

20        Q.       Right.

21        A.       That's correct.

22        Q.       Well, I mean the police did not observe

23   the shooting in this case, the police officers don't

24   observe shootings as eyewitnesses; is that accurate?

25        A.       That's accurate.

1    Q.    And as part of their investigation they

2  talk to witnesses; is that right?

3    A.    That's correct.

4    Q.    And then based on their conversations

5  with the witnesses, they broadcast descriptions of cars,

6  descriptions of suspects, and things like that; is that

7  correct?

8    A.    That's correct.  We get information from

9  the officers in the field who give us information

10  regarding description of vehicles and people, and we also

11  get that from people as they call in.

12    Q.    So in this particular instance, referring

13  to Defendant's Exhibit Number 8, indicates the suspect is

14  male black, no further description, right?

15    A.    That's correct.

16    Q.    We don't know where that came from except

17  it was put on the police radio, so it could have been from

18  a witness or something like that at the scene?

19    A.    Can I ask if there is a number prior to

20  --

21    Q.    Sure.  It says supplemental text.

22    A.    Just looking at that, there is no way

23  that I can tell exactly where that information came from,

24  correct.

25    Q.    You don't know whether it came from a

1    police officer or 911 call or something like that?

2        A.        That's correct.

3        Q.        Now, up here, we've got suspect, small

4    brown possibly a Toyota, a description of the car, right?

5        A.        (Indicate yes.)

6        Q.        And that came from 1481. That would be a

7    police unit itself?

8        A.        That's correct.

9        Q.        Again, over here, Ms. Zucker highlighted

10   passenger is shooter, male black, 19 to 20, black baseball

11   cap, medium complexion, black jacket. That was the

12   description that came in; is that right?

13       A.        Yes, sir.

14       Q.        Now, I want to refer to State's Exhibit

15   Number 12, and I don't have my highlighter to point this

16   out, but at 3:28, that's miscellaneous and it comes back

17   up to 1481. That would have been a police officer giving

18   this information; is that right?

19       A.        Yes.

20       Q.        If you could, would you please approach

21   me and just take a look at Defendant's Exhibit Number 12.

22   What does that indicate?

23       A.        3:28, miscellaneous text was added either

24   by car 1481 or from car 1481. Witness gave plate, two

25   o-c-c-s in front/one in back. Driver (shooter), dark cap,

1   possible baseball cap.

2        Q.        So according to this description, this

3   witness indicated that there were three occupants in the

4   car, two in the front and one in the back, and there was

5   driver was the shooter; is that right?

6        A.        It's in parentheses behind the words.

7        Q.        But I saw in another one of these and I'm

8   not sure where it was, but it indicated that the passenger

9   was the shooter.

10        A.        (Indicating.)

11        Q.        So we got descriptions from different

12   people coming in, as far as the number of occupants of the

13   vehicle and who in fact was the shooter, whether it was

14   the driver or passenger or things like that; is that

15   right?

16        A.        That's correct.

17        Q.        Is it fair to say that at 3:15 in the

18   morning -- people see things differently at night?

19             MR. RADER:  Objection, Your Honor.  Asks

20        for speculation.

21             THE COURT:  Sustained.

22             MR. ANDERSON:  You can have a seat, sir.

23        I have no further questions.

24             THE COURT:  Anything else, Ms.  Zucker?

25

REDIRECT EXAMINATION

BY MS. ZUCKER:

    Q.      Referring back to Defendant's Exhibit 11,
3:53 MISC 1420, that was also broadcast by a police
officer; isn't that correct?

    A.      The miscellaneous information was either
added to that incident -- you said it was 1420?

    Q.      Yes.

    A.      It was either added to that incident by
1420, his computer, or it was relayed verbally to the
dispatcher who referred it to 1420.

                (Pause in proceedings.)

    Q.      For clarification on Defendant's Exhibit
12, 3:28, Mr. Anderson asked about the description that
was broadcast by 1481. "Witness gave plate, two OCCS."
Would it be fair to say that OCCS stands for occupants?

    A.      Yes, ma'am.

                MS. ZUCKER:  I have no further questions.

                THE COURT:  Anything else, Mr. Anderson?

                MR. ANDERSON:  No, Your Honor.

                THE COURT:  Mr. Whitton, thank you very

        much for your time.  You're free to leave.  Don't

        discuss this case with anyone until you return, if

        you do.

                (Witness excused.)

1                    C-E-R-T-I-F-I-C-A-T-E

2          I, PATRICIA E. NASH, the undersigned, an

3     Official Court Reporter for the Hamilton County

4     Court of Common Pleas, do hereby certify that at

5     the time and place stated herein, I recorded in

6     stenotype and thereafter transcribed the within

7     229 pages, and that the foregoing Transcript of

8     Proceedings is a true, complete, and accurate

9     transcript of my said stenotype notes.

10              IN WITNESS WHEREOF, I hereunto set my

11    hand this    day of July, 1999.

12

13                    _____
                      PATRICIA E. NASH
14                    Official Court Reporter
                      Court of Common Pleas
15                    Hamilton County, Ohio

16

17

18

19

20

21

22

23

24

25