```
 1              COURT OF COMMON PLEAS

 2            HAMILTON COUNTY, OHIO

 3
   STATE OF OHIO              )
 4            PLAINTIFF,      )
                              )
 5        vs.                 )    Case Number:  B-980752
                              )
 6   FREDRICK HALL            )    Volume 4 of 4
              DEFENDANT.      )
 7                            )

 8            TRANSCRIPT OF TRIAL TESTIMONY

 9

10

11   APPEARANCES:

12        WILLIAM ANDERSON, ESQ.

13              On behalf of the Plaintiff.

14        ELIZABETH ZUCKER, ESQ.
                and
15        JAMES RADER, ESQ.

16              On behalf of the Defendant.

17

18        BE IT REMEMBERED that upon the hearing of

19   this cause, in the Court of Common Pleas, before the

20   Honorable STEVEN E. MARTIN, one of the judges of the said

21   Court of Common Pleas, on the date hereinafter stated, the

22   following proceedings were had.

23

24

25
```

1.              MORNING SESSION, MAY 4, 1999

2                    THE COURT:  Okay.  Mr. Rader, it's my

3      understanding that you're not going to put on any

4      additional evidence, but there is a stipulation

5      that you want to enter into.  Let's do it now.

6                    MR. RADER:  Your Honor, I believe that

7      relates to Defendant's Exhibits 15 and 16.  Number

8      15 is a request submitted by Officer Huffman for

9      fingerprint analysis of the three, .380 shell

10     casings in this case, and the attempt to develop

11     latent fingerprints resulted in a negative result.

12                   Defendant's Exhibit 16 is -- there was a

13     latent print of good quality retrieved from the

14     automobile, which was compared with the

15     fingerprint of Fredrick Hall.  That request for

16     analysis was also submitted by Officer Huffman.

17                   THE COURT:  That's Defendant's Exhibits

18     15 and 16.

19                   MR. ANDERSON:  Judge, the State will

20     stipulate to those two exhibits.

21                   THE COURT:  Do you have any other

22     evidence that you want to submit?

23                   MR. RADER:  Your Honor, also, there was a

24     stipulation as to Defendant's Exhibit 13, which is

25     the medical records from Correctional Medical

1    Services, Inc., which is the facility Justice

2    Center, I believe the prosecutor will stipulate to

3    those.

4              MR. ANDERSON:  So stipulated.

5              THE COURT:  And Defendant's Exhibit

6    number 14 is medical records from University

7    Hospital, beginning with treatment on the 3rd of

8    October, 1998.  I believe the prosecution will

9    agree to stipulate those as well.

10             MR. ANDERSON:  That's correct.

11             THE COURT:  Okay.  All right.  Any other

12   exhibits or evidence?

13             MR. RADER:  Yes, we have some other

14   exhibits, your Honor.

15             THE COURT:  I know defense exhibits,

16   we'll go in order of introduction:  Defendant's

17   Exhibit 5, it's a chart; do you want that

18   admitted?

19             MR. RADER:  Please excuse me.  Can we

20   back up to 4, which is marked as Defense Exhibit

21   4, which is the tape that was authenticated the

22   other day by the gentleman who came down from the

23   police communications.

24             THE COURT:  All right.

25             MR. RADER:  That's numbered 4 because it

```
 1        was numbered such in the motion to suppress

 2        hearing.

 3                    THE COURT:  Okay.

 4                    Defendant's 4, the tape, do you have

 5        something to give them to play it on.

 6                    MR. RADER:  Yes.

 7                    THE COURT:  Okay.  Any objection, Mr.

 8        Anderson?

 9                    MR. ANDERSON:  No.

10                    THE COURT:  Defendant's 5, some chart

11        that you did; do you want that introduced?

12                    MR. RADER:  Yes, your Honor.

13                    THE COURT:  Defendant's 6 -- another

14        chart?

15                    MR. RADER:  Right.  Any objection to 5 or

16        6?

17                    MR. ANDERSON:  No.

18                    MR. RADER:  Number 7 and Number 8, your

19        Honor, if it please the Court, are the blowups,

20        the computer generated chronologies from police

21        communications.

22                    THE COURT:  Any objection?

23                    MR. ANDERSON:  No.

24                    THE COURT:  Defendant's 9 is a subpoena?

25                    MR. RADER:  Yes.
```

```
 1              MR. ANDERSON:  Object to that.

 2              MR. RADER:  You do?

 3              THE COURT:  Sustained.  Defendant's 9

 4      won't come in.

 5              Defendant's 10, 11, and 12?  Those were

 6      the blowups, weren't they?

 7              MR. RADER:  Your Honor, Number 10 was a

 8      transcript that Ms. Zucker used one page of to

 9      cross-examine Officer Baker.

10              MR. ANDERSON:  Objection.

11              THE COURT:  Sustained.  That will be

12      admitted.

13              THE COURT:  What are 11 and 12?

14              MR. RADER:  Those are, again,

15      enlargements of  computer-generated materials from

16      police communications.

17              THE COURT:  You object?

18              MR. ANDERSON:  No.

19              THE COURT:  They'll be both be admitted.

20              (Defendant's Exhibit 11 and 12 admitted.)

21              THE COURT:  Defendant's 13, 14, 15, and

22      16 are all stipulated in; is that correct?

23              MR. RADER:  That's correct.

24              May I digress to Defendant's Exhibit

25      Number 10?
```

1          THE COURT:  Uh-huh.

2          MR. RADER:  Mr. Bailey was asked if he

3     made these statements, et cetera, which included

4     that one page.  He looked at the page here in

5     court from the witness stand, authenticated that

6     is, in fact, what he said.  I would ask that one

7     page be admitted.

8          THE COURT:  You indicated before, and

9     it's the way that he recalled it, it was for

10    impeachment.  If you impeach him, you have the

11    testimony from which you can impeach him.

12         MR. ANDERSON:  Not only that, he admitted

13    that's what he said.

14         MR. RADER:  Okay.  With the prosecution's

15    agreement that he admitted what he said in the

16    transcript, we have no problem.

17         MR. ANDERSON:  He said what he said.

18         THE COURT:  He said whatever is in the

19    record he said.

20         All right.  You'll rest.

21         Bring the jury in.  We'll do the

22    stipulation as to Defendant's Exhibits 13, 14, 15

23    and 16.  You will rest on the record.

24         Mr. Anderson, I understand you have one

25    rebuttal witness.

1              MR. ANDERSON:  I do.

2              THE COURT:  We will go directly from that

3       rebuttal witness.  Are you going to introduce any

4       more exhibits?

5              MR. ANDERSON:  No.

6              THE COURT:  We will go directly from

7       rebuttal into closing.  How long do you need to

8       close?  I'm thinking of an hour each side; is that

9       enough time?

10             MR. RADER:  Yes.

11             THE COURT:  In advance, Mr. Rader, are

12      you or Ms. Zucker going to do the close or both or

13      what?

14             MR. RADER:  I believe, I will, your

15      Honor.

16             THE COURT:  Okay.  Mr. Anderson, how much

17      time do you want reserved for rebuttal?

18             MR. ANDERSON:  It doesn't matter.  If I

19      run over 45 minutes in my opening portion, I have

20      talked too long anyway.

21             THE COURT:  If you hit 45 minutes in your

22      opening portion, I will tell you, Mr. Anderson,

23      you have 15 minutes left.  You do what you want.

24             MR. ANDERSON:  Thank you.

25             THE COURT:  Okay.  Then we will probably

1           take a break, maybe send them to lunch before we

2           read the charge.

3                       Krista is finishing up the charge.  The

4           charge, itself, is done.  She's finishing up the

5           verdict forms right now.

6                       THE COURT:  Okay.  Are all exhibits on

7           this table, the exhibits that have been admitted?

8                       MR. RADER:  Right.

9                       THE COURT:  Do you need that thing during

10          your closing?  If you do, pull it out now.

11                      MR. RADER:  I don't believe it's

12          worthwhile, to answer your question.

13                      THE COURT:  You don't need it?

14                      MR. RADER:  No.

15                      (The jury entered the courtroom at 10:37

16          a.m.)

17                      THE COURT:  I apologize for the delay,

18          ladies and gentlemen.

19                      Does the defense have some stipulations

20          that they want to state?

21                      MR. RADER:  Yes, your Honor, if it please

22          the Court, the prosecution and I have agreed to

23          stipulate the admission into evidence of some

24          medical records from the Hamilton County Justice

25          Center.  That's Exhibit Number 13.

1              Exhibit Number 14 are the medical records

2        from the University Hospital Medical Center.

3              Exhibit 15 is a report from the Police

4        Department requesting fingerprint analysis of the

5        three cartridge cases.  That is the report

6        submitted to the lab by Officer Huffman.

7              And Exhibit Number 16 was, again, a

8        report submitted by Officer Huffman requesting the

9        examination of a fingerprint found in the

10        automobile.  The prosecution and I have agreed to

11        stipulate those documents into evidence without

12        objection.

13              THE COURT:  Objection.  Thank you.  So

14        stipulated.

15              MR. ANDERSON:  Yes, your Honor.

16              THE COURT:  Any further witnesses you

17        want to present for the defense?

18              MR. RADER:  No, your Honor, defense

19        rests.

20              THE COURT:  Any rebuttal from the

21        State of Ohio?

22              MR. ANDERSON:  I have one additional

23        rebuttal witness, your Honor.

24              THE COURT:  Okay.

25              MR. ANDERSON:  The State will call

1          Officer Huffman back to the stand, please.

2                    THE COURT:  Officer, come up.  You have

3          been previously sworn.  You're still under oath in

4          this case.

5                    THE WITNESS:  Yes.

6                    THE COURT:  Sit down and pull the

7          microphone over to you.

8                    THE COURT:  Okay.  Mr. Anderson.

9                    MR. ANDERSON:  Thank you, your Honor.

10                        DAN HUFFMAN

11    being previously duly sworn, was examined and testified as

12    follows:

13                    DIRECT EXAMINATION

14    BY MR. ANDERSON:

15         Q.      Officer Huffman, you testified in this

16    matter last week, I believe?

17         A.      Yes, sir.

18         Q.      Okay.  You're still under oath.  What I

19    will do is I will hand you what's been marked for

20    identification Defendant's Exhibit 15.  Can you identify

21    what that exhibit is, sir?

22         A.      Yes, sir.  It's a photo card evidence

23    submission sheet.  Any time we submit evidence to

24    coroner's lab or our lab, we fill one of those out.

25         Q.      You previously identified as Defendant's

1    Exhibit 3, three shell casings.  Did you do anything with

2    the shell casings once they were recovered?

3         A.        Yes, sir.  I only recovered one of the

4    spent shell casings, which was in Mr. Hall's car.

5         Q.    .  Okay.

6         A.        I placed that in a evidence submission

7    envelope, and the other two was already placed in the

8    other two by other officers.  And we sent them to the

9    fingerprint criminalist, and I asked to see if there were

10   fingerprints on those shell casings.        _

11        Q.        According to Defendant's Exhibit 15,

12   Officer Ron Camden, who does the fingerprint analysis, was

13   unable to lift any latent prints from the shell casings?

14        A.        Yes, sir.

15        Q.        You indicated the shell casings were

16   placed in different envelopes, the one that was recovered

17   from the car and two that were recovered from the scene?

18        A.        Yes.

19        Q.        Look at State's Exhibit 10.  Today those

20   shell casings are, in fact, contained in the same

21   envelope?

22        A.        Yes, sir.  After a day or so, after the

23   results of the fingerprint tests, I requested that the

24   criminalist send them to the coroner's lab for a striation

25   test, which is a test to determine -- if all three casings

1   were fired from the same gun, they leave marks and

2   striations in the shell casings.

3        Q.        And you have also got a report from the

4   coroner's office indicating that two of the shell casings

5   were fired from the same gun, and one was not fired from

6   the same gun; is that correct?

7        A.        That's correct, yes, sir.

8        Q.        Can you tell which particular shell

9   casings were recovered from the car and the ones that were

10  recovered from the scene?

11       A.        Not now, no.

12       Q.        Why is that?

13       A.        Evidently, the criminalist or the lab

14  technician, whoever, after the striation test or before

15  the striation test, they were placed together.

16       Q.        Inadvertently?

17       A.        Yes, sir.

18       Q.        Okay.  Now, I will also hand you what's

19  marked as Defendant's Exhibit 16.  Can you identify what

20  that particular exhibit is?

21       A.        Yes, sir.  At the time that I was called

22  in, at the time I processed the car, I had no idea if

23  there was going to be more victims or whatever, so I took

24  fingerprints from the automobile.

25       Q.        How many viable latent fingerprints did

1    you obtain from the automobile?

2         A.       I obtained one quality print, which means

3    it could be identified, but it came back without being

4    Fred Hall's, who I submitted.

5         Q.       Did you submit anybody else?

6         A.       No.

7         Q.       How about Mr. Davis?

8         A.       I believe he was an one of the juveniles,

9    or they were both juveniles at the time.  I cannot recall.

10   No, sir, I did not submit anybody else.

11        Q.       So the fingerprint that was recovered

12   from the car, it was not traced to the defendant.  We

13   don't know whose fingerprint that is; is that correct?

14        A.       That's correct.

15        Q.       Now, how long have you been on the police

16   force?

17        A.       I have been a member of the police

18   division for 27 years.

19        Q.       What can you tell about gunshot residue

20   tests?

21        A.       From what I understand, there's a

22   two-hour period, a window between the time that supposedly

23   someone has fired a weapon and the time that the test

24   should be taken.

25        Q.       Okay.  Do you know why that is?

1      A.        Apparently they can rub it off on their

2    shirt.  If there is -- if they have gone from the scene

3    and out of sight and hiding or whatever, they can rub it

4    in the grass area and get it off, or apparently it loses

5    it's effectiveness in two hours.  I have never been in

6    that division.

7      Q.        Okay.  According to your understanding,

8    there's a two-hour window within which a gunshot residue

9    test can be performed?

10     A.        Yes.

11     Q.        Was there a gunshot residue test

12   performed in this case on the defendant?

13     A.        No, sir, to my knowledge, there was not.

14     Q.        Did you perform one?

15     A.        No.

16     Q.        Why didn't you?

17     A.        When I met Mr. Hall, the shooting was

18   close to three hours old.

19     Q.        That would be outside the window where

20   gunshot residue findings are valid?

21     A.        Yes, sir, and they lost track of Mr. Hall

22   for a while.

23     Q.        Did the defendant ever ask you to give

24   him a gunshot residue test?

25     A.        No, sir, not as I recall.

1        Q.        Okay. Did the defendant, when you

2    interviewed him, after you advised him of his rights

3    contained in State's Exhibit 1, did the defendant ever ask

4    for a lawyer?

5        A.        No.

6        Q.        Did the defendant ever indicate he didn't

7    want to talk to you?

8        A.        No, he was very cooperative talking to

9    me.

10       Q.        Did you use any threats of force against

11   the defendant in order to get him to talk to you?

12       A.        No, sir.

13       Q.        Did you ever threaten the defendant that

14   you're going to charge his wife and his son with murder

15   and things likes that?

16       A.        No, sir.

17       Q.        Did you force him to go back up with you

18   to look for the gun?

19       A.        No, sir.  He suggested he go back up.

20       Q.        He suggested that he go back up and look

21   for the gun?

22       A.        I advised him anything he could do to

23   help with the investigation would help.  If we could

24   recover the gun, that was a big item, so it doesn't fall

25   into the hands of a juvenile or a child.

1    Q.        That's when you suggested you go back up

2    and look for the gun?

3    A.        Yes.

4    Q.        The gun was never recovered?

5    A.        That's correct.

6              MR. ANDERSON:  Thank you.  I have no

7         further questions.

8              THE COURT:  Any cross-examination?

9                   CROSS-EXAMINATION

10   BY MR. RADER:

11   Q.        Good morning, Officer Huffman.  Officer,

12   isn't it almost a universal police practice for officers

13   to mark items of evidence that they recover?

14   A.        Yes, sir, that's correct.

15   Q.        Can you tell why none of these three

16   cartridge cases were marked where they were recovered?

17   A.        A .380 casing is very small.  I didn't

18   want to ruin any latent prints off any of the striation

19   marks.^

20   Q.        Isn't it a fact that you didn't see these

21   casings or didn't have them into your possession until

22   after four o'clock in the morning?

23   A.        That's correct.

24   Q.        Officer Fromhold recovered these casings,

25   didn't he?

1          A.          I recovered one from the front seat of

2    the Honda Accord.

3          Q.          Can you tell who marked these casings --

4    and you had the opportunity to look at them -- A, B, and

5    C?

6          A.          No, sir, I cannot.

7          Q.          Have you seen the crime laboratory report

8    as to these three casings?

9          A.          Yes, sir, I believe that I have.

10         Q.          And the prosecution, I think, has marked

11    it as an exhibit.  It indicates that these were submitted

12    as Exhibit Q-1, and at the time that they were submitted

13    they were marked A, B and C.  Can you shed any light on

14    that?

15         A.          No, sir.

16         Q.          Would you agree that that's -- it's an

17    important item of evidence in this case that the odd

18    shell, the one that didn't match, had come from the

19    defendant's car, Mr. Hall's car?

20         A.          Two of the shells matched.  Which two, I

21    don't know.  I don't understand what you're asking --

22    your question.

23         Q.          Well, if the two casings laying on the

24    street down on Republic, if that could be established

25    through scientific evidence or could be established that

1   they came from the same gun, then wouldn't that be

2   important?

3          A.        Yes, sir.  It could also be one that was

4   matched in the car and one on the street.  I don't know

5   which two matched.

6          Q.        Dr. Parrott, the coroner, indicated to me

7   a couple of weeks ago --

8                    MR. ANDERSON:  Objection.

9                    THE COURT:  Sustained.

10          Q.        Is there a new gunshot residue test kit

11   recently distributed throughout the Police Department?

12          A.        I have no knowledge of that.

13          Q.        Has that ever been a part of your

14   training?

15          A.        No, sir.

16          Q.        What is your rank in the police

17   department?

18          A.        I am a police investigator for District

19   1.

20          Q.        Have you ever used a gunshot residue kit

21   to try to preserve that kind of evidence?

22          A.        No, sir.

23          Q.        And how long have you been on the

24   department?

25          A.        Twenty-seven years.  It will be 27 in

1    July.

2          Q.       Was Mr. Hall handcuffed during his ride

3    back up to Windsor?

4          A.       He was placed in a marked police cruiser,

5    I believe he was, yes, sir.  As I recall, he was.

6          Q.       Do you know if he was handcuffed behind

7    him; his hands were handcuffed behind him?

8          A.       I know he was kind of complaining about

9    his arm.  By procedure, he should have been handcuffed

10   behind his back.  As I recall he was, but it's been

11   awhile.

12              MR. RADER:  No further questions, your

13          Honor.  Thank you.

14              MR. ANDERSON:  Nothing further.

15              THE COURT:  All right.  Officer Huffman.

16          Thank you very much for your time.  See you out in

17          the hallway.

18              THE COURT:  State have any further

19          evidence?

20              MR. ANDERSON:  No, your Honor.

21              THE COURT:  State rest?

22              MR. ANDERSON:  Yes

23              THE COURT:  Anything else from the

24          defense?

25              MR. RADER:  No, your Honor.

1           THE COURT:  Ladies and gentlemen, we'll

2     now go directly into closing arguments.  And Mr.

3     Anderson, you put that podium wherever you want

4     to.

5           MR. ANDERSON:  Thank you.

6           THE COURT:  Closing arguments of counsel

7     are, as opening arguments, not evidence.  You have

8     now heard all of the testimonial evidence, though

9     you have not seen the physical exhibits nor have

10    you heard my instruction as to the law.  So

11    nothing counsel say in the next two hours is going

12    to be evidence.

13          However, it is a perfectly permissible

14    part of the trial, counsel will be able to

15    summarize what they believe the evidence has shown

16    and what they believe the conclusions are that you

17    should come to.  I have allotted each side one

18    hour total for their closing arguments.  It's a

19    total of two hours.  Mr. Anderson will speak first

20    and last, and Mr. Rader will speak in between.

21          Mr. Anderson, go ahead.

22          MR. ANDERSON:  Thank you, your Honor.

23          May it please the Court, counsel, ladies

24    and gentlemen of the jury, on October 17, 1998,

25    this defendant, Fredrick Hall, took out a loaded

1    .380 caliber handgun, and he shot Kevin Davis and

2    Johann Hart on 14th and Republic Street at

3    approximately 3:15 in the morning.

4            The evidence is clear in this case.

5    Proof beyond a reasonable doubt -- listen to the

6    definitions of proof beyond a reasonable doubt

7    that Judge Martin gives to you.  He will tell you

8    that after having carefully considering and

9    compared the evidence, you cannot say that you are

10   firmly convinced of the truth of the charges.

11           If you look at the evidence in this case

12   carefully, there are some things that are beyond

13   dispute.  The elements in this indictment are

14   beyond dispute.  There is no question that Kevin

15   Davis -- somebody attempted to cause physical harm

16   to Kevin Davis by means of a deadly weapon, a

17   handgun.  There is no doubt that somebody caused

18   serious physical harm to Kevin Davis by shooting

19   him through the shoulder.

20           There is no doubt that somebody attempted

21   to cause serious physical harm to Johann Hart

22   means of a deadly weapon.  There is no doubt that

23   somebody attempted to cause -- actually did cause

24   -- serious physical harm to Johann Hart means of a

25   deadly weapon.  There is no question that somebody

1    shot a gun off at those two individuals with

2    purpose to kill them, with purpose to murder them,

3    shooting Johann Hart through the neck and in the

4    shoulder, shooting him while he is lying on the

5    street, shooting Kevin Davis in the arm.

6         This question is a question of identity.

7    There is no question that Johann Hart and Kevin

8    Davis were shot.  There is no question they were

9    shot with a gun.  And there is no question that

10   whoever shot them was trying to kill them.

11        Ladies and gentlemen, the evidence proves

12   that this defendant, Fredrick Hall, is, in fact,

13   the individual who did that.  Take a look at the

14   evidence.  You have got photographs, State's

15   Exhibits 2 through 6.  These are photographs of

16   the car that Fredrick Hall was driving on the

17   night of the shooting.

18        We heard testimony from his wife

19   yesterday that this is, in fact, her car.  We

20   heard testimony from his wife yesterday that he

21   wasn't around when these shootings occurred.  We

22   heard testimony from his wife that he wasn't at

23   the house, he had the car keys, and that he had

24   been gone for a period of time before the shooting

25   occurred.

1          We heard testimony from Johann Hart and

2     Kevin Davis that, in fact, the driver of this car

3     was the assailant.  We have heard testimony from

4     Officer Fromhold, when he arrived on the scene, he

5     got a license plate number that matches this car

6     that was driven by the assailant.

7          He put out that license plate number, and

8     Officer Bailey, finding out where that license

9     plate number was registered to, figures this

10    person might be driving that way.  He stakes it

11    out, and he sees this car driven by this

12    defendant.  And when this defendant sees officer

13    Bailey, he takes off at a high rate of speed --

14    60, 70 miles an hour -- down Gilbert Avenue and

15    through Eden Park, running stop signs, running red

16    lights.  Officer Bailey got a good look at him.

17    He pulled up beside him.  The defendant turned and

18    looked at officer Bailey, and he took off.

19         Officer Bailey loses the car momentarily.

20    Officer Neack responds to the area.  They find the

21    car.  And what do they find when they find the

22    car, this car -- the car that was used in the

23    shooting; the car that there is no dispute this

24    gunman drove -- they find him, this defendant,

25    Fredrick Hall, hiding in the bushes.

1           And what does he tell the police then?

2   He tells Officer Neack I was just out buying

3   shaving cream.  I am just out for a little stroll

4   in the night buying shaving cream.  The defendant

5   admitted he told Officer Neack that he was out

6   buying shaving cream.

7           When he takes the witness stand and tells

8   you yesterday, or day before, he told you that he

9   was going to drive that car.  He was going to the

10  car with the car keys and move the car.

11          This defendant was personally capable of

12  driving the car, much as he would have you believe

13  otherwise.  He was perfectly capable of driving

14  the car that night, and he perfectly capable of

15  pulling the trigger of a gun and striking down two

16  young men.

17          Take a look at that, because I know there

18  is going to be a lot of talk about these boards,

19  what they mean, what they say.  And I will be the

20  first to admit, you have a shooting occurs at 3:15

21  in the morning.  It's dark on an inner-city

22  street.  Crack cocaine is around; we know that.

23  Kevin Davis had crack cocaine on him.

24          We have witness statements from two

25  people that we attempted bring in, that the

1    defense attempted to bringing, and we couldn't

2    locate.  One of them was an allegedly a crack head

3    -- or Jimmy Martin.  He is the one that gave the

4    police officer the license plate number off of

5    this car.

6              The suspect is a male black, no further

7    description.  Suspect small brown, possible

8    Toyota.  It's on Defendant's Exhibit 8.  You will

9    hear that tape.  I am sure defense counsel will

10   play the tape for you about the calls coming in.

11   The bottom line is in certain of these items they

12   say, "Three people in the car; driver is a

13   shooter; passenger is a shooter," things like

14   that.

15             I don't know -- I don't know who put

16   those reports out, and I don't know where they

17   came from.  I know they show up here.  Think about

18   this.  Think about the testimony that Johann Hart

19   gave you.  He sees the defendant in a car.  He

20   approaches the car.  He and the defendant are

21   talking.  They get into some type of an argument.

22   Kevin Davis is

23   across the street.  He comes over.  Johann Hart

24   tells you this crack head, Jimmy, gets in the car.

25   He says, "Hey, I will take you where there is some

1  crack cocaine." That's two people in the car

2  right there, according to Johann Hart, according

3  to whatever witnesses there were.

4    We have a witness down the street -- this

5  female -- who says there were probably three

6  people in the car. She sees the crack head get in

7  the car, this defendant pulls out a .380, shoots

8  Johann Hart in the neck, shoots him in the

9  shoulder and Kevin Davis in the arm. The crack

10  head jumps out of the car, according to Johann,

11  and takes off.

12    You have got four people at the scene:

13  Two are shot; one jumps in the car; one jumps out.

14  Jimmy, the crack head -- I think he was referred

15  to as John also -- the one in the car, gave them

16  this the license. That's the person this witness

17  down the street saw get out of the car.

18    We heard testimony from Officer Fromhold

19  indicating one of the witness he interviewed

20  talked about somebody getting out of the car and

21  going through one of the person's pockets that is

22  shot. That was the crack head. He gets out of

23  the car. He comes around, and he tries to help

24  Johann Hart, as he was shot in the neck. Look at

25  these for what they are worth.

1          I know this:  This car they are referring

2     to is this car right there, the car driven by that

3     defendant, identified by Johann Hart, Kevin Davis,

4     and Dave Bailey.  And we know from his wife's

5     testimony, he wasn't at the house, he had gone for

6     a while.  She didn't know how long.  She was

7     laying in bed, and he had the car keys.

8          And we also know his son was at the house

9     because, if you remember, when Police Officer

10    Eatrides showed up at the house and started

11    talking to the defendant's wife, she initially

12    said her son wasn't there.  But the police were at

13    that location for approximately 40 minutes outside

14    that house.  Nobody could come in or get out of

15    that house.  The defendant certainly didn't come

16    out of that house.  And what did they tell you?

17    What did Eatrides tell you?  He told you, as he

18    was at that location out in front of that house,

19    he heard the radio broadcast concerning the chase,

20    the chase Officer Bailey was engaged in of that

21    car driven by that defendant, when Dexter Hall

22    was, in fact, at home.          If you look at

23    one of these boards, it says "Cancel that call for

24    Dexter Hall.  He has been at home, and he's been

25    there for a long time."

1              You also heard about the black jacket.

2      Look at State's Exhibit Number 7.  The defendant

3      was wearing a black jacket that night.

4      Admittedly, he was not clean shaven.  One of the

5      descriptions says "clean shaven."  Who did that

6      come from?  Did that come from a witness who was

7      150 feet down the street, saw a car going by, and

8      heard shots going off?

9              This defendant, Fredrick Hall is, in fact

10     the shooter in this case.  Look at the testimony

11     of Johann Hart and Kevin Davis.  When Officer

12     Huffman gets this defendant down at the district,

13     he takes this photograph of him, and he puts them

14     in the photo lineup.  What did he do?  He goes up

15     to the hospital.  He goes up to talk to Johann

16     Hart.          Johann is in the hospital.  He had

17     been shot through the neck, been shot in the back,

18     and he said, "Johann, can you give me a

19     description of the guy that shot you?"

20             Johann says, "If I see a picture of that

21     guy, I will tell you.  I can point him out.  I

22     know who he is."  He shows him this exhibit,

23     State's Exhibit Number 7.  What does Johann Hart

24     do?  He picks out Fredrick Hall, and he picks out

25     this defendant, the defendant that Officer Bailey

1    saw driving this car.

2           The interesting thing about it is that

3    when -- and I'll refer to State's Exhibit Number 8

4    -- when Johann Hart made the identification of

5    Fredrick Hall, this photograph, Mr. Hall's picture

6    was actually right here.  It was in the center.

7    And if you look at State's Exhibit Number 8, this

8    is a Polaroid photograph of the photo lineup as it

9    existed when Officer Huffman showed it to Johann

10   Hart for identification purposes.

11          Officer Huffman, being aware of the

12   relationship between Johann Hart and Kevin Davis,

13   decides he is going to mix things up a little bit.

14   Instead of leaving the defendant's picture in the

15   center, he is going to such switch it around.

16          What does he do?  He goes and talks to

17   Kevin Davis who has been released from the

18   hospital.  He said, "Kevin, can you give me a

19   description of the guy?"  He says, "If I see him,

20   I will know who is."  Again, he gives him State's

21   Exhibit Number 9 in the current form, and State's

22   Exhibit Number 9 is a photocopy of this Polaroid

23   copy of it as he showed it to Kevin Davis.

24   Kevin Davis says, "That's the guy," without

25   hesitation.

1                 Johann Hart and Kevin Davis didn't get a

2       chance to talk: "Let's conspire. Let's identify

3       this guy." Look at the identification in this

4       case. We have got two witnesses independently

5       identifying Fredrick Hall as the shooter at

6       different times, at different places, without ever

7       having talked to each other. We have got Officer

8       Bailey, who sees him operating the motor vehicle.

9                Identification. This case is about

10      identification. The evidence is clear beyond a

11      reasonable doubt that this defendant, in fact, was

12      the shooter that night. You heard what he said

13      from the witness stand. I asked him, "Why don't

14      you tell us what you told the police that night?"

15               Finally, he fessed up about telling him

16      he was out looking for shaving scream. He said,

17      "I don't remember what he told the police that

18      night. All I remember is they threatened me.

19      They did this. They did that. I don't remember

20      what I told him."

21               Let's take a look what he did tell them.

22      You heard from Officer Neack that when he

23      Mirandized the defendant, the defendant was aware

24      of his rights, and he made a knowing, intelligent,

25      and voluntary waiver of those rights. He told him

1    he was out buying shaving cream.  He stuck with

2    that story for three hours.

3         Officer Neack transports him from Windsor

4    Avenue down to the district to a wait for Officer

5    Huffman to show, up the investigator on case.

6    Again, they Mirandize him.  This one is in

7    writing, State's Exhibit 1.  You will have a

8    chance to look at this.  You have heard talk about

9    this.  When Officer Neack and Huffman explained

10   the defendant's Miranda Rights to him, he refused

11   sign this waiver.  He said, "I'm not going to sign

12   it."

13         Listen to the instructions that Judge

14   Martin gives to you, because he will tell you that

15   his refusal to sign this waiver doesn't mean he

16   can't intelligently waive his rights, which he

17   did.  You do not need a written rights waiver to

18   take statements from somebody.  That's the law.

19         He says, he asked for an attorney.  We

20   heard Officer Huffman say he didn't ask for an

21   attorney.  You heard him say he asked for a

22   gunshot residue test.  You heard Officer Huffman

23   tell you, he never asked gunshot residue test.

24   You heard him tell you the police threatened to

25   arrest his son and charge him with murder and

1    arrest his wife and charge her with murder.

2           Officer Huffman told you this that didn't

3    happen.  We haven't heard from Dexter.  His wife

4    didn't say -- on the witness stand yesterday, she

5    didn't say that.  He said everybody in it case is

6    wrong except him.  Johann is wrong in his

7    identification.  Kevin Davis is wrong in his

8    identification.  Officer Bailey is wrong in his

9    identification.  Officer Neack is wrong in reading

10   him his rights.  Huffman is wrong in reading him

11   rights.

12          I asked him, "What did you tell the

13   police?  Tell the ladies and gentlemen of the jury

14   what you told the police that night.

15          "I don't remember."

16          I will tell you who does remember is

17   Officer Huffman, because he wrote it down, and you

18   heard what he said.  He said we gave him his

19   Miranda rights he agreed to talk to us.  He didn't

20   want to sign the waiver, and this is what he said:

21   He said, "He picked up Dave and went to 14th and

22   Republic Street.

23          I always wondered about this until

24   yesterday.  I wondered about Dave.  Who is Dave?

25   We found out the answer yesterday when his wife

1    took the witness stand.  She said, "I lent the car

2    to Dave earlier in the day."

3         "Dave had the car.  We were in Dayton."

4    I don't know where the car was.  My son, Dexter,

5    got the keys back from Dave.  Dexter gave the keys

6    to my husband, and he was gone.  He was out of the

7    house at the time of the shooting.  He had the car

8    keys.  He was gone.

9         What does he do?  He figures, "Well, the

10   shaving cream story hasn't worked so far.  I will

11   try something else.  I will tell them I picked up

12   Dave, and we went down to 14th and Republic."

13        He tells Police Officer Huffman that the

14   two subjects who robbed and shot him two weeks ago

15   were there, Johann Hart and Kevin Davis, that

16   Dave, begins to shoot.  He was on the passenger

17   side next to the driver, and he shot these guys.

18   Then he tells Officer Huffman that he drove off,

19   dropped off Dave somewhere and told him to hide

20   the gun.  That's the second story.  The first is

21   the shaving- cream story; the second is Dave was

22   in the car, Dave did the shooting, and I dropped

23   off Dave and told him to hide the gun.

24        What does he say later?  He says, "If the

25   car is released, I will tell the police the

1    truth." This time it's stated that Dave was in

2    the back seat behind him and fired the shot. Then

3    he stated he would take the police to where the

4    weapon was, up on Windsor Avenue where he was

5    arrested.

6            He voluntarily goes with the police; they

7    are not forcing him, holding a gun to his head.

8    He says, "I will try top take you where the gun

9    is."            They look for the gun. They are

10   unsuccessful. The gun is gone. He has either

11   pitched it during a high-speed chase with Officer

12   Bailey somewhere in Eden Park, or he, in fact, he

13   planted it somewhere up around Windsor when he was

14   hiding behind a tree. The gun has not been

15   recovered.

16           Why couldn't he remember what he told

17   Officer Huffman? Because it's not true. The

18   truth is: He was out that night looking to score

19   some crack cocaine or something; he sees these two

20   individuals; he talks to Johann Hart; they get in

21   some type of argument; he pulls out a gun and he

22   fires. Why? I don't know.

23           Let's take a look at some of the other

24   evidence in this case. I'm sure you will hear a

25   lot about the shell casings. I will be honest:  I

1    wish the shell casings hadn't been mixed up.  Do

2    you know what?  In the final analysis of this

3    case, it doesn't matter.  This case is a case

4    about identity.  We have three shell casings

5    recovered from the scene; one recovered from the

6    car, all of them .380 caliber.

7         The police did what they should have

8    done:  Submit them for fingerprints, which they

9    did.  Referring to Defendant's Exhibit No. 15, the

10   shell casings, that was an attempt to go take

11   fingerprints from them, which was unsuccessful.

12   Fingerprint are hit or miss.  Sometimes we get

13   them; sometimes we don't.  On objects as small as

14   shell casings, sometimes they don't.  They shipped

15   them up to the coroner's lab to have Bill Schrand

16   actually make another examination.

17        Look at this report.  This is another

18   fingerprint taken off the car.  They lifted one

19   latent print off the car and compared it to the

20   defendant's.  That wasn't his.  Does that mean

21   anything?  This one doesn't.  It could be

22   anybody's fingerprint.  Let's take a look to the

23   Bill Schrand's report.  He indicates three

24   discharged .380 caliber shell casings were

25   submitted to him.  That Q-1(W) and Q-1(C).  They