1    are marked now:  Q-1(A) Q-1(B) and Q-1(C).  And

2    Q-1 (B) Q-1 (C) were fired from the same firearm.

3    Q-1 (A) was not.

4          We know two of these three shell casings

5    were fired from the same gun and one was not.  I

6    cannot tell you where they came from.  I don't

7    know if the one in the car doesn't match the other

8    two.  I don't know if the one in the car might

9    have matched the one recovered from the street.  I

10.   can tell you that is not a fatal flaw in the case.

11   It's not.  It's a case of identity.  Did Fredrick

12   Hall shoot these two individuals on October 17,

13   1998?  The evidence says beyond a reasonable doubt

14   that he, in fact, did.

15          There were some other exhibits contained

16   in here.  I think they were photographs of shell

17   casings, where they were recovered; a little bit

18   of the Johann Hart's blood in the street, where

19   the defendant left him as he sped off in the car.

20   Here's the defendant in the infamous black jacket

21   that came across one of those reports.

22          Take a look at these medical records

23   quickly.  Let's look at Defendant's Exhibits 13

24   and 14 that we stipulated to.  Defendant's

25   Exhibits 13 and 14 are medical records from the

1    defendant's gunshot wound that he received a

2    couple weeks prior to this shooting.  And I know

3    there is a date on here somewhere.  But look

4    through the medical reports.

5         The defendant, on the witness stand,

6    talked about being shot in the arm -- this arm

7    that he can't use.  But it doesn't seem to inhibit

8    him from tying his shoes and putting his tie on,

9    taking his sling off and showing you where that

10   bullet wound was with that arm that was going to

11   disable him or not allow him to drive the car.

12        He was, in fact, shot; there is no

13   question about it.  But look at the medical

14   reports.  He didn't report it for like three, four

15   or five hours after it was done.  He claims he got

16   robbed, he claims he got shot, and he doesn't go

17   to the hospital immediately.

18        When he does go to the hospital, he

19   doesn't file a police report about being robbed.

20   Let's see, he goes in the hospital for a gunshot

21   wound, and what is the history of the present

22   illness?  "The patient is a 42-year-old

23   Afro-American male with a past history" -- I

24   cannot pronounce, but -- "stab wounds and other

25   gunshot wounds."  He has been stabbed before.  He

1    has been shot before.  Handguns are nothing new to

2    Mr. Hall.          Judge Martin will indicate to

3    you that one of things that you're called upon to

4    assess is the credibility of witnesses that you

5    hear from, including the defendant.  One of the

6    ways you test the credibility of witnesses is you

7    use your everyday test that you use in every day

8    life.

9         One of the things that you're allowed to

10   consider for credibility purposes are prior felony

11   convictions.  When the witness was up on the

12   stand, I asked him, "Have you been convicted of a

13   theft offense or any other type of felony

14   offense?"

15        "Yes."  He's been convicted of receiving

16   stolen property from '89; receiving stolen

17   property of a motor vehicle -- receiving stolen

18   property of a motor vehicle, burglary, CCW.  He

19   was just in a car where a handgun was located up

20   in Dayton.  You can consider those for purposes of

21   assessing the defendant's credibility.

22        I want to talk a little bit about the

23   fleeing and eluding.  There is no question that

24   the operator of the car was the defendant, and his

25   operation of a motor vehicle after Officer Bailey

1    turn on the lights and siren is, in fact, fleeing

2    and eluding.  That created a substantial risk of

3    serious physical harm to anybody on the street --

4    60 to 70 miles an hour in a 35-mile-an-hour zone,

5    running red lights and stop signs.

6              Ladies and gentlemen, listen carefully to

7    the instruction on reasonable doubt that Judge

8    Martin gives to you.  It's evidence of such

9    character that you would be willing to act and

10   rely upon it in the most important of your own

11   affairs.              Ladies and gentlemen, consider

12   the testimony of Johann Hart, consider the

13   testimony of Kevin Davis, consider the testimony

14   of Officer Bailey, consider the testimony of

15   Officer Huffman, consider the testimony of Officer

16   Eatrides, consider the testimony of Officer Neack,

17   and see if this is just some big conspiracy these

18   individuals have hatched to railroad him.

19             We have got all of these witnesses on

20   this side.  Credibility shouldn't be questioned

21   the identification process was made versus the

22   defendant who says, "They are all wrong.  I wasn't

23   there.  I didn't do it.  I don't know what you're

24   talking about.  I was just out buying shaving

25   cream."

1           Ladies and gentlemen, carefully consider

2      the evidence, assess credibility of the witnesses

3      that you have heard from, reach a true and just

4      verdict in this case, a true and just verdict in

5      this case of guilty, as charged, against that

6      defendant, Fredrick Hall, on all four counts of

7      felonious assault, two for using a handgun to

8      shoot Johann Hart in the street, two for using a

9      handgun to shoot down Kevin Davis in the street,

10     two for attempted murder of Johann Hart and Kevin

11     Davis and one for fleeing and eluding.

12          Judge Martin will also read to you what

13     are called specifications.  There are three

14     specifications contained in each of the first six

15     counts.  Specification 1 is that the defendant had

16     on or about his person or under his control, a

17     firearm, while committing the offenses.

18          Specification Number 2 is that the defendant

19     had on or about his person or under his control,

20     and he possessed a firearm, he brandished it,

21     indicated he possessed it, or used it to

22     facilitate the offense.

23          And the third specification is that the

24     defendant fired the firearm from a motor vehicle,

25     and again, the evidence is by proof beyond a

```
 1            reasonable doubt that this defendant, Fredrick

 2            Hall, in fact was the shooter on October 17, 1998.

 3                     THE COURT:  Thank you, Mr. Anderson.

 4                     Mr. Rader.

 5                     MR. RADER:  Your Honor, would a

 6            ten-minute recess be appropriate?

 7                     THE COURT:  I don't know.  Let's just

 8       do it.

 9                     Does anybody on the jury need to take a

10       break to go to the bathroom?  If you do, say so.

11                     Let's just go forward.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        Mr. Rader.
 2                     MR. RADER:  Your Honor, would a
 3          ten-minute recess be appropriate?
 4                     THE COURT:  I don't know.  Let's just
 5          do it.
 6                     Does anybody on the jury need to take a
 7          break to go to the bathroom?  If you do, say so.
 8                     Let's just go forward.
 9                     MR. RADER:  Good morning, ladies and
10          gentlemen.  An older appellate judge once said to
11          me, "Let's have a little more light and a little
12          less heat," and I'm going to make every effort to
13          shed some light on this situation -- sort the
14          evidence out, if you will.
15                     I have a feeling, ladies and gentlemen,
16          as a preliminary matter that I want to address to
17          you.  I hope that when you ladies and gentlemen go
18          home and talk to your families about this case and
19          your friends that you will tell them that you had
20          a wonderful time, that it was a good experience,
21          and I say that because I have a great respect for
22          the jury system.
23                     There are blemishes.  The blemishes are not
24          the system.  The blemishes are the shortcomings of
25          the people participating in the system.  I cannot
```

1.  think of voting and sitting on a jury.  I hope you

2.  can go home and say, "I had a great experience --

3.  a wonderful experience.  I saw how the jury system

4.  works.  It's marvelous."  The shortcomings are not

5.  in the system.  The shortcomings are human

6.  frustration.

7.         Office Officer Bailey was the officer at

8.  the corner of McMillan and Gilbert.  He came into

9.  court and said that the car stopped for a red

10. light and that Mr. Hall looked at him, and he was

11. sitting there in his car.  Mr. Hall was sitting

12. right next to him, and he got a good look.

13.        Ms. Zucker brought out on cross-examination

14. quite a different scenario.  If I can quote from

15. that testimony on cross-examination: "Right.  And

16. he, as he passed me, he looked at me.  I looked

17. back.  He proceeded to the intersection.  He had

18. the green light.  I pulled away from the curb, and

19. at that point, Mr. Hall began to flee in his

20. Honda.  And for -- at that point, he came up

21. behind me.  He was traveling, you know, at the

22. speed limit, or, you know, about as fast as the

23. rest of the traffic coming through there."  Ladies

24. and gentlemen, that's exactly  what he said.

25.        My job, at this point, is to comment on

1      the law and the evidence in a helpful way.

2              The prosecutorial mechanism in this case

3      has tried to belittle Mr. Hall's injury.   In

4      regard to his injury, please recall what Officer

5      Huffman said today, that his procedure is to

6      handcuff people's hands behind their back.   He

7      believes after daylight they rode back up to

8      Windsor, and Mr. Hall's hands were handcuffed

9      behind his back.

10             You saw Mr. Hall stand up here, take his

11     arm, and move this bone around that's not

12     connected to his elbow.   They say "seeing is

13     believing," but that fact, ladies and gentlemen,

14     is documented by the Justice Center infirmary

15     medical records.  And you'll have those with you

16     to factor in your deliberation.

17             You'll have the University of Cincinnati

18     hospital records.   And if you'll go through the

19     doctor's notes, which are in long hand -- and no

20     doctor can write so we can read it -- but if you

21     go to the first typewritten page in that report

22     from University Hospital, the second typewritten

23     page.   If you will take the time to read that

24     second typewritten page, it will tell you that the

25     bone was factured and severed.   It will tell you

1    which digits of his finger had nerve damage and

2    numbness, just as Mr. Hall described to you on the

3    witness stand.

            Now, if you take -- this evidence was

5    shown to you in court -- the medical records.  If

6    you take that evidence that he has an arm injury,

7    that sort of has implications.  Mr. Hall sat on

8    this witness stand and told you, yes, he could

9    drive the car, that he went to get the car, and he

10    can drive the car by putting his knee up against

11    the steering wheel as he shifts, essentially

12    driving with one hand.  That's what he said.

            Now, let's compare that with driving with

14    this arm in this condition through an 80-mile-

15    an-hour chase through twisting, winding streets

16    over around Eden Park with a standard shift

17    automobile with the arm in the condition as it's

18    described on the second typewritten page in the

19    University Hopital report.

            Ladies and gentlemen, that is going to

21    cause you a doubt:  An eighty-mile-an-hour chase,

22    winding streets, in a standard-shift automobile,

23    compared to that medical report.

            The other half of this is, coming out of

25    the implication of this arm injury, why Fred Hall

 1          was handcuffed on the street, and he was taken

 2          into custody at 3:43 a.m. on October 17th.  And

 3          the radio tapes, et cetera, will show you

 4          conclusively beyond any doubt exactly what time

 5          that he left.  "5:11 a.m., advised tow truck just

 6          left, enroute with individual handcuffed."

 7               From 3:43 to 5:11 a.m., an hour and 25

 8          minutes, Fredrick Hall was sitting in a police car

 9          with his hands handcuffed behind him with the

10          injury that's described to you through the

11          University of Cincinnati medical reports -- that

12          injury, by the way, occurred -- again, relating to

13          the medical records -- on the third of October,

14          exactly 14 days prior to this incident.

15               If you have a bone shot in your arm and

16          substantial nerve damage, if you can imagine

17          sitting in this police car handcuffed, sitting on

18          your hands, ladies and gentlemen, for an hour and

19          25 minutes, what if that happened to you?  Is that

20          going to raise your blood pressure?  Are you going

21          to tell somebody, "Hell, I went out and got

22          shaving cream"?  Can you understand the disgust?

23          Can you understand the intimidation?  Can you

24          understand a citizen's feelings of being

25          mistreated?

1          Now, the police, as you know -- I know you

2    know -- the police tried to characterize this, "I

3    went out to get some shaving cream," as an

4    inculpatory admission of guilt. And I just ask

5    you:  Is this an inculpatory admission of guilt,

6    or was Mr. Hall in pain?  Was he under duress?

7          And ladies and gentlemen, back in the jury

8    room, you just read that second page of the

9    typewritten material, and I ask you to think about

10   him sitting on his hands and arms for an hour and

11   25 minutes.

12          The police talked about Mr. Hall making

13   statements, and ladies and gentlemen, the Judge is

14   going to give you an instruction.  His Honor, the

15   Judge -- let me clarify that when I'm talking to

16   you, I can say "the Judge."  If I'm talking to

17   him, it's your Honor.  I have done that without

18   exception.  I have great respect for the Court.  I

19   can say the Judge to you but not to him.

20          His Honor will give you an instruction that

21   we don't contest.  We don't contest the legal

22   notion that a person can voluntarily make an

23   admission but refuse to waive their rights.  We

24   submit that's technically possible.

25          But what are the implications or the

1     ramifications of this?  Our contention is that he

2     made no inculpatory admissions of guilt at all in

3     this case.  The best one that we have heard is

4     that he was out buying shaving cream.

5           And do with that whatever you're going to

6     do with the shaving cream, ladies and gentlemen.

7     That's a statement that comes out of pain and

8     frustration.  That has nothing to do with this

9     case at all.  It's irrelevant, immaterial, and it

10    has nothing to do with this case.  It's a common

11    frustration.

12          On the topic of statements, there is simply

13    no written statement in this case.

14    I submit to you that if I were a police officer,

15    if a person was willing to make a statement, I

16    would make every effort to get that statement in

17    writing.  There is not a statement here that we

18    can analyze and review and deal with confidence.

19          There is a cloud over this statement

20    business.  Why would a person refuse to sign a

21    waiver?  Why would a person who is voluntarily

22    going to talk to the police, why would he not sign

23    a waiver?  Although, technically, as I said, you

24    can refuse to sign the waiver, but go ahead and

25    voluntarily make admissions and talk to the

1     police.  That's technically possible.  In your

2     common sense experience, which you're going to

3     apply in this case, why would a person refuse to

4     sign a waiver if it was their intent to talk to

5     the police to deal with the police and to make

6     statements?

7          I don't know how to pronounce this --

8     Officer Eatrides, the officer who was with the

9     lady officer, arrived at Fulton Street at 3:38

10    a.m.  Ladies and gentlemen, this is a brief

11    summary of this evidence to try to shed some light

12    on this situation:  The police came to the door.

13    Mrs. Hall told them that Dexter wasn't there, but

14    she gave him a description of Dexter, and that

15    came out on the radio stuff, computer printout,

16    radio log, recording, et cetera.  And she told

17    them that this was her car, no question about

18    that.

19         The police came back about a half-hour

20    later, and she admitted to them that Dexter was

21    there, and he was arrested and taken down to the

22    juvenile detention center.  After the police

23    arrived there at 3:38 and had this brief

24    conversation, the car was found at Windsor at

25    3:43.

1          From the tape, you can figure it out. And

2     there is just an overplay of ten seconds,

3     whatever, and it makes it difficult to listen to

4     the tape. But you can listen for yourself.

5     There was as little as three minutes -- depending

6     how the seconds fall on each end -- there was as

7     little as three minutes between the time that the

8     police arrived at Fulton and the time that the car

9     was found on Windsor.

10         If you listen to the tape and verify that

11    it's between five minutes and three minutes,

12    depending upon how the seconds fall, it's obvious,

13    ladies and gentlemen, that when the police arrived

14    at Fulton, that Dexter was at home, and Mr. Hall

15    was at the car or almost to the car or whatever in

16    the area of Windsor when the police arrived at

17    Fulton. It's not real complicated if you listen

18    to the tape to figure out the time, the three

19    minutes difference between the police arriving at

20    Fulton, getting a description of the car and the

21    finding of the car on Windsor.

22         It is apparent that Mr. Hall was approaching

23    that car in the vicinity of that car and that

24    Dexter was at home. It seems to me the police --

25    the prosecution have tried to make something out

1       of that.

2           Officer Huffman submitted a latent

3       fingerprint, a fingerprint that was taken from the

4       car to the lab, and he also submitted it with a

5       fingerprint from Fredrick Hall.  The fingerprints

6       didn't match.

7           Now, ladies and gentlemen, it's my job here

8       to shed some light here on the situation.  And I'm

9       just going to tell you that if you think about

10      your automobile, how many people touch that

11      automobile and how many fingerprints are probably

12      on that automobile, that the chance of one

13      fingerprint matching any particular person is not

14      great.  As a matter of fact, it's very remote.

15          So Officer Huffman submitted this

16      fingerprint.  We don't know where it came from on

17      the car.  He submitted it, and it didn't match.

18      Now, I'm not going to insult you and tell you that

19      is a substantial important piece of evidence,

20      because there are fingerprints all over the car.

21      There are fingerprints on the tires from the last

22      person who fixed a flat -- you are see what I mean

23      -- but it wasn't Fredrick Hall's fingerprint.

24          Three cartridge cases were submitted to the

25      fingerprint specialist for analysis.  Ladies and

1    gentlemen, Officer Huffman sat here and told you

2    that it's police procedure fundamentally to mark

3    evidence where you get it. Yet these cases were

4    submitted to the lab for analysis for

5    fingerprints, and there was another report, which

6    is a prosecutor's exhibit, for the firing pen

7    marks.

8        We paid for better police work than we got

9    as to this particular evidence. We should know

10   where those cases came from. Two of them came

11   from the same gun; one of them didn't. I just ask

12   you rhetorically: Was the one in the car from

13   being robbed 14 days earlier? I don't have a

14   clue. We need to know that. It's not Fredrick

15   Hall's fault that that evidence is not here before

16   you.

17       You may think there is an undercurrent here,

18   an undercurrent that maybe there is a

19   self-fulfilling prophesy. The police think that

20   they know something, and then they to make it

21   true. They didn't try -- they didn't try to

22   disprove their own case.

23       I think everybody on this jury panel is

24   familiar with gunshot residue tests on people's

25   hands. The police think they know, so they are

1    not going to do a gunshot residue test.  They are

2    not going to destroy what they think is their

3    case.

4         Officer Huffman said there is a two-hour

5    limit on that because a person might wipe their

6    hands off in the grass or wash their hands.  Let

7    me tell you, if a person washed their hands,

8    washed it all off, then the test results are

9    meaningless.  But what if they don't wash off

10    their hands and the test is given three, four,

11    five, six hours later?  That's evidence that you

12    could use.  That's conclusive evidence.  And in

13    this class of cases and the magnitude of the case,

14    we need that evidence.

15         An officer comes up and in 20 years he

16    has never done this test.  He has no training in

17    this test.  The exhibits weren't marked -- the

18    shell cases.  We don't know where they came from.

19    He has never had any training in gunshot residue

20    tests -- never used it in 20 years.

21         I think that factual pattern, that's what I

22    mean by "undercurrent."  I think it fits a pattern

23    in this case.

24         They say that Officer Huffman went to

25    Windsor to look for the gun with Fred Hall.  They

1       said Fred Hall went voluntarily.  Let me tell you,

2       ladies and gentlemen, Fred Hall was under arrest.

3       He didn't go anyplace voluntarily.  He was under

4       arrest.  What is the logic of telling the police,

5       "Okay.  I'll show you where the gun is, but I

6       won't put that in writing?  I'm not going to put

7       that in writing.  I'm not going to sign my waiver

8       form.  I'll cooperate with you.  I will show you

9       where the gun is," and then go up there and not

10      find the gun.  The only thing that you have done

11      then is incur the wrath of the policeman.  You

12      have not done anything to your benefit.  What is

13      the logic?

14          The logic in that is Officer Huffman got him

15      in the car, took him up there, they looked for the

16      gun, thought they might get lucky and find it, and

17      the fact is he didn't find it.

18          Ladies and gentlemen, I have said twice

19      already, and I'll say it again, this is a

20      profoundly serious case.  When you read the

21      indictment in this case or the instructions as it

22      relates to the indictment, it will be become

23      completely clear how important this case is.  This

24      tape is aggravating to listen to, but you will

25      have that tape back in the jury room with you with

1    a recorder.  If you can't get the recorder to work

2    or have problems with it, the Judge will·give you

3    instructions about how to communicate that.

4         The license number in this case came out at

5    .0321 on the tape thanks to the good efforts of

6    Officer Fromhold.  There was an indication of a

7    person with a white T-shirt being in the car.  I'm

8    not going to characterize this -- I'm telling you

9    this is on the tape and where, and I'm begging

10    your indulgence to listen to it -- but a white

11    T-shirt at 3:23.  There are three occupants, two

12    in front, one in back, male black, dark hat,

13    suspect Dexter Hall, male black, passenger, 19 to

14    20, medium complexion, black ball cap.

15    Black jacket.  Clean shaven shooter.  Passenger,

16    male black, black baseball cap, clean shaven,

17    medium build, black jacket.  3:45.

18         This case is of such magnitude, ladies and

19    gentlemen, I ask you to listen to that tape to

20    verify what is on it.  And it's got a rewind

21    button.  If you will be a good enough citizen,

22    good enough people to verify what is on that tape,

23    to listen to it yourself in the original voices,

24    in the original voices, real time and see what is

25    there.

1          Officer Fromhold was apparently the first

2     officer on the scene -- bicycle patrol.  And I was

3     sincere when I indicated to him, it's excellent

4     police work having this license number out very

5     quickly.  But let's address the issue of the

6     number of people in the car.  I think we are

7     getting closer to the fundamentals of this case.

8          Johann Hart said that the crack head got

9     into the car briefly and got back out.  Do you

10    remember Jimmy Martin, who kept repeating the

11    license number, and the license number was, in

12    fact, correct.  Jimmy Martin saw this and he was

13    concerned enough to repeat that license number

14    over and over to try to help the police.  Is he

15    going to mislead the police in some other way?

16         Some of the information that Officer

17    Fromhold testified to that he got from Jimmy

18    Martin was male black, dark cap, 20 to 21, three

19    people in the car.  Officer Fromhold said in his

20    testimony, "I recall him explaining to me that it

21    was one of the two people in front; and the one in

22    the back, I don't recall where the person in the

23    back was seated, what side of the vehicle."

24         Now, this is information that Jimmy Martin

25    gave Officer Fromhold, and Officer Fromhold relays

1   that to us in court, in person:  I don't recall

2   where the person in the rear was, but I do recall

3   him explaining to me that it was one of the two

4   people in the front; and the one in the back, I

5   don't recall where the person in the back was

6   seated, which side of the vehicle.

7           Another comment attributed to Jimmy

8   Martin from Officer Fromhold:  He told me there

9   were three, and one jumped out of the car.  Now, I

10  want you to compare Officer Fromhold's implication

11  from Jimmy Martin with Officer Fromhold's analysis

12  of what Lolita Moore said.

13          This is what Lolita Moore told Officer

14  Fromhold:  She was, I believe, west of the crime

15  scene and saw the vehicle proceed past her, start

16  to make a turn, and multiple gunshots rang out.

17  She said somebody exited the vehicle and went over

18  to the fallen victim.  The other subject, Mr.

19  Davis, had run -- let me back up a minute.

20          She said somebody had exited the vehicle,

21  went over to the fallen victim -- the other

22  victim, Mr. Davis had already run away -- and goes

23  through his pockets and runs back to the vehicle

24  and got back to the car and takes off.

25          Lolita Moore is telling Officer Fromhold

1    that she saw somebody, one of the three, jump out

2    of the car, go over, rifle through Johann Hart's

3    pockets, because Mr. Davis had already run out of

4    the area.   Compare that with Jimmy Martin's

5    statement to Officer Fromhold, that he told me

6    there were three and one jumped out of the car.

7         Ladies and gentlemen, there's got to be some

8    credibility from these people on the street that

9    are talking to the police and trying to assist

10   them.   I think this is a very important

11   revelation, and, again, it's from Jimmy Martin to

12   Officer Fromhold on the scene.  He heard the first

13   gunshot, then turned to see the vehicle driven by

14   somebody hanging out the window shooting, and

15   that's when he saw the rear of the vehicle proceed

16   southbound and he made a mental note of the

17   license plate.

18        Ladies and gentlemen, there is no other

19   evidence in this case of that quality and

20   reliability.  He heard the first gunshot, then

21   turned to see the vehicle driven by somebody

22   hanging out the window shooting, and that's when

23   he saw the rear of the vehicle proceed southbound

24   and made a mental note of the license plate.

25        That statement rings more true than

1    anything in this case.  You cannot believe that he

2    got this license number correct and believe the

3    identification and rendition of Johann Hart and

4    Kevin Davis, too.  You cannot do both.

5        Kevin Davis started out by saying that he

6    watched the car from across the street for a half

7    an hour.  And there is some more questioning from

8    the prosecutor and he said 15 minutes.  They

9    settled on 15 minutes.

10       Johann Hart said he talked to him for four

11    minutes, five minutes.  Notice, too, that Kevin

12    Davis says that he never saw his hands.  Johann

13    says he, all of a sudden, started waiving his

14    arms, waiving his hands.  Relate that to the

15    injury of Mr. Hall's arms, but more importantly

16    relate this to the statement from Jimmy Martin,

17    the statement that resulted in the license plate

18    being broadcast.

19       This is a drive-by shooting; that describes

20    a drive-by shooting.  Both the statement of Lolita

21    Moore and Jimmy Martin describe a drive-by

22    shooting, somebody hanging out the window

23    shooting.  That is a drive-by shooting.

24        Again, Lolita Moore saw the vehicle

25    proceed past there, start to make the turn,

1    multiple gun shots rang out.  Ladies and

2    gentlemen, that is a drive-by shooting.

3    It's is totally diametrically opposed to the

4    statements of Johann Hart and Kevin Davis.

5         Let me talk about something ancillary

6    here for a minute.  These cartridge cases that

7    were mishandled, Officer Fromhold found those.

8    They were 35 feet apart.  35 feet apart.  How

9    could they get to be 35 feet apart other than

10   evidence to corroborate the story told to you by

11   Lolita Moore, that this car was traveling and

12   somebody was hanging out the window shooting.

13        Now, somebody will probably put the spin

14   on this case that this was just another casing

15   laying around, just another cartridge case laying

16   around.  But somewhere it was said -- that's what

17   I'm looking for, and I can't find it -- he says,

18   "That's rare to find cartridge cases on the

19   street."  What's the probability or possibility of

20   finding the cartridge cases of the same rank and

21   same caliber within 35 feet on the same day at the

22   same time?

23        I found that.  I can quote to you

24   directly from Officer Fromhold.  "That's unusual

25   to find shell cases in that area.

1               "Question:  That shell case was also

2         recovered from the scene, correct?

3               "Yes."

4         Ladies and gentlemen, the scene is the heart

5    of this case.  You cannot believe the testimony of

6    Johann Hart and Kevin Davis and believe this

7    testimony from the two witnesses on the stand --

8               MR. ANDERSON:  Objection, your Honor.

9               THE COURT:  Sustained.

10              MR. RADER:  And then you also have a

11   problem with the identification of Johann Hart and

12   Kevin Davis.  If you have problem with their

13   identifications in the photo lineup, it is part

14   and parcel of that, based on what they claim they

15   saw sitting still in the car, carrying on this

16   conversation, they claim that is the basis of the

17   identification.  They claim that's where they saw

18   Fred Hall.

19              If that opportunity did not happen, if it

20   did not happen as they say it happened, if it

21   happened as the other people say it happened --

22   and the photo identification is part and parcel of

23   this misrepresentation to us about what happened.

24   And was this a drive-by shooting?  Was this a

25   15-minute or a 30-minute deal?  When you answer

1    that question, things start to fall into place.

2    Shell casings 35 feet apart.  There is the license

3    number being broadcast.

4         His Honor, the Judge, will give you these

5    written jury instructions to take with you.  I

6    said in opening statement, these words are chosen

7    with profound care over hundreds of years.  His

8    Honor will tell you with great care how you are to

9    use proof beyond a reasonable doubt, the doubt

10   that would concern you in the most important of

11   your own personal affairs.

12        Is buying a car one of your most

13   important affairs, or is it buying a house?

14   Buying a house.  Think about that.  Buying a

15   house.  If anybody came up to you in this case and

16   tried to sell you a house, you would walk away

17   from them, absolutely stone flat walk away from

18   them.

19        Don't do to Fred Hall what you wouldn't do

20   purchasing your own house.  If this is so

21   uncredible, so confusing, so ill prepared that you

22   would not rely on it in the most important of your

23   own affairs -- buying a house -- if you would turn

24   around and walk away from it, then, ladies and

25   gentlemen, turn around and walk away from this

1    case.  Don't convict this man on this kind of

2    evidence, ladies and gentlemen.

3         I'm proud to have the opportunity to talk to

4    you.  We are content to leave it in your hands.

5    Thank you very much

6              THE COURT:  Mr. Anderson, you have 18

7    minutes left if you need it.

8              MR. ANDERSON:  Thank you, your Honor.

9              There is an interesting thing that

10   occurred thoroughout the course of this case, and

11   that is this:  We just heard Mr. Rader allude to

12   the testimony of Jimmy Martin and Lolita Moore,

13   and we all know that Jimmy Martin and Lolita Moore

14   were never present in Court.

15             Despite the efforts of the State, Mr.

16   Rader and Ms. Zucker, they couldn't be found.

17   They didn't testify here.  And the interesting

18   thing about it is that the Court, upon my

19   objection, could have prevented you from hearing

20   anything about those people.  I could have

21   prevented Mr. Rader from getting into the

22   descriptions that they gave, the number of

23   occupants of the vehicle and everything else they

24   said based on hearsay, I could have objected to,

25   and the Judge could have sustained it.  And you

1    never would have heard anything about it.

2         I didn't think that it was fair in this

3    case.  I didn't think that it was reasonable

4    because Lolita Moore and Jimmy Martin were there.

5    Jimmy Martin did give a license plate number.

6    Lolita Moore did see the car drive by.  But it

7    wasn't fair for you not to hear it, although you

8    didn't get chance to hear them testify.  Because

9    they didn't, you didn't get a chance to assess

10   their credibility, because they were not here.

11        Let's talk about the problem with the

12   identification by Johann Hart and Kevin Davis.

13   There is no problem with the identification.  If

14   this defendant, Fredrick Hall, wasn't the gunman,

15   how could those two individuals pick them out

16   independent of each other?  They couldn't.  They

17   saw him.  He was there with the gun.

18        What about the identification by Officer

19   Bailey?  He was wrong, too?  I haven't heard any

20   dispute -- there's been no dispute by defense

21   counsel that this car with this license plate

22   number wasn't used in the shooting.  There is no

23   dispute.  Somebody has to be driving the car.

24   Somebody has to be behind the wheel.

25             Kevin Davis and Johann Hart said it was

1    the defendant.  Officer Bailey said he chased the

2    defendant.  In opening statement, I wrote this

3    down, part of opening statements was the facts

4    that are going to come out are this:  Dexter Hall

5    came home and told his dad that the police were

6    following me.  Dexter Hall came into the house in

7    a panic with the car keys and told his dad that

8    the police were following me, and based on that

9    information, that that's why Fredrick Hall went to

10    the car on Windsor.  But we know that's not true.

11    Look at the defense exhibits themselves.  Look at

12    the time frame between when the police arrived on

13    the scene at Fulton, which is where they were

14    living Eatrides and a few other officers were on

15    the scene while the car chase was going on.

16        How was Dexter Hall, if he was involved in

17    this -- and that's what the defense is attempting

18    to allude to somehow -- Dexter Hall and his

19    buddies were the ones involved -- how would Dexter

20    Hall have gotten past Officer Bailey, and Officer

21    Bailey makes a bad identification?  How would

22    Dexter Hall get from that car into his house and

23    past the police?  How would he have time to tell

24    daddy and give him the keys and then daddy comes

25    out the front door?  It couldn't happen that way.

1           The police were there when Dexter Hall was

2       in the house and this defendant was found cowering

3       behind the bushes after having just abandoned the

4       car.  That was his opening.  That was what his

5       evidence was going to show.

6           There is no dispute that the cars there.

7       Mr. Rader indicated that we were attempting to

8       belittle the defendant's injury.  I am not

9       belittling his injuries.  He was shot with a gun.

10      If he was shot with a gun in his elbow, I don't

11      know, but I know this, that no officer testified

12      that he had a sling on that night.  Nobody

13      testified that the defendant had a sling on at all

14      that night.  He certainly is capable of driving a

15      car, because he told you that.

16          Let's take a look at these medical records.

17      There is a document dated December 4, 1998, date

18      of request 12/2/98.  This is a form filled out by

19      the defendant to the hospital, to the Justice

20      Center's personnel.  It says I went to the hand

21      doctor two weeks ago.  The hand doctor ordered a

22      few things for me.  Pain medication was one.  So

23      he has been to the hand doctor, they ordered a few

24      things for him.  One of the things was pain

25      medication.

1          These reports look pretty thick.  When you

2     look through the reports, I would say the majority

3     of the reports contain some other conditions the

4     defendant had -- kidney stones.  But then look at

5     the December 4th entry from the defendant

6     requesting pain medication along with other things

7     that the doctor recommended, then look at the one

8     dated December 14, 1998, and under "treatment

9     provided," I believe it's a splint and an isotomer

10    glove.  December 14th is when those items were

11    given to him for the treatment of this injury.

12    There is no other evidence indicating that he

13    received that sling beforehand or anything else.

14    The first notation of that is on December 14,

15    1998.

16          I'm not saying he was not shot.  I'm not

17    saying that it might not have hurt.  I'm saying he

18    was wearing that sling in court in an attempt to

19    mislead you as to the severity of the injuries for

20    you to believe that he was incapable of driving a

21    car that night.

22          Let's talk about the refusal to sign the

23    rights waiver.  Mr. Rader says, why would anybody

24    refuse to sign a rights waiver if had he wanted to

25    give a voluntary statement.  It happens every day.

1      The police give a defendant -- advise him of his

2      rights, and they say, "I understand that, and I

3      don't want to sign anything." Do we see that

4      anywhere else? Yes, Fredrick Hall's medical

5      report dated 10/23/98. They are trying to treat

6      him for the medical injuries that he sustained.

7      He refused the finger splint. He refused medical

8      treatment.

9              How about the entry dated 12/23/98?

10     Refused.

11             MR. RADER: Objection, your Honor.

12             THE COURT: Overruled.

13             MR. ANDERSON: It's right there on this

14     page and you can look at them -- refused. He

15     refused medical treatment for these injuries that

16     he apparently sustained. What is preventing him

17     from refusing to sign a rights waiver?

18             Mr. Rader talks about the inculpable

19     statement, what he feels is the most inculpable

20     statement that the defendant made, that he was out

21     buying shaving cream. I would submit to you that

22     is something that the defendant made up when he

23     was put on the spot because he was caught cowering

24     behind the bushes behind the car. He made it up.

25     He was going to stick to that story as long as he

1      could.

2           Then Mr. Rader indicated there is a cloud

3      over his statement.  There is no written statement

4      in this case.  He is right.  The defendant did not

5      give a written statement.  Officer Huffman took

6      notes of that statement, but you saw the defendant

7      on the witness stand.  I asked the defendant:

8      "Tell the ladies and gentlemen of the jury

9      everything that you told the police that night.

10          "I don't remember.

11          "Tell them what you told them.

12          "I don't remember.

13          "Well, did you tell them about the shaving

14     cream?

15          "Yes, I think I might have.

16          "Did you tell them about picking up some guy

17     named Dave?

18          "I might have said that, too."

19          But he doesn't remember anything that he

20     said.  Either he does not remember or he does

21     remember it, and he doesn't want to tell you

22     because it confirms everything that officer

23     Huffman indicated that he said in his statement.

24          Ladies and gentlemen, this car was used in

25     the shooting.  This defendant Fredrick Hall was

1    operating the car.  Dexter was at home.  Officer

2    Bailey saw him.  Officer Bailey chased him.

3    Officer Bailey identified him.  Johann Hart

4    identified him.  Kevin Davis identified him.

5         Proof beyond a reasonable doubt.  Can you

6    say that you are firmly convinced of the truth of

7    the charge?  He says Dexter was driving the car

8    with his friends.  Dexter was at home.  He was

9    driving the car and Officer Bailey was chasing

10   him.  Carefully consider the evidence.  Carefully

11   assess the credibility of the witnesses that you

12   have heard from the witness stand and render a

13   true and just verdict in this matter, a true and

14   just verdict in this case, a verdict of guilty as

15   charged against Fredrick Hall for the cold-blooded

16   shooting of Johann Hart and Kevin Davis

17              (EXCERPT ENDS.)

18

19

20

21

22

23

24

25