# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

Frederick Hall,
     Petitioner


    vs                     Case No. 1:02cv34
                                (Spiegel, S.J.; Black, M.J.)


Ernie Moore,
     Respondent

---

## SUPPLEMENTAL REPORT AND RECOMMENDATION

---

Petitioner is an inmate in state custody at the Lebanon Correctional Institution in Lebanon, Ohio. In January 2002, counsel from the Ohio Public Defender's Office filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on petitioner's behalf.

In the petition, petitioner challenges his August 1999 conviction following his re-trial before a jury in the Hamilton County, Ohio, Court of Common Pleas, after his first trial had ended in a mistrial because the jury was unable to reach a verdict. Specifically, petitioner was convicted on the following charges contained in a seven-count indictment: two counts of felonious assault involving victim Kevin Davis, with three firearm specifications; two counts of felonious assault involving victim Johann Hart, with three firearm specifications; one count of attempted murder of Johann Hart, with three firearm specifications; and one count of failure to comply with the order or signal of a police officer.[1] (*Id.,* Ex. 2). On August 23, 1999, petitioner was sentenced to terms of imprisonment totaling thirty-four (34) years and five (5) months. (Doc. 1, p. 1; *see also* Doc. 10, Ex. 1 & Ex. 3,

---

[1] Petitioner was acquitted on a count charging the attempted murder of Kevin Davis. (*See* Doc. 10, Ex. 2).

pp. 3-4).[2]

In the petition, petitioner alleges three grounds for relief:

**Ground One:**  Mr. Hall was denied his right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution, as the State failed to provide exculpatory witness statements to the defense at trial.

**Supporting facts:**  As attested through sworn affidavit in Mr. Hall's new trial motion, eyewitness Lolita Moore–and second eyewitness Jimmie Martin–gave statements to the Cincinnati police that would have exculpated Mr. Hall in the shootings of Messrs. Hart and Davis. Those statements were never provided to Mr. Hall.

**Ground Two:**  Mr. Hall's Fourteenth Amendment due process and Fifth Amendment double jeopardy rights were violated when he was convicted of and sentenced for both felonious assault and attempted murder on the same victim in the same transaction.

\*\*\*\*

**Ground Three:**  Mr. Hall was denied his right to the effective assistance of counsel as guaranteed by the Sixth Amendment.

(Doc. 1, pp. 4-5).

---

[2]  Specifically, as discussed in the prior Report and Recommendation filed March 23, 2004, the trial court merged the two counts charging petitioner with the felonious assault of Kevin Davis, as well as the two counts charging petitioner with the felonious assault of Johann Hart, for sentencing purposes.  (Doc. 19, p. 2; *see also* Doc. 10, Ex. 1 & Ex. 3, p. 3).  The court then imposed the following consecutive terms of confinement: (1) for the felonious assaults of Davis and Hart, seven years on each charge plus an additional five years for the merged firearm specifications; (2) for the attempted murder of Hart, nine years plus an additional five years for the merged firearm specifications; and (3) for failure to comply, seventeen months.  (Doc. 19, p. 2; *see also* Doc. 10, Ex. 1 & Ex. 3, pp. 3-4).

Magistrate Judge David S. Perelman of the United States District Court for the Northern District of Ohio was a visiting judge assigned for a brief period to this case. On March 23, 2004, he issued a Report and Recommendation to deny the petition with prejudice after addressing and rejecting each of petitioner's grounds for relief on the merits.[3] (Doc. 19).

On October 11, 2005, United States Senior District Judge S. Arthur Spiegel issued an Opinion and Order upholding the portion of the Report and Recommendation addressing petitioner's second and third grounds for relief, but rejecting the portion of the Report and Recommendation pertaining to petitioner's first ground for relief. (Doc. 22, p. 4 n.1 & p. 8). Although the Court refused to "find the grant of a writ to Petitioner appropriate at this time[,] . . . out of an abundance of caution," the case was remanded for an evidentiary hearing on issues raised by petitioner in challenging the magistrate judge's conclusion that the State's withholding of exculpatory eyewitness statements did not violate *Brady v. Maryland,* 373 U.S. 83 (1963). (*See id.,* pp. 5-7).

Specifically, the Court found that because the first trial had ended in a hung jury, and therefore "potentially exculpatory evidence might undermine confidence in the final verdict[,]" an evidentiary hearing was appropriate to determine the materiality of the withheld written statement of Lolita Moore, which "depending on the credibility the trier of fact would attach to her statement, . . . could fall within the scope of *Brady*." (*Id.,* pp. 6-7). Moreover, with respect to Jimmie Martin's statement, which petitioner claimed had been improperly destroyed by the Cincinnati Police Department or the Hamilton County Prosecutor's Office in violation of *Arizona v. Youngblood,* 488 U.S. 51 (1988), the Court found that further inquiry was appropriate "into the circumstances surrounding the destruction of the evidence" to determine whether or not an inference could be drawn in petitioner's favor that he was "intentionally deprived" of exculpatory evidence. (*Id.,* pp. 7-8). Citing *Jamison v. Collins,* 291 F.3d 380 (6th Cir. 2002), the Court concluded: "Should such inference and/or a positive credibility determination as to Moore's statement result in a finding that confidence in the jury's verdict is undermined, Petitioner should be entitled to another trial." (*Id.,* p. 8).

---

[3] The magistrate judge noted that petitioner had asserted an argument with respect to his third ground for relief for the first time in his "traverse" brief in response to the return of writ; that particular argument, therefore, was deemed "waived" due to petitioner's procedural default in failing to raise it in the state direct review proceedings. (*See* Doc. 19, p. 14 n.2).

Respondent filed a motion for relief from the October 11, 2005 Order. (Doc. 23). In an Opinion and Order filed July 13, 2006, Judge Spiegel denied respondent's motion and again remanded the matter for evidentiary hearing, with the clarification that "[i]n its October 11, 2005 Order, the Court found it appropriate for the Magistrate Judge to conduct an evidentiary hearing on the circumstances surrounding the destruction of statements of Moore and Martin." (Doc. 26, pp. 3, 9-10).[4]

In addition, the Court rejected respondent's arguments that (1) the state court record is sufficient to resolve any factual dispute based on findings of fact made by the Ohio Court of Appeals in rejecting petitioner's *Brady* claim, which findings are entitled to a presumption of correctness; and (2) petitioner, in any event, failed to meet his burden of showing cause for his failure to develop the facts in the state court. The Court reasoned in pertinent part:

> . . . .[T]he presumption of correctness of state federal determinations simply is inapplicable to a *Brady* claim, which is an allegation of the denial of due process. One cannot presume the withholding of evidence would result in a correct factual determination.

> Moreover, . . . [h]ere there is no question, based on the Affidavit of Lolita Moore, that clear evidence in Petitioner's favor existed, which the government had in its possession, and which the government ultimately destroyed. In such a situation, the applicant here has rebutted the presumption of correctness, and has shown cause for not developing the facts further.

> ****

> . . . .Petitioner did not withhold or destroy evidence, and it is unfair to place the fault on him for failure to develop the factual record, when he did not know such evidence existed due to the fact the government

---

[4] Although in the October 11, 2005 Order, the Court referred to Moore's statement as "withheld," as opposed to "destroyed," petitioner apparently made his position clear in the interim that Moore's written statement to the police, as averred by Moore in a subsequent affidavit submitted in support of petitioner's motion for new trial, also had been destroyed by the police or prosecutor. (Doc. 26, pp. 2-3).

4

withheld it from him.  The record shows, on the contrary, that
Petitioner subpoenaed Moore and Martin, but that neither witness
appeared at trial.  Only subsequent to the trial was Petitioner's counsel
able to locate Moore, and to learn about the content of her testimony.
The evidence in question, as argued by Petitioner, is not necessarily
"cumulative" evidence, as found by the state court, but might
reasonably be viewed as the only eyewitness testimony contradicting
the testimony of the victims.

. . . .An evidentiary hearing is appropriate in this matter so as to
determine at what point in time and under what circumstances the
evidence was destroyed.  The record is unclear as to when and why
the police or the prosecutor destroyed the evidence.  Should the result
of the evidentiary hearing indicate that the destruction happened under
circumstances or in a time frame that demonstrates a bad faith
destruction of evidence, then the Court could find it appropriate for all
evidence, including the Affidavit of Moore, and a favorable inference
regarding the destroyed statement of Martin, to be put before a trier of
fact. . . .

(*Id.,* pp. 7-9).

An evidentiary hearing was held as ordered before the undersigned
magistrate judge on August 29, 2006, and was continued on November 1, 2006.
(*See* Docs. 41, 42).[5]  The following witnesses testified at these hearings: Jimmie
Martin; Lolita Moore; Cincinnati police detective Patrick Galligan; William
Anderson, a Hamilton County assistant prosecutor, who represented the State
during petitioner's trial; and Cincinnati police officer Steven Fromhold, who had
responded to the "call regarding a shooting on Republic Street on October 17th,
'98," and spoke with the eyewitnesses at the scene.  (*See id.*).

---

[5]  The first hearing was continued because Lolita Moore, who was observed outside the
courtroom prior to the hearing, left the courthouse and could not be located to testify on
petitioner's behalf.  (*See* Doc. 34).  Moore subsequently submitted an affidavit, stating that she
had to leave the courthouse "in a hurry" in response to a phone call from her babysitter.  (*See*
Doc. 35).  Thereafter, the Court granted petitioner's motion, made orally at the August 29, 2006
hearing, "to continue the evidentiary hearing in progress in order that Moore's testimony could
be heard."  (Doc. 36).

In addition, respondent was ordered on May 1, 2007 to file a "copy of the transcript of petitioner's first trial, as well as any other available evidence reflecting how the jury voted, or the reasons behind the jury's vote, in the first trial." (Doc. 43). On July 20, 2007, respondent filed a response to the May 1, 2007 Order together with a copy of the transcript of petitioner's first trial. (*See* Doc. 46).

It, therefore, appears that at this juncture the issues raised in Ground One of the petition, which were remanded for evidentiary hearing, are now ripe for final adjudication.

## FINDINGS OF FACT

### A.  Evidence Adduced During The State Criminal Trial Proceedings Regarding The Incident Giving Rise To The Criminal Charges

It is undisputed that the incident giving rise to the charges against petitioner occurred on October 17, 1998, at approximately 3:00 a.m., when victim Johann Hart was shot in the neck and lower back and victim Kevin Davis was shot in the arm while they were standing outside near the corner of Fourteenth and Republic Streets in the Over-the-Rhine area of Cincinnati, Ohio.  Their assailant, who was in a "beige Honda or Nissan," drove off immediately after the shooting.  (*See* Doc. 7, Tr. 190; *see also* Doc. 6, Tr. 132-33; Doc. 7, Tr. 164; Doc. 46, Tr. 229).

Two Cincinnati police officers, who were on "mountain bike patrol . . . one block south of the location of the offense," responded to the scene.  (*See* Doc. 7, Tr. 188-89; *see also* Doc. 46, Tr. 221-22).  One of the police officers, Steven Fromhold, obtained the license plate number of the shooter's vehicle from one of the eyewitnesses, who "kept . . .  repeating it over and over and over." (Doc. 7, Tr. 190; *see also* Doc. 46, Tr. 229-31).

It appears from the record of police radio transmissions, which was introduced at both trials, that at 3:21 a.m., the license plate number provided to Officer Fromhold was radioed in from police car number 1481, and that at 3:28 a.m., car number 1481 also transmitted an initial description of "two occupants in front, one in back, driver, shooter, . . . male black, dark cap, possible BB cap."

(Doc. 8, Tr. 391-92; Doc. 46, Tr. 352-53).[6]

The car's license plate number was immediately traced to petitioner's home address on Fulton Avenue, which is "around the Eden Park area just off of Gilbert." (Doc. 8, Tr. 307; Doc. 46, Tr. 179). Cincinnati police officer Gregory Eatrides, from District 1, responded to the Fulton Avenue address. (Doc. 8, Tr. 292-94; Doc. 46, Tr. 178-79). When Eatrides and his partner arrived at petitioner's home shortly after 3:30 a.m., they first searched for but could not find the car involved in the shooting. (Doc. 8, Tr. 294-95; Doc. 46, Tr. 180). Thereafter, they "had a conversation" with petitioner's wife, Sheila Parker-Hall, who said she "believed that her son Dexter Parker had the car." (Doc. 8, Tr. 295; *see also* Doc. 46, Tr. 181). She gave a description of Dexter, which Eatrides broadcast over the police radio.[7] (Doc. 8, Tr. 296; Doc. 46, Tr. 181-82). The description given was of a "possible suspect, young, male black, late teens or early twenties;" Eatrides could not recall if he "gave any additional description," but stated he "probably gave a height and weight also." (Doc. 8, Tr. 296; Doc. 46, Tr. 181).

In the meantime, District 2 Cincinnati police officer Dave Bailey, who was out patrolling in his cruiser, heard the initial police broadcast of the crime and description of the vehicle reportedly involved in the shooting. (Doc. 8, Tr. 307; Doc. 46, Tr. 198-99). Bailey stated that he chose to remain at the intersection of "Gilbert and East McMillan, thinking that, if the car was going back to its address, it would probably go through" that area. (Doc. 8, Tr. 307; *see also* Doc. 46, Tr. 199-200).

Soon thereafter, Bailey, whose cruiser was "facing southbound on Gilbert," observed the same car described in the broadcast traveling southbound on Gilbert. (Doc. 8, Tr. 308-09; *see also* Doc. 46, Tr. 200). As the car approached from the rear and passed Bailey, Bailey was able to get a "good look" at the driver; Bailey

---

[6] Over a half hour later, at 3:53 a.m., an "updated" description was broadcast from a different police car, numbered 1420. The information relayed in that transmission was that "passenger is shooter, male black, 19 to 20, black baseball cap, medium complexion, clean-shaven, thin build, and black jacket." (Doc. 8, Tr. 392; *see also* Doc. 46, Tr. 349-50).

[7] It appears from the record that Eatrides radioed in this information from police car number 1421, which was the car that reported to the Fulton Avenue address. (*See* Doc. 8, Tr. 392).

identified petitioner as the person he observed driving the car. (Doc. 8, Tr. 310-11, 319; Doc. 46, Tr. 200-01).

Bailey at that point activated the lights and siren on his cruiser, but the car sped away. (Doc. 8, Tr. 311; *see also* Doc. 46, Tr. 201-02). Bailey chased after the vehicle, but lost contact with it near the entrance to Eden Park. (Doc. 8, Tr. 312; Doc. 46, Tr. 202-04). Within minutes of losing sight of the car, Bailey was notified by other police units that the vehicle, a Honda Accord, had been found parked and unattended on Windsor Avenue, which is adjacent to the park and "[r]ight around the block" from Fulton Avenue. (Doc. 8, Tr. 312-13; *see also* Doc. 7, Tr. 269; Doc. 46, Tr. 205). It appears from the record of police radio transmissions, which was entered into evidence at both trials, that the Honda was found by a District 4 police unit at 3:45 a.m. (*See* Doc. 8, Tr. 392, 400). By the time Bailey arrived at the Windsor Avenue location within a minute thereafter, petitioner had been apprehended by other police officers, who found him standing behind a tree near the car. (*See* Doc. 8, Tr. 322-23, 361-62; *see also* Doc. 46, Tr. 284).[8]

Petitioner was read his *Miranda* rights and was transported to Cincinnati's District 1 police station for questioning. (Doc. 7, Tr. 235; Doc. 46, Tr. 245, 247). Doug Neack, the police officer who read petitioner his rights and drove petitioner to the station, testified that the only statement petitioner made at that time was that "he was out buying shaving cream." (Doc. 7, Tr. 236; Doc. 46, Tr. 246).

---

[8]  Officer Eatrides testified that his conversation with petitioner's wife at the Fulton Avenue address "ceased when [he] heard the broadcast that Lieutenant Bailey put out . . . [about seeing] the car in Eden Park and [that the car chase] was heading into the area that we were at." (Doc. 8, Tr. 297; *see also* Doc. 46, Tr. 182). At that point, Eatrides and his partner "started to respond out to [the] car, which was out front, to assist." (Doc. 8, Tr. 297; *see also* Doc. 46, Tr. 182). However, as things began to unfold "very quickly" with Officer Bailey reporting first that he "lost the vehicle for a brief period," and then that he had relocated the car "parked and unattended," they "responded back up to the residence." (Doc. 8, Tr. 298, 300-01; *see also* Doc. 46, Tr. 183, 196-97). They had another brief conversation with petitioner's wife and were starting to leave again, when she "came out yelling for us, and said that she had located, actually had located her son, that he was in his room" asleep. (Doc. 46, Tr. 183; *see also* Doc. 8, Tr. 299). During the 45-minute time period they were at the Fulton Avenue address, from 3:38 until 4:18 a.m., the police officers did not observe anyone entering or leaving the house. (Doc. 8, Tr. 300; Doc. 46, Tr. 183-84). Eatrides took custody of petitioner's son Dexter and interviewed him that night. Dexter stated that "he had been in the car . . . several hours earlier . . ., but he denied any involvement in the shooting, denied that he was in the car at the time of the shooting, denied that he was down in Over The Rhine in the car at the time of the shooting." (Doc. 46, Tr. 184-85; *see also* Doc. 8, Tr. 299-300).

When petitioner arrived at the police station, he was taken to an interview room and read his *Miranda* rights a second time. (*See* Doc. 7, Tr. 239- 41, 262-63; Doc. 46, Tr. 247, 259-60). Cincinnati police detective Dan Huffman conducted the interview. According to Huffman, petitioner first stated that "he was in Dayton earlier that night, dropped off his son; he was riding around; he picked up an individual by the name of Dave at the Burn Barrel, which is located at Fifteenth and Pleasant in Over-the-Rhine; they were riding around; and when they came up Republic Street, they spotted two individuals that had robbed him and shot him two weeks prior." (Doc. 7, Tr. 265; *see also* Doc. 46, Tr. 261). At that point, "Dave" told petitioner that "he'd take care of them," and when they called one of the men over to the car, "Dave did the shooting." (Doc. 7, Tr. 265-66; *see also* Doc. 46, Tr. 261).

Huffman testified that petitioner's story changed during the course of the interview. For example, petitioner first stated that Dave was in the back seat of the car, but later said that Dave was in the front seat. (Doc. 7, Tr. 270-71). Petitioner also stated at first that after the shooting, he dropped Dave off somewhere and told him to hide the gun. (*Id.,* Tr. 266; Doc. 46, Tr. 261). Later in the interview, petitioner asked Huffman "if it would help if we recovered the gun." (Doc. 7, Tr. 269; *see also* Doc. 46, Tr. 262). When Huffman responded affirmatively and asked petitioner "where the gun was," petitioner "said he would take me to it." (Doc. 7, Tr. 270; *see also* Doc. 46, Tr. 262).

At that point, petitioner was handcuffed and taken back to Windsor Avenue. Huffman testified:

> We searched for the gun for over 45 minutes. At one point [petitioner] was physically removed from the police vehicle and brought up to the grassy area. He stated to us that he placed the gun at the base of . . . a limb or the base of a tree. In this particular yard there were several branches and limbs and trees. So he was physically removed from the police car and brought up to the yard. He stood there and looked around and just kind of – it appeared that the gun – he wasn't going to go to the gun.

(Doc. 7, Tr. 271; *see also* Doc. 46, Tr. 262). The gun was never located. (Doc. 7, Tr. 272; Doc. 46, Tr. 263).

At both trials, Hart and Davis testified that petitioner was alone in the car at the time of the shooting.  (*See* Doc. 6, Tr. 135-36; Doc. 7, Tr. 164, 168; Doc. 46, Tr. 104-05, 151, 157).[9]  Hart and Davis, who testified that they had never seen petitioner before October 17, 1998, were separately presented photo arrays containing petitioner's picture by the police soon after the incident.  Both Hart and Davis picked petitioner's picture out of the array as the person who shot them. (Doc. 6, Tr. 150-52; Doc. 7, Tr. 170-72; Doc. 46, Tr. 111-13, 147-48).  At both trials, they unequivocally identified petitioner as their assailant.  (Doc. 6, Tr. 150; Doc. 7, Tr. 162; Doc. 46, Tr. 101, 140-41).

Petitioner testified at both trials, where he presented an entirely new version of events.  Petitioner stated that a few weeks before Hart and Davis were shot, he himself was shot in the arm and that he could drive only with great difficulty. (Doc. 8, Tr. 336-41; Doc. 46, Tr. 275-80, 283).  Petitioner further intimated that his son Dexter had been out that night with the Honda, returning home sometime after 3:00 a.m.  (Doc. 8, Tr. 334-35; Doc. 46, Tr. 281-82).  Petitioner testified that he spoke with Dexter, who handed him the keys to the car and informed him of the car's location on Windsor Avenue; that he left the residence and walked to the car with the intent to drive it back home; and that it was at this point, that he was approached and arrested by the police who were surrounding the car.  (Doc. 8, Tr. 335-36, 342; Doc. 46, 281-84).

---

[9]  Hart testified that "at some point" after petitioner had stopped the car and called Hart over to talk with him, someone else, whom Hart described as a "crackhead" named "John," walked up and entered the "[f]ront seat passenger's side" of the car.  (Doc. 6, Tr. 147; *see also* Doc. 46, Tr.123, 133-34).  Hart stated that John sat in the passenger seat for a few seconds, but got "right back out" when petitioner began arguing with Hart and started shooting.  (Doc. 6, Tr. 148-49).

**B.  Evidence Adduced and Rulings Made In The State Court Proceedings Regarding Eyewitnesses Jimmie Martin and Lolita Moore**

**1.  <u>The First Trial:</u>**

It appears from the state trial transcripts that the parties were aware at the time of petitioner's first trial of the identities of eyewitnesses Jimmie Martin and Lolita Moore, where they could be located, and the substance of statements they made to police officer Steven Fromhold at the scene.

Specifically, the following colloquy occurred when Fromhold was cross-examined by defense counsel at the first trial:

Q.  Officer, being on the scene, you know – I've studied this situation fairly closely, and I compliment the department on the fact that I think this license number was out on the radio within about three minutes of the first 911 call at 3:18; do you recall that?

A.  Yes.

\*\*\*\*

Q.  And at some point not long after that, there was a description broadcast of a male black, light complected, clean shaven, 20 or 21 years old.  Do you remember that description being broadcast?

A.  No. . . .  I don't recall that.  I recall putting a description out of a male black with a dark cap, and that age range.

Q.  Okay.  You're with me.  Male black, how old?

A.  I believe it was like in his twenties is what I stated.

Q.  And male black in his twenties, baseball cap?

A.  That's correct.

Q.  You don't remember light complected?

11

A.  I believe I stated on the radio dark cap.  That's about the description.  I was just ecstatic that we got a good license plate number from a witness.

Q.  You don't remember clean shaven?

A.  No, I don't.  I reviewed the reports yesterday, and I was just going off what we wrote on the report.  I don't recall saying that without listening to the tape.

Q.  But if they came out on the radio, as I've indicated, as clean shaven, roughly 20 years old, light complected black gentleman, baseball cap, then you would have been the source of that information?

A.  I don't know what transpired in the District 2 pursuit of a vehicle that was allegedly involved in it. . . .   I wasn't on that area.  That was a different channel.  I picked up part of the pursuit on my radio.  But my generating that information, my generation of it was what I explained.

Q.  Excuse me, didn't mean to interrupt but as you're testifying here today, it refreshed your recollection reading your report the other day?

A.  Certainly.  This happened in October.

Q.  I understand that.  This radio transmission I've been able to listen to also indicates that there were three people in the car?

A.  That's what my report reflected, yes.

Q.  That's your initial – put out over your radio?

A.  That's correct.

Q.  Do you recall . . . what their position was in the car?

A.  I don't recall where the rear person was, but I do recall them

12

explaining to me that it was one of the two people in the front, one in the back. I don't recall where the person in the back was seated, what side of the vehicle.

Q. Now, this information that you were able to get was not from either one of the victims?

A. No, that's correct.

Q. Can you shed some light on who this information came from? Do you recall their names or --

A. It's in the addendum to the report, their names. The one gentleman was tending to Johann, trying to – telling him he was going to be okay, hang in there.

As soon as I walked up, I got off my bike and walked up and he mumbled out a license number. . . .

****

. . . .And he kept repeating the license plate to reinforce it in his mind and make sure I got it. I put that much out almost immediately because he seemed pretty confident that he had the license plate down.

Q. Did he tell you how many people were in the car?

A. Later, once we got Hart stabilized, his version was pretty consistent with the female's version. There were some discrepancies.

Q. How many people did he tell you?

A. He told me there were three and one jumped out of the car.

Q. Can you describe the witness for us?

A. Male black, mid thirties, probably one of our street people that's drug dependent.

13

Q.  Did you get his name?

A.  Oh yeah.

Q.  And address?

A.  Oh yeah.

Q.  And the second witness, I understand that that was a female?

A.  Yes.

Q.  Can you tell generally what she looked like?

A.  20, 30 year old female black.  Lived on 1400 block of Race.  Her name is in the addendum, also.

Q.  Let's go back to the man for a moment, if we could, please.  In your experience as a police officer, did this person seem to you to be forthright and credible?

A.  Well, the thing that impressed me most about him, was he just kept repeating the license number.  So he had made, in my opinion, a cognizant desire to remember that.  He kept repeating it, repeating it, repeating it, over and over.  He probably said it six, seven times.

And I wrote it down the second time he said it.  So I think he knew in his mind he had something solid that could contribute to the investigation and he didn't want to forget it.

                                    ****

Q.  Maybe I can refresh your memory a little bit.  Maybe you'll recognize – the man, was his name Jimm[ie] Martin; does that ring a bell?

A.  I believe so.

14

Q.  Are you fairly confident?

A.  I can look at the report.  I don't have it right in front of me.

Q.  Do you have the report here?

A.  I'm sure Detective Huffman has got it out in the hall or the prosecutor probably has a copy of that.

(Doc. 46, Tr. 226-31).

At that point, defense counsel requested the court's permission to ask Officer Huffman if he had the report in his possession.  (*Id.,* Tr. 231).  In response, the prosecutor requested a sidebar conference, and an off-the-record discussion was held in chambers.  (*See id.,* Tr. 232).  When the parties returned to the courtroom, Fromhold's cross-examination continued in relevant part as follows:

Q.  Officer, do you recall that the lady that we're talking about is Lolita Moore?

A.  That rings a bell, yes.

Q.  Okay.  Can you indicate to us the nature of the information that she gave you?

A.  My recollection was, without looking at the report, was she was on Thirteenth, I believe, west of the crime scene, and saw the vehicle proceed past her[], start to make a turn, multiple gunshots rang out. She said somebody exited the vehicle, went over to the fallen victim – the other subject, Mr. Davis, had ran – and go through his pockets and run back to the vehicle, go back to the car and take off.

**** 

Q.  Did Ms. Moore indicate to you how many people were in the car?

A.  I believe she said three.

15

Q.  And she indicated that somebody got out of the car?

A.  She did.

****

Q.  Did Ms. Moore indicate to you that she had seen the shooter?

A.  I don't believe she gave me a very good description.  I don't think so.  I don't believe so.  She saw the vehicle and somebody run from the vehicle and then re-enter the vehicle.  I don't believe so.

I think my description, the vague description of – the one you referenced earlier was a little off from what I thought I'd put out. Male black, twenties, dark baseball cap, was generated from the male subject, male witness, as the operator of the vehicle, because that would have been the position he would have the best view of, to my recollection.

Q.  Did he tell you anything about the proceedings of the vehicle?

A.  Yes, he did.

Q.  What did he tell you?

A.  He was actually, according to him, on the opposite corner of Johann and Mr. Davis.  He was on the northeast corner, and they were on the southeast corner.

He was facing northbound.  The vehicle came east and then turned south.  And he didn't see the vehicle initially.  He heard the first gunshot, then turned to see the vehicle driving by, somebody hanging out the window shooting.  And that's when he saw the rear of the vehicle proceed southbound and made a mental note of the license plate.

(*Id.,* Tr. 232-35).

16

Finally, on Fromhold's re-direct examination by the prosecutor, the following additional evidence was elicited regarding eyewitnesses Martin and Moore:

Q.  Officer Fromhold, could you describe Jimm[ie] Martin?

A.  Seemed to be a homeless person, somebody you would see commonly in that area.  Possibly drug dependent.  Thin male black.  Mid thirties.

Q.  Now, according to what you testified to on cross-examination, he told you that he first became aware of this car being there when he heard the first gunshots; is that correct?

A.  That's correct.

Q.  So he didn't see anything prior to that?

A.  No, he didn't.

Q.  Did he give you an address?

****

A.  He did.

Q.  And that was 662 Ridge Acres?

A.  Yes.

Q.  And what about Lolita Moore; can you give us a description of her?

A.  Female black, probably in her late twenties, early thirties.  Gave me an address on Race Street.  I believe it was one of the Hart Realty buildings.

Q.  How about 1527 Race Street?

17

A.  Yes, sir.

Q.  Can you describe her?

A.  She was kind of well dressed actually for the area.  She didn't look like a street person.  She didn't look disheveled like the other gentleman did.  She surfaced later in the investigation, not initially.

She was there probably within, I think maybe 20 minutes after we saw her standing over there, one of them talked to her.  She didn't seem real interested in getting involved initially.

Q.  So these are the two witnesses that you talked to at the scene?

A.  Right.

**\*\*\*\***

Q.  How far away did Ms. Moore indicate she was when these gunshots rang out or when she saw the car?

A.  She would have been a hundred, 150 feet.

Q.  Away from the scene?

A.  (Indicate yes.)

(*Id.,* Tr. 238-40).

During closing arguments, it was revealed that both parties had attempted to bring in the two eyewitnesses, Martin and Moore, for questioning, but were unable to do so because the witnesses could not be located.  (*See id.,* May 4, 1999 Jury Trial Tr. 28).  Both the prosecutor and defense counsel addressed these witnesses' statements in their closing arguments.  (*Id.,* May 4, 1999 Jury Trial Tr. 28-30, 66-72).  In rebuttal argument, the prosecutor closed by stating:

There is an interesting thing that occurred throughout the course of this case, and that is this: We just heard [defense counsel] allude to the

18

testimony of Jimmie Martin and Lolita Moore, and we all know that
Jimmie Martin and Lolita Moore were never present in Court.
Despite the effort of the State and despite the effort of [defense
counsel], they couldn't be found. They didn't testify here. And the
interesting thing about it is that the Court, upon my objection, could
have prevented you from hearing anything about those people. I
could have prevented [defense counsel] from getting into the
descriptions that they gave, the number of occupants of the vehicle
and everything else they said based on hearsay. I could have objected.
The Judge could have sustained it, and you wouldn't have heard
anything about it.

I didn't think that it was fair in this case. I didn't think that it was
reasonable, because Lolita Moore and Jimmie Martin were there.
Jimmie Martin did give a license plate number. Lolita Moore did see
the car drive by, but it wasn't fair to you not to hear it, although you
didn't get the chance to hear them testify. Because they didn't, you
didn't get a chance to assess their credibility, because they were not
here.

(*Id.,* May 4, 1999 Jury Trial Tr. 76-77).

## 2.  **The Second Trial:**

At petitioner's second trial, Officer Fromhold was not questioned as
extensively as he had been at the first trial regarding the identities and whereabouts
of the two eyewitnesses. Without identifying Jimmie Martin by name, Fromhold
testified that the man who provided him with the license plate number of the
shooter's car gave a description of the driver and said there were three people in
the vehicle, two in the front and one in the back. (Doc. 7, Tr. 190-91, 211-12).
Fromhold further testified that he also talked "to a lady at the scene named Lolita
Moore," who gave "her version of what she saw as far as the shooting went,"
which she observed at a distance of approximately 150 feet. (*Id.,* Tr. 200-01, 212).

According to Fromhold, he did not relay any of the information Moore gave
him to "put out over the air." (*Id.,* Tr. 212). He explained:

. . . .That was very late in the investigation. I had made notes and

19

> added them to the addendum to the report. She gave me that account
> of what she saw. By then, there was something going on in another
> district with a vehicle already. It occurred, and the information she
> provided wouldn't have assisted anymore there, so I just documented
> what she told me.

(*Id.,* Tr. 211-12). Fromhold also stated that at no time did he report that "this was a
drive-by shooting." (*Id.,* Tr. 213).

Defense counsel made only one other reference to the eyewitnesses during
the evidentiary phase of trial, when he indicated at the close of the presentation of
evidence that he did not plan to call any more witnesses to testify on petitioner's
behalf "unless I can find Lolita Moore tonight, your Honor." (Doc. 8, Tr. 428).
Apparently, Moore could not be located because the defense rested the next day.
(*Id.,* Tr. 444).

In contrast to petitioner's first trial, the prosecutor did not make any
statements in closing argument about the eyewitnesses or their statements to the
police indicating that they had observed three people in the shooter's car. Defense
counsel referred to the eyewitnesses' statements only to the extent he argued that
"the exhibits in this case will indicate to you that there were three people in this
car, that there was a drive-by shooting," which served to undermine the credibility
of the victims' testimony. (*See id.*, Tr. 483-84).

The jury convicted petitioner on August 9, 1999. (*See* Doc. 10, Ex. 2).

On August 20, 1999, prior to sentencing, petitioner's counsel filed a motion for new trial. (Doc. 11, "Motion For New Trial"). In the motion, counsel argued in relevant part that the Cincinnati Police Department "failed to reveal the contents of exculpatory statements made by Jimm[ie] Martin and Lolita Moore." (*Id.*). Counsel claimed that there was "[n]ewly discovered evidence in that a key witness, Lolita Moore, has been located." (*Id.*). Attached to the motion was Lolita Moore's Affidavit, executed August 16, 1999, wherein Moore averred:

> At approximately 3:00 a.m., on the morning of October 17, 1998, I was in the v[i]cinity of 1330 Republic Street, Cincinnati, Ohio when I saw two cars parked on 14th Street, one of the cars was a beige Honda, four door. There were three people standing outside the beige Honda. All three appeared to be young boys, or men, aged in their early twenties. The driver was wearing a black tee shirt, a black baseball cap, and blue jeans. I saw all three get into the Honda just before it started and squealed the tires as it went around the corner onto Republic Street. The car was going south, toward the river and the young boy was standing on the east side of Republic Street.

> All three people in the Honda were African American. The passenger side person and the person in the back seat had on white tee shirts. All were clean shaven.

> After the gun shots, the other car drove away at a normal speed. It may have not had anything to do with the shooting.

> Three shots were fired from the beige Honda as it passed the young boy. I don't know if the shots were fired by the driver or the person on the driver's side of the back seat. The Honda continued south on Republic at a high rate of speed.

> I saw the license plate number of the car. Although I don't remember the number now. I gave the number to the police when they arrived.

> After the shooting, I immediately went over to the young man who was lying on the street and I could tell that he needed help. He was bleeding and he said to me "please help me, I think I'm going to die, don't leave me."

21

Jimmie "Kool" was also a witness. We sat in the same police car and told the police what had happened. The police took me and Jimmie "Kool" to District 1 where we both signed written statements. We wrote the statements out ourselves for the police. At about 8:00 a.m. the police took me and Jimmie back to Liberty and Race Streets. My statement to the police was true and consistent with what I'm saying in this Affidavit.

(*Id.,* Ex. A).

The trial court denied the motion for new trial without opinion and proceeded to sentencing. (*See* Doc. 8, Tr. 574).

## C. The State Trial Record Regarding The Declaration Of Mistrial

Respondent has submitted the transcript from petitioner's first trial, which reveals that the declaration of mistrial resulting in petitioner's re-trial was based on concerns about one of the jurors which arose after deliberations had begun in the first trial. (*See* Doc. 46, Response & Tr. 499-531).

The transcript of proceedings held both in-chambers and in the courtroom throughout the deliberation period appears to have been put together out of chronological sequence. Upon review of the transcript, it appears that the issue first arose when the jury reached an impasse early in the deliberations on the first count. At that juncture, the juror came forward and voiced "some problems [with] continuing as a juror in this case." (*Id.,* Tr. 509).

In a conference held in-chambers outside the presence of the other jurors, the juror complained that when she told the others how she was planning to vote with respect to the first count, she was "admonished" and stated in response that she "was not going to change [her] mind on that." (*Id.,* Tr. 510-11). The juror continued: "And that sort of sent everybody spinning which I did not understand at first why it did. They said if you're not going to change your mind, then we might as well just leave here." (*Id.,* Tr. 512). After further questioning, the juror indicated to the trial judge that she could "go back into the jury room, and follow the law and evaluate the evidence and try" to reach a decision on the remaining six counts; she therefore was excused and returned to the jury room for continued

22

deliberations.  (*Id.,* Tr. 515).

The following discussion then ensued among counsel and the trial judge, who had remained in the room:

> PROSECUTOR:  It sounds to me, and I'm not trying to read too much into it, but it sounds like she is having a disagreement with the rest of the jurors as far as the potential verdict on Count 1, and that her vote disagreed with the rest of the members of the jury. . . .
>
> THE COURT:  Certainly several of the other members of the jury.
>
> PROSECUTOR:  Right.  It sounds to me, Judge, like she is not going to change her mind, come hell or high water.  And I know that we've asked her to go back in deliberations. . . .
>
> ****
>
> I'm looking down the road.  If she's going to reach the same conclusions on Counts 2, 3, 4, 5, 6 and 7, what I'm saying is we're faced with a situation where, I don't know, but it sounded to me from what she said in here that she's essentially made up her mind and she is not going to change it and she is not going to fully participate in the free exchange of ideas that deliberations require.
>
> THE COURT: Okay.
>
> ****
>
> DEFENSE COUNSEL: I think the crux of what she said was she is upset because they wouldn't listen to her explanation and her reasons.  I think that's a normal part of jury deliberations.  I think it should go to its conclusion, whatever that might be.

(*Id.,* Tr. 516-18).

The court and counsel went on to discuss how to handle a number of questions from the jury, including: "One juror says not guilty with no change emphatically, and we're only on Count 1."  (*Id.,* Tr. 521).  When the jury was

23

brought in to hear the answers to its questions, the court gave the following instruction in response to that concern:

> My suggestion is to remind you all that you are to decide this case for yourselves.  As the instructions indicated you have a duty and an obligation to deliberate.
>
> You're only on Count 1.  Let me know where you stand once you've gone through all the counts, okay?  And however long that takes, if it takes you another 20 minutes or it takes you another two days, let me know where you are when you get done with all the counts. . . .

(*Id.,* Tr. 524).

The jury continued deliberating, but relayed a request to the court for the trial testimony of Officers Eatrides and Bailey.  (*Id.,* Tr. 526).  At that point, defense counsel moved for the first time that a mistrial be declared "based on [the juror's] testimony in chambers."  (*Id.,* Tr. 527-28).  The court noted the objection, but refused to rule on it "until the trial is over" because the juror had "said she could fairly review the evidence and follow the law and that's all we can ask." (*Id.,* Tr. 528.).  The court explained:

> The fact that it's gotten uncomfortable for her back there doesn't make her different than any other juror from time to time.  The fact that she spoke up makes her a little unusual but she can follow the law and apply the evidence to the law.  That's all we can ask.

(*Id.*).

At some point thereafter, the jury foreperson came forward with "some concerns" that she "and perhaps some of the other jurors" were having in regards to "one of the jurors who had a relative shot in the neck or some injury."  (*Id.,* Tr. 499).[10]  In a discussion held in-chambers, the foreperson stated that the juror in

---

[10]  Upon review of the record, this portion of the transcript appears to have been transcribed out of chronological sequence.  This discussion only could have occurred *after* the jury failed to reach a verdict on the first count and was instructed to continue to deliberate on the remaining counts, and *after* defense counsel formally moved for a mistrial in the first instance.

24

question had expressed that she was unable to believe any of the police officers'
testimony, because previously police had ruled her son's death from a gunshot
injury to the neck was a suicide despite the fact that her son was right-handed and
was shot in the left side of the neck. (*Id.,* Tr. 500-01).  The foreperson continued:

> Yesterday, the reason we did not reach any opinion [with respect to
> the first count] is because if anyone questioned anything that was said,
> she immediately attacked what they said and how they said it and
> reflected back on, "You don't believe me?"  Or she assumed an
> attitude, "Why are you saying that."

(*Id.,* Tr. 501-02).

The trial judge sent the foreperson back to the jury room with instructions to
continue "to make an effort to work through the counts" and reach "some type of
decision." (*Id.,* Tr. 502-03).  Immediately after the foreperson left the room,
defense counsel renewed his request for a mistrial, which was agreed to by the
prosecutor.  (*Id.,* Tr. 503).

The prosecutor stated:

> I don't want somebody back there who has made up their mind and
> not believing anything that a police officer has to say. . . .
>
> ****
>
> According to what the foreperson has just stated, she doesn't believe a
> word of what the police said, and she would never believe a word the
> police said because of this incident involving her son.  That, to me, is
> a predisposition to not give any weight at all to the police officers'
> credibility.  She's not weighing their credibility.  She's saying I don't
> believe a damn thing they say because of what happened to me.
> That's the first issue.
>
> The second issue, which is just as important, is we took a lot of time
> selecting this jury.  I went over the facts of this case.  I asked about
> gunshots.  I asked about guns.  I asked all sorts of things.  Certainly
> any normal person would raise their hand if their son had been shot in

the neck and died and said, you know, this sounds familiar.  If she said my son was shot in the neck and died, we would have explored that further.

My personal opinion is she withheld that information willingly in order to interject herself on the jury to fulfill some agenda she has.

(*Id.,* Tr. 503-05).  Defense counsel expressed as his reason for requesting a mistrial that "this has and will create so much animosity and confusion that proper deliberations won't occur."  (*Id.,* Tr. 505).

At that point, the court called the juror, the same person who previously had voiced her own concerns about continuing on the jury, into chambers for questioning.  She stated that her son-in-law, her daughter's ex-husband, recently was shot and killed in Chicago, and that it had been "ruled a suicide."  (*Id.,* Tr. 506-07).  She also stated that she mentioned this matter to the other jurors in the case-at-hand, but would not answer the court's question regarding her belief as to whether her son-in-law had committed suicide or whether "some sort of foul play" was involved; instead, she stated only that she was "here in Cincinnati" and "had to go to Chicago as a mother-in-law, because [her son-in-law] had no other relatives to take care of the business."  (*Id.,* Tr. 507).

After excusing the juror from chambers, the trial judge stated that he was going to declare a mistrial.  (*Id.,* Tr. 508).  He expressed that the prosecutor had "a right to be bitter," because "what [the juror] is doing in this case is just anti – it's anti everything the system is supposed to stand for."  (*Id.*).

The jury returned to the courtroom, where the court granted "the joint motions for mistrial in this matter."  (*Id.,* Tr. 530).  The trial judge stated on the record:

[I]t's not easy to tell you this, but at this point both sides – we've had some discussions on and off the record – both sides of this case have made a motion for mistrial.  Both sides believe they cannot receive, for similar and different reasons, . . . that they cannot receive a fair trial in this case. . . .

. . . .I apologize for any inconvenience that sitting through six days of

26

this and not being able to complete your deliberations may cause you....

But on the other hand, it is important that we get a fair trial in this case.  And for a number of different unrelated reasons, both sides believe that it's just not possible right now.

(*Id.,* Tr. 530-31).


## D.  Federal Habeas Proceeding

### 1. **Pre-Hearing Discovery**:

Before the initial Report and Recommendation was issued on March 23, 2004, petitioner's counsel filed a motion for discovery in the instant action, which was granted "to the extent petitioner s[ought] the production of allegedly exculpatory eyewitness statements made by Lolita Moore and Jimmie Martin to the Cincinnati Police Department."  (Docs. 11, 15).  On May 19, 2003, respondent filed a "Response To Court's Discovery Order," informing the Court that he was unable to obtain statements made by either Moore or Martin from the Hamilton County Prosecutor's Office or the Cincinnati Police Department.  (Doc. 17).

William Anderson averred in an attached affidavit that he had been contacted by the Ohio Attorney General's Office "concerning whether I had access to witness statements of Jimmie Martin and Lolita Moore taken at or near the time of the offense in question;" that he had "reviewed the Hamilton County Prosecutor's Office case jacket which according to office procedure had been stripped and microfilmed;" and that the "only paperwork in the case jacket was a copy of the Indictment and a copy of the Grand Jury transcript."  (*Id.,* Ex. 1). Anderson further averred that "[n]either Jimmie Martin nor Lolita Moore testified before the Grand Jury," and that to his knowledge, "there are no additional records, documents and/or witness statements in the possession of the Hamilton County Prosecutor."  (*Id.*).  Finally, Anderson stated that both Martin and Moore were subpoenaed by the State and the defense to testify at trial, but that "[n]either individual appeared pursuant to either subpoena."  (*Id.*).

James Whalen, a Captain in the Cincinnati Police Department, also

27

submitted an affidavit which was attached to respondent's response to the discovery order. Whalen averred that after he was contacted by the Ohio Attorney General's Office, he "reviewed the records kept by District One in the Cincinnati, Ohio Police Department to ascertain whether any documents from the criminal investigation . . . had been retained." (*Id.,* Ex. 2). Whalen stated that prior to 2001, the police department "had no formal procedures for the retention of records in closed cases, such as [petitioner's]." (*Id.*). Whalen further averred that the "investigating officer in the . . . criminal investigation has since retired and has moved out of state;" that "[a]ny files formerly retained by him were reviewed to ascertain if any documents from the criminal investigation . . . had been retained;" that "[t]here were no such documents retained;" and that the "Cincinnati Police Department does not have any files or documents, including eyewitness statements, pertaining to the criminal investigation." (*Id.*).

## 2. **August 29, 2006 Evidentiary Hearing**:

At the evidentiary hearing held on August 29, 2006, Patrick Galligan, a detective with the Cincinnati Police Department, was the only witness available to testify on petitioner's behalf.

Galligan testified that "within the last month," he was contacted by the Ohio Attorney General's Office to locate and turn over the police files pertaining to petitioner's criminal case. (Doc. 42, Tr. 11-12). Although Galligan had not been involved in the original police investigation, he contacted Dan Huffman, who is now retired. (*Id.,* Tr. 10-11). Huffman told Galligan that he had "turned all of his files over to a Detective Scholl, who has also since retired." (*Id.,* Tr. 11). Galligan stated that Detective Scholl had "turned his files over to me," but that he was "not able to locate the particular file" or even a "case jacket." (*Id.*).

Galligan testified that he was able to locate the "offense report" on a computer database, but was not questioned about the substance of that report other than whether he "happen[ed] to know the year of the incident" based on his "review of the offense report." (*See id.,* Tr. 12). Galligan was questioned about office policy prior to 2001pertaining to the retention of closed criminal case files. Galligan stated that it was his understanding that "there was no policy" prior to 2001. (*Id.*). Instead, "[e]ach officer made his own file and kept them for court, and it was viewed as the officer's property." (*Id.*).

28

Galligan testified that it is "the Cincinnati Police Department's policy to turn over all evidence, all that would be considered evidence, to the prosecutor's office," and that "[i]f a detective had received written statements from a witness," such statements "would have gone to the prosecutor's office." (*Id.,* Tr. 15-17).

After Galligan testified, respondent's counsel next called William Anderson to testify on respondent's behalf.

Anderson testified that he was the prosecutor who represented the State at both of petitioner's criminal trials. (*Id.,* Tr. 19). Anderson stated that after talking with the jury when petitioner's first trial ended in a mistrial, it was his "understanding [that] it was eleven to one for a conviction," and that after speaking with the jury, he decided not to make any changes to the presentation of the State's case at the second trial. (*Id.,* Tr. 20).

Anderson said that he subpoenaed Lolita Moore and Jimmie Martin on "several occasions" to testify at the trials because "they were witnesses to the crime that had occurred." (*Id.,* Tr. 20-21). He further stated that he did not have specific knowledge regarding their "anticipated testimony" other than that they were "listed as witnesses on the information . . . received from the police" and Anderson knew that "they had been present at or near the scene where the shootings occurred." (*Id.,* Tr. 21).

Anderson had no knowledge of any written statements made by either Lolita Moore or Jimmie Martin. (*Id.,* Tr. 21, 28). He said that in his 20 years as an assistant prosecuting attorney, if he "had received any written statements or anything exculpatory in nature" from the police, he would have "turn[ed] it over to defense counsel as I'm required to do by my ethical obligation." (*Id.,* Tr. 21-22). Anderson emphasized again on cross-examination that he "absolutely" had an "ethical obligation to turn over any evidence that's favorable." (*Id.,* Tr. 33). He continued: "And for someone to allege that either the police or the prosecutor's office destroyed exculpatory information in this case really kind of makes me angry." (*Id.*).

Anderson testified that he had reviewed Lolita Moore's affidavit filed "back in 1999" in support of petitioner's motion for new trial. (*Id.,* Tr. 22, 35). Because Moore indicated in the affidavit that she observed one person who was shot "when, in fact, [there were] two victims," Anderson was of the opinion that Moore "did

not see the shooting and . . . showed up some time after the shooting occurred." (*Id.,* Tr. 22-23). Anderson further stated that although he was unaware of any reason for Moore to be "biased in any way in making [her] affidavit," he did "have questions about her ability to accurately recount what happened that evening," given that it was 3:00 in the morning, in a "high drug area" where the "lighting wasn't real great." (*Id.,* Tr. 42).

Anderson indicated that because Moore did not appear to testify at either of petitioner's trials pursuant to the State's or the defense's subpoenas, he could only speculate as to whether he would have attempted to impeach her credibility. (*See id.,* Tr. 23, 25). Anderson testified that if he had attempted to impeach Moore's credibility, he "would have used the information allowable by law, which are convictions within the last ten years, if they're a felony or punishable by imprisonment of excess of a year, or if they were some type of theft-related misdemeanor." (*Id.,* Tr. 23). After reviewing a printout of Moore's criminal record, which was admitted into evidence as Exhibit B, Anderson said he would have sought to impeach Moore based on her convictions in 1996 for falsification and theft and in 1997 for forgery, as well as numerous theft convictions in the preceding ten-year period. (*See id.,* Tr. 25-26).[11]

On cross-examination, Anderson testified that it was the policy of the prosecutor's office "to reduce the file to microfilm at such time as the case is over." (*Id.,* Tr. 39). It was his understanding of office policy that the following items are microfilmed at the close of a case: the "front and back of the [case] jacket which shows all the dates and the actions that occurred on the date," the indictment, grand jury testimony, and police reports. (*Id.,* Tr. 40). Anderson stated that in this case, the "appropriate time to reduce the case to microfilm," would have been when the state supreme court denied petitioner leave to appeal from the Ohio Court of Appeals' decision on direct appeal. (*Id.*, Tr. 39).

Anderson did not find written statements from either Moore or Martin on the microfilm of petitioner's case. (*Id.,* Tr. 41). Anderson testified later:

> . . . .But I would point out that in that affidavit that Ms. Moore filed

---

[11] Anderson further averred that if he were to impeach Moore's testimony based on any testimony given by her "today," he would refer in addition to Moore's more recent criminal record indicating three convictions for falsification in 1999 and 2000.

with the court it indicates that she went down and filled out a written statement with the police. I know that came up prior to the sentencing in this case, you know. There was never any [other corroborating] evidence that any type of a written statement was made. There was no evidence that anybody was ever transported to district.

(*Id.,* Tr. 44).

Anderson explained that "[o]bviously [Moore] made an oral statement at the scene," which was turned over to defense counsel along with Moore's and Martin's contact information. (*See id.,* Tr. 45-47). However, with respect to Moore's claim that "she went down [to the police station] and filed a written statement which was turned over to me as an officer of the court and I somehow destroyed some written statement by not only Lolita Moore but [also] Jimmie Martin," Anderson stated: "My position is that those [written] statements never existed. I never saw them." (*Id.,* Tr. 46). Anderson further testified that if defense counsel could have found Lolita Moore prior to trial, they would have been able to talk with her themselves. (*Id.,* Tr. 47).

Jimmie Martin, who is currently in state custody for aggravated burglary, testified next. Martin provided the following account of the events that took place in the early morning hours of October 17, 1998:

31

Q.  Did you witness a shooting in October of 1998 on Republic Street?

A.  Yes, I saw part of it.  I didn't see the whole, complete incident.

Q.  Where were you?

A.  Coming out of a vacant building at the time.

Q.  And where was the vacant building located?

A.  On Republic, Fourteenth and Republic.

Q.  And what did you see?

A.  I just heard some gunshots and saw a car pull out.  That was all.  I didn't see who did it, nothing like that.

Q.  Do you recall what the car looked like?

A.  . . . .I can't recall.

Q.  Back in '98 would you have recalled?

A.  Probably back then I probably would, but right now I wouldn't.

Q.  Okay.  After you saw the shooting, what did you do?

A.  I talked to one individual that was laying on the ground that had got shot.

Q.  Okay.  What happened next?

A.  At that time, . . . the police finally came and I was back on my drug run.

Q.  Okay.  Did you speak with the police when they came?

32

A.  Yes, I spoke to them.

Q.  Where were you when you spoke with the police?

A.  On the corner of Fourteenth and Republic.

Q.  Okay.  Did you make a statement?

A.  Yeah.

Q.  And what did the police officer do?

A.  He say he get back in contact with me but never did.

Q.  Okay.  Did the police officer write down your statement?

A.  Yeah. . . .  I assumed he was doing it.

Q.  Did you ever write down your statement in writing?

A.  Naw, not that I can recall.

Q.  Okay.  Did you ever sign a written statement?

A.  None that I can recall.  The only statement I recall . . . signing [was] yesterday when [the attorney from the Ohio Attorney General's Office] came to see me.

Q.  Okay.  Were you ever transported to District 1?

A.  In '98?

Q.  Yeah, regarding this case?

A.  No, ma'am.

(*Id.,* Tr. 50-52).

33

Martin later testified that he could not "remember today" the number of people that he saw in the car that night. (*Id.,* Tr. 62). He also could not recall telling the police he spoke with that night that he saw three people in the car. (*Id.,* Tr. 60).

Martin testified that he gave the police his sister's address and phone number as his contact information, because he was homeless at the time. (*Id.,* Tr. 52). He also recalled that he "did sit in a police car" with an officer when he made his statement, but could not remember if anyone else was in the car with them. (*Id.,* Tr. 54). He explained: "You're talking about years ago. . . . [A]nd my mind at that time was . . . clogged up with drugs. I cannot recall too many events that went on at that time." (*Id.*). Martin, who was "into crack cocaine" back then, stated that he took drugs both before and after he witnessed the shooting. (*Id.,* Tr. 54, 57). He specifically recalled that after he gave his statement to the police officer, he "went and got me some drugs." (*Id.,* Tr. 53).

In addition, Martin remembered "some female" was in the area at the time of the shooting, but that he did not know her and would not recognize her "today." (*Id.*, 53). Martin said she was with him talking to the victim on the ground. (*Id.,* Tr. 58). Martin did not know if she had seen the shooting. (*Id.*).

### 3. <u>November 1, 2006 Evidentiary Hearing</u>:

At the final evidentiary hearing held on November 1, 2006, Lolita Moore testified for petitioner, and Steven Fromhold testified for respondent.

Lolita Moore was called to testify first. She stated on direct examination that the account set forth in her 1999 affidavit regarding the events she observed on October 17, 1998 is the same account she relayed to the police that night. (Doc. 41, Tr. 7). Moore testified that she provided a written statement to the police, which she wrote at the District 1 police station. (*Id.,* Tr. 7-8). The colloquy continued:

> Q. How, if you remember, did you get to the police station October 17th, 1998?
>
> A. They took us. They took me and the guy that was outside at the time of the shooting.

Q.  And do you remember what that guy's name was?

A.  Jimmie Cool.

Q.  And did you and Jimmie ride in the same or different police cruisers to District 1?

A.  The same.

Q.  And prior to October 17th of 1998, did you know Jimmie Cool?

A.  Yes.

Q.  And do you remember what time in the morning you arrived at District 1?

A.  Probably about 3:30, quarter to four in the morning.

Q.  And how long did you stay at District 1 that morning?

A.  About 9:30 in the morning.

Q.  And during those approximately four hours, did you verbally tell what you saw to any police officer?

A.  Yes.

Q.  And, additionally, did you write down what you saw on the 17th?

A.  Yes, yes.

Q.  To a police officer?

A.  Yes.

Q.  And the best of your recollection, did you sign your name to whatever you wrote down about what you saw?

A.  Yes, I did.

****

Q.  And if you remember, did Jimmie Cool make a statement at the police department that morning?

A.  Yes, he did.

Q.  And how do you remember that?

A.  Because we sat next to each other at the time of writing our statements.

Q.  And when you say "we" wrote our statements, does that mean that Jimmie Cool also wrote a statement –

A.  He wrote his statement, and I wrote my statement.

Q.  If you recall, did he sign his name to the statement that he wrote?

A.  Yes, he did.

Q.  And when you were done writing your statement, what if anything did you do with the written statement at the police department?

A.  I gave it to them.

Q.  And if you recall, did Jimmie Cool do the same thing?

A.  Yes, ma'am.

Q. And how did you leave the police station that morning?

A.  They took me back to my house and they took him back to his house, the police.

(*Id.,* Tr. 8-10).

Moore provided the following account based on her memory of the events that occurred on October 17, 1998.  She was "walking around the block" from Fourteenth and Race "[u]p to Republic" after walking a girlfriend home who lived near Fifteenth and Vine.  (*Id.,* Tr. 15).  When Moore first saw the vehicle in question, "it was parked" with people standing outside of it.  (*Id.,* Tr. 14).  According to Moore, the following events ensued:

> . . . .Whatever they were talking about or communicating about, they jumped in the car and drove off real fast. . . .  As they turned the corner, I heard the gun – I seen guns – I heard gunshots, and I seen the guy fall.  That was the one person out there: that vehicle, those three guys, and the victim that got shot.  (*Id.*).

Moore later stated on cross-examination that she saw the car before she "walked around the block" and that when she "came back, it was squealing off as I was coming around the corner."  (*Id.,* Tr. 16).  She said she saw the license plate number of the car and called 911.  (*Id.*).  She further confirmed that other than Jimmie Cool, "nobody else was out there except the three people, [herself], and the [one] victim that got shot."  (*Id.,* Tr. 17).

Moore testified that she did not know petitioner personally, but had "met his son and his wife before she passed."  (*Id.,* Tr. 10).  Moore said she did not meet petitioner's wife until 2003 or 2004.  (*Id.,* Tr. 11).

Cincinnati police officer Steven Fromhold was the last witness to testify at the evidentiary hearing.  He pointed out that there were two victims who were shot on October 17, 1998.  (*Id.,* Tr. 22).  He also affirmed that he spoke with witnesses at the scene.  (*Id.,* Tr. 23).

Consistent with his testimony at both of petitioner's trials, Fromhold testified that he obtained statements from both Lolita Moore and a male witness who was tending to the more critically wounded victim on the ground; that the male witness provided the license plate number of the shooter's vehicle, which "he kept reciting ... over and over," and described the car as a "beige Honda or Nissan;" that the information obtained from the male witness was radioed out; that Moore's statement was obtained later, which was not broadcast because it was received "in the latter parts of the preliminary investigation" after the "active vehicle pursuit" had begun; and that the two witnesses' statements were

37

documented by Fromhold and placed in an "addendum to [his] report." (*Id.,* Tr. 23-24). Fromhold also consistently recalled that in her statement, Moore placed herself 150 feet away from the scene of the shooting. (*Id.,* Tr. 24).

On direct examination, Fromhold was questioned more extensively as follows as to when he came in contact with Moore at the scene:

Q. . . . .When you first arrived at the scene, did you see Lolita Moore immediately?

A. I did not.

Q. When did you see Lolita Moore?

A. Actually, my recollection was we had had . . . Mr. Hart transported, and I was conversing with the gentleman that was tending to him. I can't recall his name. We'd already roped off the scene, marked some evidence to be collected. It was just prior to my departure and the investigator's arrival that she approached, and it was after the incident in District 2 with the pursuit of the vehicle.

Q. Was she standing over the victim as well?

A. No.

Q. And how long after the shooting did you arrive?

A. Less than a minute.

(*Id.,* Tr. 25-26).

Fromhold further testified that he did not transport any witnesses to District 1 for questioning given that he was on a bicycle at the time, and that he was not aware of any witnesses being transported to District 1 that night. (*Id.,* Tr. 24-25).

On cross-examination, Fromhold testified that he had a copy of the police report containing the eyewitnesses' documented statements and their contact information with him at petitioner's trial. (*Id.,* Tr. 28-29). Fromhold said: "What

she [Moore] provided me with that night was on the addendum to the report."
(*Id.*).  He emphasized that in the addendum, he not only documented Moore's
name and address, but also "what she said."  (*Id., Tr.* 29).

When asked whether he had "that report with you today," Fromhold
responded:  "It was destroyed, just routine records were destroyed after five years,
police division."  (*Id.*).  Fromhold stated that he was unaware as to whether the
police report he wrote "with Miss Moore's statement was ever turned over to
defense counsel."  (*Id., Tr.* 31).  Nor was Fromhold aware whether Moore made
any statements later to a follow-up investigator.  (*Id., Tr.* 30).  Fromhold said:  "If
she talked later to an investigator, I'm not aware of anything else she told them."
(*Id.*).

## CONCLUSIONS OF LAW

"Under the Due Process Clause of the Fourteenth Amendment, criminal
prosecutions must comport with prevailing notions of fundamental fairness,"
which includes the defendant's right to a "meaningful opportunity to present a
complete defense."  *California v. Trombetta,* 467 U.S. 479, 485 (1984).  To
safeguard that right, the Supreme Court has developed "what might loosely be
called the area of constitutionally guaranteed access to evidence."  *Id.* (quoting
*United States v. Valenzuela-Bernal,* 458 U.S. 858, 867 (1982)).  "Taken together,
this group of constitutional privileges delivers exculpatory evidence into the hands
of the accused, thereby protecting the innocent from erroneous conviction and
ensuring the integrity of our criminal justice system."  *Id.*

Within this context, the Supreme Court held in *Brady v. Maryland,* 373 U.S.
83 (1963), that "the suppression by the prosecution of evidence favorable to an
accused upon request violates due process where the evidence is material either to
guilt or to punishment, irrespective of the good faith or bad faith of the
prosecution."  *Strickler v. Greene,* 527 U.S. 263, 280 (1999) (quoting *Brady,* 373
U.S. at 87); *see also Trombetta,* 467 U.S. at 485.  The Court has "since held that
the duty to disclose such evidence is applicable even though there has been no
request by the accused, *United States v. Agurs,* 427 U.S. 97, 107 . . . (1976), and
that the duty encompasses impeachment evidence as well as exculpatory evidence,
*United States v. Bagley,* 473 U.S. 667, 676 . . . (1985)."  *Strickler,* 527 U.S. at 280.

The Supreme Court has further held that the duty to disclose "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Id.* at 280-81 (quoting *Kyles v. Whitley,* 514 U.S. 419, 438 (1995)). Therefore, in order to comply with *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . ., including the police." *Id.* at 281 (quoting *Kyles,* 514 U.S. at 437).

To establish a *Brady* violation, the petitioner has the burden of demonstrating that (1) the prosecution suppressed evidence, either willfully or inadvertently; (2) the evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) the suppressed evidence is material to guilt or punishment. *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); *see also Strickler,* 527 U.S. at 281-82; *Brady,* 373 U.S. at 87; *Carter v. Bell,* 218 F.3d 581, 601 (6th Cir. 2000); *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6th Cir. 2003), *cert. denied,* 543 U.S. 842 (2004).

Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682; *see also Strickler,* 527 U.S. at 280 (citing *Kyles,* 514 U.S. at 419). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Bagley,* 473 U.S. at 682. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs,* 427 U.S. at 109-10. This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20), *cert. denied,* 504 U.S. 930 (1992).

The Sixth Circuit has recognized that "*Brady* is concerned only with cases in which the government possesses information which the defendant does not." *Carter,* 218 F.3d at 601 (quoting *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir. 1994)). There is no *Brady* violation if at the time of trial, the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source. *See, e.g., Coe v. Bell,* 161 F.3d 320, 344 (6th Cir. 1998); *United States v. Clark,* 928 F.2d 733, 738 (6th Cir.) (and cases cited therein), *cert. denied,* 502 U.S.

40

846, 885 (1991). Therefore, the *Brady* rule applies only to evidence discovered *after* trial that was unknown to the defense. *United States v. Panzero,* 225 F.3d 660 (table), No. 99-3528, 2000 WL 977357, at **3 (6th Cir. July 7, 2000) (per curiam) (unpublished), *cert. denied,* 531 U.S. 973 (2000); *see also United States v. Corrado,* 227 F.3d 528, 538 (6th Cir. 2000); *Harbison v. Bell,* 408 F.3d 823, 840 (6th Cir. 2005) (Clay, J., dissenting), *cert. denied,* 547 U.S. 1101 (2006).

In this case, petitioner claims that the State not only withheld favorable evidence, but also destroyed it. In *Trombetta,* the Supreme Court held that in order to ensure that the disclosure requirements established in *Brady* are not deliberately circumvented, the government has the duty to preserve known material evidence "that might be expected to play a significant role in the suspect's defense." *See Trombetta,* 467 U.S. at 488-89; *see also Monzo v. Edwards,* 281 F.3d 568, 580 (6th Cir. 2002); *United States v. Wright,* 260 F.3d 568, 570-71 (6th Cir. 2001). The destruction of such evidence constitutes a due process violation "regardless of whether the government acted in bad faith." *Wright,* 260 F.3d at 571.

On the other hand, where the State "fails to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to the defendant," a different test is applied. *United States v. Jobson,* 102 F.3d 214, 218 (6th Cir. 1996). In such a case, as set forth in *Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1988), the defendant mush show that: (1) the prosecution acted in bad faith in failing to preserve the evidence; (2) the "exculpatory value of the evidence was apparent before its destruction;" and (3) "the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Jobson,* 102 F.3d at 218; *see also Trombetta,* 467 U.S. at 488-889.

Here, it is conceded that the allegedly suppressed evidence was favorable to the accused. As the magistrate judge found in the March 23, 2004 Report and Recommendation issued in this case, Lolita Moore's affidavit, which was attached to petitioner's motion for new trial, indicates she made a statement to the police that was favorable to the defense in that it served to impeach the testimony of the victims that there was only one person in the car.[12] (*See* Doc. 19, p. 10).

_____

[12] Moore also testified at the evidentiary hearing held on November 1, 2006 that she saw three people in the car, a fact that she relayed to the police on the night in question. (Doc. 41, Tr. 7, 14-17).

Moreover, according to Moore, the three suspects she observed were clean-shaven "young" men in their early twenties; in contrast, it appears from the record that at the time of the incident, petitioner was in his forties and was not clean-shaven. (*See id.*; *see also* Doc. 11, p. 3, n.1; Doc. 8, Tr. 333, 484).[13]

Nevertheless, upon review of the entire record, which includes the transcript of petitioner's first trial and the testimony presented at the evidentiary hearings, the undersigned concludes that petitioner has not met his burden of demonstrating (1) that the State suppressed or otherwise failed to preserve any of the exculpatory eyewitness statements for use at petitioner's trials; or (2) that the allegedly suppressed and/or destroyed evidence is "material" within the meaning of *Brady/Trombetta*.

## 1. **Petitioner Has Not Shown That Any Written Statements Were Suppressed.**

First, the undersigned gives no credence to petitioner's claim that Lolita Moore and Jimmie Martin provided the police with written statements.

Lolita Moore, the only witness to present evidence supporting this contention, stated in her 1999 affidavit and testified at the November 1, 2006 hearing that on the night in question, she and Jimmie Martin were taken to the District 1 police station, where they wrote and signed statements that were handed to the police. (Doc. 11, "Motion For New Trial," Ex. A; Doc. 41, Tr. 7-10).

However, Jimmie Martin presented contradictory testimony. Specifically, he stated at the August 29, 2006 hearing that he gave an oral statement to the police while sitting in a police vehicle at the scene, which a police officer wrote

---

[13] Jimmie Martin did not submit any affidavits or testify in the state court proceedings. At the evidentiary hearing held on August 29, 2006, Martin testified that although he made a statement to the police on the night of the shooting, he could not remember the substance of that statement or the number of people that he observed in the shooter's car that night. (Doc. 42, Tr. 51, 60, 62). However, Steven Fromhold testified at petitioner's first trial that an eyewitness, later identified as Martin, had stated to him at the scene that there were three people in the car and that "one jumped out of the car;" in addition, Fromhold indicated Martin had described the shooter as a "male black in his twenties, baseball cap." (Doc. 46, Tr. 228-31).

down.  (Doc. 42, Tr. 51-52, 54).  Martin further testified that he was not taken to the police station "regarding this case" in 1998, and in fact indicated that he returned to his "drug run" when the police left the scene; Martin also could not recall ever signing a written statement until August 28, 2006 in preparation for the evidentiary hearing in the instant matter.  (*Id.*, Tr. 52).

Steven Fromhold's testimony corroborates Martin's version of events.  The undersigned finds Fromhold to be an extremely credible witness, who has consistently testified from petitioner's first trial to the present date that he obtained oral statements from Martin and Moore at the scene, which he recorded in an addendum attached to his police report.  Fromhold, who secured the scene immediately after the shooting and remained there until around 4:00 a.m. (*see* Doc. 46, Tr. 221-22), further averred at the November 1, 2006 evidentiary hearing that he did not transport any witnesses to the District 1 police station, and was unaware of any witnesses being transported to District 1 by other officers, that night.  (Doc. 41, Tr. 24-25).

Moore's credibility is further undermined by Fromhold to the extent Fromhold has consistently testified that Moore did not speak with the police at the scene until "very late in the preliminary investigation" after reports had come in of "something going on in another district with a vehicle already."  (Doc. 7, Tr. 211-12; *see also* Doc. 41, Tr. 24-26; Doc. 46, Tr. 239).  According to Fromhold, at that juncture, the information provided by Moore would not have "assisted anymore" in locating the shooter; Fromhold, therefore, did not broadcast the information and, instead, "just documented what she told me."  (Doc. 7, Tr. 211-12; Doc. 41,

Tr. 24).[14]

Given that petitioner either already was in police custody, or would have been apprehended within a short time after Moore came forward to assist the police, it is highly unlikely that the police would have thought it necessary to transport her and Martin to the District 1 police station to obtain their written statements. If anything, the witnesses would have been taken to the station for the purpose of identifying petitioner, who was transported there for questioning immediately after his arrest. However, despite Moore's testimony that she and Martin were at the station until 8:00 or 9:30 a.m.,[15] there is no evidence in the record even remotely suggesting that Moore or Martin were ever called upon to identify petitioner in a police line-up or photo array.

Lolita Moore's testimony in her 1999 affidavit and at the November 1, 2006 evidentiary hearing is additionally suspect for other reasons. For example, in contrast to Fromhold's consistent testimony since the time of petitioner's first trial, Moore's version of events has changed dramatically over the course of the ensuing years.

Specifically, Fromhold testified at petitioner's first trial that, as set forth in the addendum to his police report, Moore had told him at the scene that she was on Thirteenth Street, approximately 150 feet away from the shooting, and that after the shooting, she saw "somebody exit[] the vehicle," run over to and go through the pockets of the fallen victim, re-enter the car, and "take off;" although like Martin, Moore said she saw three people in the car, she was unable to provide Fromhold with a "very good description" of the suspects. (Doc. 46, Tr. 232-35, 240).

In her 1999 affidavit and at the November 1, 2006 evidentiary hearing,

---

[14] Fromhold testified at the evidentiary hearing that Lolita Moore approached him "just prior to my departure and the [follow-up] investigator's arrival" on the scene. (Doc. 41, Tr. 26). No evidence was presented regarding what may have transpired between Moore and any of the follow-up investigators after Fromhold left the scene. It is noted, however, that a broadcast, with a description of young suspects similar to that provided by Moore in her later affidavit, went out at 3:53 a.m. from a police vehicle with a different car number than those used by Officers Fromhold or Eatrides.

[15] *See* Doc. 11, "Motion For New Trial," Ex. A; Doc. 41, Tr. 8.

however, Moore gave a different account.  In her affidavit, Moore provided a detailed description of the beige four-door Honda, which she said she observed parked on Fourteenth Street prior to the shooting, as well as of the three young men whom she first saw standing outside the car before they entered it and "squealed" off around the corner onto Republic Street.  In contrast to her earlier statement to Fromhold, Moore did not mention that anyone exited the car and went through the pockets of the fallen victim before driving off after the shooting.  However, she said that she saw the license plate number of the car, which she provided to the police when they arrived, and that she immediately went over to assist the victim lying on the street.  This latter testimony is directly contradicted by Fromhold, who has consistently testified since petitioner's first trial that Martin was the only person attending to the downed victim when he arrived at the scene and was the sole witness who provided the license plate number of the car for broadcast over the police radio.

At the evidentiary hearing, Moore provided further changing testimony, stating that she was walking around the block of Fourteenth and Race Streets, as opposed to standing at Thirteenth Street, when she witnessed the shooting.  In both her affidavit and at the evidentiary hearing, Moore mentioned that there was only one victim.  However, it is clear from the evidence presented during the state criminal trial proceedings, that in fact there were two victims, another factor that weighs heavily against assigning any credibility to Moore's 1999 affidavit and evidentiary hearing testimony.

Finally, Moore has a criminal record revealing convictions within the past ten years for falsification, forgery and theft.  This record, which was admitted into evidence at the evidentiary hearing held in this case, serves to further impeach her credibility.

Accordingly, for the foregoing reasons, the undersigned concludes that petitioner's only witness in support of his claim that Lolita Moore and Jimmie Martin provided written statements to the police lacks credibility.  Based on the testimony of Jimmie Martin and Officer Fromhold, as well as the testimony of other witnesses called to testify on respondent's behalf, the undersigned finds that neither Martin nor Moore provided written statements to the police on October 17, 1998, which could have been destroyed by the police or the prosecutor prior to petitioner's state criminal trials.

## 2. **Martin's and Moore's Documented Oral Statements Were Not Suppressed.**

It is clear from the record, and in fact is undisputed, that both Jimmie Martin and Lolita Moore made oral statements at the scene that were documented by Officer Fromhold and placed in an addendum attached to his police report, which also included the witnesses' contact information.

Officer Fromhold testified at the November 1, 2006 evidentiary hearing that he had a copy of the police report containing the witnesses' statements and their contact information with him at petitioner's trial. (Doc. 41, Tr. 28-29). It also appears from the transcript of petitioner's first trial that the information contained in the report was accessible to defense counsel, who demonstrated a knowledge of the report's contents during the extensive cross-examination of Officer Fromhold at the first trial. (*See* Doc. 46, Tr. 226-35). Moreover, it appears that the defense had access to the witnesses' contact information and, like the prosecutor, used that information to issue subpoenas for their appearance at trial.

The fact that the two witnesses, whose identities were known to the defense, failed to appear at petitioner's two trials cannot be attributed to the State, which also unsuccessfully sought to procure Jimmie Martin's and Lolita Moore's presence at the trials. Indeed, as the prosecutor emphasized in closing argument, although Moore and Martin failed to answer to the subpoenas issued by both the State and defense, he did not "think that it was fair in this case" to prevent defense counsel "from getting into the descriptions they gave, the number of occupants of the vehicle and everything else they said" to Fromhold "based on hearsay." (*Id.,* May 4, 1999 Jury Trial Tr. 76-77).

Accordingly, upon review of the transcripts of petitioner's state criminal trials and of the evidence admitted at the evidentiary hearing held in this case, the undersigned finds that no *Brady* violation occurred because at the time of petitioner's first trial, the defendant possessed the same information provided to the State pertaining to eyewitnesses Jimmie Martin and Lolita Moore, which was set forth in Officer Fromhold's addendum to his police report. *See, e.g., Coe,* 161 F.3d at 344; *Mullens,* 22 F.3d at 1371-72; *Clark,* 928 F.2d at 738. *Cf. Corrado,* 227 F.3d at 538-39; *United States v. Jefferson*, 134 Fed.Appx. 52, 55-56 (6th Cir.

June 3, 2005) (not published in Federal Reporter).[16]

### 3. **The Allegedly Suppressed Evidence Is Not "Material" Under** *Brady.*

Even assuming, *arguendo,* that petitioner were able to prove that the State withheld and/or destroyed evidence favorable to the defense, petitioner has not met his burden of demonstrating that the suppressed evidence is "material" within the meaning of *Brady* and *Trombetta*.

As the magistrate judge concluded in the Report and Recommendation issued March 23, 2004, "in light of the substantial evidence of petitioner's guilt," it is not reasonably probable, and indeed highly unlikely, that the result of petitioner's trial would have been different had allegedly withheld eyewitness statements of Lolita Moore and Jimmie Martin been disclosed to the defense. (*See* Doc. 19, pp. 10). As the magistrate judge reasoned:

> The victims independently identified petitioner in a photo array which was provided to them almost immediately after the shooting and which was not challenged by the defense as suggestive. (Doc. 7, Tr. 149, 170, 185). There was no testimony at trial suggesting that the victims had any motive to frame petitioner for this crime. Both petitioner and the victims testified that they did not know each other. (Doc. 6, Tr. 132; Doc. 7, Tr. 164; Doc. 8, Tr. 349).

> Police Officer Bailey who pursued petitioner in a high speed chase after the shooting based on a report of the license plate, testified that he saw petitioner driving the car. (Doc. 8, Tr. 309). When the car was finally located during the early morning hours petitioner was found standing behind a tree near it. (Doc. 8, Tr. 361-362).

> Petitioner's statements to police upon his arrest were also incriminating, because they placed him at the scene. Officer H[u]ffman testified that petitioner had stated to him that he picked up

---

[16] Although Fromhold testified at the evidentiary hearing that the police report was destroyed after five years as a "routine record[]" pursuant to police department policy, neither *Trombetta* nor *Youngblood* apply because both those cases involved *pre-trial* destruction of evidence. *See Cress v. Palmer,* 484 F.3d 844, 853 (2007).

Dave and while riding around they spotted two individuals who had robbed them. (Doc. 7, 265). Dave indicated that he would take care of them and then shot them. (*Id.*) On the stand, petitioner conceded that he told police that he picked up Dave (Doc. 8, Tr. 365), but explained that he was lying at the time (*Id.*, Tr. 369). He denied making the other statements. (*Id.*, Tr. 369-370).

Petitioner's attempt to bribe [one of the victims, Kevin Davis,] not to testify (Doc. 7, Tr. 175) was further evidence of guilt.

(Doc. 19, pp. 10-11).

Nevertheless, in ordering that the claim be remanded for evidentiary hearing, the district judge concluded that the "potentially exculpatory evidence might [be found to] undermine confidence in the final verdict," given that the "first jury could not even arrive at a verdict." (Doc. 22, p. 7). However, at that point in the proceedings, the transcript of petitioner's first trial was not part of the record.

The fact that the jury was unable to reach a verdict in the first trial is a factor to consider in assessing the "weakness" of the prosecution case, but it is not dispositive. *See, e.g., United States v. Newton,* 369 F.3d 659, 680 (2nd Cir.), *cert. denied,* 543 U.S. 947 (2004); *see also United States v. McLendon,* 378 F.3d 1109, 1115 (D.C. Cir. 2004) (citing *United States v. Williams,* 212 F.3d 1305, 1311 n.10 (D.C. Cir.) (in finding that the "most significant factor" negating the impact of erroneously admitted testimony was "the weight and nature of the evidence" against the defendant, the court rejected the dissent's conclusion that the defendant's second trial "necessarily presented a close case" because the first trial resulted in a hung jury and "advise[d] caution in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement"), *cert. denied,* 531 U.S. 1056 (2000)).[17] As the Second Circuit pointed out in *Newton,* 369 F.3d at 680: "A jury may hang for any number of reasons, including the idiosyncratic views of a single juror."

---

[17]*But cf. United States v. Stevens,* 935 F.2d 1380, 1406-07 (3rd Cir. 1991) (the error was not harmless "[g]iven the apparent closeness of the evidence" presented in both the second and first trial in which the jury was unable to reach a verdict); *United States v. Thornton*, No. CRIM. 99-600, Civ. 04-28, 2005 WL 1993843, at *4 (E.D. Pa. Aug. 17, 2005) (unpublished) (and cases cited therein).

In this case, that is exactly what happened.  As discussed above, petitioner's first trial ended in a mistrial upon the joint motion of defense counsel and the prosecutor, because it became clear early in the jury's deliberations that a single juror, who was biased against police officers, was not going to properly engage in the exchange of ideas or deliberations process with the other jurors.  Therefore, the undersigned gives no weight to the fact that petitioner's first trial ended in a mistrial in assessing the strength of the evidence against petitioner.

Finally, as discussed above, Lolita Moore's statements are suspect, and Jimmie Martin is unable to recall the substance of any of the statements that he made to the police.  To the extent that any non-disclosed statements by Martin are "potentially exculpatory" within the meaning of *Youngblood,* petitioner has not demonstrated that the police acted in "bad faith" in failing to preserve the statements after five years.

As the Ohio Court of Appeals apparently recognized on direct appeal in determining that the suppressed evidence was merely "cumulative" (*see* Doc. 10, Ex. 3, pp. 5-6), evidence was presented at petitioner's trial that there were eyewitness reports of three suspects in the car, who were described in a radio transmission as being in their twenties and clean-shaven.  Therefore, the favorable information claimed to have been suppressed was in fact disclosed to the jury, which nevertheless still found petitioner guilty on six of the seven charges.

Accordingly, in sum, upon review of the entire record, including the evidence presented at the evidentiary hearings held on August 29, 2006 and November 1, 2006, the undersigned concludes that petitioner has not demonstrated that he is entitled to habeas corpus relief with respect to his claim alleged in Ground One that material exculpatory evidence was withheld or destroyed by the Cincinnati police or the Hamilton County prosecutor in violation of *Brady/Trombetta* or *Youngblood.*

49

## IT IS THEREFORE RECOMMENDED THAT:

1.   The claim alleged in Ground One of petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2.   A certificate of appealability should not issue with respect to the claim alleged in Ground One of the petition because, for the foregoing reasons, petitioner has failed to make a substantial showing of the denial of a constitutional right that is remediable in this proceeding.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Petitioner has not shown that reasonable jurists could debate whether the claim should have been resolved in a different manner or that the issues presented are "adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell,* 537 U.S. 322, 323-324 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000)) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)).

3.   With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a) that an appeal of any Order adopting this Supplemental Report and Recommendation would not be taken in "good faith," and, therefore, DENY petitioner leave to proceed on appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 10/10/07                         s/ Timothy S. Black

       cbc                           Timothy S. Black
                                      United States Magistrate Judge

J:\BRYANCC\2007 habeas orders\02-34SuppRR-evidhring-denypet.brady-destroyevid.wpd

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

Frederick Hall,
      Petitioner


     vs                           Case No. 1:02cv34
                                     (Spiegel, S.J.; Black, M.J.)

Ernie Moore,
      Respondent

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled action. Pursuant to Fed. R. Civ. P. 72(b), any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).