UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| FREDERICK HALL, | : | |
| Petitioner, | : | Case No. 1:02cv034 |
| vs. | : | JUDGE SPIEGEL |
| ERNIE MOORE, Warden, | : | MAGISTRATE JUDGE BLACK |
| Respondent. | : | |

_____

**PETITIONER FREDERICK HALL'S OBJECTIONS TO THE
THE MAGISTRATE JUDGE'S SUPPLEMENTAL REPORT AND
RECOMMENDATION**
_____

Petitioner Frederick Hall objects to the Magistrate's Supplemental Report and Recommendation filed on October 10, 2007. 28 U.S.C. 636(B)(1); Fed.R.Civ. P. 72(b). The attached memorandum explains Mr. Hall's objections.

                                                    Respectfully submitted,

                                                    DAVID H. BODIKER  0016590
                                                    Ohio Public Defender

                                                    s/Craig M. Jaquith
                                                    CRAIG M. JAQUITH  0052997
                                                    Assistant State Public Defender
                                                    (COUNSEL OF RECORD)

                                                    OFFICE OF THE OHIO PUBLIC DEFENDER
                                                    8 East Long Street - 11th floor
                                                    Columbus, Ohio 43215
                                                    (614) 466-5394
                                                    (614) 752-5167 (fax)
                                                    e-mail: jaquithc@opd.state.oh.us

                                                    COUNSEL FOR PETITIONER

**OBJECTIONS AND ARGUMENT**

I.  Introduction

The October 1, 2007, Supplemental Report and Recommendation (Doc. 47)(hereinafter "SR&R") rejects Petitioner Hall's assertion that a *Brady* violation occurred during his state-court proceedings. But despite the SR&R's seeming comprehensiveness, it leaves open more questions than it resolves. And the questions that are ostensibly answered by the SR&R, upon closer examination, require quite different answers. Among the more pertinent questions remaining are the following: Why would eyewitness Lolita Moore lie, in 1999 and in 2006, about having made a written statement at District 1 headquarters? Is it not improbable that two eyewitnesses to a possible homicide would **not** be transported to the police station to give formal statements? Why is there no mention made in the SR&R of the fact that Detective Huffman testified that uniformed officers were interviewing two witnesses in connection with this case at District 1 headquarters when he arrived there? Why is there no mention in the SR&R that the jury in the first trial, when a poll was conducted at the beginning of deliberations, split three ways (guilty, not guilty, undecided) about whether Mr. Hall had been proven guilty?

Addressing every inconsistency in the State's case against Mr. Hall would be impracticable, but these objections will attempt to present several of the most salient inconsistencies within and between the two victims' testimony. As will be demonstrated below, in light of the victims' incredible testimony—and ample incentive to agree with the Cincinnati Police Department's version of the events of October 17, 1998—any withholding of concrete, exculpatory evidence must be deemed to be a violation of Mr. Hall's due process rights. Also demonstrated below, the SR&R's conclusions are deeply flawed, as they are built on faulty premises. This Court should reject the SR&R, and grant the habeas relief sought by Mr. Hall.

**II.    Mr. Hall objects to the Magistrate's conclusion that there never existed two written, exculpatory eyewitness statements.  Supplemental Report and Recommendation, p. 45.**

The Supplemental Report and Recommendation finds that "neither [Jimmie] Martin nor [Lolita] Moore provided written statements to the police on October 17, 1998, which could have been destroyed by the police or prosecutor prior to petitioner's state criminal trials."  In arriving at this conclusion, the SR&R cites numerous factors.  One of these is that Mr. Martin testified before this Court, in 2006, that he was not transported to District 1 after the shooting to make a written statement.  SR&R, pp. 42-43, 45.  But Martin's testimony regarding any routine event that occurred in 1998 must not be accorded any weight, in light of Martin's own testimony about his ability to recollect events of that period in his life.  Martin testified that "at that time my mind was clogged up with drugs.  I cannot recall too many events that went on at that time."  Doc. 42, Tr. 54.  In light of this explicit acknowledgement of the unreliability of his memory, the attachment of any credibility whatsoever to Martin's recollection of routine events of 1998 would itself border on the incredible.  To use his self-professedly invalid 2006 recollections to rebut the 1999 and 2006 averments of another, disinterested eyewitness is inexplicable.

And the fact that being transported to District 1 for questioning would have been a routine event for Martin is uncontroverted.  He testified that he had been questioned by police "a thousand times."  Doc. 42, Tr. 63.  Further, he testified that he had been transported to District 1 headquarters as many as ten times.  Doc. 42, Tr. 57.  Finally, he testified that he had used drugs approximately one hour before the shooting , and he did recall being placed in a police cruiser. Doc. 42, Tr. 54.  In light of these factors, and his statement regarding the unreliability of his memory, Martin's recall of whether or not he made a written statement at District 1 is entitled to literally no weight.

3

The SR&R also relies on the hearing and trial testimony of Officer Steven Fromhold to conclude that no written statements were issued. Specifically, it is noted that Officer Fromhold testified that "he did not transport any witnesses to the District 1 police station." SR&R, p. 43. It must be noted that Officer Fromhold was on bicycle patrol that night. Doc. 41, Tr. 24. Also, the SR&R notes that Officer Fromhold testified that he "was unaware of any witnesses being transported to District 1 by other officers, that night." SR&R, p. 43. But Officer Fromhold also testified that "he wouldn't have been privy to" the issuance of written witness statements because that "would have been [handled by] the follow-up investigators." Doc. 41, Tr. 25. And "[w]hat [Lolita Moore] told me, I documented. If she talked later to an investigator, I'm not aware of anything else she told them." Doc. 41, Tr. 30. Thus, Officer Fromhold's testimony does not remotely establish that Mr. Martin and Ms. Moore did not make statements at District 1 after he interviewed them at the scene.

The SR&R also attacks Lolita Moore's credibility, citing variances in her recall of the details of the night of the incident, and citing her criminal record. As will be demonstrated below, any inconsistencies in Moore's recall of events over an eight-year period absolutely pale in comparison to the inconsistencies within and between the testimony of the State's two principal witnesses. To single out Moore's recall for its flaws is to ignore the rest of the record in this case, and entirely discounts the indisputable fact that memories inevitably change, to a greater or lesser degree according to the individual, over time. And Moore's criminal past is of little consequence for two reasons. First, the prosecutor in this case, William Anderson, testified that he routinely relies on the testimony of convicted felons to obtain convictions. Indeed, the State offered convicted felon Jimmie Martin to attempt to rebut Moore's testimony, and the SR&R found his testimony credible, despite his admitted inability to remember events and his

4

lengthy criminal record. To hold Petitioner to a different standard is, for lack of a better word, unfair. Second, Moore's convictions related to incidents involving dishonesty or falsification designed to further her own interests. Moore had and has no interest at all in the outcome of this case, and the SR&R identifies no basis for attributing any bias to her. Her criminal past is irrelevant to whether she issued a truthful affidavit in 1999, and testified truthfully in 2006.

But all of the foregoing analysis is made almost inconsequential by the trial testimony of Detective Dan Huffman. It was Detective Huffman who was called at his home at approximately 5:00 a.m. to investigate the incident giving rise to this case. Doc. 7, Tr. 259. He testified that he arrived at District 1 at approximately 5:30 a.m.. *Id*. Upon his arrival, he "was briefed by the police lieutenant what had occurred and what they had. **It was an ongoing investigation**." Doc. 7, Tr. 260. As a result of that briefing, he learned that there were "**two witnesses that was being interviewed by uniformed police officers at the time**." Doc. 7, Tr. 260-61. Because there were no other witnesses to the shootings, and because there is nothing in the record about any other individual—other than Hall—making a statement at District 1 that morning, the witnesses who were being interviewed at District 1 at 5:30 a.m. on October 17, 1998, were Lolita Moore and Jimmie Martin. Because Detective Huffman's testimony firmly corroborates Moore's affidavit and courtroom testimony regarding being transported to District 1, and establishes that she has consistently been truthful with respect to that fact, there is no reason to doubt that the rest of her testimony was truthful. And because Moore's testimony was that she and Martin both made written statements that morning, it must be concluded that those statements existed and those statements were in the possession of the Cincinnati Police Department on October 17, 1998.

Because the SR&R concluded that there were no written statements, and because it appeared from the first-trial transcript that defense counsel had access to Officer Fromhold's summaries of Moore's and Martin's oral statements at the scene, the SR&R erroneously concludes that "the defendant possessed the same information provided to the State pertaining to eyewitnesses Jimmie Martin and Lolita Moore, which was set forth in Officer Fromhold's addendum to his police report." SR&R, p. 46. But that addendum did not contain the handwritten, signed statements of Martin and Moore made at District 1. Thus, the defense did not "possess the same information" as the State.

**II.     Mr. Hall objects to the SR&R's conclusion that the suppressed evidence is not material under *Brady v. Maryland*. Supplemental Report and Recommendation, pp. 47-49.**

The SR&R's analysis does not end at a finding that there were no written statements that could have been suppressed. Also addressed, *arguendo*, is whether any statements of the sort that Mr. Hall asserts were created at District 1, and then improperly withheld, would have been of such a character as to undermine confidence in the jury verdict. The SR&R concludes that such statements would not have been material to Mr. Hall's defense.

Before arriving at this conclusion, the SR&R first undertakes to analyze what transpired at the close of Mr. Hall's first trial, which resulted in a mistrial. The purpose of this analysis, of course, was to attempt assess the strength of the State's case against Mr. Hall, which could be reflected in the way in which the jury split in the first trial. The conclusion reached in the SR&R is that there was a lone juror who stated that she could not deliberate in an unbiased manner, due to her past experiences with false police testimony in another jurisdiction. SR&R, p. 49. That indeed was the reason for the mistrial. But the critical fact from the first-trial transcript, entirely ignored by the SR&R, was that the jury had taken a poll early in the deliberation process, and it

was reported by the foreperson to the trial court that "[s]ome said guilty, not guilty, some said no opinion yet."[1] Doc. 46, Tr. 500. Thus, there was not solely a holdout situation in the first trial, contrary to the SR&R's finding to the contrary. The 11 remaining jurors were split as to how they viewed the evidence.

The reasons for this split can be traced directly to the wildly inconsistent testimony offered by the two victims at both trials. As noted *supra*, a complete analysis of the inconsistencies and backtracking in their testimony would be impracticable. But the following is a discussion of the most significant defects in the States' witnesses' testimony.

The largest single discrepancy between the testimony of Messrs. Hart and Davis was the amount of time that the vehicle from which the shots came was stopped in front of Hart. Hart at one point testified that the vehicle stopped in front of him only long enough for him to purportedly talk to Mr. Hall for "four or five seconds." Doc. 46, Tr. 112. Davis, on the other hand, originally opined that the very same vehicle was stopped for "30 minutes." Doc. 46, Tr. 151-52. These times were both offered at the first trial. At both trials, they each also gave any number of time estimates between those two extremes (e.g., in the second trial, Hart put the exchange at 10 seconds, instead of four or five (Doc. 7, Tr. 138.), and Davis put it at 20 minutes (Doc. 7, Tr. 178.).

The other vast discrepancy was that Hart testified that a "crackhead" that he knew only as "John" was in the passenger seat of the car when the shots came from the driver's seat of the vehicle. "Somebody approached him and got in. Then when he shot us, the person that got in got out like, I mean kind of shook up his self." Doc. 46, Tr. 123. See also, *Id.*, at Tr. 133. (Later, Hart's testimony became "[John] got out before I got shot." Doc. 7, Tr. 148.) As an

---

[1] This, incidentally, flatly contradicts Prosecutor's Anderson's 2006 testimony in this Court that the vote

7

incidental matter, it is hard to fathom how Hart, after just being shot on the driver's side of the car, could assess the emotional state of an individual supposedly exiting the passenger side after the shooting. But the contrast with Davis' testimony is even more vexing: Davis testified that no one was in the vehicle with the shooter at the time of the shooting, and that John the crackhead was instead standing on the street corner. Doc. 7, Tr. 178-79; Doc. 46, Tr. 152. Nowhere does the SR&R address this contradiction, nor the one discussed in the preceding paragraph.

Other, seemingly less consequential disparities illustrate Hart's utter inability to tell the truth. For example, Hart testified that he not smoked marijuana earlier on the night of the shooting. Doc. 46, Tr. 102-103. Then, on cross, he testified that he had in fact smoked marijuana that night, and was "intoxicated" therefrom. Doc. 46, Tr. 116. Then, in the second trial, in cross-examination testimony, he was back to not having smoked marijuana that night, and agreed with defense counsel that he was perfectly sober." Doc. 7, Tr. 155. This instance of perjury in the second trial went unchallenged, and also went unmentioned in the SR&R. Davis, more forthrightly, testified that the pair had been hanging out earlier in the day, and that both had smoked marijuana. Doc. 7, Tr. 182-83. But Davis also had his own difficulties with sticking to one story. On one occasion, he testified that the crack cocaine on his person was for sale, and on a later occasion told the jury that it was solely for personal use. Doc. 7, Tr. 183-85.

Still, none of these inconsistencies within the State's evidence quite matches the overarching inconsistency between what Hart and Davis testified to and what two disinterested eyewitnesses saw that night. As Mr. Hall has previously noted, Moore and Martin stated to the police that three young men were in the car from which the shots came, and that the car was driving by Hart as the shots were fired. Doc. 20, Petitioner's Objections. The version of the disinterested eyewitnesses is also consistent with the physical evidence: two shell casings were

---

was 11-1 to convict Mr. Hall. Doc. 42, Tr. 20.

found 30-35 feet apart from each other, and the one casing that Officer Fromhold identified as being untarnished and not under any debris was found 25 feet from Hart. And these were, it must be noted, eyewitnesses who were close enough and attentive enough to have been able to get the license plate number on the vehicle that held the shooter. SR&R, pp. 11-18.

It is far from implausible that Hart's and Davis' difficulty with presenting truthful testimony stemmed from the crack cocaine found taped to Davis. An individual caught in possession of crack cocaine, likely for the purpose of trafficking the same, would have ample incentive to agree with the Cincinnati Police that the police had indeed captured the purported shooter at the end of their high-speed chase. Thus, in fabricating a story to fit the police version of what happened, they were unable to keep their stories straight or on the same page as each other.

Moore and Martin, in contrast, had no incentive to offer anything but a truthful recounting of what they witnessed that night. That truthfulness continued through Moore's 1999 affidavit, and her 2006 in-court testimony. Unfortunately for Mr. Hall, Martin's memory was not up to the job of accurately remembering—eight years after the incident—details about the shooting and subsequent events. In sum, Moore's credibility should not be assessed in a vacuum, but rather relative to the credibility of the two witnesses whose testimony convicted Mr. Hall. Even if her testimony is viewed without regard to the untruthful testimony of Hart and Davis, the fact that Detective Huffman corroborated her presence, and that of Martin, at District 1 on the morning of October 17, 1998, leads to the conclusion that there is no basis for doubting the rest of her testimony.[2]

---

[2] The SR&R (at p. 44) finds it implausible that Mr. Hall would not have been presented in a show-up or line-up to Moore and Martin at District 1 if they were there that morning. The opposite conclusion is more natural: why would police show—to two reliable eyewitnesses—an individual who plainly did not match the descriptions that the eyewitnesses provided to police? They were not transported to District 1

As for the ultimate question of the materiality of the signed, handwritten statements of the only two disinterested witnesses to this event, it may initially seem that the fact that defense counsel had access to Officer Fromhold's summaries of their on-scene statements means that it is unimportant that they were improperly deprived of the witnesses' written statements. But that conclusion is erroneous for one general, independent reason, and three interrelated reasons specific to this case. The independent reason is that, logically, there would be no reason for witnesses to be transported to the police station for their written statements if in fact those statements would have no more value than the initial, on-scene accounts. The very fact that the police go to the effort to obtain more formal statements demonstrates that they have considerably greater value than cursory on-scene summarization of their words by a patrol officer.

And specific to this case, there would have been immeasurable value to the jurors having in front of them as exhibits the handwritten, signed statements of Moore and Martin, as opposed to what they actually received: Officer Fromhold's recounting of the rather cursory oral versions those two witnesses offered to him at the scene. Due to the destruction of the statements after they were put at issue in this case, we cannot know how much more detail might have been in the written statements, as opposed to the officer's version of their on-scene accounts. It would be disingenuous to argue that any reasonable juror would attach the same weight to a second-hand oral account as they would to firsthand, signed accounts authored by the eyewitnesses.

Further, in light of the questionable, at best, reliability of the testimony of the State's witnesses, and the divided jury in the first trial, the additional probative value of any withheld evidence need only be of the slightest weight in order to tip the balance in favor of a finding that

---

to look at a suspect; they were transported there for the police to obtain more formal statements from them in a case that was possibly a homicide case up until 5:00 a.m., when Detective Huffman was called in from home.

the trial verdict is not deserving of our confidence. For the reasons stated in the foregoing paragraph, the written statements withheld herein possessed more than adequate weight to cast doubt on the convictions herein.

Finally, Prosecutor Anderson's own words, quoted in the SR&R, leave no doubt that the jury would have been allowed to view the written statements of Moore and Martin:

> We just heard [defense counsel] allude to the testimony of Jimmie Martin and Lolita Moore, and we all know that Jimmie Martin and Lolita Moore were never present in Court. Despite the effort of the State and despite the effort of [defense counsel], they couldn't be found. They didn't testify here. And the interesting thing about it is that the Court, upon my objection, could have prevented you from hearing anything about those people. I could have prevented [defense counsel] from getting into the descriptions that they gave, the number of occupants o the vehicle and everything else they said based on hearsay. I could have objected. The Judge could have sustained it, and you wouldn't have heard anything about it.
>
> I didn't think it was fair in this case. I didn't think that it was reasonable, because Lolita Moore and Jimmie Martin were there. Jimmie Martin did give a license plate number. Lolita Moore did see the car drive by, but it wasn't fair to you not to hear it, although you didn't get the chance to hear them testify. Because they didn't, you didn't get a chance to assess their credibility, because they were not here.

SR&R, pp. 18-19. The jurors were unaware that Moore and Martin were deemed by the police to be sufficiently reliable witnesses to warrant being transported to District 1 to obtain their formal statements. For all the jury knew, Moore and Martin passed out drunk in the gutter immediately after speaking to Officer Fromhold. But we know that that did not happen; we know that they followed through with their civic duty, in a manner that many in their shoes would not have; and we know that they had no motive whatsoever to concoct this as a fictional three-young-men drive-by shooting to appease the authorities. To determine that Lolita Moore was not believable in 1999 and in 2006, and to determine that her written statement and that of Jimmie Martin would not have mattered to the jury are, quite simply, demonstrably incorrect

11

conclusions. Mr. Hall should be granted habeas relief, due to the *Brady* violation that occurred, and that has been amply supported by the record.

## CONCLUSION

Mr. Hall respectfully requests that this Court find merit in his objections, reject the Magistrate Judge's Supplemental Report and Recommendation, and issue a writ of habeas corpus. Alternatively, Mr. Hall would request that a certificate of appealability issue, allowing him to pursue his claim in the United States Court of Appeals for the Sixth Circuit.

    Respectfully submitted,

    DAVID H. BODIKER  0016590
    Ohio Public Defender

    s/Craig M. Jaquith
    CRAIG M. JAQUITH  0052997
    Assistant State Public Defender
    (COUNSEL OF RECORD)

    OFFICE OF THE OHIO PUBLIC DEFENDER
    8 East Long Street - 11th floor
    Columbus, Ohio 43215
    (614) 466-5394
    (614) 752-5167 (Fax)
    jaquithc@opd.state.oh.us

    COUNSEL FOR PETITIONER

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2007, a copy of the foregoing OBJECTIONS TO THE MAGISTRATE JUDGE'S SUPPLEMENTAL REPORT AND RECOMMENDATION was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

<div style="margin-left: 40%">

s/Craig M. Jaquith
CRAIG M. JAQUITH
Assistant State Public Defender

COUNSEL FOR PETITIONER

</div>